LATHAM & WATKINS LLP
Serrin Turner (*pro hac vice*)
  *serrin.turner@lw.com*
Nicolas Luongo (*pro hac vice* pending)
  *nicolas.luongo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Brad Baglien (*pro hac vice*)
  *brad.baglien@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
  *melanie.blunschi@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

*Attorneys for Defendant*
*Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| In re Meta Android Privacy Litigation.<br><br>This Document Relates To:<br>All Actions | Case No. 3:25-cv-04674-RFL<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing: March 24, 2026<br>Time:   10:00 a.m.<br>Location: Courtroom 15—18th Floor<br>Judge: Hon. Rita F. Lin |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on March 24, 2026 at 10:00 a.m., before the Honorable Rita F. Lin, United States District Court, Courtroom 15, 18th Floor, 450 Golden Gate Avenue, San Francisco, California, Defendant Meta Platforms, Inc. ("Meta") will and hereby does move for an order dismissing Plaintiffs' Consolidated Class Action Complaint (Dkt. 84) for lack of Article III standing under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). This motion is based on this notice of motion; the memorandum of points and authorities in support thereof that follows; the proposed order filed concurrently herewith; the request for judicial notice and accompanying declaration; the pleadings, records, and papers on file in this action; oral argument; and any other matters properly before the Court.

## STATEMENT OF ISSUE TO BE DECIDED

Whether the Court should dismiss the Consolidated Class Action Complaint for lack of Article III standing under Rule 12(b)(1) and for failure to state any claim upon which relief can be granted under Rule 12(b)(6).

Dated: January 30, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Serrin Turner*
Serrin Turner (*pro hac vice*)
  serrin.turner@lw.com
Nicolas Luongo (*pro hac vice* pending)
  nicolas.luongo@lw.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Brad Baglien (*pro hac vice*)
  brad.baglien@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
  melanie.blunschi@lw.com
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

1

META'S MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-04674-RFL

*Attorneys for Defendant*
*Meta Platforms, Inc.*

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................................. 1

II. BACKGROUND ................................................................................................................. 2

    A. Meta Discloses That It Collects and Uses Identifiers Such as Cookies for Identity-Matching—Subject to User Controls ................................. 2

    B. Meta Pixel Code and the Subject Functionality ...................................................... 4

    C. Plaintiffs' Complaint ................................................................................................ 6

III. LEGAL STANDARD ......................................................................................................... 7

IV. ARGUMENT ...................................................................................................................... 7

    A. All of Plaintiffs' Claims Fail Due to Lack of Standing ........................................... 7

    B. All of Plaintiffs' Claims Fail Because They Consented to the Data Collection and Use at Issue ..................................................................................... 9

    C. The Wiretapping Claims Fail Because the Subject Functionality Did Not Collect User Communications—Let Alone Simultaneously to Transmission .................................................................................................. 13

    D. The Pen Register Claim Fails Because the Subject Functionality Did Not Collect Dialing, Routing, Addressing, or Signaling Information ............................................................................................................ 15

    E. The CDAFA Claim Fails Because Meta Had Permission to Access and Use the Data at Issue ...................................................................................... 20

    F. The Invasion-of-Privacy Claims Fail Because Plaintiffs Do Not Plausibly Allege a Reasonable Expectation of Privacy or a Highly Offensive Intrusion ................................................................................................. 23

    G. The Unjust Enrichment Claim Fails with the Rest of Plaintiffs' Claims and Is Precluded by *Sonner* in Any Event ............................................... 25

V. CONCLUSION ................................................................................................................. 25

## Table of Authorities
### CASES

*Agensys, Inc. v. Regents of Univ. of California*,
2024 WL 5679162 (C.D. Cal. Oct. 22, 2024)......................................................................... 22

*Application of U.S. of Am. for an Ord. Authorizing an In-Progress Trace of Wire Commc'ns*, 616 F.2d 1122 (9th Cir. 1980)................................................................................. 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................................... 7

*Belluomini v. Citigroup Inc.*,
2013 WL 5645168 (N.D. Cal. Oct. 16, 2013)....................................................................... 24

*Bradshaw v. Lowe's Companies*,
2025 WL 3171740 (S.D. Cal. Nov. 12, 2025)....................................................................... 17

*Brand v. KSF Acquisition Corp.*,
2023 WL 3225409 (S.D. Cal. Mar. 17, 2023) ...................................................................... 25

*Brodsky v. Apple Inc.*,
2019 WL 4141936 (N.D. Cal. Aug. 30, 2019) ..................................................................... 14

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ......................................................................... 9, 20, 21

*Broomes v. FullBeauty Brands Operations, LLC*,
2025 WL 829589 (N.D. Cal. Jan. 31, 2025).......................................................................... 25

*Capitol Recs. Inc. v. Thomas-Rasset*,
2009 WL 1664468 (D. Minn. June 11, 2009)........................................................................ 19

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)................................................................................................................ 7

*Dawidzik v. Tesla, Inc.*,
2025 WL 3786963 (C.D. Cal. Dec. 29, 2025) ...................................................................... 24

*Deivaprakash v. Conde Nast Digital*,
2025 WL 2779193 (N.D. Cal. Sept. 30, 2025) ....................................................................... 9

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) .................................................................................. 25

*Doe v. Eating Recovery Ctr. LLC*,
2025 WL 2971090 (N.D. Cal. Oct. 17, 2025)............................................................. 14, 19, 20

*Facebook, Inc. v. Power Ventures, Inc.*,
    2010 WL 3291750 (N.D. Cal. July 20, 2010)................................................................. 23

*Fogerty v. Fantasy, Inc.*,
    510 U.S. 517 (1994) ........................................................................................................ 19

*Gilligan v. Experian Data Corp.*,
    2026 WL 32259 (N.D. Cal. Jan. 6, 2026) ......................................................................... 8

*Graham v. Noom*,
    533 F. Supp. 3d 823 (N.D. Cal. 2021) ............................................................................ 23

*Greenley v. Kochava, Inc.*,
    684 F. Supp. 3d 1024 (S.D. Cal. 2023) ........................................................................... 17

*Hammerling v. Google, LLC*,
    2024 WL 937247 (9th Cir. Mar. 5, 2024) ............................................................. 9, 11, 24

*Hernandez v. Hillsides, Inc.*,
    47 Cal. 4th 272 (2009) .................................................................................................... 23

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) .......................................................................................... 9

*Hohenshelt v. Superior Ct.*,
    18 Cal. 5th 310 (2025) .................................................................................................... 18

*Holden v. Hagopian*,
    978 F.2d 1115 (9th Cir. 1992) ........................................................................................ 22

*Hubbard v. Google LLC*,
    2024 WL 3302066 (N.D. Cal. July 1, 2024)................................................................... 24

*In re Carrier IQ, Inc.*,
    78 F. Supp. 3d 1051 (N.D. Cal. 2015) ............................................................................ 14

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F. 3d 589 (9th Cir. 2020) ........................................................................................... 9

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .......................................................................................... 7

*In re Google, Inc. Priv. Pol'y Litig.*,
    2013 WL 6248499 (N.D. Cal. Dec. 3, 2013)................................................................... 24

*In re High Fructose Corn Syrup Antitrust Litig.*,
    216 F.3d 621 (7th Cir. 2000) .......................................................................................... 15

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) .......................................................................... 22

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

META'S MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-04674-RFL

*In re Zynga Priv. Litig.*,
    750 F.3d 1098 (9th Cir. 2014) ..................................................................................... 13, 16

*Khamooshi v. Politico LLC*,
    2025 WL 2822879 (N.D. Cal. Oct. 2, 2025).................................................................. 9, 24

*Konop v. Hawaiian Airlines, Inc.*,
    302 F.3d 868 (9th Cir. 2002) ....................................................................................... 13, 14

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)............................................................................................................ 23

*Lakes v. Ubisoft, Inc.*,
    777 F. Supp. 3d 1047 (N.D. Cal. 2025) ............................................................................. 10

*Lau v. Gen Digital Inc.*,
    2024 WL 1880161 (N.D. Cal. Apr. 3, 2024) ............................................................... 15, 25

*Lloyd v. Facebook, Inc.*,
    2023 WL 1802415 (N.D. Cal. Feb. 7, 2023), *aff'd in relevant part*, 2024 WL
    3325389 (9th Cir. Jul. 8, 2024) ................................................................................ 10, 11, 24

*LVRC Holdings LLC v. Brekka*,
    581 F.3d 1127 (9th Cir. 2009) ........................................................................................... 19

*M.D. v. Google LLC*,
    2025 WL 2710095 (N.D. Cal. Sept. 23, 2025) ................................................................... 10

*Meta Platforms, Inc. v. Nguyen*,
    2023 WL 8686924 (N.D. Cal. Nov. 21, 2023) .................................................................... 10

*Mikulsky v. Noom, Inc.*,
    682 F. Supp. 3d 855 (S.D. Cal. 2023)................................................................................... 9

*Miller v. Arizona Beverages USA LLC*,
    2024 WL 5339466 (N.D. Cal. June 5, 2024) ...................................................................... 25

*Opperman v. Path, Inc.*,
    87 F. Supp. 3d 1018 (N.D. Cal. 2014) ................................................................................ 22

*Oracle USA Inc. v. Rimini Street Inc.*,
    879 F.3d 948 (9th Cir. 2018), *rev'd on other grounds*, 586 U.S. 334 (2019).................. 20, 21

*Phillips v. Brooklyn Bedding LLC*,
    2024 WL 2830663 (N.D. Cal. Mar. 28, 2024)..................................................................... 25

*Popa v. Microsoft*,
    153 F.4th 784 (9th Cir. 2025) ........................................................................................... 7, 8

*Pragmatus AV, LLC v. Yahoo! Inc.*,
   2014 WL 1922081 (N.D. Cal. May 13, 2014) ................................................................. 16

*Shah v. Fandom*,
   754 F. Supp. 3d 924 (N.D. Cal. 2024) ......................................................................... 20

*Silver v. Stripe Inc.*,
   2021 WL 3191752 (N.D. Cal. July 28, 2021) ................................................................. 12

*Smith v. Facebook*,
   262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 .......................................... 11

*Smith v. Facebook, Inc.*,
   745 F. App'x 8 (9th Cir. 2018) .......................................................................... 10, 12

*Smith v. LoanMe*,
   11 Cal. 5th 183 (2021) ......................................................................... 13, 14, 18, 19

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ..................................................................................... 25

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ...................................................................................... 7

*Svenson v. Google Inc.*,
   65 F. Supp. 3d 717 (N.D. Cal. 2014) .......................................................................... 14

*Synopsys, Inc. v. ATopTech, Inc.*,
   2013 WL 5770542 (N.D. Cal. Oct. 24, 2013) ................................................................ 22

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .................................................................................................... 7

*Tsering v. Meta Platforms, Inc.*,
   2026 WL 89320 (N.D. Cal. Jan. 12, 2026) .......................................................... 16, 17, 23, 25

*Twitter, Inc. v. Garland*,
   61 F.4th 686 (9th Cir. 2023) ...................................................................................... 18

*U.S. Telecom Ass'n v. F.C.C.*,
   227 F.3d 450 (D.C. Cir. 2000) .................................................................................... 16

*United States v. Christensen*,
   828 F.3d 763 (9th Cir. 2015) ...................................................................................... 15

*United States v. Forrester*,
   512 F.3d 500 (9th Cir. 2008) ...................................................................................... 16

*United States v. Swinburne*,
   988 F.2d 125 (9th Cir. 1993) ...................................................................................... 18

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

META'S MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-04674-RFL

*Valenzuela v. Keurig Green Mountain, Inc.*,
  674 F. Supp. 3d 751 (N.D. Cal. 2023) ................................................................. 13

*Washington v. Flixbus, Inc.*,
  2025 WL 1592961 (S.D. Cal. June 5, 2025) ........................................................ 10

*Wendover Prods., LLC v. Paypal Inc.*,
  2025 WL 3251667 (N.D. Cal. Nov. 21, 2025) ................................................. 21, 22

*Yates v. United States*,
  574 U.S. 528 (2015) ............................................................................................. 19

## STATUTES

18 U.S.C. § 2511(1)(a) ..........................................................................................................13

18 U.S.C. § 2511(2)(d) ...........................................................................................................9

18 U.S.C. § 2703(c)(2)(E) .....................................................................................................19

Cal. Civ. Code § 3515 .......................................................................................................9, 12

Cal. Penal Code § 631(a) ...................................................................................................9, 13

Cal. Penal Code § 632(a) ...................................................................................................9, 13

Cal. Penal Code § 638.50(b) .............................................................................................15, 18

Cal. Penal Code § 638.51(a) .............................................................................................15, 19

## RULES

Rule 12(b)(1)..........................................................................................................................7

Rule 12(b)(6)..........................................................................................................................7

## OTHER AUTHORITIES

*About Event Match Quality*, Meta Business Help Center,
  https://www.facebook.com/business/help/765081237991954 ................................. 4

*Bill Analysis, Assemb B. 929 Reg. Sess.*,
  (Cal. Apr. 7, 2015) ............................................................................................... 19

## I.    INTRODUCTION

Plaintiffs are suing over a specific instance of a general practice that—as they themselves concede—Meta transparently discloses in its Privacy Policy: It attempts to match user browsing activity received from third-party advertising partners to users' Meta accounts. While Plaintiffs complain about the particular means Meta used to perform such matching here, nothing about it was illegal. It was not "wiretapping," nor a "pen register," nor "computer hacking," nor an invasion of privacy. It simply enabled a Meta app to receive an identifier generated by an advertising partner. All this helped Meta do was perform the type of identity-matching that Meta discloses— and that Meta users consent to—in the Privacy Policy. Plaintiffs' attempt to make a federal lawsuit out of this non-issue fails for multiple reasons.

First, Plaintiffs lack standing as to all their claims, as they allege no facts sufficient to show that the functionality at issue (the "Subject Functionality") caused them any concrete harm. The Subject Functionality only operated on certain Android browsers during a limited time period, and Plaintiffs merely allege they visited "several websites" during this time where it could have enabled Meta to track their activity. They do not identify any data they gave to these sites that was sensitive—either alone or in the aggregate—as required to establish a privacy harm in this context.

Second, Plaintiffs consented to the data collection and use at issue—which also defeats all their claims. Again, Meta's Privacy Policy broadly discloses that it collects identifiers from advertising partners—including the particular cookie sent through the Subject Functionality—and uses these identifiers to match users' browsing activity to their Meta accounts. Plaintiffs allege they did not consent to the specific *means* by which Meta did so here and that they expected to be free from such identity-matching on their mobile devices. But the Privacy Policy's disclosures are not limited to any particular technical means of identity-matching, nor does the policy disclaim or preclude such identity-matching where browsing activity occurs on a mobile device. Rather, the Privacy Policy informs users that, if they wish to restrict such matching, they can do so using controls provided by Meta—which Plaintiffs do not allege they ever attempted to use.

Third, beyond these across-the-board defects, Plaintiffs' claims fail because their alleged facts do not fit their causes of action. The wiretapping claims fail because the Subject Functionality

was not used to collect user communications, let alone simultaneous to their transmission; instead, it merely collected an identifier generated by a third-party website. Similarly, the pen-register claim fails because the Subject Functionality was not used to collect routing information; again, it merely collected an identifier from a website cookie. The computer-hacking claim fails because Plaintiffs do not contest Meta had permission to access the data at issue, but merely contest the *method* Meta used to access it, which is insufficient; and, in any event, they fail to coherently explain why Meta supposedly lacked permission to use the method that it did. The invasion-of-privacy claim fails because Plaintiffs cannot claim a reasonable expectation of privacy in data collection and use to which they consented, and they do not allege facts sufficient to show that the nature or scope of data collected *from them* was highly offensive. Finally, the unjust enrichment claim cannot survive if the other claims do not, and Plaintiffs cannot seek equitable relief anyway given that they have not sufficiently pleaded they lack an adequate remedy at law.

For all of these reasons, Plaintiffs' Complaint should be dismissed in its entirety.

## II.    BACKGROUND[1]

### A.    Meta Discloses That It Collects and Uses Identifiers Such as Cookies for Identity-Matching—Subject to User Controls

As the Complaint itself alleges, "Meta acknowledges" in its Privacy Policy that it collects "information obtained from the Meta Pixel" and uses this data "for numerous purposes, including to identify users and … target them with marketing messages from its advertising clients." ¶¶ 41-42 (citing Meta Privacy Policy). These disclosures are apparent from reviewing the Privacy Policy itself. Specifically, under the heading "Information from partners, vendors, and other third parties," the Privacy Policy tells users that Meta "collect[s] and receive[s] information" from third parties "about a variety of your information and activities on and off [Meta's] Products." Ex. A at 8. That information includes not only the "[w]ebsites you visit," "[h]ow you use" the products and services on those sites, and the "[p]urchases and transactions you make," but also "device information" and "cookie data." *Id.* The Privacy Policy notes that these partner websites "collect your information

---

[1] Unless otherwise indicated, the facts recited herein are based on the Consolidated Class Action Complaint ("Complaint") and are accepted as true only for purposes of this motion. Cites to the Complaint are designated with paragraph marks. All exhibits cited are attached to the Declaration of Serrin Turner filed with the Request for Judicial Notice accompanying this motion.

when you visit their site" and share it with Meta using tools Meta offers for this purpose. *Id*.

The Privacy Policy also specifically discloses that Meta uses information collected in this way to match users' browsing activity to their Meta accounts. As it explains, third-party partners "share information like your email address, cookies, and advertising device ID" with Meta to "help[] [Meta] match your activities with your account, if you have one." *Id*. at 8. The Privacy Policy states that Meta, in turn, uses the collected information "to provide a personalized experience to you, including ads." *Id*. at 22*; see also* Ex. F (Meta Help Center article linked to in the Privacy Policy), at 1 ("Businesses share information, like email addresses, cookies and advertising device IDs, that help Facebook connect those interactions with a person's Facebook account so that we can improve their ads and help businesses measure ad effectiveness.").

Meta's Cookies Policy, which Plaintiffs also cite, Compl. nn. 18, 22, 25, 27, and which the Privacy Policy references, reiterates and expands upon these same points. It states that "Meta uses cookies and receives information"—"including device information and information about your activity"—"when you visit" websites "that incorporate Meta technologies." Ex. E (Cookies Policy) at 6. It further states that these "[c]ookies enable Meta … to understand the information that we receive about you, including information about your use of other websites and apps," which Meta uses for various purposes, including "personali[z]ing content" and "tailoring and measuring ads." *Id*. at 1-2. The Cookies Policy specifically calls out the "_fbp" cookie that Plaintiffs' allegations focus on, explaining that Meta's "business partners may … choose to share information with Meta from cookies set in their own websites' domains," including "cookies named _fbp," which "serve the same purposes as cookies set in Meta's own domain, which are to personali[z]e content (including ads), measure ads, produce analytics and provider a safer experience." *Id*. at 5.

Finally, the Privacy Policy and Cookie Policy both explain that, if users *want to restrict* Meta's practice of connecting their browsing activity to their Meta accounts, Meta offers specific controls for that purpose. Thus, under a section labeled "How can you manage or delete your information and exercise your rights?", the Privacy Policy links to "a variety of tools to view, manage, download, and delete your information," including with respect to "Off-Meta Activity." *See* Ex. A at 61; *see also* Ex. E at 12-13 (Cookies Policy) (describing controls similarly). Those

controls include the ability to "disconnect" such activity from one's account—including past activity Meta has already collected as well as future activity. Ex. G at 2 (providing option to "Disconnect future activity," which will "disconnect information that businesses and organizations send us about your interactions with them" and "also clear your previous activity").

### B.  Meta Pixel Code and the Subject Functionality

Meta Pixel consists of free, publicly available code that businesses and organizations may choose to incorporate into their websites. ¶ 20. It allows those third parties to better understand actions people take on their websites and measure the effectiveness of their advertising. ¶¶ 20-21. Website developers can configure Pixel code to send information to Meta about actions that visitors take on their websites (called "event data")—such as when a person adds an item to a shopping cart—which Meta may attempt to match with Meta accounts to better personalize those users' experiences on Meta's services. ¶¶ 24-25, 32, 42, 46.

At a technical level, Pixel code running on a website sends a transmission from the website visitor's browser to Meta's servers. ¶ 24. The transmitted information may include event data as well as various identifiers, including cookies placed on the user's browser by the website. ¶¶ 24-32. One such cookie is the "_fbp cookie," which "identifies browsers for the purposes of providing advertising and site analytics services." ¶ 30. This cookie contains "a pseudonymous identifier associated with the user" that is unique to the site placing the cookie. *Id.* However, cookies are not the only identifiers that may be included with the transmission. Other "customer information parameters" may be included as well, such as the user's email address or IP address. ¶ 32 & n.26 (citing *About Event Match Quality*, Meta Business Help Center, https://www.facebook.com/business/help/765081237991954 (attached to RJN as Ex. H) (listing examples of parameters websites can opt to send Meta, including email address)); *see also* ¶ 205 (alleging collection of IP addresses and email addresses through Meta code). All these identifiers may be used by Meta to match the website visitor to their Meta account, if they have one. ¶ 32.

Plaintiffs do not purport to challenge this standard operation of the Pixel code. They make no claim that Meta failed to disclose it or that they did not consent to it. To the contrary, after making the foregoing allegations about what Pixel does, Plaintiffs specifically state (at ¶ 42):

Meta *acknowledges this use of data*. For example, the Meta Pixel is one of Meta's many "Business Tools," and the websites on which the Pixel is embedded are considered Meta's "Partners." *Meta explains in its Privacy Policy*, among other places, that Meta uses "[i]nformation from Partners," expressly including information about "[w]ebsites you visit and cookie data, like through . . . the Meta Pixel," "to provide a personalized experience to [users], including ads." (emphasis added).

Instead, Plaintiffs challenge a distinct functionality allegedly included in Pixel code between September 2024 and June 2025 that ran on certain types of web browsers on Android devices. ¶ 48. This functionality—the Subject Functionality—provided a particular method of collecting cookie data from these browsers. Specifically, the Subject Functionality allegedly caused the browser to transmit the _fbp cookie—which would already be sent to Meta servers as part of the Pixel code's standard operation—to *also* be sent to Meta's Facebook or Instagram app on the same device. If the user was logged into the app, the app could then pair the _fbp cookie with the user's Facebook or Instagram user ID and send the paired identifiers to Meta's servers— thereby helping Meta to match the user to their Facebook or Instagram account. ¶¶ 49, 61-62. Importantly, only the _fbp cookie would be sent to the Meta app as part of the Subject Functionality; meanwhile, the user's browsing activity and broader set of identifiers (including the _fbp cookie) would continue to be sent directly from the user's browser to Meta's servers through the standard operation of the Pixel code. ¶¶ 55, 62. Essentially, the flow was as follows, with the solid line reflecting the Pixel code's standard operation (which Plaintiffs do *not* challenge) and the dotted line reflecting the Subject Functionality (which they do challenge):



¶ 62. In other words, the Subject Functionality was a particular *method* by which Meta received the _fbp cookie from a partner site and used it to match a user's activity to their Meta account— consistent with Meta's disclosures that it collects and uses the _fbp cookie for this purpose.

### C.     Plaintiffs' Complaint

Plaintiffs nonetheless assert that the Subject Functionality enabled their browsing activity to be "captured and linked to their identities without their knowledge or consent." ¶ 7. They bring a scattershot set of claims, alleging variously that the Subject Functionality constituted "wiretapping" under the federal Wiretap Act and the California Invasion of Privacy Act (CIPA) (Counts III – VI), a "pen register" under CIPA (Count VII), unauthorized computer access under the California Comprehensive Computer Data Access and Fraud Act (CDAFA) (Count VIII), an invasion of privacy under common law and the California state constitution (Counts I and II), and unjust enrichment (Count IX). The core thesis running throughout these claims is that the Subject Functionality violated "sandboxing protocols," which Plaintiffs describe as a "digital wall between mobile apps, including between web browser apps and Meta's social media apps." ¶¶ 1, 47. Based on this notion, Plaintiffs claim they had a reasonable expectation that "they could browse in a more anonymous fashion on their Android mobile devices." ¶ 47.

However, in the same breath, Plaintiffs acknowledge that Android devices employ a less "restrictive" approach to sandboxing than other mobile operating systems. ¶ 50. In particular, Plaintiffs allege that the Android operating system includes "'localhost' communications channels" that are "intended to allow different Android programs or applications to communicate with one another safely and appropriately"—just "as if they were communicating over a network." ¶¶ 52-53. Those are precisely the channels that the Subject Functionality allegedly used to send the _fbp cookie from a user's browser to Meta's apps. ¶ 55. While Plaintiffs assert that the Subject Functionality used these channels in a way that violated "Google's terms," they fail to identify any specific terms that were supposedly violated. ¶ 166.

Plaintiffs also allege no facts indicating that the Subject Functionality had any significant impact on them personally. They each merely allege that they visited "several" websites on their Android devices that could have been affected by the Subject Functionality. ¶¶ 92, 98, 104, 110. None of the websites they identify—such as "nytimes.com" or "nike.com"—are websites that generally collect potentially sensitive information such as health or financial data, nor do Plaintiffs claim to have revealed any sensitive information to the sites. ¶¶ 92, 94, 98, 100, 104, 106, 110,

112. Moreover, while each Plaintiff alleges that the Subject Functionality "allowed Meta to tie [their] browsing information" to their Facebook IDs, none alleges any facts to suggest that the sites could not have provided other identifiers to Meta (such as their email addresses) that would have allowed their activity to be linked to their Facebook IDs regardless of the Subject Functionality. ¶¶ 95, 101, 107, 113.

## III.　LEGAL STANDARD

***Rule 12(b)(1):*** "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). Intangible harms such as invasions of privacy are only sufficiently "concrete" for Article III standing where they have a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). This requires that a court "look to the *specific* underlying harm experienced by the plaintiff and compare it, in detail, to a *specific* common-law tort." *Popa v. Microsoft,* 153 F.4th 784, 791 (9th Cir. 2025) (emphasis in original). "As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *TransUnion*, 594 U.S. at 430-31.

***Rule 12(b)(6):*** A claim must be dismissed unless it pleads "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Moreover, courts deciding motions to dismiss "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998).

## IV.　ARGUMENT

### A.　All of Plaintiffs' Claims Fail Due to Lack of Standing

Plaintiffs' claims fail for lack of standing because they have not plausibly alleged a concrete injury. Plaintiffs instead merely allege they each visited "several websites" where their activity could have been tracked using the Subject Functionality. That is not enough.

As the Ninth Circuit recently explained in *Popa v. Microsoft*, the mere fact that a plaintiff has visited websites using tracking technologies is insufficient for standing. At issue in *Popa* was a technology that collected more than 30 categories of data from the plaintiff's interactions with a retail website. 153 F.4th at 786-87. The court found the plaintiff lacked standing because she failed to allege the website used this technology to collect any "embarrassing, invasive, or otherwise private information" about her, and thus she could not establish a privacy injury closely related to one historically actionable at common law. *Id.* at 791. As the court put it, rather than being analogous to "look[ing] into the windows of [plaintiff's] upstairs bedroom through a telescope taking intimate pictures," the technology was more like "a store clerk's observing shoppers." *Id.* Even if the tracking "*could* be offensive in particular circumstances (e.g., involving sensitive medical or financial information)," the complaint alleged no actual "infringement of any such privacy interest" based on the website and user at issue. *Id.* at 791 & n.5 (emphasis in original).

The same holds true here. Each Plaintiff merely alleges visiting "several websites on [their] Android mobile device where the Meta Pixel was installed" during the time period the Subject Functionality was operative. ¶¶ 92, 98, 104, 110. Plaintiffs do not identify any such websites they visited where sensitive information, such as "medical or financial information," would have been implicated. Instead, the only websites they identify consist of mundane sites such as "nytimes.com" or "nike.com," none of which are plausibly—or even allegedly—sensitive in nature. ¶¶ 92, 94, 98, 100, 104, 106, 110, 112. Nor do Plaintiffs identify any intimate information they somehow transmitted to these sites that would meet *Popa*'s standard. While the Complaint inveighs at length about Meta's use of tracking technologies, *Popa* makes clear that such generalized concerns are insufficient to establish standing. Rather, a court must look to "the specific circumstances of the plaintiffs' injuries" to determine whether those "*specific* plaintiffs" have sufficiently alleged a concrete injury. 153 F.4th at 793. Plaintiffs here have not.

Nor can Plaintiffs argue that their claims involve a materially greater scope of data collection than what was alleged in *Popa*. *Cf. Gilligan v. Experian Data Corp.*, 2026 WL 32259, *2 (N.D. Cal. Jan. 6, 2026) (Lin., J.) (distinguishing *Popa* based on allegations that defendant "compiled detailed profiles by tracking [plaintiffs'] interactions across many websites");

*Deivaprakash v. Conde Nast Digital*, 2025 WL 2779193 (N.D. Cal. Sept. 30, 2025) (Lin, J.) (holding that *Popa* did not displace the holding in *In re Facebook, Inc. Internet Tracking Litig.*, 956 F. 3d 589 (9th Cir. 2020), that standing can be established through the creation of "cradle-to-grave profile[s] without users' consent"). Importantly, this case is not about Meta's alleged receipt of Plaintiffs' browsing activity across all their devices, across all time. Plaintiffs' allegations focus exclusively on their activity on particular browsers on particular Android devices during the particular timeframe the Subject Functionality was allegedly operative. Each Plaintiff only alleges they visited "several websites" on those browsers during that time that were potentially "affected" by the Subject Functionality. They allege no reason to believe their visits to these "several" websites revealed any broad scope of information about themselves. Accordingly, this is not a case where the challenged technology is plausibly alleged to have enabled the creation of a "cradle-to-grave profile" on Plaintiffs. *See Khamooshi v. Politico LLC*, 2025 WL 2822879, *3 (N.D. Cal. Oct. 2, 2025) (finding allegations that news website collected users' browsing activity insufficient for standing "[a]bsent specific allegations about the type of browsing … disclosed"); *Mikulsky v. Noom, Inc.*, 682 F. Supp. 3d 855, 865 (S.D. Cal. 2023) ("Plaintiff alleges that Defendant recorded her 'personal information' without specifying what type of information. Plaintiff's lone conclusory allegation stands in stark contrast to the sea of specific personal information collected in *Facebook* [*Internet Tracking*] and is therefore insufficient to establish a concrete injury.")

**B.    All of Plaintiffs' Claims Fail Because They Consented to the Data Collection and Use at Issue**

Beyond failing for lack of standing, Plaintiffs' claims also all fail because Plaintiffs broadly consented to Meta's receipt of the information at issue and to Meta using it to match their browsing activity to their Meta accounts. That consent defeats all of Plaintiffs' claims.[2]

---

[2] *See* 18 U.S.C. § 2511(2)(d) (no liability where "one of the parties to the communication has given prior consent"); Cal. Penal Code §§ 631(a), 632(a) (imposing liability for wiretapping and eavesdropping only "without the consent of all parties"); *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 131-32 (N.D. Cal. 2020) (noting that CDAFA "prohibits only access or disruptions to a computer system that are without permission" (quotation omitted)); *Hammerling v. Google, LLC*, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024) (dismissing invasion of privacy claim on consent grounds for lack of reasonable expectation of privacy); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 n.6 (9th Cir. 2018) (consent defeats unjust enrichment claim); *see also* Cal. Civ. Code § 3515 ("A person who consents to an act is not wronged by it.").

Plaintiffs all allege they are Facebook users. ¶¶ 93, 99, 105, 111. Like "all users," they had to agree to Meta's Terms of Service, along with incorporated policies like the Privacy Policy, "to create a Facebook account." *Lloyd v. Facebook, Inc.*, 2023 WL 1802415, *1 (N.D. Cal. Feb. 7, 2023), *aff'd in relevant part*, 2024 WL 3325389 (9th Cir. Jul. 8, 2024); *see also Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686924, *2 (N.D. Cal. Nov. 21, 2023) ("All Facebook users must agree to its Terms of Service."). Indeed, Plaintiffs acknowledge Meta's Privacy Policy and Cookies Policy throughout the Complaint. *See* ¶¶ 27, 29, 32, 42, 72, 189 & accompanying notes.

As explained above, the Privacy Policy, inclusive of the Cookies Policy it incorporates, transparently discloses that Meta receives event data and user identifiers from third-party websites that use Meta technologies like Pixel. Notably, the _fbp cookie is specifically called out as one of a number of identifiers that Meta may collect through such technologies. The Privacy Policy further explains that Meta uses such identifiers to match the event data it receives to users' Meta accounts. Even Plaintiffs themselves concede that "Meta acknowledges this use of data" in its Privacy Policy—specifically, that it "uses '[i]nformation from Partners,' expressly including information about '[w]ebsites you visit and cookie data, like through…the Meta Pixel,' 'to provide a personalized experience to [users], including ads." ¶ 42. That is exactly the sort of data collection and use that the Subject Functionality facilitated. Plaintiffs thus consented to policies with "disclosures [that] 'explicitly notify' users of the practice at issue." *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1055 (N.D. Cal. 2025) (dismissing based on consent); *see also M.D. v. Google LLC,* 2025 WL 2710095, *5 (N.D. Cal. Sept. 23, 2025); *Washington v. Flixbus, Inc.*, 2025 WL 1592961, *5-6 (S.D. Cal. June 5, 2025).

Indeed, the Ninth Circuit has already twice concluded that "Facebook's data policy gives clear notice that third party partners may share data with Facebook." *Lloyd*, 2024 WL 3325389, *2; *see also Smith v. Facebook, Inc.*, 745 F. App'x 8, 8-9 (9th Cir. 2018). In *Smith*, the Ninth Circuit recognized that Meta's policies disclose that a "reasonable person viewing [Facebook's] disclosures would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes." 745 F. App'x at 8-9. The court thus held that the plaintiffs there had consented to "collect[ion] and us[e] [of] their

browsing data" and affirmed dismissal of CIPA and privacy claims. *Id*. Similarly, in *Lloyd*, the Ninth Circuit affirmed dismissal of a privacy claim where the plaintiff had alleged that Meta "impermissibly track[ed] her online activity," "because Facebook's data policy gives clear notice" that such data will be shared from third parties. 2024 WL 3325389, *2.

Plaintiffs attempt to challenge consent by arguing that they were not aware of the specific *technical means* by which Meta engaged in such data collection and use here. ¶¶ 97, 103, 109, 115 (alleging Plaintiffs did not consent because they did not "know about" the Subject Functionality). But the Privacy Policy does not purport to limit Meta to collecting identifiers sent via Pixel code only via particular technical means. The Privacy Policy instead broadly discloses that Meta collects such identifiers and uses them for identity-matching. Contractual language "is not ambiguous just because it is broad.'" *Smith v. Facebook*, 262 F. Supp. 3d 943, 954 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 . Because Plaintiffs broadly agreed to permit Meta to collect identifiers sent by third-party websites and use them to match their activity on those sites to their Facebook IDs, including for advertising purposes, they cannot complain that Meta actually collected such data and used it for this purpose. *See Hammerling*, 2024 WL 937247, *3 ("[T]he Policy here expressly disclosed Google's intention to track [users'] activity on third-party apps. As a result, Plaintiffs have no reasonable expectation of privacy in that data.").

By the same token, Plaintiffs cannot deny they consented based on the notion that they believed that "sandboxing protocols" would prevent Meta from collecting identifiers from their mobile devices and using them for identity-matching. *See* ¶¶ 95, 101, 107, 113. As an initial matter, Plaintiffs fail to provide any coherent support for this belief: They acknowledge that "sandboxing protocols" on Android devices do not categorically prevent one app from sending data to another app, as the Android operating system includes "internal channels" that "are intended to allow different Android programs or applications to communicate with one another." ¶ 52. Given that, Plaintiffs cannot plausibly allege they had a reasonable basis to believe that Meta lacked the ability to collect an identifier like the _fbp cookie through a mechanism like the Subject Functionality. Moreover, Plaintiffs also acknowledge that, separate and apart from the _fbp cookie, websites commonly transmit "other 'customer information parameters'" to Meta via Pixel code—such as

user email addresses or IP addresses—specifically to facilitate identity-matching.[3] For this reason as well, Plaintiffs cannot plausibly allege they had a reasonable basis to believe that Meta had no way to track their browsing activity on their mobile devices.

But in any event, regardless of whether Plaintiffs might have held such a belief, the point is that Meta made no such promise in the Privacy Policy. Nowhere does the Privacy Policy represent that Meta does not or cannot collect identifiers from mobile devices and use them for identity-matching. Instead, it broadly asserts that Meta collects identifiers shared by third-party websites and uses them for identity-matching—*without limitation* as to the types of devices used to visit those sites. Likewise, in advising users what they can do to avoid having their browsing activity linked to their Facebook accounts, the Privacy Policy does not tell users they can simply browse on their mobile devices. Instead, it advises them to use controls provided by Meta through which they can "disconnect" such activity from their accounts—which Plaintiffs do not claim they ever used. "[Meta] is not bound by promises it did not make." *Smith*, 745 F. App'x at 9. Because Meta made no promise to refrain from identity-matching with respect to browsing activity on mobile devices, Plaintiffs cannot claim that their consent to identity-matching somehow did not apply to their mobile devices. *See id.* (rejecting attempt to read limitations into Meta privacy policies and concluding that "the practice complained of falls within the scope of Plaintiffs' consent" to those policies); *Silver v. Stripe Inc.*, 2021 WL 3191752, *4 (N.D. Cal. July 28, 2021) (rejecting argument that privacy policy did not sufficiently disclose that Plaintiffs' specific information would be tracked, given that it disclosed "without limitation" that website's partners "'use various technologies' to 'collect information about your online activity over time and across different websites or online services'").

---

[3] For example, if Plaintiff Cunningham accessed "nike.com" on her Android device, ¶ 98, and made a purchase there using her email address, Nike could have sent her email address to Meta through the standard operation of the Pixel code—i.e., regardless of the Subject Functionality—and thereby potentially enabled Meta to link the purchase to her Facebook ID. Similarly, if Plaintiff Ginder visited "nytimes.com" on his Android device, ¶ 110, the website could have sent his IP address to Meta—again, regardless of the Subject Functionality—and thereby potentially enabled Meta to link this activity to his Facebook ID (i.e., based on his accessing the Facebook app on his device from the same IP address).

**C.    The Wiretapping Claims Fail Because the Subject Functionality Did Not Collect User Communications—Let Alone Simultaneously to Transmission**

Even putting aside the issue of consent, Plaintiffs fail to state their wiretapping and eavesdropping claims because they do not plausibly allege that Meta intercepted or recorded the contents of any of Plaintiffs' communications, much less during transmission.

The Wiretap Act imposes liability only where a party intentionally "intercept[s]" another party's "communication." 18 U.S.C. §§ 2511(1)(a). A communication is "intercepted" only if acquired "during transmission." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002). California's state-law analogs are at least as strict. CIPA § 631(a) makes it unlawful "to read, or to learn the contents or meaning of" a party's "communication while the same is in transit," Cal. Penal Code § 631(a), which courts interpret to require contemporaneous acquisition, not later processing, *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 758-59 (N.D. Cal. 2023). Similarly, CIPA § 632 makes it unlawful "to eavesdrop upon or record" a party's "confidential communication," Cal. Penal Code § 632(a), which targets "simultaneous" acquisition and not "secondhand repetition," *Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

Plaintiffs' factual allegations fail to meet these requirements. Most importantly, the only information Meta received via the Subject Functionality was the _fbp cookie—a randomly generated identifier that simply "identifies browsers for the purposes of providing advertising and site analytics services." ¶ 30. That is the only information the Subject Functionality allegedly passed from the user's browser to the Meta app residing on their device. ¶ 49. As Plaintiffs acknowledge, the _fbp cookie is "created by a website"—i.e., the third-party website the user visits—not the user themselves. ¶ 23; *see also* ¶ 30 (stating that the cookie is "offered by and unique to the website the user is visiting"). As such, the _fbp cookie does not constitute the contents of *Plaintiffs' communications with* those websites. Because the _fbp cookie is merely an "identifier associated with the user," ¶ 30, and not a user's "intended message to another," its collection cannot qualify as an interception or recording of a person's communications under wiretapping or eavesdropping laws. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107-08 (9th Cir. 2014) (holding that Facebook ID does not constitute "contents" of communication for purposes of

wiretapping laws); *see also Brodsky v. Apple Inc.*, 2019 WL 4141936, \*7 (N.D. Cal. Aug. 30, 2019) (same for username and password); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1083-84 (N.D. Cal. 2015) (same); *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 728-30 (N.D. Cal. 2014) (same for contact information such as name, email address, and telephone number).[4]

Plaintiffs' claims also independently fail because they do not plausibly allege that the Subject Functionality enabled Meta to collect communications while *in transit*. Putting aside that the data sent through the Subject Functionality did not constitute user communications in the first place, the data was received by Meta over multiple steps—*after* any user website interaction. Plaintiffs allege these distinct steps in the Complaint: first, the Pixel code would direct users' browsers to send the _fbp cookie to a localhost port accessible to the Meta app; second, "once" the app received that cookie, the app would then "link" the identifier with users' Meta account information; and third, only then would the app transmit this information to Meta's servers. ¶¶ 55, 61-62. That is sequential, asynchronous data processing—not interception "during transmission" under the Wiretap Act and CIPA § 631 or "simultaneous dissemination" under CIPA § 632. *Konop*, 302 F.3d at 878-79; *Smith*, 11 Cal. 5th at 200; *see also Doe v. Eating Recovery Ctr. LLC*, 2025 WL 2971090, \*5 (N.D. Cal. Oct. 17, 2025) (rejecting CIPA wiretapping claims because "the [relevant code] operation indisputably takes place after the communication had already traveled from the website visitor to the website operator").

Plaintiffs try to change the subject by pointing to websites' "real-time" transmission of event data to Meta through the standard operation of Pixel code—i.e., through transmission of data directly from the user's browser to Meta's servers. *See, e.g.*, ¶¶ 94, 100, 106, 112. But Plaintiffs do not purport to challenge the lawfulness of Meta's receipt of that transmission; nor could they, as they specifically concede that "Meta acknowledges this use of data" in its Privacy Policy, to which Plaintiffs agreed. ¶ 42. Plaintiffs instead dispute consent exclusively with respect to the

---

[4] The same holds for the "linked" identifier transmitted from Meta's apps to its servers as part of the Subject Functionality, after the _fbp cookie was passed to the app: The only additional information allegedly transmitted by the app was Meta account identifiers—provided *by Meta's apps*—rather than any communications between the user and a website. *See, e.g.*, ¶ 49 (alleging that the Subject Functionality caused Meta's apps to "collect and link [the _fbp cookie] to the user's Meta account information (e.g., names and email addresses)").

Subject Functionality. Those consent arguments are flawed too, *see supra* at pt. IV.B, but in any event they have nothing to do with websites' transmissions to Meta's servers involved in the standard operation of Pixel code. Nor can Plaintiffs argue that Meta's receipt of the event data sent in such (unchallenged) transmissions somehow became wiretapping once the data was eventually connected to their Facebook IDs through the Subject Functionality. That is a complaint not about the *acquisition* of the event data, but instead about its *subsequent use*—which cannot form the basis of a wiretapping claim where the acquisition itself was lawful. *See United States v. Christensen*, 828 F.3d 763, 796 (9th Cir. 2015) (explaining that "[a]ny subsequent use of [a] recorded conversation" is not governed "by the prohibition on interception" in ECPA (citation omitted)); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 216 F.3d 621, 625 (7th Cir. 2000) (where "interception in [a] case was not obtained in violation of the [Wiretap] Act, its subsequent use and disclosure was not a violation of the Act"); *Lau v. Gen Digital Inc.,* 2024 WL 1880161, *1 (N.D. Cal. Apr. 3, 2024) (Lin, J.) (dismissing wiretapping claims where plaintiffs' allegations spoke "only to how user information is catalogued and stored, not the initial interception of that information").

**D.    The Pen Register Claim Fails Because the Subject Functionality Did Not Collect Dialing, Routing, Addressing, or Signaling Information**

Similar to their wiretapping claims, Plaintiffs' claim under CIPA's pen-register provision fails because the Subject Functionality did not collect the sort of information protected by the cited provision—namely, dialing, routing, addressing, or signaling information.

CIPA Section 638.51(a) prohibits the unauthorized installation or use of a "pen register" or "trap and trace," which are both devices or processes that capture "dialing, routing, addressing, or signaling information." A "pen register" is a "device or process that records or decodes *dialing, routing, addressing, or signaling information* transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Pen. Code § 638.50(b) (emphasis added). A "[t]rap and trace" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other *dialing, routing, addressing, or signaling information* reasonably likely to identify the source of a wire or

electronic communication, but not the contents of a communication." *Id.* § 638.50(c) (emphasis added).

Such "dialing, routing, addressing, or signaling information" refers to information used to direct a communication from one person to another. "Dialing information" refers, of course, to the numbers dialed on a phone to call another phone.[5] "Routing" or "addressing" information refers to information used to send—i.e., to "route" or "address"—a communication from one person to another.[6] "Signaling" information likewise refers to information used to direct communications signals from one device to another.[7] All these terms are meant to capture information analogous to the "to/from" information someone would write "on the outside of an envelope" in the context of physical mail. *Zynga*, 750 F.3d at 1108 (comparing information covered by pen register/trap-and-trace to envelope information).

The _fbp cookie collected via the Subject Functionality does not qualify as this sort of information. Plaintiffs do not, and cannot, allege that the _fbp cookie is used to route user communications over the internet. The cookie is not alleged to appear in the origin or destination header of any internet communication sent to or from a user, similar to what would appear on the "outside of an envelope." *Zynga*, 750 F.3d at 1108. Indeed, the _fbp cookie would mean nothing to an internet service provider. Instead, it merely consists of a "pseudonymous identifier" used by Meta and its advertising partners—not telecommunications carriers—"for the purposes of providing advertising and site analytics services"—not routing a user's communications. ¶ 30. As this Court recently held, mere "unique device identifiers" are not tantamount to routing information and thus do not implicate CIPA. *See Tsering v. Meta Platforms, Inc.*, 2026 WL 89320,

---

[5] *See U.S. Telecom Ass'n v. F.C.C.*, 227 F.3d 450, 458 (D.C. Cir. 2000) (referring to "dialing information" as the information "conveyed by telephone numbers").

[6] *See United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (using "routing" and "addressing" synonymously, in explaining that "e-mail to/from addresses and IP addresses constitute addressing information" as they are "used by Internet service providers for the specific purpose of directing the routing of information"); *cf. Pragmatus AV, LLC v. Yahoo! Inc.,* 2014 WL 1922081, at *7 (N.D. Cal. May 13, 2014) (interpreting "addressing information" in patent dispute to refer to the location of a device on a network).

[7] *See U.S. Telecom. Ass'n*, 227 F.3d at 463 (explaining that cell-site signals, "which are necessary to achieve communications between the caller and the party he … is calling, clearly are 'signaling information'").

*6 (N.D. Cal. Jan. 12, 2026) (Lin, J.) (dismissing CIPA pen register claim based on Meta's alleged collection of "unique device identifiers" and other "personal data," because plaintiffs had not adequately alleged "this information is used for 'dialing, routing, addressing, or signaling'"); *Bradshaw v. Lowe's Companies*, 2025 WL 3171740, *5 (S.D. Cal. Nov. 12, 2025) (dismissing CIPA pen-register claim because plaintiffs alleged no basis to show that "PII" collected by tracker, including "the user's MUID [(Microsoft ID)], device information, and browser information, constitutes 'dialing, routing, addressing, or signaling information'"); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (noting that CIPA's pen register provision is "specific as to the type of data" it covers—"dialing, routing, addressing, or signaling information").[8]

Nor can Plaintiffs base their pen-register claim on data received by Meta through the standard operation of Pixel code. Plaintiffs assert that "Meta's code" constitutes a pen register based on its collection of users' IP addresses, ¶ 205, but there is no allegation that the *Subject Functionality* collects IP addresses. To the extent Plaintiffs are referring to websites sending IP addresses to Meta through the standard operation of Pixel code, the Privacy Policy clearly discloses that Meta receives users' "device information" from third-party websites, which includes "[i]nformation about the network you connect your device to and your connection, including your IP address." Ex. A at 7. Again, Plaintiffs do not even purport to challenge their consent to the Privacy Policy as it applies to the Pixel code's standard operation.

Moreover, Plaintiffs' IP-address theory is fundamentally misplaced, as a pen register does not capture the IP address of the device it is *installed on,* but rather it captures the *outgoing* IP addresses the device is *communicating with*. This is evident from the statutory text. The statute defines a "pen register" as capturing the routing information "transmitted by" a device, i.e., the

---

[8] Plaintiffs' claim also fails because, insofar as the Subject Functionality transmits the _fbp cookie from a Meta app to Meta's servers, it is retransmitting the *content* of a message—i.e., the message sent from the third-party website to the Meta app through localhost channels, containing the _fbp cookie. A process for retransmitting the content of a message, by definition, cannot constitute a pen register. *See Tsering*, 2026 WL 89320, at *6 (Lin, J.) (finding CIPA pen register claim subject to dismissal because plaintiffs had failed "to allege that the information collected did not constitute the content of such communication": "For example, if Plaintiffs' cell phones periodically sent their geolocation information to the app developers as a standalone message, and then the app developers forwarded that information to Meta through the SDK, that would appear to be the content of the underlying communication.").

routing information *sent* by a device to direct a communication to its destination, analogous to the "to" information on an envelope—which, in the case of internet communications, would be the IP addresses of the computers it is sending communications *to*. CIPA § 638.50(b). This reading is supported by the accompanying "trap-and-trace" provision, which defines a trap-and-trace as capturing "incoming" routing information reflecting the "source" of a communication, i.e., the routing information *received* by a device, analogous to the "from" information on an envelope—which, in the case of internet communications, would be the IP addresses of the computers the device is receiving communications *from*. *Id.* § 638.50(c)

Reading the provisions in this way allows them to be construed harmoniously as a cohesive statutory framework: By providing a legal process for law enforcement to install both a pen register and a trap-and-trace on a device, CIPA enables law enforcement to identify all the *other* devices the target device is in communication with. *Smith*, 11 Cal. 5th at 190 ("We do not examine [statutory] language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment."). This reading also accords with how the terms "pen register" and "trap-and-trace" have long been interpreted by courts (under the similarly worded federal pen register statute)[9]—precedent with which the California legislature must be presumed to have been familiar. *See Hohenshelt v. Superior Ct.*, 18 Cal. 5th 310, 340 (2025) ("[W]e presume the Legislature is aware of existing laws and intends to enact new law in harmony with background laws absent a definitive indication to the contrary." (quotation omitted)). Indeed, the legislative history of CIPA's pen register and trap-and-trace provisions explains that their purpose was to model California state law after federal law, which was understood to provide a process by which law enforcement could track "incoming" and "outgoing" phone numbers, in order "to track which people in an investigation are communicating

---

[9] *See, e.g.*, *Twitter, Inc. v. Garland,* 61 F.4th 686, 691 n.2 (9th Cir. 2023) ("Pen registers and trap and trace devices, respectively, capture the phone number associated with an outgoing or incoming call (or other communication) on a given communication line."); *United States v. Swinburne*, 988 F.2d 125, 125 n.1 (9th Cir. 1993) ("A pen register records the outgoing numbers dialed from a telephone … . A trap and trace identifies the originating points of incoming calls to a telephone number."); *Application of U.S. of Am. for an Ord. Authorizing an In-Progress Trace of Wire Commc'ns*, 616 F.2d 1122, 1127 (9th Cir. 1980) ("[T]he pen register records the telephone numbers to which all outgoing calls are made from the monitored telephone, while an ESS trace records the numbers from which incoming calls to the subject telephone have been made.").

with one another." Bill Analysis, Assemb. B. 929, Reg. Sess., at pp. T-U (Cal. Apr. 7, 2015).

By contrast, reading CIPA's pen register provision as Plaintiffs do, to encompass merely collecting the IP address of a device—as opposed to collecting all the IP addresses *in contact* with a device—would have absurd consequences. The IP addresses of devices on the internet are generally visible to each other, as they must be for the devices to communicate with each other. Thus, internet-connected devices capture the IP addresses of other devices *all the time*. "If [the pen register laws] did apply in those cases, then the Internet could not function because standard computer operations require recording IP addresses so parties can communicate with one another over the Internet." *Capitol Recs. Inc. v. Thomas-Rasset*, 2009 WL 1664468, *3 (D. Minn. June 11, 2009). Likewise, companies (and even individuals) often need to install software that shares computer IP addresses with third parties—such as anti-virus software that inspects all incoming traffic for malicious IP addresses. Interpreting CIPA's pen register provision to apply to any third-party collection of IP addresses would render that ubiquitous activity unlawful as well.[10]

Under well-established California rules of statutory construction, courts must give statutes a "commonsense meaning" and avoid "a literal interpretation" if it "would result in absurd consequences the Legislature did not intend." *Smith*, 11 Cal. 5th at 190. Had the California legislature intended to outlaw practices basic to the functioning of the internet, surely it would have given "a clearer indication of that intent." *Yates v. United States*, 574 U.S. 528, 540 (2015); *see also Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994) ("Such a bold departure from traditional practice would have surely drawn more explicit statutory language and legislative comment.").[11] Particularly given that CIPA is a *criminal* statute to which the rule of lenity applies, any such sweeping reading of the statute is unjustified. *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134 (9th Cir. 2009) ("The Supreme Court has long warned against interpreting

---

[10] Another absurd consequence of interpreting CIPA's "pen register" definition to apply to any process for collecting a computer's IP address is that it would bring the statute into conflict with federal law—which allows law enforcement to obtain the IP address of a computer with a mere subpoena, *see* 18 U.S.C. § 2703(c)(2)(E), rather than a court order as CIPA requires for a pen register, *see* Cal. Penal Code § 638.51(a).

[11] For similar reasons, to the extent CIPA could be construed to apply so broadly, it would be unconstitutionally vague. *See Doe*, 2025 WL 2971090, at *6 n.9 (citing void-for-vagueness concerns as additional reason to adopt narrower construction of CIPA).

criminal statutes in surprising and novel ways that impose unexpected burdens on defendants."); *Doe*, 2025 WL 2971090, *1 (criticizing conflicting rulings on CIPA's scope as "untenable," as "companies have no way of telling whether their online business activities will subject them to liability," and urging that courts "resolve CIPA's many ambiguities in favor of the narrower interpretation" given rule of lenity).[12]

### E.    The CDAFA Claim Fails Because Meta Had Permission to Access and Use the Data at Issue

Plaintiffs' CDAFA claims fail because Plaintiffs do not plausibly allege that Meta lacked permission to access and use the data the Subject Functionality collected from their devices—i.e., _fbp cookies.

CDAFA "prohibits only access or disruptions to a computer system that are 'without permission.'" *Brodsky*, 445 F. Supp. 3d at 131-32. Here, the gravamen of Plaintiffs' CDAFA claims is that the Subject Functionality accessed and used Plaintiffs' data in a manner that supposedly violated "Android sandboxing protocols." ¶ 224. However, the "key" question under CDAFA is whether the defendant "was authorized in the first instance to take and use the information" at issue; it does not matter whether the plaintiff "disapproved of the *method* … by which [the defendant] took [the plaintiff's] information." *Oracle USA Inc. v. Rimini Street Inc.*, 879 F.3d 948, 962 (9th Cir. 2018), *rev'd on other grounds*, 586 U.S. 334 (2019). Thus, in *Oracle*, the defendant had permission to access the plaintiff's servers to download software, but it used automated means to do so, which was expressly in violation of the plaintiff's terms of use. *Id.* at 961-62. The Ninth Circuit rejected the plaintiff's CDAFA claim, holding that "taking data using a *method* prohibited by the applicable terms of use, when the taking itself generally is permitted, does not violate the CDAFA." *Id.* at 962 (emphasis in original). Similarly, in *Brodsky*, the plaintiffs alleged they had revoked consent for Apple to use a particular feature on Apple devices as a

---

[12] We are aware that the Court has previously interpreted CIPA's pen register provision to apply to the collection of a device's IP address, rather than the IP addresses of the computers the device is communicating with. *See Shah v. Fandom*, 754 F. Supp. 3d 924, 929-30 (N.D. Cal. 2024) (Lin, J.). If the Court were to reach the question here, Meta respectfully requests that it reconsider that holding in light of the above arguments, which were not squarely raised or addressed in *Shah*. However, there is no need for the Court to reach the question here, given that, as explained above, Plaintiffs consented to Meta's collection of their IP addresses by agreeing to its Privacy Policy.

"method of access[ing]" their "login activity"; but the court, following *Oracle*, rejected this as a basis for a CDAFA claim, because it was undisputed that the plaintiffs had granted Apple "access to [their] login activities through other means." 445 F. Supp. 3d at 130-32.

Similarly, here, Plaintiffs do not—and cannot—allege that Meta lacked permission to access the data at issue in the first instance. To the contrary, they specifically allege that "Meta acknowledges" in its Privacy Policy that "the Pixel is embedded" in partner websites that users may visit in their browsers, and that it enables Meta to collect information about them, "expressly including information about '[w]ebsites you visit and cookie data.'" ¶ 42. Indeed, Meta's disclosures specifically call out the _fbp cookie as one of the cookies Meta collects. Ex. E at 3, 5, 6. By agreeing to the Privacy Policy, Plaintiffs permitted Meta to "take and use" that data. *Oracle*, 879 F.3d at 962. Plaintiffs' complaint about the Subject Functionality concerns the particular *method* by which Meta did so—i.e., it is a complaint about the fact that Pixel code sent the _fbp cookie not only directly to Meta's servers, but also to a Meta app on Android devices. But there is no dispute that Meta was permitted to access the cookie in the first instance. That negates any CDAFA claim. *See id.* ("Because [the defendant] indisputably had such authorization, at least at the time it took the data in the first instance, [the defendant] did not violate the [CDAFA]."); *Brodsky*, 445 F. Supp. 3d at 132 ("[B]ecause the SAC only challenges the login method of 2FA without alleging that Apple is otherwise accessing Plaintiffs' login activities without authorization, Plaintiffs' [CDAFA] claims fail."); *see also Wendover Prods., LLC v. Paypal Inc.*, 2025 WL 3251667, *5 (N.D. Cal. Nov. 21, 2025) (holding that CDAFA does not "impose[] any duty to disclose how permissions will be exercised").

In any event, even putting aside that objections to the method of access cannot ground a CDAFA claim as a matter of law, Plaintiffs do not coherently explain why the method of access used here was unpermitted. Plaintiffs vaguely assert that the Subject Functionality violated "Android sandboxing protocols," ¶ 224, but they do not concretely explain what this phrase is supposed to mean. Plaintiffs seem to conceptualize "sandboxing protocols" as a kind of technical barrier to access, referring to them as a "digital wall between mobile apps." ¶ 47. But this conclusory assertion is contradicted by more specific allegations elsewhere in the Complaint,

which make clear there is no absolute "wall" between mobile apps on Android devices.[13] Plaintiffs specifically allege that Android uses a less "restrictive" approach to sandboxing, in that it allows apps to communicate over "localhost" channels, which "are *intended* to allow different Android programs or applications to communicate with one another"—just "as if they were communicating over a network." ¶¶ 50, 52-53 (emphasis added); *see also* ¶ 54 (alleging that "Google designed and implemented the Android operating system in a manner such that apps *can access* localhost ports" (emphasis added)). Plaintiffs thus cannot plausibly allege that the Subject Functionality circumvented technical barriers, when it used internal communication channels included in the Android operating system by design. Their real beef seems to be that they believe the Android operating system should have been designed differently than it was. *See* ¶¶ 84, 90 (alleging that Google "implemented an 'overly permissive' design of its Android operating system," due to a "lack of controls Android imposes on [app] developers"). But Google's alleged decision not to implement controls preferred by Plaintiffs hardly implies that such controls existed and that Meta circumvented them. *See Opperman v. Path, Inc.,* 87 F. Supp. 3d 1018, 1054 n.19 (N.D. Cal. 2014) (rejecting CDAFA claim where the complaint did not allege "that the subject apps circumvented any restrictions" but instead alleged that "*Apple failed to implement* any such restriction, thereby enabling the App Defendants to copy Plaintiffs' address books" (emphasis added)); *see also Wendover Prods*., 2025 WL 3251667, *4 (holding, where defendant was granted extensive permissions to access data, that "for the purpose of the … CDAFA, it is of no consequence that Plaintiffs apparently believe that these authorizations are 'far beyond what would be needed'").

Plaintiffs also try to equate "Android sandboxing protocols" with Google's terms of use, alleging that the Subject Functionality was a "violation of Google's terms." ¶ 166. But they fail to identify any specific provisions in Google's terms that the Subject Functionality supposedly violated. Instead, they merely cite an allegation made in a media article, ¶ 65—which does not render the allegation any less conclusory. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."). Particularly given its lack of specificity, Plaintiffs' bare allegation of a terms-of-use violation is not sufficient to plead that Meta acted "without permission" under the CDAFA. *See Synopsys, Inc. v. ATopTech, Inc.*, 2013 WL 5770542, *12 (N.D. Cal. Oct. 24, 2013) (finding that an allegation that

---

[13] *See Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992) (explaining that courts must "examine whether conclusory allegations follow from the description of facts as alleged by the plaintiff"); *Agensys, Inc. v. Regents of Univ. of California,* 2024 WL 5679162, at *4 (C.D. Cal. Oct. 22, 2024) (explaining that "when specific facts alleged in a complaint contradict general, conclusory allegations, the specific facts are controlling" (quotation omitted)).

licensing agreements prohibited access in question "[did] not provide enough detail to be plausible," and that "Plaintiff must explain how the License Agreements and its other user agreements with Defendant were enough to put Defendant on notice that its access to [the system at issue] was 'without permission'"); *see also Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, *11 (N.D. Cal. July 20, 2010)) (warning that overbroad application of the CDAFA "would create a constitutionally untenable situation in which criminal penalties could be meted out on the basis of violating vague or ambiguous terms of use").[14]

For all the reasons Plaintiffs have failed to adequately plead that Meta lacked permission to access and use the data at issue, *a fortiori* they have failed to adequately plead that Meta *knew* it lacked permission. *See Tsering*, 2026 WL 89320, *4 ("Requiring an individual to know that they lack permission to engage in the proscribed acts aligns with the purpose of CDAFA, which was originally enacted to combat computer crime and hacking." (quotation omitted)). Again, Meta specifically disclosed to Facebook users like Plaintiffs that it collects event data and cookies from third-party websites and uses the cookies to match browsing data to users' Facebook IDs. Moreover, Plaintiffs have not identified a technical barrier or provision in Google's terms that purportedly blocked or prohibited such data from being transmitted to a Meta app on a user's device. On these facts, Plaintiffs cannot plausibly allege that Meta knew that it lacked permission for its conduct. *See id.* *4-5 (dismissing CDAFA claim based on finding that plaintiffs had not plausibly alleged that Meta knew that it lacked permission to collect data at issue, where collection was disclosed in applicable privacy policies).

**F.      The Invasion-of-Privacy Claims Fail Because Plaintiffs Do Not Plausibly Allege a Reasonable Expectation of Privacy or a Highly Offensive Intrusion**

To state their privacy claims, Plaintiffs must plausibly allege a reasonable expectation of privacy and an intrusion "so serious as to constitute an egregious breach of social norms such that the breach is highly offensive." *Graham v. Noom*, 533 F. Supp. 3d 823, 835 (N.D. Cal. 2021) (quotation omitted); *see also Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009). Plaintiffs cannot plausibly allege either.

---

[14] Moreover, even if Plaintiffs had sufficiently alleged that Meta violated Google's terms of use—which they have not—it is unclear why that contractual violation would imply that Meta lacked permission for its conduct *from Plaintiffs*, as opposed to Google. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (noting that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Plaintiffs cannot plausibly allege a reasonable expectation of privacy in the data collected because, again, they consented to Meta's Privacy Policy, which specifically permits Meta to collect cookies from third-party advertising partners and use them for identity-matching. Because the Privacy Policy "expressly disclosed [Meta's] intention to track [users'] activity" through such data, "Plaintiffs have no reasonable expectation of privacy in that data." *Hammerling*, 2024 WL 937247, *3; *Lloyd*, 2024 WL 3325389, *2 ("[B]ecause Facebook's data policy gives clear notice that third party partners may share data with Facebook, Lloyd did not have a reasonable expectation of privacy in this information."); *see also In re Google, Inc. Priv. Pol'y Litig.*, 2013 WL 6248499, *16 (N.D. Cal. Dec. 3, 2013) (finding that plaintiffs had not plausibly pled reasonable expectation that data provided to Google through various products would stay separate, given "Google's earlier disclosure that it would commingle PII across products to support its advertising model").

Plaintiffs also fail to allege any intrusion was "highly offensive"—a standard that "set[s] a high bar." *Belluomini v. Citigroup Inc.*, 2013 WL 5645168, *3 (N.D. Cal. Oct. 16, 2013). Meta's receipt of the _fbp cookie cannot be considered highly offensive because the use of cookies for advertising on the internet is "routine commercial behavior." *See Hubbard v. Google LLC*, 2024 WL 3302066, *7 (N.D. Cal. July 1, 2024). Even to the extent the _fbp cookie was allegedly used to link Plaintiffs' browsing activity to their Facebook IDs through the Subject Functionality, Plaintiffs do not allege facts sufficient to show this amounts to a highly offensive intrusion, because they only allege they visited "several" websites that were affected by the Subject Functionality, none of which allegedly (or plausibly) involve sensitive data. "While some types of browsing activity implicate protectable privacy interests, others do not. … Absent specific allegations about the type of browsing … information disclosed, [such information is] insufficient to support [an invasion-of-privacy claim]." *Khamooshi*, 2025 WL 2822879, *3; *Dawidzik v. Tesla, Inc.*, 2025 WL 3786963, *5 (C.D. Cal. Dec. 29, 2025) (finding "highly offensive" element was not satisfied based on use of tracking pixels "[w]ithout more particular allegations" about the types of websites plaintiffs had allegedly been tracked on).

**G.    The Unjust Enrichment Claim Fails with the Rest of Plaintiffs' Claims and Is Precluded by *Sonner* in Any Event**

Finally, Plaintiffs' unjust enrichment claim must be dismissed along with their remaining claims. Unjust enrichment is not a standalone cause of action in California, but "essentially a claim for restitution." *Lau*, 2024 WL 1880161, *5. Accordingly, because Plaintiffs fail to state any claim against Meta, they cannot state an unjust enrichment claim either. *See Tsering*, 2026 WL 89320, *7; *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 848-49 (N.D. Cal. 2024) (dismissing unjust enrichment claim because "plaintiffs ha[d] not stated a claim … for any unlawful conduct"); *Brand v. KSF Acquisition Corp.*, 2023 WL 3225409, *9 (S.D. Cal. Mar. 17, 2023) (similar).

Further, unjust enrichment is an equitable remedy and can only be sought where a plaintiff has plausibly alleged they lack an adequate remedy at law. *See, e.g.*, *Phillips v. Brooklyn Bedding LLC*, 2024 WL 2830663, *1 (N.D. Cal. Mar. 28, 2024) (Lin, J.) (dismissing unjust enrichment claim on this ground) (citing *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)). Here, Plaintiffs allege no facts sufficient to make such a showing, but instead merely state without elaboration that "[t]he remedies available to Plaintiffs and Class members are inadequate to compensate them." ¶ 240. Such conclusory allegations are insufficient to meet *Sonner*'s requirements. *See, e.g.*, *Broomes v. FullBeauty Brands Operations, LLC*, 2025 WL 829589, *3 (N.D. Cal. Jan. 31, 2025) (Lin, J.) (dismissing unjust enrichment claim because plaintiff "fail[ed] to plead in a non-conclusory fashion that she lacks an adequate legal remedy"); *Miller v. Arizona Beverages USA LLC*, 2024 WL 5339466, *2 (N.D. Cal. June 5, 2024) (Lin, J.) (same).

**V.    CONCLUSION**

For all of the foregoing reasons, the motion to dismiss should be granted.

Dated: January 30, 2026                                    Respectfully submitted,

                                                          LATHAM & WATKINS LLP

                                                          By /s/ Serrin Turner
                                                              Serrin Turner (*pro hac vice*)
                                                              serrin.turner@lw.com
                                                              Nicolas Luongo (*pro hac vice* pending)
                                                              nicolas.luongo@lw.com

1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Brad Baglien (*pro hac vice*)
 *brad.baglien@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
 *melanie.blunschi@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

*Attorneys for Defendant*
*Meta Platforms, Inc.*