**BURSOR & FISHER, P.A.**
Philip L. Fraietta (SBN 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656

**MILBERG, PLLC**
Gary M. Klinger (*pro hac vice*)
William Edelman (SBN 285177)
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878

[Additional counsel listed on signature pages]

**LIEFF CABRASER HEIMANN
 & BERNSTEIN, LLP**
Michael W. Sobol (SBN 19485)
Michael K. Sheen (SBN 288284)
Amelia A. Haselkorn (SBN 339633)
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
Theodore W. Maya (SBN 223242)
Alyssa D. Brown (SBN 301313)
Sarper Unal (SBN 341739)
Lisa Cintron (SBN 356009)
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Interim Class Counsel*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Meta Android Privacy Litigation,*<br><br>This document Relates to:<br><br>All Actions | Case No. 3:25-cv-04674-RFL<br><br>**PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS CLASS ACTION COMPLAINT**<br><br>Hearing: March 24, 2026<br>Time: 10:00 a.m.<br>Location: Courtroom 15, 18th Floor<br>Judge: Hon. Rita F. Lin |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION .................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................... 2

        A.      Industry-standard sandboxing protocols protect mobile devices from privacy and security threats. ................................................................................................ 2

        B.      Meta surreptitiously exploited Android's sandboxing restrictions. ...................... 2

        C.      Meta avoided detection for nearly a year before it was caught. .......................... 4

III.    STATEMENT OF THE ISSUES TO BE DECIDED ................................................ 4

IV.     ARGUMENT ........................................................................................................... 5

        A.      Plaintiffs suffered a concrete privacy injury sufficient to confer Article III standing. ............. 5

        B.      Meta's consent-based affirmative defense fails. ................................................. 7

                1.      Meta's policies do not disclose the alleged misconduct. ........................... 7

                2.      The lack of limiting language in Meta's disclosures does not cure its failure to obtain consent. ................................................................................. 10

                3.      Disclosures about user privacy controls do not establish consent. ........... 11

        C.      Plaintiffs state cognizable invasion of privacy claims. ...................................... 12

                1.      Plaintiffs allege a reasonable expectation of privacy. .............................. 12

                2.      Meta engaged in highly offensive conduct. ............................................. 13

        D.      Plaintiffs plausibly allege CIPA §§ 631, 632, 635, and ECPA violations. ........... 14

                1.      Meta illegally intercepted Plaintiffs' communications and not just the rerouted cookie. .................................................................................................. 14

                2.      Plaintiffs plausibly allege that Meta intercepted the contents of Plaintiffs' communications. ................................................................................... 15

                3.      Meta intercepted Plaintiffs' communications while in transit. .................. 16

        E.      Plaintiffs plausibly allege a CIPA § 638.51 claim. ............................................ 17

                1.      The Modified Pixel and Modified Meta Apps record "routing, addressing, or signaling information." .......................................................................... 17

                2.      The Modified Pixel and Modified Meta Apps are pen registers that capture "routing, addressing, or signaling information." ........................................ 19

        F.      Plaintiffs plausibly plead a CDAFA claim. ....................................................... 23

V.      CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Application of U.S. for an Order Authorizing Use of A Pen Register and Trap On (XXX) Internet Service Account/User Name [xxxxxxxx@xxx.com]*,
396 F. Supp. 2d 45 (D. Mass. 2005) ........................................................................................... 21

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020) ................................................................................................................. 21, 22

*Bradshaw v. Lowe's Cos., Inc.*,
No. 25CV0742 DMS (MMP), 2025 WL 3171740 (S.D. Cal. Nov. 12, 2025) ....................................... 19

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ............................................................................... 14, 25

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........................................................................... 9, 15, 23

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) ........................................................................................................ 7

*Campbell v. Facebook Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ............................................................................. 7, 9, 15

*Camplisson v. Adidas Am., Inc.*,
No. 25-CV-603-GPC-KSC, 2025 WL 3228949 (S.D. Cal. Nov. 18, 2025) ................................. 5, 6, 18

*Capitol Recs. Inc. v. Thomas-Rasset*,
No. CIV 06-1497(MJD/RLE), 2009 WL 1664468 (D. Minn. June 11, 2009) ....................................... 22

*Carpenter v. United States*,
585 U.S. 296 (2018) .......................................................................................................................... 2

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ........................................................................... 14, 17, 24

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ........................................................................................................................ 21

*Dealertrack, Inc. v. Huber*,
No. CV 06-2335-AG, 2008 WL 5792509 (C.D. Cal. Sept. 27, 2008) ....................................... 18

*Deivaprakash v. Condé Nast Digital*,
798 F. Supp. 3d 1100 (N.D. Cal. 2025) ..................................................................... 5, 6, 11, 23

*Doe v. Eating Recovery Ctr. LLC*,
No. 23-CV-05561-VC, 2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) ....................................... 17, 23

*Doe v. GoodRx Holdings, Inc.*,
No. 23-CV-00501-AMO, 2025 WL 2052302 (N.D. Cal. July 22, 2025) ................................................ 8

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Doe v. Talkiatry Mgmt. Servs., LLC*,
No. 5:25-CV-00781-SSS-DTBx, 2025 WL 3190813 (C.D. Cal. Oct. 1, 2025) ..................................... 17

*Drummer v. Costar Grp., Inc.*,
2025 WL 3190656 (C.D. Cal. Oct. 22, 2025) ................................................................................. 22

*Drummer v. Costar Grp., Inc.*,
No. EDCV 25-1047 ......................................................................................................................... 22

*Esparza v. Kohl's, Inc.*,
723 F. Supp. 3d 934 (S.D. Cal. 2024) ........................................................................................... 24

*Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ................................................................................................... *passim*

*Facebook, Inc. v. Power Ventures, Inc.*,
No. C 08-05780 JW, 2010 WL 3291750 (N.D. Cal. July 20, 2010) .................................... 23, 24

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) ................................................................................................................... 20

*Frasco v. Flo Health, Inc.*,
No. 21-CV-00757-JD, 2025 WL 2680068 (N.D. Cal. Sept. 17, 2025) ...................................... 8

*Fregosa v. Mashable, Inc.*,
No. 25-cv-01094-CRB, 2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) ................................. 18, 21, 22, 23

*Fregosa v. Mashable, Inc.*,
No. 25-CV-01094-CRB, 2026 WL 183857 (N.D. Cal. Jan. 23, 2026) ...................................... 21

*Gabrielli v. Motorola Mobility LLC*,
No. 24-CV-09533-JST, 2025 WL 1939957 (N.D. Cal. July 14, 2025) ...................................... 5

*Gilligan v. Experian Data Corp.*,
No. 25-CV-02873-RFL, 2026 WL 32259 (N.D. Can. Jan. 6, 2026) ............................................ *passim*

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ................................................................................. 8, 9, 12, 15

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) ................................................................................................... 11, 13

*In re Google Inc.*,
No. 13-MD-02430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .................................. 10, 11

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ................................................................................. 11, 24

*Harris v. iHeartMedia, Inc.*,
No. 25-CV-06038-EKL, 2026 WL 247875 (N.D. Cal. Jan. 29, 2026) ...................................... 7, 20

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) ............................................................................... 17

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ............................................................................................... 12, 14

*In re High Fructose Corn Syrup Antitrust Litig.*,
216 F.3d 621 (7th Cir. 2000) ........................................................................................... 17

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ............................................................................. 12

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) ........................................................................................... 17

*Krzyzek v. OpenX Techs., Inc.*,
No. 25-CV-05588-SI, --- F. Supp. 3d ---, 2026 WL 206855 (N.D. Cal. Jan. 27, 2026)............ 5, 6, 16, 20

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) .............................................................................. 9

*Lau v. Gen Digital Inc.*,
No. 22-CV-08981-RFL, 2024 WL 1880161 (N.D. Cal. Apr. 3, 2024) .................................... 17

*Lewis v. Magnite, Inc.*,
No. 2:25-CV-03448-MWC-SSCx, 2025 WL 3687546 (C.D. Cal. Dec. 4, 2025) .................................. 21

*Lloyd v. Facebook, Inc.*,
No. 23-15318, 2024 WL 3325389 (9th Cir. July 8, 2024)....................................................... 10

*M.D. v. Google LLC*,
No. 24-CV-06369-AMO, 2025 WL 2710095 (N.D. Cal. Sept. 23, 2025) .............................................. 9

*Margolis v. Apple Inc.*,
743 F. Supp. 3d 1124 (N.D. Cal. 2024) ............................................................................. 24

*McCoy v. Alphabet, Inc.*,
2021 WL 405816 (N.D. Cal. Feb. 2, 2021) ....................................................................... 12

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) .............................................................................. 15

*In re Meta Pixel Tax Filing Cases*,
793 F. Supp. 3d 1147 (N.D. Cal. 2025) ............................................................................ 18

*Moody v. C2 Educ. Sys. Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. 2024) ............................................................................ 20

*Nelson v. Reddit, Inc.*,
No. 25-CV-1470 JLS (AHG), 2026 WL 445627 (S.D. Cal. Feb. 17, 2026) .................................. 20, 23

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Ocasio v. United States*,
578 U.S. 282 (2016) .......................................................................................................... 23

*Opperman v. Path, Inc.*,
205 F. Supp. 3d 1064 (N.D. Cal. 2016) ......................................................................... 9, 13

*Oracle USA Inc. v. Rimini Street Inc.*,
879 F.3d 948 (9th Cir. 2018), *rev'd in part*, 586 U.S. 334 (2019) ........................................ 25

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ......................................................................................... 6, 7

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) .............................................................................. 15

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) ......................................................................... 12, 23

*Rodriguez v. Autotrader.com, Inc.*,
762 F. Supp. 3d 921 (C.D. Cal. 2025) .............................................................................. 18

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017) ..................................................................................... 25

*Selby v. Sovrn Holdings, Inc.*,
No. 25-CV-03139, 2025 WL 2950164 (N.D. Cal. Oct. 17 ....................................... 14, 16, 25

*Shah v. Fandom*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) ................................................................. 19, 20, 21, 22

*Shah v. MyFitnessPal, Inc.*,
2026 WL 216334 (N.D. Cal. Jan. 27, 2026) ....................................................................... 5

*Silver v. Stripe Inc.*,
No. 4:20-CV-08196-YGR, 2021 WL 3191752 (N.D. Cal. July 28, 2021) ............................. 10

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) ....................... 10

*Smith v. LoanMe, Inc.*,
11 Cal. 5th 183 (2021) .............................................................................................. 17, 23

*Smith v. Rack Room Shoes, Inc.*,
No. 24-CV-06709, 2025 WL 1085169 (N.D. Cal. Apr. 4, 2025) ......................................... 16

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
313 F. Supp. 3d 1056 (N.D. Cal. 2018) ........................................................................ 23, 24

*Tsao v. Desert Palace, Inc.*,
698 F.3d 1128 (9th Cir. 2012) ........................................................................................... 7

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Tsering v. Meta Platforms, Inc.*,
    No. 25-CV-01611, 2026 WL 89320 (N.D. Cal. Jan. 12, 2026) ..................................................... 5, 19, 24

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2015) ............................................................................................................ 17

*Walsh v. Dollar Tree Stores, Inc.*,
    No. 25-CV-01601-SVK, 2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) ...................................... 22

*Washington v. Flixbus, Inc.*,
    No. 3:25-CV-00212-H-MSB, 2025 WL 1592961 (S.D. Cal. June 5, 2025) ............................... 9

*Wright v. TrueCare Property Holdings, LLC*,
    No. 3:25-CV-00786-JES-BLM, 2025 WL 3248749 (S.D. Cal. Nov. 21, 2025) .............................. 18, 20

*In re Zynga Privacy Litig.*,
    750 F.3d 1098 (9th Cir. 2014) .......................................................................................................... 18

**Statutes**

18 U.S.C. § 2703(c)(2)(E)................................................................................................................... 22

Cal. Pen. Code § 4............................................................................................................................. 23

Cal. Pen. Code §§ 502(c)(1)–(4), (6)–(8) ......................................................................................... 23

**Other Authorities**

AMERICAN HERITAGE DICTIONARY (4th ed. 2006) .......................................................................... 18

MERRIAM-WEBSTER'S DICTIONARY.................................................................................................... 18

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

## I.  INTRODUCTION

This case concerns indisputably deliberate conduct that stunned computer scientists, the public, and even Google when exposed last year: a covert scheme by Meta to impermissibly exploit a security vulnerability in Google's Android operating system, which allowed Meta to tie together users' real-world identities and their detailed web browsing activities without consent. Meta engaged in this brazen plot to de-anonymize the web browsing activities of many millions of Android mobile device users to build and enrich detailed dossiers linked to their Facebook and Instagram accounts. These dossiers were, and remain, highly valuable to Meta, allowing it to leverage and profit from marketing-related inferences about these people at the expense of their reasonable expectations of privacy.

Meta operated its secret de-anonymization scheme for nearly a year, despite knowing its actions violated a long-held industry security and privacy feature known as "sandboxing," which isolates mobile device applications to prevent the inappropriate accessing of data between apps or with the underlying operating system without permission. Meta evaded detection until June 3, 2025, when internet security researchers publicly revealed the misconduct. The company immediately announced it would "pause" the de-anonymization scheme, which did little to quell the industry shockwaves caused by Meta's extraordinary departure from universally-accepted sandboxing protocols. Upon learning of Meta's misconduct, Google confirmed that Meta's invasive techniques had blatantly violated its terms of service as well as the privacy expectations of Android users, compromising their privacy and security. This litigation followed.

Meta's standing and consent arguments have no merit. Meta ignores well-developed jurisprudence in this Circuit recognizing that allegations of surreptitious aggregation and commercialization of vast quantities of personal and identifiable web browsing information are sufficient to plead a serious invasion of privacy. Plaintiffs' allegations mirror those that the Ninth Circuit and courts in this District have repeatedly found sufficient to state privacy claims against other data aggregators, including in cases against Meta itself. *See, e.g.*, *Facebook, Inc. Internet Tracking Litig.* ("*Facebook Tracking*"), 956 F.3d 589, 601 (9th Cir. 2020). And in asserting its consent-based arguments, Meta retreats behind generic disclosures and strained arguments that Plaintiffs somehow consented to Meta's undisclosed and intentionally covert conduct to commandeer their Android devices to de-anonymize their browsing activity. Such arguments fall flat in the face of allegations that even sophisticated website and web browser developers were unaware of Meta's

3437202.1

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

scheme until it was publicly revealed.

Meta's remaining hodgepodge of challenges to Plaintiffs' invasion of privacy, wiretapping, and California Comprehensive Computer Data Access and Fraud Act ("CDAFA") claims fare no better.  Its arguments raise improper questions of fact, misread controlling Ninth Circuit precedent, and unconvincingly attempt to diminish the severity of its misconduct.  Meta's Motion to Dismiss (ECF No. 101) ("Mot." or "Motion") should be denied.

## II.    FACTUAL BACKGROUND

### A.    Industry-standard sandboxing protocols protect mobile devices from privacy and security threats.

Mobile devices and the "services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Carpenter v. United States*, 585 U.S. 296, 298 (2018) (citation omitted).  Mobile apps are a critical source of those services.  The presence of these apps (developed by multiple third parties) on a single mobile device, however, introduces privacy and security risks to the mobile computing environment.  To address those risks, mobile operating systems implement a foundational internet security principle called "sandboxing," which prevents unauthorized interactions between apps and protects access to sensitive data or privileged system resources.  ECF No. 84 (Consolidated Class Action Complaint) ("Compl.") ¶¶ 1–2, 50–51.

On the Android operating system, this means that Meta's surveillance (via the Meta Pixel) of activity conducted on a person's web browser app must occur separate and apart from Meta's tracking of the person's activity in Meta's social media apps (e.g., Facebook or Instagram) (the "Meta Apps").  *Id.* ¶¶ 2, 47, 50–52, 59.  Thus, Android's sandboxing architecture generally allows Meta App users to browse websites on their mobile web browsers free from identification and associated targeting by Meta.  *Id.* ¶¶ 2–3, 25, 32, 47, 64–65, 71–72, 95, 101, 107, 113, 129–31, 188.

### B.    Meta surreptitiously exploited Android's sandboxing restrictions.

On June 3, 2025, internet security researchers revealed that from September 2024 through at least June 2, 2025, Meta intentionally circumvented sandboxing restrictions on Android mobile devices with the Meta Apps to tie people's browsing information directly to their Meta account information, rendering their web browsing activity *completely non-anonymous and identifiable* in real time.  *Id.* ¶¶ 4, 48, 74.  To

accomplish this, Meta modified the Meta Pixel (the "Modified Pixel") and the Meta Apps (the "Modified Meta Apps") to create a backdoor channel between each person's web browser and Modified Meta App.

Meta's de-anonymization scheme involved four key components (*see id.* ¶ 62 (illustration)).[1] *First*, when a person visited a website on an Android device, the Modified Pixel directed the person's web browser to send detailed web browsing activity—including the website address, actions taken on and information provided to the website, and the person's browsing-related pseudonymous identifier (i.e., the _fbp cookie)—to Meta's servers. Compl. ¶¶ 24–32. *Second*, the Modified Pixel simultaneously[2] directed the web browser to send the _fbp cookie to a designated Android device localhost port, using one of several commonly used communications protocols. *Id.* ¶¶ 4, 49, 52, 55–62. A localhost port is an internal communication channel that provides a shorthand for apps running on the same device to route information to each other without that information leaving the device. *Id.* ¶¶ 52–53. The communications protocols used (i.e., HTTP, Websocket, and WebRTC) are intended to facilitate the transmission of certain information across the internet (such as website content, two-way communications, and audio/video conferencing)—not the passing of sensitive data between two apps. *Id.* ¶¶ 55–60. *Third*, a Modified Meta App "listened" on the designated localhost port for the _fbp cookie sent by the Modified Pixel. *Id.* ¶ 55. *Fourth*, after collecting the _fbp cookie from the localhost port, the Modified Meta App combined that cookie data with personal information and Meta account identifiers residing in the Modified Meta App and transmitted the combined data to Meta's servers. *Id.* ¶¶ 55, 62. In this manner, Meta could instantaneously and accurately attribute a person's detailed browsing activity with the vast real-world identifying information already associated with their Meta account—something Meta could not have achieved absent the circumvention of Android's sandboxing protections. *Id.* ¶¶ 18, 55, 61–64.

---

[1] In its motion, Meta repeatedly uses the vague term "Subject Functionality" in an apparent attempt to minimize the scope of its wrongdoing. *See* Mot. at 1–2, 5–17, 20–22, 24. Meta introduces a self-serving diagram to draw an artificial distinction between conduct that it says is being challenged (dotted lines) and what is not (solid lines). Mot. at 5. But that characterization is inaccurate—Plaintiffs challenge Meta's de-anonymization scheme *in its entirety* (i.e., the dotted *and* solid lines). And, as supported by allegations in the complaint, none of the components described herein should be viewed in isolation.

[2] Meta contends it received data through its technologies "over multiple steps" in a "sequential, asynchronous" manner. Mot. at 14. Such an assertion is not directly supported by the allegations in the complaint, and is belied by the researchers' report, which suggests simultaneous data flows. *See* Compl. ¶¶ 49, 55; *see also* Narseo Vallina-Rodriguez, et al., *Disclosure: Covert Web-to-App Tracking via Localhost on Android*, LOCAL MESS, https://localmess.github.io/ (describing the first and second components in differing orders).

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

3437202.1

Meta covertly circumvented Android's sandboxing protections to feed its surveillance apparatus vast amounts of reliably identified user browsing information. Meta's business is built on collecting and processing personal data to develop detailed insights into people's behaviors, preferences, and demographics to serve personalized, targeted advertising. *Id.* ¶¶ 18–19. With the precision achieved through the de-anonymization scheme described above, Meta further enriched the detailed profiles it compiled and the information it inferred about each person's behaviors in support of its targeted advertising business. *Id.* ¶¶ 19–21, 35–45.

### C.    Meta avoided detection for nearly a year before it was caught.

Knowing it lacked permission to bypass mobile device security to identify and surveil Android users, Meta took careful steps to prolong and cover up its scheme. *Id.* ¶¶ 56–60, 65, 67, 69; *see also* ECF No. 104 (Google's Mot. to Dismiss) at 17 (Meta's "novel tracking methods" were an "extraordinary" "misuse of Android's functionality"). Over the course of at least ten months, Meta deliberately and repeatedly modified its methods for passing a person's browsing-related identifiers between their web browser (as controlled by the Modified Pixel) and the Modified Meta Apps via localhost ports, refining its technique to circumvent privacy updates and to avoid public detection. Compl. ¶¶ 56–60. As a result, Meta successfully shielded its misconduct from Google, web browser developers, and website developers who were puzzled as to why Meta's Pixel was communicating with localhost ports. *Id.* ¶¶ 65, 67, 73.

The reactions to revelations of Meta's misdeeds are telling. The same day researchers publicly reported their findings, Meta immediately "decided to pause" its scheme. Compl. ¶ 69. Upon learning of the same, Google confirmed that Meta's "invasive techniques" had "violate[d] the terms of service for [Google's] Play marketplace and the privacy expectations of Android users," in a manner that "blatantly violate[d] [Google's] security and privacy [principles]." *Id.* ¶ 65. Likewise, Firefox developer Mozilla denounced Meta's behavior as "severe violations of [its] anti-tracking policies." *Id.* ¶ 67.

## III.    STATEMENT OF THE ISSUES TO BE DECIDED

Whether Plaintiffs' complaint plausibly alleges Article III standing (Rule 12(b)(1)), and whether the complaint alleges claims upon which relief can be granted (Rule 12(b)(6)).

3437202.1

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

## IV.    ARGUMENT

### A.    Plaintiffs suffered a concrete privacy injury sufficient to confer Article III standing.

As this Court and others have recognized, Plaintiffs' allegations satisfy the standing requirement of Article III because the alleged collection and identification of Plaintiffs' web browsing activity "allowed [Meta] to: (1) build a profile reflecting [Plaintiffs'] personal information; and (2) interfere with [Plaintiffs'] ability to remain anonymous." *Deivaprakash v. Condé Nast Digital*, 798 F. Supp. 3d 1100, 1107, 1107 n.4 (N.D. Cal. 2025) (Lin, J.); *see, e.g.*, *Krzyzek v. OpenX Techs., Inc.*, No. 25-CV-05588-SI, 2026 WL 206855, at *3 (N.D. Cal. Jan. 27, 2026); (standing established where defendant syphoned browsing activity "across the internet" into unique profiles); *Shah v. MyFitnessPal, Inc.*, No. 25-CV-04430-PCP, 2026 WL 216334, at *3 (N.D. Cal. Jan. 27, 2026) (standing established where plaintiffs were promised "that their individual information would not be shared because they could opt out of unnecessary cookies, and yet it was shared"); *Tsering v. Meta Platforms, Inc.*, No. 25-CV-01611, 2026 WL 89320, at *3 (N.D. Cal. Jan. 12, 2026) (Lin, J.) (standing established where "Meta was able to monetize [plaintiffs'] data by collecting it, creating comprehensive user profiles, incorporating it into its advertising products, and selling it for advertising purposes"); *Gilligan v. Experian Data Corp.*, No. 25-CV-02873-RFL, 2026 WL 32259, at *2 (N.D. Can. Jan. 6, 2026) (Lin, J.) (standing established where defendant engaged in "unauthorized widespread tracking and data collection, allowing [it] to compile detailed profiles of each [p]laintiff's online web browsing activity tied to their email address and other personal identifiers"); *Camplisson v. Adidas Am., Inc.*, No. 25-CV-603-GPC-KSC, 2025 WL 3228949, at *6 (S.D. Cal. Nov. 18, 2025) (standing established where plaintiffs alleged "a violation of privacy, particularly in the control of their own information" where "[t]rackers on [d]efendant's website . . . collected a broad set of their personal identifying and addressing information without their consent"); *Gabrielli v. Motorola Mobility LLC*, No. 24-CV-09533-JST, 2025 WL 1939957, at *6 (N.D. Cal. July 14, 2025) ("allegations that Motorola deprived [plaintiff] control of personal information regarding his digital activity and profile [were] sufficient to establish a concrete injury to his right to privacy"); *Deivaprakash*, 2025 WL 2779193, at *2 (concrete privacy injury sustained where plaintiff "allege[d] that internet trackers allowed third parties to generate profiles reflecting his personal information").

Meta's argument misconstrues Plaintiffs' allegations as being similar to the "generalized concerns"

3437202.1

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

addressed by the Ninth Circuit in *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025). Mot. at 8. But *Popa* involved a challenge to the defendant's use of session-replay technology to track a user's interactions with a website, rather than her personal or private information. *Popa*, 153 F.4th at 786. Critically, the information recorded in *Popa* was also anonymous. *Id.* at 787 & n.1 (website had configured the third-party software to exclude the user's "street number and zip code"). As this Court and others in the District have since observed, the tracking at issue in *Popa* was limited to "plaintiff's non-sensitive interactions with a single website." *Gilligan*, 2026 WL 32259, at *2. "*Popa* did not set out a new rule of law for Article III standing, but rather applied the same common law rules to the individual circumstances of that case." *Krzyzek*, 2026 WL 206855, at *3 n.5. Indeed, *Popa* confirmed that the Ninth Circuit's decision in *Facebook Tracking*—where it reasoned that Facebook's continued nonconsensual tracking of users "in order to receive and compile [the plaintiffs'] personally identifiable browsing history . . . no matter how sensitive or personal" was sufficient to establish a concrete injury—"remains good law." *Deivaprakash*, 2025 WL 2779193, at *1 (quoting *Facebook Tracking*, 956 F.3d at 598).

The comprehensive de-anonymization of Android users' browsing activity alleged here stands in stark contrast to the superficial and anonymous tracking alleged in *Popa*. Here, Plaintiffs allege that Meta systematically de-anonymized users' detailed browsing activities for nearly a year to build and enrich "a real-time comprehensive profile of [each] Plaintiff . . . and [their] Internet activity," Compl. ¶¶ 96, 102, 108, 114, doing so "even if users were 'not logged in to Facebook [or] Instagram . . . on their mobile browsers,' or if they took affirmative steps to protect their privacy," *id.* ¶ 72; *see also id.* ¶¶ 18–19, 22–23, 25, 35, 37–38, 40–45, 61–62. If anything, such allegations are closer to those at issue in *Facebook Tracking*, where "Facebook continued to collect [plaintiffs'] data after they had logged off the social media platform," "'no matter how sensitive' or personal users' browsing histories were," which it then correlated "with users' personal Facebook profiles," "gain[ing] a cradle-to-grave profile without users' consent." *Facebook Tracking*, 956 F.3d at 598–99 (citations omitted). Accordingly, Plaintiffs' allegations that Meta deprived them of their control of their personal information by compiling detailed user profiles of private web browsing activities across the internet are sufficient to establish a concrete violation of their privacy rights for purposes of Article III standing. *See Camplisson*, 2025 WL 3228949, at *6 ("[*Popa*] is distinguishable from the facts presented in this case, where the collection of Plaintiffs' information concerns their person, is

much broader in scope, and has been found to be a privacy harm in a wide variety of cases."); *Harris v. iHeartMedia, Inc.*, No. 25-CV-06038-EKL, 2026 WL 247875, at *1–2 (N.D. Cal. Jan. 29, 2026) (finding "the extent of tracking in *Popa* was significantly less intrusive" than iHeart's continuous tracking and collection of users' identifying information to build comprehensive profiles).

**B.    Meta's consent-based affirmative defense fails.**

"Consent is an affirmative defense for which defendant bears the burden of proof." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) (citation modified). To establish actual consent, a defendant must demonstrate that the disclosures, understood by a reasonable person, "explicitly notify users of the conduct at issue." *Id.* (citation modified). Courts are directed to consider "whether the circumstances, considered as a whole, demonstrate that a reasonable person understood that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Id.* (citation omitted). "If [a] user could have plausibly understood the disclosures as *not* disclosing that the defendant would engage in particular conduct, then the disclosures are insufficient to establish consent." *Id.* (citation modified). Here, Meta fails to carry its burden of proof: nothing in the hundreds of pages of disclosures Meta submits in support of its Motion would have put a reasonable person on notice of Meta's de-anonymization scheme.[3]

**1.    Meta's policies do not disclose the alleged misconduct.**

The Ninth Circuit has long held that for consent to be effective, the person alleging harm must have consented "to the *particular conduct*, or to substantially the same conduct," and the alleged tortfeasor cannot have exceeded the scope of that consent. *Id.* (emphasis added) (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012)); *see also Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 847 (N.D. Cal. 2014) (disclosure must be "specific enough to establish that users expressly consented"). Here, pointing to various disclosures that it broadly "collects," "receives," and "uses" information from third parties, Meta argues that it "explicitly notif[ied]" users of the practice of de-anonymizing people's browsing activity on their mobile devices. *See* Mot. at 2–4, 10–12. Even assuming Plaintiffs could have and did agree to terms containing these disclosures, they simply cannot establish consent to Meta's conduct here.

Meta identifies the following statements from its Privacy Policy and Cookies Policy as evidence of

---

[3] As reflected in Plaintiffs' response to Meta's Request for Judicial Notice, filed concurrently herewith, the Court need not consider these disclosures to conclude that Meta has failed to establish consent. Nevertheless, as discussed below, Plaintiffs' claims are plausible even in light of those disclosures.

user consent: (1) Meta "collect[s] and receive[s] information from [third parties (including, as relevant here, websites employing the Meta Pixel)] about a variety of your information and activities on and off our Products"; (2) "some examples of information we receive about you" include, among other things, "[y]our device information," "[w]ebsites you visit and cookie data, like through Social Plugins or the Meta Pixel," "[p]urchases and transactions you make," and "how you use our partners' products and services"; (3) third parties "also share information like your email address, cookies, and advertising device ID with us"; (4) "Meta uses cookies and receives information when you visit those sites [i.e., websites that incorporate Meta technologies, including the Meta Pixel] . . . including device information and information about your activity"; and (5) third parties "may also choose to share information with Meta from cookies set in their own websites' domains," including "cookies named . . . _fbp."  Mot. at 2–3; ECF Nos. 102-1 (Privacy Policy) at 8, 102-5 (Cookies Policy) at 5–6.  Taken together, these statements disclose that, through the Meta Pixel, third parties may elect to disclose a variety of information—including from the _fbp cookie—to Meta.  *See also* Compl. ¶¶ 3, 20, 24–32.

Critically, these statements do not disclose Meta's de-anonymization scheme.  As an initial matter, Meta's admittedly broad disclosures about a "general practice" of tracking people (Mot. at 1) are "too general to conclusively establish consent."  *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 823 (N.D. Cal. 2020).  Courts in this District have repeatedly held that Meta's broad disclosures about receiving data from third parties (like the ones it relies on now) are insufficient to establish consent for specific conduct not referenced in those disclosures.  *See, e.g.*, *Frasco v. Flo Health, Inc.*, No. 21-CV-00757-JD, 2025 WL 2680068, at *20 (N.D. Cal. Sept. 17, 2025) ("There was more than enough evidence at trial for the jury to conclude that [plaintiffs] did not consent to the recording of their answers to the onboarding survey because a reasonable user could find Meta's privacy disclosure too ambiguous to explicitly notify users of the conduct at issue.") (citation modified)); *Doe v. GoodRx Holdings, Inc.*, No. 23-CV-00501-AMO, 2025 WL 2052302, at *9 (N.D. Cal. July 22, 2025) ("A reasonable user reading [Meta's] broad disclosures . . . about the general use of the tracking technologies on the GoodRx Platform, when reading them together with the portions of GoodRx's policies . . . and its Co-CEO's express promises . . . would reasonably think they were not consenting to the sharing and interception of sensitive medical information.").  Here, the cited disclosures say nothing whatsoever about the de-anonymization scheme: there was no disclosure that the

- 8 -

Modified Pixel would automatically open a covert communication channel on one's mobile device, and no disclosure that the Modified Pixel and Modified Meta Apps would, together, simultaneously transmit detailed browsing activity to Meta's servers while pairing a person's pseudonymous browsing-related identifier (the _fbp cookie) with Meta account information to render that browsing activity completely identifiable. *See* Compl. ¶¶ 3, 31–32, 55, 61–64.[4]  In fact, even sophisticated website developers who deployed the Modified Pixel and Google itself claim they were not aware of Meta's scheme until it was publicly revealed.  Compl. ¶ 73; *see* ECF No. 104 (Google's Mot. to Dismiss) at 11 (contending Google did not foresee Meta's "exploitation technique").  This reading of Meta's disclosures is particularly reasonable when read in conjunction with Google's promises to Android users that it would "keep your phone and data private, safe, and secure," and that users could "choose when to share certain sensitive data with apps [they] download."  Compl. ¶¶ 77, 79.  A reasonable person, having no reason to doubt Google's representations, would therefore assume the privacy and security of their browsing activity would be protected against Meta's de-anonymization scheme.

Accordingly, because Meta's de-anonymization scheme was never disclosed, no reasonable person could have consented to it.  *See, e.g.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1064 (N.D. Cal. 2021) (general disclosure that "never mentions private browsing mode" could not establish consent to collection of data from users in private browsing mode); *Facebook Tracking*, 956 F.3d at 602 (no consent to tracking of logged-out users where Facebook "failed to acknowledge" such conduct); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 824 (consent to Google's collection of voice data does not extend to its data disclosure of same to third parties); *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1073 (N.D. Cal. 2016) (consent to Yelp's "access" to user contact data does not extend to Yelp's "upload" of data to its servers); *Campbell*, 77 F. Supp. 3d at 848 (disclosure that Facebook may use information it receives for "data

---

[4] This is not a garden-variety Meta Pixel case.  Meta unhelpfully cites three such cases where disclosures were found to explicitly notify users about the exact data-sharing practices at issue.  *See M.D. v. Google LLC*, No. 24-CV-06369-AMO, 2025 WL 2710095, at *4–5 (N.D. Cal. Sept. 23, 2025) (no consent to sharing private health information where former privacy policies "ma[d]e no reference to disclosure of privacy health information to Meta or Google for purposes of online advertising," whereas changed privacy policy established consent because it "makes clear" defendant would share users' personal data with Meta and Google, including for advertising); *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1052, 1056 (N.D. Cal. 2025) (plaintiffs consented to the disclosure of their personal information and browsing activity to Facebook because website "clearly disclose[d]" it used cookies and "explicitly state[d]" users' information would be shared with third parties); *Washington v. Flixbus, Inc.*, No. 3:25-CV-00212-H-MSB, 2025 WL 1592961, at *4 (S.D. Cal. June 5, 2025) (similar).

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

analysis" did not establish consent for "the scanning of message content for use in targeted advertising"); *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013) (disclosure that Google may review emails to exclude objectionable content did not constitute consent to interception of emails for purposes of creating user profiles or targeted advertising).[5]

Nor does Meta's reference to a disclosure about "event match quality" demonstrate user consent. *See* Mot. at 4, 11 (citing ECF No. 102-8). As that disclosure makes clear, the Meta Pixel is normally *incapable* of identifying a person (e.g., by using their Meta account information in the Meta Apps) on a mobile device, and event matching is employed precisely because the person's true identity is unavailable. *See* Mot. at 12 n.3 (conceding parameters like email and IP addresses alone only "potentially enable" identification). Instead, Meta relied on a probabilistic scoring system to make inferences about one's identity, *see* ECF No. 102-8 at 1("Meta calculates a score from 0 to 10 based on the quality of customer information.")—exactly the type of uncertainty Meta sought to eliminate by opening a backdoor in Android mobile devices. In any event, that disclosure makes no mention of the de-anonymization achieved by the Modified Pixel and Modified Meta Apps, and therefore cannot establish consent to Meta's misconduct.[6]

### 2. The lack of limiting language in Meta's disclosures does not cure its failure to obtain consent.

Meta alternatively argues that Plaintiffs consented to its de-anonymization scheme because "Meta made no . . . promise" that it would *not* do so. Mot. at 11–12. A reasonable person, Meta argues, would have no "reasonable basis to believe that Meta lacked the ability to collect an identifier like the _fbp cookie through a mechanism like the Subject Functionality." *Id.* This argument strains credulity. Even if Meta affirmatively disclosed that it had the *ability* to associate people's detailed browsing activities with their

---

[5] Meta continues to reference inapposite cases where plaintiffs were notified that the defendant would share data with or receive data from third parties; however, Meta's de-anonymization scheme does not concern third-party data sharing. *See Lloyd v. Facebook, Inc.*, No. 23-15318, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024) (finding Facebook's policy gave "clear notice" that third parties may share data with Facebook); *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 956 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) (finding Facebook disclosed its practices of collecting users' data from third parties and using that data for advertising); *Silver v. Stripe Inc.*, No. 4:20-CV-08196-YGR, 2021 WL 3191752, at *2–4 (N.D. Cal. July 28, 2021) (privacy policy conspicuously disclosed that Instacart may share data with third parties for advertising purposes).

[6] Meta uses a similar-sounding term, "identity-matching" throughout its briefing, in a seeming attempt to characterize the alleged misconduct as simply an extension of its "event match" process. Setting aside the accuracy of that term, it is found nowhere in the disclosures Meta submits.

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

real-world identities on mobile devices—which it did not—such a disclosure could not establish consent to Meta actually *carrying out* the de-anonymization of those browsing activities. *In re Google Inc.*, 2013 WL 5423918, at \*13. Indeed, the allegations in Plaintiffs' complaint amply support the conclusion that a reasonable person would have generally understood the opposite—that Meta's technologies (i.e., its Meta Pixel and Meta Apps) were programmed to function according to industry norms on sandboxing principles and the proper use of communications protocols over localhost ports. *See* Compl. ¶¶ 1–2, 47, 50–60.

### 3.    Disclosures about user privacy controls do not establish consent.

Lastly, Meta argues that Plaintiffs somehow consented to its de-anonymization scheme based on the existence of "a variety of tools to view, manage, download, and delete your information." *See* Mot. at 3–4 (citing ECF Nos. 102-1 at 61, 102-5 at 12–13, 102-7 at 2) & 12. But Meta makes no attempt to suggest such tools would have actually prevented the de-anonymization of users' browsing activities, let alone why users would understand the existence of such tools to disclose a de-anonymization scheme that circumvented Android's sandboxing protections. By way of example, while one such tool pertaining to "activity off Meta" purportedly allows users to "control or disconnect the information *businesses send to Meta*," it is far from clear that a reasonable person would understand this control to prevent Meta's de-anonymization scheme. *See* ECF No. 102-7 at 1.

Plaintiffs plausibly allege that such "protections would not have done any good, even if users had employed them." *Facebook Tracking*, 956 F.3d at 605; *see In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 150 (3d Cir. 2015) (no consent to tracking where Google overrode "plaintiffs' cookie blockers, while concurrently announcing in its Privacy Policy that internet users could 'reset your browser to refuse all cookies.'"); Compl. ¶¶ 64, 72 (alleging Meta's conduct bypassed common privacy protections, such as private browsing modes, VPNs, and cookie clearing, and thereby "eliminated the possibility of such user control"). And in any event, because the alleged misconduct was not disclosed (*see supra* Section IV.B), "the opportunity to opt-out cannot create consent." *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1040 (S.D. Cal. 2023); *see Deivaprakash*, 798 F. Supp. 3d at 1106 ("[I]f Deivaprakash did not know about the data collection, he could not have exercised his right to opt out.").

For these reasons, Meta has failed to establish consent. At worst, should the Court determine "the contract language at issue is reasonably susceptible to more than one interpretation," Meta's Motion should

be denied. *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 823; *see McCoy v. Alphabet, Inc.*, No. 20-CV-05427-SVK, 2021 WL 405816, at *6 (N.D. Cal. Feb. 2, 2021) ("At the motion to dismiss stage, the Court is not prepared to rule that the Privacy Policy establishes an absolute bar to Plaintiff's claims.").

### C.    Plaintiffs state cognizable invasion of privacy claims.

Courts consider claims for invasion of privacy under the California Constitution and intrusion upon seclusion together and "ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Facebook Tracking*, 956 F.3d at 601 (citing *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009)). Plaintiffs have alleged facts sufficient to support both claims.

#### 1.    Plaintiffs allege a reasonable expectation of privacy.

Meta's argument that "Plaintiffs cannot plausibly allege a reasonable expectation of privacy in the data collected" rests solely on the notion that they consented to Meta's de-anonymization scheme. Mot. at 24. For the reasons stated above, Meta cannot establish such consent and its argument necessarily fails.

Meta does not otherwise dispute that Plaintiffs allege facts sufficient to support a reasonable expectation of privacy, considering "the amount of data collected, the sensitivity of data collected, the manner of data collection, and the defendant's representations to its customers." *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 941 (N.D. Cal. 2023) (citation omitted). Here, for ten months, Meta amassed a vast collection of data tying the detailed web browsing activities (i.e., every time a person visited a website with the Modified Pixel) of millions of Android mobile device users to their real-world identities. Compl. ¶¶ 1, 4, 18, 24–32, 49, 52–53, 55–64. While such data pertaining to even one website would be sensitive, this data was particularly highly sensitive in the aggregate because it allowed Meta to build and enrich detailed profiles of millions of people, an exploit it could not previously accomplish with the same precision and consistency. Compl. ¶¶ 18–19, 55, 62. Despite Meta's arguments that the websites visited were "mundane" or did not reveal information "sensitive in nature," *see* Mot. at 15, 17, 33, such information in combination can reveal deep insights and paint a detailed picture of an individual's beliefs, habits, motivations, fears, and other highly personal characteristics. *See, e.g.*, *Katz-Lacabe*, 668 F. Supp. 3d at 942 ("accumulation of a vast repository of personal data" from sources including Plaintiffs' browsing activity and online communications "contravene[d] the reasonable expectation of privacy"); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1087 (N.D. Cal. 2025) ("tracking of individuals' activity across

thousands of websites, combined with extensive offline records . . . to generate uniquely identifying profiles on those individuals is sufficient to allege intrusion into privacy" (citation modified)); *Gilligan*, 2026 WL 32259, at *2 (no expectation of privacy where defendant "engages in unauthorized widespread tracking and data collection, allowing it to compile detailed profiles of each Plaintiff's online web browsing activity tied to their email address and other personal identifiers").

The nature of Meta's de-anonymization scheme is also relevant.  Meta knowingly and purposefully violated industry norms and well-accepted principles of internet security (e.g., sandboxing).  Compl. ¶¶ 1–5, 25, 47–60; *see, e.g.*, *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 132, 151 (3d Cir. 2015) ("[A] user would also reasonably expect that her activated cookie blocker meant her URL queries would not be associated with each other due to cookies" where "cookie blockers were well-known to industry participants."); *Opperman*, 205 F. Supp. 3d at 1073 ("Apple's privacy guidelines suggest that app users had a reasonable expectation of privacy in knowing how their data would be used, and the breach of those guidelines suggests that Yelp exceeded the scope of users' consent when it uploaded Contacts data without explicit permission.").  And Meta did so out of sight from, and without providing any notice to, its users, website developers, and web browser developers.  Compl. ¶¶ 5, 7, 48; *see supra* Section IV.B; *Facebook Tracking*, 956 F.3d at 603 (plaintiffs adequately alleged a reasonable expectation of privacy where challenged conduct was not disclosed).

### 2.    Meta engaged in highly offensive conduct.

In its attempt to minimize the severity of its conduct, Meta neglects to cite to any Ninth Circuit case examining the "highly offensive" standard (*see* Mot. at 15, 23–24)—including, notably, the Ninth Circuit's instruction that the ultimate question of whether Meta's de-anonymization scheme "could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage." *Facebook Tracking*, 956 F.3d at 606.

Here, Meta's practice of collecting vast amounts of de-anonymized web browsing data from which it could infer sensitive insights about them goes well beyond routine commercial behavior.  Compl. ¶¶ 18–19, 61–66.  As Plaintiffs allege, Meta's de-anonymization scheme was implemented in secret and in contravention of industry norms and Android's sandboxing protections, and was transparently motivated by a desire to maximize its collection of identifiable browsing data it could monetize for advertising purposes.

Compl. ¶¶ 18–19, 56–66.  Such allegations plausibly support the conclusion that Meta's conduct was highly offensive.  *See Gilligan*, 2026 WL 32259, at *2 ("compil[ing] detailed profiles of each [p]laintiff's online web browsing activity tied to their email address and other personal identifiers" was highly offensive); *Selby v. Sovrn Holdings, Inc.*, No. 25-CV-03139, 2025 WL 2950164, at *3 (N.D. Cal. Oct. 17, 2025) (Lin, J.) (same); *Riganian*, 791 F. Supp. 3d at 1088 (degree of offensiveness of "alleged aggregation, synthesis, and sale of comprehensive online and offline data of individuals without their knowledge" could not be determined on the pleadings).

Meta's actions were also deceitful, as reflected in its attempts to avoid detection and its decision to stop immediately after the conduct was exposed.  Compl. ¶¶ 56–60, 69, 130.  *See In re Google Location Hist. Litig.*, 514 F. Supp. 3d 1147, 1157 (N.D. Cal. 2021) ("Courts have held that deceit can be a kind of plus factor that is significant in making a privacy intrusion especially offensive." (citation modified)); *McDonald v. Kiloo ApS*, 385 F. Supp. 3d 1022, 1036 (N.D. Cal. 2019) ("While courts have found this kind of 'plus' factor to be significant in establishing an expectation of privacy or making a privacy intrusion especially offensive, no court has held deceit to be a requirement of an intrusion claim."); *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 293 (2009) (defendant's attempt to hide video equipment to avoid detection indicated his surveillance was highly offensive).[7]

### D.    Plaintiffs plausibly allege CIPA §§ 631, 632, 635, and ECPA violations.

#### 1.    Meta illegally intercepted Plaintiffs' communications and not just the rerouted cookie.

As explained above in Section IV.B, Plaintiffs never authorized Meta to de-anonymize their detailed browsing activity.  Plaintiffs therefore plausibly allege that Meta had no consent to intercept *any of their communications* or the content thereof[8] using the undisclosed Modified Pixel and Modified Meta Apps.  *See* Compl. ¶¶ 92, 98, 104, 110.

Courts in this District sustain wiretapping claims where, like here, the defendant's use of plaintiffs'

---

[7] Notably, the only other company that has been found to be engaging in this conduct is "Russian-based Yandex [Metrica]."  ECF No. 104-4 (Trebicka Decl., Ex. 2) at 2.

[8] Meta's claim that Plaintiffs "do not plausibly allege that [it] intercepted or recorded the content of any of Plaintiffs' communications" and that Meta only intercepted the Rerouted Cookie is wrong.  Mot. at 13. Meta's cases about the kinds of data points that do not comprise content are irrelevant.  *See id.* 13–14 (citing *In Re Zynga Priv. Litig*, *Brodsky v. Apple Inc.*, *In re Carrier IQ, Inc.*, and *Svenson v. Google Inc.*).

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

3437202.1

data was unauthorized.  For example, in *Campbell v. Facebook*, the court upheld Plaintiffs' ECPA and CIPA claims, rejecting Facebook's consent defense because "any consent with respect to the processing and sending of messages itself does not necessarily constitute consent to *the specific practice alleged in this case*—that is, the scanning of message content for use in targeted advertising."  *See Campbell*, 77 F. Supp. 3d at 846–48 (emphasis added); *accord In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 824 (rejecting consent arguments where policies disclosed one use but not the use giving rise to a wiretapping claim).  The same holds true here: Meta's disclosure of how its unmodified, standard Pixel could process Plaintiffs' data does not constitute consent for the materially different and specific data use for which the Modified Pixel and Modified Meta Apps were designed and used.  Consequently, Meta's arguments about the "standard operation of Pixel code" have no relevance to this action, which is predicated exclusively on Meta's use of the Modified Pixel and Modified Meta Apps in an unforeseeable and impermissible manner.  *See* Mot. at 14–15.

Meta's arguments fail for another reason: Meta deployed an entirely different, customized "device" or "instrument" under the ECPA and the CIPA than its "standard" Pixel when it used the Modified Pixel in Android devices.  This constitutes a "separate 'interception'" from any interceptions resulting from the use of its non-modified Pixel.  *See Campbell*, 77 F. Supp. 3d at 840, 847 (Facebook does not have "blanket immunity" to intercept communications via a separate "web crawler" to scan and potentially redirect the content of private messages).  In other words, no matter the scope of any consent Meta may have obtained for Meta's collection of data through its non-modified Pixel, Meta lacked such consent to deploy the Modified Pixel and Modified Meta Apps, which it secretly used to identify and target Plaintiffs.

### 2.    Plaintiffs plausibly allege that Meta intercepted the contents of Plaintiffs' communications.

Under both CIPA and the federal Wiretap Act ("ECPA"), "[c]ontent is defined to include[] any information concerning the substance, purport, or meaning of [the] communication."  *Brown*, 685 F. Supp. 3d at 935 (citation modified); *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) ("The analysis for a violation of CIPA is the same as that under the federal Wiretap Act.").  .  Content includes "the links, pages, and tabs users click and view and the search terms they employ."  *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024); *see also In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d

778, 795 (N.D. Cal. 2022) (holding "a URL disclosing a search term or similar communication made by the user could constitute a communication") (citation modified); *Facebook Tracking*, 956 F.3d at 605 (finding search terms and URLs are contents because they "could divulge a user's personal interests, queries, and habits").

Plaintiffs plainly allege that Meta intercepted the content of their communications under relevant case law interpreting the wiretapping statues. *Compare* Compl. ¶¶ 3, 24 (Meta collects via the Pixel "the URLs of the webpages visited," the "information . . . the user searched for in a search bar," the "actions the user took on a page (e.g., opened an article, added an item to a shopping cart)," and the "contents of commonly used form fields."), 33 ("Since 2015, the Pixel has transmitted . . . the URL of each page visited on a website[] by default."), 94 (Meta collected online articles viewed by Plaintiff Rose, "what he searched for, and the specific search terms he used"), 100 (same for Plaintiff Cunningham), 106 (same for Plaintiff Velilla), 116 (same for Plaintiff Ginder), 157; *with, e.g.*, *Selby*, 2025 WL 2950164, at *3 (finding "contents" where disclosures of URLs "reflect not only the website visited, but also, for example, search queries and specific items Plaintiffs viewed"); *Smith v. Rack Room Shoes, Inc.*, No. 24-CV-06709, 2025 WL 1085169, at *4 (N.D. Cal. Apr. 4, 2025) (Lin, J.) (finding "contents" where disclosures included users' "URLs, button clicks, and viewing and cart history"); *Krzyzek*, 2026 WL 206855, at *6 (Plaintiffs plausibly allege the content of communications where complaint identifies interception of specific websites visited, that each website page was collected, and that this data was used to create user profiles).

### 3.   Meta intercepted Plaintiffs' communications while in transit.

Meta also argues that Plaintiffs do not plausibly allege its sandboxing scheme "enabled Meta to collect communications while *in transit*," but instead, allege "sequential, asynchronous data processing." Mot. at 14 (emphasis in original). This is incorrect: Plaintiffs plausibly allege that the data flows are intercepted simultaneously while in transit and not sequentially. *See* Compl. ¶¶ 24 ("when the user performs an action on the website . . . the Pixel surreptitious directs the web browser to send a message to Meta's servers . . ."), 49 (describing interception during transmission process), 94 (Plaintiff Rose's search terms intercepted in real time via the Modified Pixel), 100 (same as to Cunningham), 106 (same as to Velilla), 112 (same as to Ginder); *see also supra* note 2. These allegations are sufficient to establish interception "in transit." *See, e.g.*, *Rack Room Shoes*, 2025 WL 1085169, at *4 (interceptions caused by

standard Meta Pixel "occurred 'in transit'"); *Heerde v. Learfield Commc'ns*, *LLC*, 741 F. Supp. 3d 849, 862 (C.D. Cal. 2024) (same).

The cases cited by Meta have no bearing on the facts alleged in this action. *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 877–78 (9th Cir. 2002) (unauthorized access to communications previously stored on a secure website is not interception under the ECPA); *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (determining whether CIPA § 632.7 applies equally to parties and nonparties of cellphone communications, *not* whether CIPA requires simultaneous acquisition of data); *Doe v. Eating Recovery Ctr. LLC*, No. 23-CV-05561-VC, 2025 WL 2971090, at \*5 (N.D. Cal. Oct. 17, 2025) (summary judgment order dismissing CIPA claim following discovery into server-side activity); *see also In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1076–78 (N.D. Cal. 2015) (*Konop* does not preclude wiretapping claims predicated upon acquisition occurring "*during* the transmission process," as alleged in this case (emphasis in original)).

Meta is also wrong that Plaintiffs' wiretapping claims are only predicated upon only subsequent use and not initial interception. The cases cited by Meta concerning subsequent use are thus not relevant here. *See* Mot. at 15 (citing *United States v. Christensen*, 828 F.3d 763, 796 (9th Cir. 2015); *In re High Fructose Corn Syrup Antitrust Litig.*, 216 F.3d 621, 625 (7th Cir. 2000); *Lau v. Gen Digital Inc.*, No. 22-CV-08981-RFL, 2024 WL 1880161, at \*1 (N.D. Cal. Apr. 3, 2024) (Lin, J.).[9]

### E.    Plaintiffs plausibly allege a CIPA § 638.51 claim.

#### 1.    The Modified Pixel and Modified Meta Apps record "routing, addressing, or signaling information."

Plaintiffs allege the Modified Pixel and Modified Meta Apps are, individually and/or collectively, "pen registers" because they record "routing, addressing, or signaling" information—users' IP addresses, device information, HTTP header information, and unique user identifiers (e.g., various cookies). *See*, *e.g.*, Compl. ¶¶ 24, 26–33, 205.  Meta does not dispute that IP addresses fall within this definition, and courts have held that these other types of information Plaintiffs allege that Meta recorded constitute "routing, addressing, or signaling" information—including in cases concerning the Meta Pixel. *Doe v. Talkiatry Mgmt. Servs., LLC*, No. 5:25-CV-00781-SSS-DTBx, 2025 WL 3190813, at \*7 (C.D. Cal. Oct. 1, 2025) (Meta Pixel is a "pen register" because "[i]n determining whether a device is a pen register, courts must

---

[9] Meta does not otherwise dispute that Plaintiffs have sufficiently alleged their CIPA §§ 632 and 635 claims.

look to the type of information being collected" and "[s]oftware that identifies consumers, gathers data, and correlates that data through unique fingerprinting constitutes a pen register") (citation modified); *In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147, 1151-52 (N.D. Cal. 2025) (same); *Fregosa v. Mashable, Inc.*, No. 25-cv-01094-CRB, 2025 WL 2886399, at *5 (N.D. Cal. Oct. 9, 2025) ("Device 'fingerprints' likewise serve as unique identifiers across websites and browsing sessions."); *Camplisson*, 2025 WL 3228949, at *1 ("pen register" alleged where trackers recorded "IP address . . . unique identifiers . . . device details . . . and browser information"); *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 930 (C.D. Cal. 2025) (same where "the software collects not just IP addresses, but also operating system information [and] browser information"); *Wright v. TrueCare Property Holdings, LLC*, No. 3:25-CV-00786-JES-BLM, 2025 WL 3248749, at *4 (S.D. Cal. Nov. 21, 2025) ("Data capable of being associated with a user's identity falls within the statutory definition of addressing information."); *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1102, 1109 (9th Cir. 2014) (noting the "referer header that provided both the user's Facebook ID" constitutes "basic identification and address information").

Nevertheless, Meta contends "[t]he _fbp cookie . . . does not qualify as this sort of information." Mot. at 16. This is wrong. Merriam Webster's dictionary defines an "address" as "a series of usually alphanumeric characters that specifies the storage location (as on a network or in a computer's memory) of particular information." ADDRESS, MERRIAM-WEBSTER'S DICTIONARY. And "routing" means "sending or forwarding by a particular route." *Dealertrack, Inc. v. Huber*, No. CV 06-2335-AG (FMOx), 2008 WL 5792509, at *3 (C.D. Cal. Sept. 27, 2008) (quoting AMERICAN HERITAGE DICTIONARY (4th ed. 2006); *see also* ROUTE, MERRIAM-WEBSTER'S DICTIONARY ("To divert in a specified direction."), *available at* https://www.merriam-webster.com/dictionary/route. That is how Meta used the _fbp cookie here. When users access a website where the Meta Pixel is installed, Meta records various identifiers like the _fbp cookie associated with that communication. *See*, *e.g.*, Compl. ¶¶ 24, 30. And by passing the _fbp cookie through the localhost port, Meta de-anonymized users. *Id.* ¶ 49. In other words, Meta used the _fbp cookie to direct user information through the localhost port to a specific user profile, in the same way that a bank account and routing number would be used to direct funds to a specific account. Thus, at minimum, the _fbp cookie is "addressing" or "routing" information. Moreover, neither the identifiers within the _fbp cookie, nor the _fbp cookie itself, are the "contents" of Plaintiffs' communications because "the 'electronic

3437202.1

communication' at issue is the transmission of the HTTP request from the user's . . . smartphone to [a] website." *Shah v. Fandom*, 754 F. Supp. 3d 924, 929 (N.D. Cal. 2024) (Lin, J.).

On this point, *Tsering* is distinguishable. In *Tsering*, 2026 WL 89320, at \*6, this Court held the plaintiff did not "adequately allege what exactly the electronic communication at issue was, and thus fail[ed] to allege that the information collected did not constitute the content of such communication." In other words, the allegations in *Tsering* did not sufficiently distinguish the "dialing, routing, addressing, or signaling" information from "the content of the underlying communication." Here, by contrast, Plaintiffs allege that the _fbp cookie and other identifiers are associated with their communications to access the mobile websites, and that the _fbp cookie is used to connect users (route their information) to specific profiles (addresses). Compl. ¶¶ 24, 30, 49. And in *Bradshaw v. Lowe's Cos., Inc.*, No. 25CV0742 DMS (MMP), 2025 WL 3171740, at \*5 (S.D. Cal. Nov. 12, 2025)—on which Meta also relies—the plaintiffs' claim was "limited to the capture of their IP addresses," and they did not show that "other PII, specifically, the user's MUID, device information, and browser information, constitutes dialing, routing, addressing, or signaling information." *Id.*, at \*4–5 (citation modified). Plaintiffs' claim here is not so limited and they have shown above why the other recorded information falls within the ambit of CIPA § 638.50(b).

### 2. The Modified Pixel and Modified Meta Apps are pen registers that capture "routing, addressing, or signaling information."

Meta argues its Modified Pixel and Modified Meta Apps cannot be "pen registers" based on Plaintiffs' allegation that they collect the IP addresses transmitted by their Android devices in connection with outgoing requests to websites on which the Modified Pixel is embedded (*see* Compl. ¶ 215), because "a pen register does not capture the IP address of the device it is *installed* on, but rather it captures the *outgoing* IP addresses the device is *communicating with*.") (emphasis in original). Meta acknowledges this Court has previously considered and rejected its position:

> Nothing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register . . . By the plain meaning of § 638.50(b), collection of the recipient phone number or IP address is not a required element. All that is required is that the Trackers record addressing information transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to [a] website, *regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue*.

*Shah*, 754 F. Supp. 3d at 929 (emphasis added). Every federal court to have addressed this question since has reached the same conclusion. *See*, *e.g.*, *Harris*, 2026 WL 247875, at *2 (rejecting argument that "the trackers are not pen registers because they only collect information about the source of communications made to the Website (*i.e.*, his device), rather than the outgoing dialing, routing, addressing, or signaling information sent from that source" (citation modified)); *Krzyzek*, 2026 WL 206855, at *9 (rejecting argument that a "pixel is not a pen register because it records a user's own information, and is therefore not akin to the numbers dialed on a telephone"); *Nelson v. Reddit, Inc.*, No. 25-CV-1470 JLS (AHG), 2026 WL 445627, at *4 (S.D. Cal. Feb. 17, 2026) ("The Court is not persuaded that the definition of pen register requires the collection of only outgoing data."); *Wright*, 2025 WL 3248749, at *4 ("Data capable of being associated with a user's identity falls within the statutory definition of addressing information.").

Meta does not provide a compelling reason for the Court to reconsider its prior reasoning. *First*, Meta argues "[t]he statute defines a 'pen register' as capturing the routing information 'transmitted by' a device, *i.e.*, the routing information *sent* by a device to direct a communication to its destination." Mot. at 17–18 (emphasis in original). But users' IP addresses and unique identifiers are sent by their devices, and the information is used to direct communications as noted above. *See supra* Section IV.E.1. The statutory definition of a "pen register," as this Court previously held, only requires the information to be "transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to [a] website." *Shah*, 754 F. Supp. 3d at 929. Meta claims that its interpretation is needed to square the definition of a "pen register" with the definition of a "trap and trace device," but an easier way to square those provisions is to find that a "trap and trace device" captures information associated with a communication *to* a user's computer or device, while a "pen register" captures information associated with a communication *from* a user's computer or device. This accords with the purpose of the CIPA to "protect the right of privacy of the people of this state," *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002) (citation modified), which supports a reading that the subject of the statute—that is, the person to whom information is "incoming" or "outgoing"—is the user, not Meta. *See Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1077 (C.D. Cal. 2024) (finding the plaintiff who visited the website was the relevant "user" for CIPA § 638.51(b)(5), not the website). Beyond that, it does not matter who the information concerns, as this Court held in *Shah*.

Meta also argues its interpretation "accords with how the terms 'pen register' and 'trap-and-trace'

have long been interpreted by courts." Mot. at 18. But again, "[n]othing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Shah*, 754 F. Supp. 3d at 929. And "the Court's analysis must begin with the statutory text, and if that text is clear, must end there." *Id.*; *see Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (noting "[t]he text of a law controls over purported legislative intentions unmoored from any statutory text") (citation modified).

Similarly, and citing several cases, Meta argues that "[h]ad the California legislature intended to outlaw practices basic to the functioning of the internet, surely it would have given a clearer indication of that intent." Mot. at 19. To be sure, this case has nothing to do with basic internet functionality. However, the California Legislature could not have been more clear in its intent by adopting a broad definition of a "pen register"—identical to the modern Federal Pen Register Act (18 U.S.C. § 3127(3)), which has long been held to apply to the collection of IP addresses. *See, e.g.*, *Fregosa*, 2025 WL 2886399, at *9 ("The statutory text is deliberately expansive, designed to encompass new technologies and apply to conduct like that alleged here."); *Shah*, 754 F. Supp. 3d at 933 ("The pen register statute is broadly written, and under California law, is to be interpreted broadly to protect privacy and to be applied to new techniques and technologies."); *In re Application of U.S. for an Order Authorizing Use of A Pen Register & Trap On (XXX) Internet Service Account/User Name [xxxxxxxx@xxx.com]*, 396 F. Supp. 2d 45, 47 (D. Mass. 2005). In other words, "[t]his elephant has never hidden in a mousehole; it has been standing before us all along." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 680 (2020). "[T]he limits of the drafters' imagination supply no reason to ignore the law's demands" and there is no "such thing as a 'canon of donut holes,' in which [the legislature's] failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, when [the legislature] chooses not to include any exceptions to a broad rule [as here], courts apply the broad rule." *Id.* at 653, 669.

*Second*, Meta claims Plaintiffs' (and this Court's) interpretation "would have absurd consequences" (at least as to IP addresses) because "internet-connected devices capture the IP addresses of other devices all the time." Mot. at 19. Courts have repeatedly found this kind of hyperbolic rhetoric "to be overstated." *Fregosa v. Mashable, Inc.*, No. 25-CV-01094-CRB, 2026 WL 183857, at *2 (N.D. Cal. Jan. 23, 2026); *Lewis v. Magnite, Inc.*, No. 2:25-CV-03448-MWC-SSCx, 2025 WL 3687546, at *13 (C.D. Cal. Dec. 4,

2025) ("Defendant's prophecy has not come to fruition in the last few years since other courts have interpreted CIPA as this Court does."). Further, Meta is not a website operator here. It is a third party surreptitiously using the Modified Pixel and Meta Apps to de-anonymize Plaintiffs and class members without their consent. As this Court recognized, "[a] user who consents to disclose their IP address to [a website] as part of accessing its website does not necessarily consent to disclose their IP address to [a] third part[y] operating [a] [t]racker[]." *Shah*, 754 F. Supp. 3d at 932; *see also id.* at 932 n.3 (distinguishing *Capitol Recs. Inc. v. Thomas-Rasset*, No. CIV 06-1497(MJD/RLE), 2009 WL 1664468, at *3 (D. Minn. June 11, 2009), which Meta cites). And Plaintiffs do not allege that Meta—a *third party* here—"violated CIPA simply by receiving IP addresses as part of an ordinary online exchange," but rather, surreptitiously "for profiling and advertising purposes." *Fregosa*, 2025 WL 2886399, at *7. Thus, the "*further . . .* transmission of [Plaintiffs'] IP addresses" and other information to Meta—an unconsented-to third party— has no effect on "basic internet function[ality]." *Drummer v. Costar Grp., Inc.*, No. EDCV 25-1047 JGB (SPX), 2025 WL 3190656, at *4 (C.D. Cal. Oct. 22, 2025) (emphasis in original).[10]

Moreover, while technologies like the "anti-virus software" Meta describes (Mot. at 19) may not be "pen registers" pursuant to the carveout in Cal. Pen. Code § 638.50(b), Meta's technology—used here to de-anonymize class members to build dossiers about them to facilitate further targeting and monetization—is not exempt. *Walsh v. Dollar Tree Stores, Inc.*, No. 25-CV-01601-SVK, 2025 WL 2939229, at *18 (N.D. Cal. Oct. 16, 2025) ("The [c]omplaint implicates not only Essential Cookies, which may be subject to the carveout . . . but also Analytics Cookies and Advertising Cookies, which are not . . . ." (citation modified)). Regardless, whether these other technologies "might not qualify as" pen registers "are questions for future cases." *Bostock*, 590 U.S. at 681.[11]

---

[10] To the extent that Meta argues it had Plaintiffs' consent to collect their IP addresses and other identifiers through its *standard* Meta Pixel, that argument has no bearing here. *See supra* Section IV.D.1. Not only did Meta collect this information through its *Modified* Pixel—which was undisclosed—but also through its Modified Meta Apps when Plaintiffs were not even using those apps

[11] Meta also argues that Plaintiffs' interpretation would bring the CIPA "would bring the statute into conflict with federal law—which allows law enforcement to obtain the IP address of a computer with a mere subpoena, rather than a court order." Mot. at 19 n.10 (citation modified). Not so. Under the Stored Communications Act—which Meta cites—government entities may request information from "[a] provider of electronic communication service" using "an administrative subpoena authorized by a Federal *or State* statute." 18 U.S.C. § 2703(c)(2)(E) (emphasis added). It is unclear why a government's after-the-fact request for IP address information from an electronic communications services provider would constitute a "pen register." And it is also unclear why a court order under the CIPA would not constitute an

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

*Finally*, Meta argues that because "CIPA is a criminal statute to which the rule of lenity applies, any such sweeping reading of the statute is unjustified." Mot. at 19 (citation modified). But "[t]he rule of the common law, that penal statutes are to be strictly construed, has no application to this Code." Cal. Pen. Code § 4. Moreover, the rule of lenity only applies "when a criminal statute contains a grievous ambiguity or uncertainty." *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (citation modified). And here, the CIPA "contains no grievous ambiguity." *Fregosa*, 2025 WL 2886399, at *9. The California Supreme Court has rejected the rule of lenity's application to other unambiguous provisions of CIPA. *See LoanMe*, 11 Cal. 5th at 202 (declining to apply rule of lenity to CIPA § 632.7). Likewise, this Court and every other federal court to adjudicate this question has rejected the rule of lenity's application to CIPA §§ 638.50-638.51. *See Deivaprakash*, 798 F. Supp. 3d at 1108 ("[T]he application of the CIPA to the allegations . . . does not require the interpretation of any ambiguities in the statute."); *Riganian*, 791 F. Supp. 3d at 1094 ("LiveRamp . . . has not established [] any 'grievous ambiguity' in the statute's express language."); *Nelson*, 2026 WL 445627, at *6 ("The Court again follows other courts addressing similar arguments and finds that there is no ambiguity regarding the application of §§ 638.50 and 638.51 to these facts."). *Doe*, 2025 WL 2971090, is inapt, as that decision evaluated CIPA § 631, not CIPA §§ 638.50–638.51, and appears in tension with the *LoanMe* and the preliminary provisions of the Penal Code in any event.

## F.    Plaintiffs plausibly plead a CDAFA claim.

As to Plaintiffs' CDAFA claim, Meta principally argues that Plaintiffs have not plausibly alleged that it acted "without permission" in taking copying, accessing, using, and altering Plaintiffs' data and computers, in violation of Cal. Pen. Code §§ 502(c)(1)–(4), (6)–(8). *See* Mot. at 20–22.[12] Courts in this District agree that defendants act "without permission" in a variety of circumstances. *See, e.g.*, *Brown*, 525 F. Supp. 3d at 1075 (circumvention of user-imposed privacy barriers); *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1073–74 (N.D. Cal. 2018) (users given no notice or ability to remove or opt-out of a hidden code's functionality); *Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780 JW, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010) (access or use "in a manner that overcomes technical or code-based barriers"). Here, Plaintiffs have adequately alleged facts to support the conclusion that Meta

"administrative subpoena."

[12] Cal. Pen. Code § 502(c)(8) does not contain the "without permission" requirement.

- 23 -

knowingly acted without permission in at least three independent respects.

*First*, Meta acted without permission by surreptitiously deploying the Modified Pixel and Modified Meta Apps to de-anonymize Plaintiffs' browsing activity in real time, which Plaintiffs did not authorize, or even know was occurring. *See Greenley*, 684 F. Supp. 3d at 1049 ("Code hidden in embedded software may plausibly use or take computer data 'without permission.'"); *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1074 (N.D. Cal. 2018) (hidden code, even in voluntarily-installed software, may plausibly violate CDAFA if users have no notice the code is operating and have no way to remove or opt out of its functionality); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d at 1099–1101 (same); *Esparza v. Kohl's, Inc.*, 723 F. Supp. 3d 934, 94–45 (S.D. Cal. 2024) (same). Here, Plaintiffs had no notice that Meta had deliberately and repeatedly revised its code in the Modified Pixel and Modified Meta Apps to avoid detection. *See* Compl. ¶¶ 56–60, 65, 67, 69; *see also id.* ¶¶ 48, 49, 55, 62.

*Second*, by re-routing the _fbp cookie through a backdoor channel to circumvent Android's sandboxing protections, Meta knowingly accessed people's mobile devices "in a manner that overcomes technical or code-based barriers." *See Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780 JW, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010). As reflected in Plaintiffs' allegations, Meta understood that (i) the communication protocols it used to perpetrate its de-anonymization scheme (i.e., HTTP, Websocket, and WebRTC) were not designed for hiding user data, *see* Compl. ¶¶ 55–60; (ii) localhost ports were not intended to facilitate covert communication between apps, *see id.* ¶¶ 52–53; and (iii) sandboxing protocols are "a fundamental principle of modern internet security," *id.* ¶ 1, 77. Despite this understanding, Meta made an "end-run around" a built-in privacy framework. *See Greenley*, 684 F. Supp. 3d at 1049; Compl. ¶¶ 78, 65–67 (Both Google and Mozilla Firefox publicly declared Meta's conduct a "severe violations of our anti-tracking policies"). Meta's efforts to overcome these barriers and avoid detection reflect its knowledge "that any access gained through such action [was] unauthorized." *Power Ventures*, 2010 WL 3291750, at *11; *Margolis v. Apple Inc.*, 743 F. Supp. 3d 1124, 1136 (N.D. Cal. 2024) (allegations inferring Apple's knowledge were sufficient for CDAFA).[13]

---

[13] Meta's direct knowledge here is unlike the second-hand knowledge alleged in *Tsering.*, 2026 WL 89320. There, the Court found implausible that Meta would have "known that *third-party app developers* were not disclosing [its] geolocation tracking to consumers" based on Meta's limited disclosures to the app developers. *Id.* at *4.

*Third*, Meta acted without permission by defeating user-level privacy controls. *See Brown*, 525 F. Supp. 3d at 1075 (nullifying users' ability to prevent access to their data circumvents any user-imposed technical barriers and is therefore "without permission") (citation omitted)). In *Brown*, plaintiffs plausibly alleged Google acted "without permission" when it "render[ed] ineffective any barrier that [p]laintiffs implemented" by continuing to transmit their data to Google without notice while they used its private browsing mode. 525 F. Supp. 3d at 1075. Here, too, as Meta provided no notice to users of its de-anonymization scheme, it also did not offer any method for disabling such a scheme. Moreover, it rendered ineffective other user-initiated anonymization controls such as private browsing modes, VPNs, and the clearing cookies from browsers. Compl. ¶¶ 64, 72.

Meta's reliance on *Oracle USA Inc. v. Rimini Street Inc.*, 879 F.3d 948, 962 (9th Cir. 2018), *rev'd in part*, 586 U.S. 334 (2019), and *Brodsky*, 445 F. Supp. 3d 110 is misplaced. In both cases, the court held there could be no CDAFA violation because defendants' conduct did not access data that they were otherwise unauthorized to access. *See Oracle*, 879 F.3d at 962 (no CDAFA violation in the automated downloading of data to which access was otherwise permitted); *Brodsky*, 445 F. Supp. 3d at 116–17, 132 (enabling two-factor authentication did not provide Apple access to information unique from other login methods). In contrast, here, Plaintiffs challenge far more than just the method by which Meta accessed otherwise permitted data. Plaintiffs allege that without circumventing sandboxing protocols, Meta lacked the capability (or consent) to associate a user's anonymous web browsing data with the identifying information in their social media profiles. Compl. ¶¶ 1, 55, 62.

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant Meta's Motion to Dismiss. To the extent the Court grants the Motion in any respect, Plaintiffs respectfully request leave to amend pursuant to Fed. R. Civ. P. 15(a) to cure any such deficiencies. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017).[14]

---

[14] Plaintiffs voluntarily dismiss their unjust enrichment claim without prejudice. *Selby*, 2025 WL 2950164, at *4 ("Plaintiffs' unjust enrichment claim must be dismissed . . . because Plaintiffs have failed to allege that they lack an adequate remedy at law."); *Gilligan*, 2026 WL 32259, at *4 (same).

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

3437202.1

Dated:  February 20, 2026

Respectfully submitted,

By: */s/ Douglas Cuthbertson*
        Douglas Cuthbertson

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Michael W. Sobol (SBN 19485)
msobol@lchb.com
Michael K. Sheen (SBN 288284)
msheen@lchb.com
Amelia A. Haselkorn (SBN 339633)
ahaselkorn@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Douglas I. Cuthbertson (*pro hac vice*)
dcuthbertson@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile:  212.355.9592

**BURSOR & FISHER, P.A**.
Philip L. Fraietta (State Bar No. 354768)
pfraietta@bursor.com
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656

**BURSOR & FISHER, P.A**.
Yitzchak Kopel (*pro hac vice*)
ykopel@bursor.com
Max S. Roberts (SBN 363482)
mroberts@bursor.com
Victoria X. Zhou (*pro hac vice*)
vzhou@bursor.com
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa D. Brown (SBN 301313)
abrown@ahdootwolfson.com

3437202.1

- 26 -

PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS
CASE NO. 3-25-CV-04674-RFL

Sarper Unal (SBN 341739)
sunal@ahdootwolfson.com
Lisa Cintron (SBN 356009)
lcintron@ahdootwolfson.com
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

**MILBERG, PLLC**
Mariya Weekes (*pro hac vice*)
333 SE 2nd Avenue, Suite 2000
Miami, FL, 33131
Tel: (786) 879-8200
Fax: (786) 879-7520

**MILBERG, PLLC**
Gary M. Klinger (*pro hac vice*)
William Edelman (SBN 285177)
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
gklinger@milberg.com
wedelman@milberg.com

*Interim Class Counsel*

3437202.1