LATHAM & WATKINS LLP
Serrin Turner (*pro hac vice*)
 serrin.turner@lw.com
Nicolas Luongo (*pro hac vice*)
 nicolas.luongo@lw.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Brad Baglien (*pro hac vice*)
 brad.baglien@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
 melanie.blunschi@lw.com
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

*Attorneys for Defendant
Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re Meta Android Privacy Litigation.<br><br>This Document Relates To:<br>All Actions | Case No. 3:25-cv-04674-RFL<br><br>**DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS CLASS ACTION COMPLAINT**<br><br>Hearing: March 24, 2026<br>Time:   10:00 a.m.<br>Location: Courtroom 15—18th Floor<br>Judge: Hon. Rita F. Lin |

## **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................................... 1

II.     ARGUMENT .................................................................................................................. 2

      A.      Plaintiffs' Standing Arguments Fail ................................................................. 2

      B.      Plaintiffs' Consent Arguments Fail .................................................................. 3

      C.      Plaintiffs' Wiretapping Arguments Fail............................................................ 7

      D.      Plaintiffs' Pen Register Arguments Fail ........................................................... 9

      E.      Plaintiffs' CDAFA Arguments Fail ................................................................ 12

      F.      Plaintiffs' Common-Law Arguments Fail ....................................................... 14

III.    CONCLUSION............................................................................................................. 15

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Aviles v. Liveramp, Inc.*,
2025 WL 487196 (Cal. Super. Jan. 28, 2025) ..........................................................................10

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ....................................................................................6

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) .......................................................................................3, 5, 6

*Camacho v. DG Premium Brands LLC*,
No. 24STCV21672 (Cal. Super. Apr. 17, 2025).......................................................................10

*Campbell v. Facebook Inc.*,
77 F. Supp. 3d. 836 (N.D. Cal. 2014) ........................................................................................8

*Camplisson v. Adidas Am., Inc.*,
2025 WL 3228949 (S.D. Cal. Nov. 18, 2025) ...........................................................................3

*Crowley v. CyberSource Corp.*,
166 F. Supp. 2d 1263 (N.D. Cal. 2001) ...................................................................................11

*Deivaprakash v. Condé Nast Digital*,
798 F. Supp. 3d 1100 (N.D. Cal. 2025) (Lin, J.) .......................................................................3

*Doe v. Eating Recovery Center LLC*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) ...................................................................................12

*Doe v. GoodRx Holdings, Inc.*,
2025 WL 2052302 (N.D. Cal. July 22, 2025).............................................................................6

*Doe v. Wirta*,
2019 WL 13472128 (N.D. Cal. Apr. 10, 2019) ........................................................................15

*Esparza v. Gen Digital Inc.*,
2024 WL 655986 (C.D. Cal. Jan. 16, 2024) ..............................................................................8

*Esparza v. Kohl's, Inc.*,
723 F. Supp. 3d 934 (S.D. Cal. 2024).......................................................................................15

*Facebook, Inc. v. Power Ventures, Inc.*,
2010 WL 3291750 (N.D. Cal. 2010) ........................................................................................13

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ...........................................................................................13, 14

*Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*,
  2014 WL 2213910 (N.D. Cal. May 28, 2014) ..................................................................12

*Frasco v. Flo Health, Inc.*,
  2025 WL 2680068 (N.D. Cal. Sept. 17, 2025) ...................................................................6

*Gabrielli v. Motorola Mobility LLC*,
  2025 WL 1939957 (N.D. Cal. July 14, 2025) .....................................................................3

*Gilligan v. Experian Data Corp.*,
  2026 WL 32259 (N.D. Cal. Jan. 6, 2026) (Lin, J.) ............................................................3

*Greenley v. Kochava, Inc.*,
  684 F. Supp. 3d 1024 (S.D. Cal. 2023)............................................................................13

*Hammerling v. Google LLC*,
  615 F. Supp. 3d 1069 (N.D. Cal. 2022) ...........................................................................15

*Heeger v. Facebook, Inc.*,
  509 F. Supp. 3d 1182 (N.D. Cal. 2020) ...........................................................................15

*Heiting v. HP Inc.*,
  2025 WL 2993673 (Cal. Super. Aug. 1, 2025)............................................................10, 11

*Hubbard v. Google LLC*,
  2024 WL 3302066 (N.D. Cal. July 1, 2024)......................................................................15

*In re Facebook, Inc. Internet Tracking Litigation*,
  956 F.3d 589 (9th Cir. 2020) .........................................................................................2, 6

*In re Google Assistant Privacy Litigation*,
  457 F. Supp. 3d 797 (N.D. Cal. 2020). ..............................................................................8

*In re Google Inc.*,
  2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ...................................................................6

*In re iPhone Application Litig.*,
  2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) .................................................................12

*In re iPhone Application Litig.*,
  844 F. Supp. 2d 1040 (N.D. Cal. 2012) ...........................................................................15

*Krzyzek v. OpenX Techs., Inc.*,
  2026 WL 206855 (N.D. Cal. Jan. 27, 2026)........................................................................3

*Lakes v. Ubisoft, Inc.*,
  777 F. Supp. 3d 1047 (N.D. Cal. 2025) .............................................................................5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

iii

META'S REPLY ISO MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-04674-RFL

*Lau v. Gen Digital Inc.*,
2024 WL 1880161 (N.D. Cal. Apr. 3, 2024) (Lin, J.),
*aff'd*, 2025 WL 3002610 (9th Cir. Oct. 27, 2025) ...................................................................8

*Lloyd v. Facebook, Inc.*,
2023 WL 1802415 (N.D. Cal. Feb. 7, 2023) .........................................................................4

*Lloyd v. Facebook, Inc.*,
2024 WL 3325389 (9th Cir. July 8, 2024)........................................................................4, 14

*Lopez v. Apple, Inc.*,
519 F. Supp. 3d 672 (N.D. Cal. 2021) ................................................................................15

*Opperman v. Path, Inc.*,
205 F. Supp. 3d 1064 (N.D. Cal. 2016) ................................................................................6

*Oracle USA, Inc. v. Rimini St., Inc.*,
879 F.3d 948 (9th Cir. 2018) ...................................................................................12, 13, 14

*People v. Achrem*,
213 Cal. App. 4th 153 (2013) .............................................................................................10

*People v. Guiamelon*,
205 Cal. App. 4th 383 (2012) .............................................................................................12

*Phillips v. U.S. Customs & Border Prot.*,
74 F.4th 986 (9th Cir. 2023) .................................................................................................2

*Popa v. Microsoft*,
153 F.4th 784, (9th Cir. 2025) ..........................................................................................2, 3

*Reyes v. Educ. Credit Mgmt. Corp.*,
773 F. App'x 989 (9th Cir. 2019) .........................................................................................3

*Rodriguez v. Google LLC*,
2022 WL 214552 (N.D. Cal. Jan. 25, 2022).........................................................................8

*Rojas v. HSBC Card Servs. Inc.*,
93 Cal. App. 5th 860 (2023) .................................................................................................3

*San Diegans for Open Gov't v. City of San Diego*,
242 Cal. App. 4th 416 (2015) .............................................................................................11

*Shah v. Cap. One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) ..............................................................................11

*Shah v. MyFitnessPal, Inc.*,
2026 WL 216334 (N.D. Cal. Jan. 27, 2026)..........................................................................3

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021)....................................................................3, 5

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ................................................................................4, 6, 7

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
313 F. Supp. 3d 1056 (N.D. Cal. 2018) ........................................................................13

*TransUnion LLC v. Ramirez*,
594 U.S. 413, 426 (2021)..................................................................................................3

*Tsering v. Meta Platforms, Inc.*,
2026 WL 89320 (N.D. Cal. Jan. 12, 2026) (Lin, J.) ..........................................3, 9, 15

*Wagging Tails Prods., Inc. v. Coakley*,
2023 WL 4316777 (C.D. Cal. Feb. 21, 2023)................................................................15

*Weston v. Lefiti*,
2024 WL 4579237 (9th Cir. Oct. 25, 2024)....................................................................3

**STATUTES**

Cal. Pen. Code

§ 4.....................................................................................................................................12
§ 502.................................................................................................................................12
§ 638.50.......................................................................................................................10, 11

**OTHER AUTHORITIES**

Bill Analysis,
Assemb. B. 929, Reg. Sess., (Cal. Apr. 7, 2015) ...........................................................11

## I.    INTRODUCTION

This is an opportunistic lawsuit based on data collection and use that Meta disclosed, that Plaintiffs consented to, and that caused them no harm. Plaintiffs' Opposition confirms it. Despite their inflammatory rhetoric about a "de-anonymization scheme" and "brazen plot," Plaintiffs' Opposition boils down to a complaint that Meta collected information from websites they visited on their mobile devices and linked it to their Facebook accounts—which is just what Meta says it does in its Privacy Policy. Those disclosures are fatal to every claim Plaintiffs assert. They specifically explain that Meta collects identifiers from third-party websites—including the _fbp cookie—and uses them "to match your activities with your account." Plaintiffs fail to explain how their consent to those disclosures does not extend to the conduct alleged here. While Plaintiffs quibble that the Privacy Policy did not disclose the granular code mechanisms involved in the Subject Functionality, they can point to no law requiring Meta to delve into such details. The Privacy Policy made perfectly clear *what data* Meta collected and *what purposes* it used the data for. Meta did not need to publish a technical manual on *how* it did so.

Nor can Plaintiffs fix all the other problems with their case. They have no standing because they fail to allege collection of any sensitive information. Their wiretapping theory collapses because the only data the Subject Functionality transmitted was the _fbp cookie, which is not the contents of any user communication, but merely an identifier generated by a third-party website. Their pen-register claim fails because the _fbp cookie is not used to route any communications from sender to recipient; it is merely an identifier used for advertising purposes. Their CDAFA claim fails because the statute does not reach objections to the method of data collection when the defendant had permission to collect the data in the first place, as Meta had here. Finally, their invasion-of-privacy claims fail for much the same reasons as they lack standing and cannot dispute consent: Plaintiffs agreed to Meta's collection of the information at issue, and they allege only tracking of visits to nonsensitive news and shopping websites—not any highly offensive intrusion into their private affairs.

For all these reasons, the Complaint should be dismissed in its entirety.

## II.    ARGUMENT

### A.    Plaintiffs' Standing Arguments Fail

Under *Popa v. Microsoft*, the mere fact that a plaintiff visited websites using tracking technologies is insufficient for Article III standing absent allegations of "embarrassing, invasive, or otherwise private information collected." 153 F.4th 784, 791 (9th Cir. 2025). Plaintiffs here merely allege they visited "several" non-sensitive websites, and that Meta matched their activity to their user accounts. That is not enough. *Id.*

Plaintiffs try to distinguish *Popa* by suggesting that identity-matching by itself supports standing. It does not. Contrary to Plaintiffs' suggestion, *Popa* did not turn on whether the collected information was anonymous. In fact, the information there was allegedly matched to the user's device, *id.* at 786, and *Popa* held that other identifying information (e.g., plaintiff's "street name") "does not implicate a … sensitive sphere," *id.* at 791. That makes sense, as there is no common-law tradition of recognizing a person's identity as private; rather, what the common law protects are sensitive facts about a person's life.[1] Matching Plaintiff Cunningham's Facebook ID with her visit to nike.com, for instance, does not make that information sensitive—any more than if a clerk had personally observed her in a Nike retail store, or collected her name and email during the checkout process, to adapt *Popa*'s example. *See id*. Shoe-store preferences—like "pet-store preferences"—are simply not the stuff of common-law privacy injury. *Id.*

Nor can Plaintiffs bluff their way to standing through facile comparisons to *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020). That case allegedly involved "cradle-to-grave profiles"—including "sensitive" information—created "without users' consent" and "without affording users a meaningful opportunity to control or prevent" it. *Id.* at 599. Putting aside that the data collection and use here was done *with* Plaintiffs' consent and they *did* have a meaningful opportunity to control or prevent it, *see* Mot. 9-12, the only facts Plaintiffs allege as to how the Subject Functionality affected them are that they each visited "several" non-sensitive

---

[1] *See, e.g.*, *Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 996 (9th Cir. 2023) (explaining that a person's name, address, or similar "identifying information is … a far cry from the types of information that we have held are so sensitive that another's retention of the information is analogous to tortious conduct").

META'S REPLY ISO MOT. TO DISMISS
CLASS ACTION COMPLAINT
CASE NO. 3:25-cv-04674-RFL

websites on their Android devices—which does not add up to a "cradle-to-grave profile." While the Complaint is full of generalized claims that the Subject Functionality enabled Meta to construct "comprehensive profiles" of users, Plaintiffs do not allege *facts* sufficient to show this purported injury happened *to them*. *See Popa*, 153 F.4th at 791-92 (explaining that standing analysis requires "assess[ing] whether the *specific* plaintiffs ha[ve] experienced" a traditional privacy injury, not whether "tracking software *could* be offensive in particular circumstances").[2]

### B. Plaintiffs' Consent Arguments Fail

Plaintiffs' consent arguments do not hold water. To start, Plaintiffs are wrong that Meta "bears the burden of proof" on consent in a CIPA case. Opp. 7 (quoting *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) (describing what "[t]he parties agree[d]" in that case, and citing TCPA case)). "[T]he plaintiff bringing a CIPA claim has the burden to prove that the defendant lacked consent." *Reyes v. Educ. Credit Mgmt. Corp.*, 773 F. App'x 989, 990 n.1 (9th Cir. 2019); *Rojas v. HSBC Card Servs. Inc.*, 93 Cal. App. 5th 860, 889 (2023) ("lack of consent is a required element" of CIPA claims); *see also* Mot. 9 n.2. Thus, consent is grounds for dismissal of a CIPA claim where it is "obvious on the face of a complaint" and from judicially noticeable materials. *See Weston v. Lefiti*, 2024 WL 4579237, at *2 (9th Cir. Oct. 25, 2024); *Silver v. Stripe Inc.*, 2021 WL 3191752, at *2, 4-5 (N.D. Cal. July 28, 2021) (collecting cases).

---

[2] Plaintiffs' cited cases do not support their standing arguments. Several are distinguishable because the allegations concerned collection of sensitive or voluminous information about the plaintiffs' browsing—exactly what is lacking here. *See Krzyzek v. OpenX Techs., Inc.*, 2026 WL 206855, at *3 (N.D. Cal. Jan. 27, 2026) (collection of "sensitive browsing activity"); *Shah v. MyFitnessPal, Inc.*, 2026 WL 216334, at *3 (N.D. Cal. Jan. 27, 2026) ("information … related to personal topics" that were "embarrassing, invasive, or otherwise private information"); *Tsering v. Meta Platforms, Inc.*, 2026 WL 89320, at *1 (N.D. Cal. Jan. 12, 2026) (Lin, J.) ("sensitive information such as where a user lives, works, and receives medical treatment"); *Gilligan v. Experian Data Corp.*, 2026 WL 32259, at *2 (N.D. Cal. Jan. 6, 2026) (Lin, J.) (defendant "compiled detailed profiles by tracking [plaintiffs'] interactions across many websites"). Another case is distinguishable because it addresses statutory standing, not Article III standing. *See Deivaprakash v. Condé Nast Digital*, 798 F. Supp. 3d 1100, 1107 (N.D. Cal. 2025) (Lin, J.) ("Article III standing is different from, and not to be measured by, statutory standing"). Two others found standing based merely on the fact that plaintiffs had alleged a statutory privacy violation—which is clearly incorrect given the holding in *TransUnion LLC v. Ramirez* that the "creation of a statutory prohibition … does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." 594 U.S. 413, 426 (2021); *compare id.*, *with Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957, at *6 (N.D. Cal. July 14, 2025) (reasoning that CIPA "codif[ies] a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing"), *and Camplisson v. Adidas Am., Inc.*, 2025 WL 3228949, at *6 (S.D. Cal. Nov. 18, 2025) (same).

Plaintiffs' consent is indeed apparent here. The Ninth Circuit has squarely held that Facebook users cannot state a claim against Meta for "collecting and using their browsing data" because Meta's policies clearly disclose that it "maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes." *Smith v. Facebook, Inc.*, 745 F. App'x 8, 8-9 (9th Cir. 2018); *see Lloyd v. Facebook, Inc.*, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024).[3] Plaintiffs acknowledge these very disclosures in their Complaint, conceding that Meta "disclose[d] … the _fbp cookie" and "the variety of information" it collects, Opp. 8, and they do not dispute that they, like "all users" of Facebook, consented to the disclosures, *Lloyd v. Facebook, Inc.*, 2023 WL 1802415, *1 (N.D. Cal. Feb. 7, 2023).

Plaintiffs instead try to gerrymander their consent, arguing that Meta did not disclose its "de-anonymization scheme."  That tactic fails because Meta plainly disclosed that it engages in identity-matching. Tellingly, Plaintiffs' Opposition fails to address the language in Meta's Privacy Policy specifically stating  it uses identifiers from third-parties to "match your activities with your account, if you have one," in order to "provide a personalized experience to you, including ads." Ex. A, ECF No. 102-1, at 8, 22. The reason Plaintiffs ignore that language is obvious—it dooms their claims. Using identifiers to "match your activities with your account" *is* "de-anonymization." Likewise, personalizing a user's experience necessarily involves *matching data to the user.*

Plaintiffs half-heartedly argue that Meta failed to disclose that it *can* or *does* match browsing activity on user mobile devices to their Meta profiles; but the arguments do not withstand scrutiny. Contrary to Plaintiffs' baffling assertion, Meta's disclosures nowhere represent that it "is normally *incapable* of identifying a person … on a mobile device." Opp. 10. The disclosures specifically state that Meta collects identifiers from third-party websites for purposes of matching activity to users' accounts—including on mobile devices.[4] While Plaintiffs point to a Meta help

---

[3] Plaintiffs cannot distinguish *Lloyd* and *Smith* by arguing that the conduct here "does not concern third-party data sharing." Opp. 10 n.5. It most certainly does: Third-party websites share the _fbp cookie sent via the Subject Functionality, *e.g.*, ¶ 30 (explaining that "the _fbp cookie …is offered by and unique to the website the user is visiting"). And they share the event data matched to it. This is exactly the sort of collection and use of third-party data alleged in *Lloyd* and *Smith*.

[4] *See* Ex. A at 8 (explaining that device information and other identifiers are received from third-party websites and used for identity-matching), 15 ("Devices include … phones"), 16-17 ("Identifiers we collect include device IDs [and] mobile advertiser ID").

page reflecting that some identifiers are "more likely" than others to enable Meta to match event data to an account, Ex. H, ECF No. 102-8, at 1 (cited at Opp. 10), that hardly implies Meta is "normally incapable" of identifying users. Quite the opposite: It means there are a variety of methods by which Meta may do so.

Plaintiffs similarly err in arguing that Meta's disclosure of "the *ability* to" match event data with user identities does "not establish consent to Meta actually *carrying out*" the matching. Opp. 10-11. That is not the law. "Privacy policies often make disclosures by stating what companies 'may' do, and such disclosures have been upheld time and again by courts as sufficient to establish consent." *Silver*, 2021 WL 3191752, at *4 (collecting cases). Besides, Meta's Privacy Policy describes actual conduct, not hypothetical ability: It affirmatively states that Meta "collect[s] and receive[s]" information from third-party websites and that this data "helps us match activities with your account." No user could read the policy and reasonably conclude that Meta does not actually engage in such matching.

Meta thus plainly discloses *what* it does—it uses information from websites to match activities to accounts and deliver personalized experiences. So Plaintiffs resort to demanding detailed disclosure of *how* Meta does it, complaining that "there was no disclosure that the Modified Pixel would automatically open a covert communication channel on one's mobile device, and … that the Modified Pixel and Modified Meta Apps would, together, simultaneously transmit detailed browsing activity to Meta's servers while pairing a person's pseudonymous browsing-related identifier (the _fbp cookie) with Meta account information to render that browsing activity completely identifiable." Opp. 8-9. No law requires such "granular disclosure" of technical processes—which would be incomprehensible to average users anyway. *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1056 (N.D. Cal. 2025); *see Calhoun*, 113 F.4th at 1149 ("[T]he governing standard is what a 'reasonable user' of a service would understand they were consenting to, not what a technical expert would."). Consent requires a reasonable person to have "understood *that* an action would be carried out"—not precisely *how*. *Calhoun*, 113 F.4th at 1147 (emphasis added).

Plaintiffs' cited cases are distinguishable on this basis: They concern disclosures that allegedly failed to adequately disclose what data the defendant collected or what purposes it used

the data for.[5] Plaintiffs identify no case requiring specific consent to the technical *means* of data collection or use that is otherwise disclosed. That is unsurprising, as the consent inquiry looks to "the conduct at issue." *Id.* Underlying techniques like "open[ing] a … communication channel" or "transmit[ting] … to Meta's servers," Opp. 9, are not the "conduct at issue." Rather, the conduct that allegedly injured Plaintiffs is the *matching* (or de-anonymization, as they call it). So the consent inquiry properly operates at that level of specificity/generality: Was the *matching* disclosed? The answer here is yes, as Meta told users it would use identifiers like the _fbp cookie to "match your activities with your account." Ex. A at 8. Plaintiffs accepted that policy, and they thereby consented to the conduct of which they now complain.[6]

Finally, Plaintiffs have no cogent response to Meta's disclosures about the privacy controls it offers users. Those disclosures told Plaintiffs how to restrict Meta's identity-matching practices if they wished, including using Meta controls to "disconnect" any "off-Meta activity" from their accounts. Plaintiffs do not allege they used those controls, which only underscores their consent to Meta connecting their off-Meta activity to their accounts. That also distinguishes this case from ones like *Facebook Tracking*, where users had no "opportunity to control or prevent" the conduct at issue. 956 F.3d at 598-99. Plaintiffs suggest that Meta's controls were unclear because they refer to Meta disconnecting "the information *businesses send to Meta*," Opp. 11; but the controls are perfectly clear that they apply to "information that businesses and organizations share with us

---

[5] *E.g.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1064-66 (N.D. Cal. 2021) (incognito browsing data collected, contrary to disclosures); *Facebook Tracking*, 956 F.3d at 602 ("Plaintiffs have plausibly alleged that Facebook set an expectation that logged-out user data would not be collected, but then collected it anyway"); *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1073 (N.D. Cal. 2016) ("permission to look at data does not equate with permission to take [i.e., collect] it"); *In re Google Inc.*, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013) (consent to collection for the purpose of blocking "objectionable content" did not extend to using data "for the purposes of creating user profiles or providing targeted advertising"); *Doe v. GoodRx Holdings, Inc.*, 2025 WL 2052302, at *9 (N.D. Cal. July 22, 2025) (no consent to collect "sensitive medical information"); *Frasco v. Flo Health, Inc.*, 2025 WL 2680068, at *20 (N.D. Cal. Sept. 17, 2025) (similar).

[6] Along the same lines, whether "sophisticated website developers" or Google were aware of Meta's "technique," Opp. 9, is irrelevant because the consent inquiry looks to whether *users* were told about *what data Meta collected and how it was used*—not what non-users understood about Meta's specific techniques (which may be trade secrets, after all). Also irrelevant are "Google's promises to Android users" that *Google* "would 'keep your phone and data private, safe, and secure,' and that users could 'choose when to share certain sensitive data with apps they download.'" Opp. 9. Meta's disclosures govern the consent analysis, and Meta "is not bound by promises it did not make." *Smith*, 745 F. App'x at 9.

about your interactions with them such as visiting their apps or websites," Ex. G, ECF No. 102-7, at 1—exactly what Plaintiffs profess to be concerned about. Plaintiffs also argue that they "plausibly allege that such protections would not have done any good, even if users had employed them." Opp. 11 (quotations omitted). But the only allegations they cite (¶¶ 64, 72) are about *non*-Meta controls—e.g., using VPNs or private browsing modes—which have nothing to do with the efficacy of Meta's controls.

### C.    Plaintiffs' Wiretapping Arguments Fail

Plaintiffs' wiretapping arguments do nothing but kick up dust in an effort to conflate the standard operation of Pixel code with the Subject Functionality they challenge here. Meta's receipt of event data from third-party websites—which Plaintiffs contend to be their "communications"—occurs as part of the standard operation of Pixel code. Plaintiffs have no basis to dispute their consent to that collection, because it occurs *with or without* the Subject Functionality, and because Meta plainly discloses it. As the Ninth Circuit has stated, "[a] reasonable person viewing [Meta's] disclosures would understand that [Meta] … collect[s] its users' data from third-party sites." *Smith*, 745 F. App'x at 8-9. The Subject Functionality did not involve any *additional* collection of user communications, because the only content it allegedly transmitted to Meta is the _fbp cookie—an identifier generated by a third-party website, not a user communication. Mot. 5, 13-14; *see also* ¶ 49 (alleging "Meta's scheme" involved "modifying the Pixel to route a user's *browsing-related pseudonymous identifiers located in the _fbp cookie*" to Meta via the Meta app) (emphasis added)).

Recognizing this, Plaintiffs pivot to challenging Meta's *use* of their data as opposed to its collection. They argue that they "never authorized Meta to de-anonymize their detailed browsing activity," and that this somehow means Meta retroactively "had no consent to intercept *any of their communications* or the content thereof." Opp. 14. Putting aside that Plaintiffs *did* consent to Meta "de-anonymizing" their browsing activity, the alleged de-anonymization occurred—necessarily—only *after* the activity was collected. (Data can be processed only after being received, after all.[7]) And the "wiretapping statutes … are directed at the unauthorized *interception* of communications,

[7] Specifically, here, de-anonymization is alleged to have occurred through the linking of the _fbp cookie to the user's account on the Meta app and the transmission of that linked data to Meta's servers—both of which occurred *after* the user's communication to the website. ¶¶ 49, 55.

not any subsequent storage and/or use." *Lau v. Gen Digital Inc.*, 2024 WL 1880161, at *1 (N.D. Cal. Apr. 3, 2024) (Lin, J.), *aff'd*, 2025 WL 3002610 (9th Cir. Oct. 27, 2025).[8]

Plaintiffs' two cited cases do not suggest otherwise and do not support Plaintiffs' arguments. In *In re Google Assistant Privacy Litigation*, the court distinguished between consent to collection of communications versus consent to their disclosure to third-parties in sustaining a *Stored Communications Act* claim based on the disclosure; but it explicitly *rejected* the plaintiffs' reliance on that subsequent use with respect to their wiretapping claims, which it explicitly *dismissed* because the plaintiffs had consented to "the initial recording of [their] conversations." 457 F. Supp. 3d 797, 824, 828 (N.D. Cal. 2020). And in *Campbell v. Facebook Inc.*, the court recognized that a wiretapping claim could not be based on the subsequent use of intercepted communications, but it found that the conduct alleged appeared to involve routing "the content of plaintiffs' private messages" to third-parties, which "could constitute a 'redirection' of the contents of users' messages, and therefore, a separate 'interception' under the Wiretap Act." 77 F. Supp. 3d. 836, 840, 846-48 (N.D. Cal. 2014). Allegations about a "separate 'interception'" of the contents of Plaintiffs' communications are exactly what are missing here.

Plaintiffs fare no better with the "in transit" element. They cite two cases for the proposition that "interceptions caused by standard Meta Pixel" were "in transit," Opp. 16-17, but that does not help Plaintiffs, since (as Plaintiffs concede) their claims do not (and cannot) rest on the "standard Pixel," Opp. 15. When it comes to the Subject Functionality, Plaintiffs have "merely restated the pleading requirement of real time interception[,] which is insufficient to state a claim." *Esparza v. Gen Digital Inc.*, 2024 WL 655986, at *4 (C.D. Cal. Jan. 16, 2024); *see Rodriguez v. Google LLC*, 2022 WL 214552, at *2 (N.D. Cal. Jan. 25, 2022) ("Using the word 'intercept' repeatedly is simply not enough."). What matters is the *facts* Plaintiffs allege about the Subject Functionality, and those facts reflect sequential data processing, not "simultaneous" collection: The _fbp cookie was sent from browser to localhost port, then the Meta app received it, and only then did the app send it on

---

[8] Indeed, Plaintiffs expressly frame their wiretapping arguments as being about Meta's "use" of their data. *See* Opp. 14-15 (arguing that Meta's "use of plaintiffs' data was unauthorized"), 15 (arguing that Plaintiffs did not consent to the "specific data use" facilitated by the Subject Functionality). That is not what the wiretapping laws are about.

to Meta servers. *See* Mot. 14; Opp. 3. All of this happened *after* the user's "communication" to the website (which is not even what the Subject Functionality transmitted), so Plaintiffs have no basis to argue the Subject Functionality collected data (let alone communication contents) in transit.

### D.    Plaintiffs' Pen Register Arguments Fail

Plaintiffs' arguments as to CIPA's pen register provision distort the provision beyond recognition and would render its scope essentially boundless.

First, Plaintiffs argue that the _fbp cookie—the only data point allegedly sent to Meta by the Subject Functionality—qualifies as "dialing, routing, addressing, or signaling information." Opp. 18-19. It does not. It is merely an identifier used for *advertising*—not routing a communication—just like the "unique device identifiers" this Court deemed outside the statute's scope in *Tsering*. 2026 WL 89320, at *6. Plaintiffs nonetheless try a Hail Mary, arguing the _fbp cookie constitutes "routing" information because Meta uses it to "connect" event data to profiles. Opp. 18-19. The argument is risible. All sorts of information can be used to make connections between different data points. If that were all it took to qualify as "routing information," then virtually any computer code would constitute a pen register. Routing information instead is information used by *communications providers* to route a communication *from sender to recipient*. The _fbp cookie is not alleged to have been used in any such manner. Mot. 16-17. Moreover, Plaintiffs continue to ignore that the _fbp cookie is the *content* transmitted to Meta by the Subject Functionality. Plaintiffs cannot allege that the "routing information" that supposedly makes the Subject Functionality a "pen register" is the very content it conveys. Mot. 17 n.8.

Nor can Plaintiffs rely on the collection of a user's IP address as the basis for their claim. To start, the Complaint does not even make any allegations about the Subject Functionality collecting a user's IP address. But in any event, Meta's Privacy Policy expressly informs users that it collects their IP addresses—both from third-party websites and directly from users' devices. *See* Ex. A at 7 ("Device information we collect and receive includes … your IP address."); *id.* at 8 (explaining that Meta also receives device information from third-party websites). The Court thus need not address whether the mere collection of a device's IP address constitutes the operation of a "pen register," because Plaintiffs consented to Meta collecting their IP addresses regardless.

To the extent the Court wishes to consider it, however, Plaintiffs' position is untenable. Plaintiffs construe the words of the statute in isolation, without regard to its structure—which makes clear that a "pen register" is meant to be the counterpart to a "trap and trace." A trap and trace, as the statute expressly states, is for collecting information about "the source" of communications sent *to* the device the trap and trace is placed on, Cal. Pen. Code § 638.50(c). The logical counterpart to that is a process for collecting information about the *destination* of communications sent *by* the subject device—which is what a pen register does, by capturing the routing information "transmitted by" the device, i.e., the information needed to route its communications outward. *Id.* § 638.50(b). Nowhere does the pen register definition refer to collecting information about "the source" of the communications sent *by* the device the pen register is placed on. It would make no sense to interpret the definition that way—because the source is the device itself, which one must know to install a pen register on it to begin with.[9]

Moreover, Plaintiffs have no real answer to the absurd consequences their interpretation of the statute entails. California law is clear that "statutory language should not be given a literal meaning if it would result in absurd consequences that the Legislature did not intend." *People v. Achrem*, 213 Cal. App. 4th 153, 157 (2013). And the consequences of Plaintiffs' construction are, truly, absurd. If any process for collecting a device's IP address constitutes a "pen register," then every device on the internet is operating a pen register—*and every internet user is therefore a criminal*—because devices must collect the IP addresses of other devices for internet communication to work.[10] Plaintiffs try to play down this point by suggesting that the statute only

---

[9] *See, e.g., Aviles v. Liveramp, Inc.,* 2025 WL 487196, at *2 (Cal. Super. Jan. 28, 2025) (explaining that a pen register collects the IP address "of a website accessed by a computer—but not the computer's own IP address"); *Heiting v. HP Inc.*, 2025 WL 2993673, at *3 (Cal. Super. Aug. 1, 2025) (concluding that technology that "identif[ies]  the source of the incoming … communications to [a] [w]ebsite" "is not a trap and trace device" because it does not "allow[] Defendant to monitor who else contacts Plaintiff"); Ex. I, *Camacho v. DG Premium Brands LLC*, No. 24STCV21672, Order at 2-3 (Cal. Super. Apr. 17, 2025) (holding that statute covers capture of "outgoing data identifying who the subject is contacting and incoming data identifying who is contacting the subject," but does not prohibit merely collecting the subject's IP address).

[10] *See Aviles*, 2025 WL 487196, at *3 (rejecting pen register claim based on IP address collection that was not "above and beyond how the internet normally works"); *Heiting*, 2025 WL 2993673, at *4 ("If CIPA broadly prohibits any process by which anyone identifies any 'originating number,' then every cell phone in the world—which identify the phone number of incoming calls—would

applies where IP addresses are collected by "a third party." But CIPA's pen register provision does not purport to have any "party exception." Plaintiffs cannot insist the statute be construed literally, yet then read in exceptions to escape the absurdities of that construction.

Nor do Plaintiffs have any satisfying response to the point that many commonplace internet technologies involve the collection of IP addresses by third parties. For example, a website may protect itself from DDOS attacks by routing all traffic through a vendor to screen out IP addresses associated with botnets; a company may pass all incoming email through a vendor that can block IP addresses associated with spam; an online merchant may seek to prevent fraud by using a vendor to check whether purchasers' IP addresses are suspicious. Plaintiffs suggest that such technologies might fall under the "carveout" in the pen register definition, Opp. 22, but the suggestion is nonsensical, as the carveout only applies to processes used by communications services providers for "billing" or "accounting" (which yet again confirms the pen register provision is about "to" information, as providers historically billed based on outgoing phone calls). Cal. Pen. Code § 638.50(b).[11] Otherwise, Plaintiffs merely shrug their shoulders and say that whether these technologies qualify as "pen registers" are questions for "future cases." Opp. 22. No—these questions matter *now*, as they go to whether Plaintiffs' construction entails absurd consequences.

"When it appears that a literal interpretation of a statute may lead to absurd results, a review of the legislative history is proper." *San Diegans for Open Gov't v. City of San Diego*, 242 Cal. App. 4th 416, 429 (2015). And the history of CIPA's pen register provision leaves no mystery about its purpose: The legislature was seeking to create a statutorily protected privacy interest in information about "which people" a person is "communicating *with*," as such to/from information is not protected constitutionally. Ex. J, Bill Analysis, Assemb. B. 929, Reg. Sess., at pp. T-U (Cal. Apr. 7, 2015); *see id.* at p. X (explaining that pen register laws were enacted in response to case

be a prohibited trap and trace device. So would every website interaction that identifies electronic information about the user in a manner that allows the website to function.").

[11] Nor does a mere ordinary website qualify as a communications services provider, rendering the carveout doubly inapplicable to these examples. *See, e.*g., *Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1055 (N.D. Cal. 2025) ("Because Defendant's website does not allow customers to send and receive messages to third parties, Defendant is not an electronic communication service."); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1270 (N.D. Cal. 2001) (holding that online merchant such as Amazon is not an electronic communication service provider).

law holding that "individuals have no Fourth Amendment expectation of privacy in the numbers *dialed to or from* their telephone lines"). Collecting a person's own IP address does not implicate this interest, and construing CIPA to extend to such collection would radically expand the statute's scope—and render it unconstitutionally vague. *Cf. Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109, 1118 n.9 (N.D. Cal. 2025). Particularly given that CIPA is a criminal statute subject to the rule of lenity, such indiscriminate application of the statute must be avoided. *Id.* at 1112 (explaining that rule of lenity applies to CIPA); *see also People v. Guiamelon*, 205 Cal. App. 4th 383, 411 (2012) (observing "the rule of lenity" is "fully consistent with Penal Code section 4").

### E.    Plaintiffs' CDAFA Arguments Fail

Plaintiffs' CDAFA arguments fail because they still cannot identify any *data* that Meta accessed and used without permission. They do not even try.[12] That is because Meta undisputedly had permission to collect and use the _fbp cookie to match Plaintiffs' activity on third-party websites to their Meta accounts. Plaintiffs merely object to the *method* by which Meta did so here (the Subject Functionality). Such an objection cannot form the basis for a CDAFA claim. *See* Mot. 20 (citing *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 962 (9th Cir. 2018)).

Plaintiffs ultimately acknowledge *Oracle*'s holding that "there could be no CDAFA violation because defendants' conduct did not access data that they were otherwise unauthorized to access." Opp. 25. But they fail to distinguish it. They respond only that "without circumventing sandboxing protocols, Meta lacked the capability (or consent) to match user data with social media profiles." *Id.* Again, this ignores that the Privacy Policy—to which Plaintiffs consented—discloses that Meta uses identifiers like the _fbp cookie to "match activities [on third-party websites] with your account." Thus, regardless of whether Meta used a method that involved "circumventing sandboxing protocols" (whatever that is supposed to mean), *id.*, the fact remains that Meta "was authorized in the first instance to take and use the information." *Oracle*, 879 F.3d at 962.

---

[12] Plaintiffs misleadingly claim that CDAFA § 502(c)(8), which prohibits introducing a "computer contaminant," "does not contain the 'without permission' requirement." Opp. 23 n.12. "[T]he very definition of a 'computer contaminant,'" found in § 502(b)(12), "limits liability to conduct that occurs 'without the intent or permission of the owner of the information.'" *In re iPhone Application Litig.*, 2011 WL 4403963, at *13 (N.D. Cal. Sept. 20, 2011); *see Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*, 2014 WL 2213910, at *5-6 & n.51 (N.D. Cal. May 28, 2014).

None of Plaintiffs' other arguments disproves that Meta had authorization to access and use the data at issue; instead, each amounts to challenging the method of data collection, which *Oracle* holds is insufficient. Plaintiffs first argue that Meta deployed the Subject Functionality "surreptitiously." Opp. 24. But software code is not normally visible to users. That does not make the access or use of data unauthorized, and Plaintiffs' cases about "hidden" code do not suggest otherwise. In those cases, unlike here, the defendants lacked users' consent to collect the data in the first place—by *any* method. Only *then* did it matter whether code was "hidden" or not. *See, e.g.*, *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1048-49 (S.D. Cal. 2023) (defendant was unknown to the plaintiffs altogether and fact that software was hidden in third-party apps meant that plaintiffs were unaware of defendant's collection of their data); *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1073-74 (N.D. Cal. 2018) (software was "not only … hidden" but also "accessed" data "wholly unconnected to" authorization).

Plaintiffs next argue that "Meta knowingly accessed people's mobile devices 'in a manner that overcomes technical or code-based barriers.'" Opp. 24 (quoting *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *11 (N.D. Cal. 2010)). But they continue to lack any cogent explanation for what "technical or code-based barriers" were "overcome." As Meta pointed out in its motion (at 22), Plaintiffs themselves assert that the Subject Functionality used "communications channels in the Android operating system" that were "intended to allow different Android programs or applications to communicate with one another." ¶ 52. That is not "circumventing" a "barrier"; it is traversing an open pathway. Plaintiffs have no response to this point.[13] In any event, even if Plaintiffs had alleged enough to show the circumvention of a barrier—which they have not—"[s]imply bypassing" a technical barrier, "without more, would not constitute unauthorized use." *Facebook, Inc. v. Power Ventures, Inc.,* 844 F.3d 1058, 1068 n.5 (9th Cir. 2016). Only where the defendant otherwise lacks permission to access data "in the first instance" does the

---

[13] Plaintiffs also continue to suggest that Meta used these channels in a way that Google did not intend, Opp. 24 (arguing that the channels "were not designed for hiding user data" or "intended to facilitate covert communication"), but they fail to point to any Google terms of use prohibiting the manner in which the channels were used here. Particularly given CDAFA's mens rea requirement, Plaintiffs' vague allegations of impropriety are not sufficient to show that Meta was on notice that its use of the channels at issue was somehow unauthorized. Mot. 22-23.

circumvention of a technical barrier become violative conduct. *Oracle*, 879 F.3d at 962; *see Power Ventures*, 844 F.3d at 1069 (finding circumvention of technical barriers relevant only because the plaintiff had sent cease-and-desist letter rescinding the permission the defendant previously had to access its systems). Here, where Meta did have permission to access the data at issue (i.e., event data and identifiers) in the first instance, Plaintiffs' allegations about circumvention of a technical barrier amount to mere complaints about the method of access, which do not suffice under *Oracle*.

Plaintiffs lastly argue that Meta "defeat[ed] user-level privacy controls," referring to their allegations that the Subject Functionality "rendered ineffective other user-initiated anonymization controls such as private browsing modes, VPNs, and the clearing [of] cookies from browsers." Opp. 25. However, Plaintiffs make no allegation that *they* used any such controls, and thus they have no basis to allege that Meta "defeat[ed]" them on their devices. Nor do Plaintiffs adequately explain how Meta is supposed to have "defeat[ed]" these controls even where someone did use them. They merely allege that the controls "could not prevent Meta's actions," ¶ 64, which means the controls did not restrict the aspects of the Android operating system used by the Subject Functionality—so Meta did not have to "defeat" them to begin with. But most important, this is just another variant of an argument that Meta circumvented a "technical or code-based barrier." It fails, again, for the simple reason that Meta had permission to access and use the data at issue. If Plaintiffs wanted to restrict that permission, they had the option to do so through *Meta's* privacy controls—which they do not allege they ever attempted to use.

### F.     Plaintiffs' Common-Law Arguments Fail

Finally, Plaintiffs cannot save their common-law claims. First, they cannot allege an objectively reasonable expectation of privacy in the relevant data (i.e., the _fbp cookie that the Subject Functionality collected). They are wrong that their failure to do so "rests solely on the notion that they consented to Meta's de-anonymization scheme." Opp. 12. It rests on the fact they consented to Meta's policies, which disclose the collection and use of the information at issue, and preclude "a reasonable expectation of privacy in this information," as the Ninth Circuit has unambiguously held. *Lloyd*, 2024 WL 3325389, at *2.

Plaintiffs' claims also fail because they only allegedly visited "several" mundane websites,

which do not plausibly reveal their "sensitive" information. *See* Mot. 6-8, 23-24. Courts regularly dismiss invasion-of-privacy claims like these, where the complaint "does not plead any facts to suggest Defendant collected intimate or sensitive personally identifiable information or otherwise disregarded Plaintiff's privacy choices while simultaneously holding itself out as respecting them." *Esparza v. Kohl's, Inc.*, 723 F. Supp. 3d 934, 946 (S.D. Cal. 2024); *see, e.g.*, *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 690-91 (N.D. Cal. 2021) (no "sensitive and confidential information"); *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1193 (N.D. Cal. 2020) (same). Nor can Plaintiffs defend their *own* claims by pointing to "web browsing activities" of "millions of [*other*] Android mobile device users" as supposedly "sensitive in the aggregate." Opp. 12. "It is well settled that the right of privacy is purely a personal one," *Wagging Tails Prods., Inc. v. Coakley*, 2023 WL 4316777, at *12 (C.D. Cal. Feb. 21, 2023), and those assertions say nothing about Plaintiffs' "*own* personal information," *Doe v. Wirta*, 2019 WL 13472128, at *4 (N.D. Cal. Apr. 10, 2019).

Plaintiffs also independently fail to allege a highly offensive intrusion. Courts "do in fact[] decide the 'highly offensive' issue … at the pleading stage when appropriate." *Hubbard v. Google LLC*, 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024); *see Tsering*, 2026 WL 89320, at *7 (dismissing for failure to allege Meta engaged in highly offensive conduct). This is such a case. Plaintiffs editorialize their pleadings, but tracking Plaintiffs' visits to anodyne websites such as nytimes.com and nike.com is not plausibly "highly offensive." Such routine commercial behavior does "not constitute an egregious breach of social norms," "[e]ven assuming this information was transmitted without Plaintiffs' knowledge and consent." *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012); *see Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022) (collection of app usage information not highly offensive, even if plaintiffs had a reasonable expectation of privacy).

## III.   CONCLUSION

For all the foregoing reasons, the motion to dismiss should be granted. Because the flaws in the Complaint are rooted in consent to Meta's disclosures that they cannot dispute, and fundamental misapplications of the law that they cannot fix, dismissal should be with prejudice.

Dated: March 6, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Serrin Turner*
   Serrin Turner (*pro hac vice*)
   serrin.turner@lw.com
   Nicolas Luongo (*pro hac vice*)
   nicolas.luongo@lw.com
   1271 Avenue of the Americas
   New York, NY 10020
   Telephone: +1.212.906.1200

   Brad Baglien (*pro hac vice*)
   brad.baglien@lw.com
   555 Eleventh Street, NW, Suite 1000
   Washington, D.C. 20004
   Telephone: +1.202.637.2200

   Melanie M. Blunschi (Bar No. 234264)
   melanie.blunschi@lw.com
   505 Montgomery St., Suite 2000
   San Francisco, CA 94111
   Telephone: +1.415.391.0600

   *Attorneys for Defendant*
   *Meta Platforms, Inc.*