**BURSOR & FISHER, P.A.**
Philip L. Fraietta (SBN 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656

**MILBERG, PLLC**
Mariya Weekes (*pro hac vice*)
333 SE 2nd Avenue, Suite 2000
Miami, FL, 33131
Telephone: (786) 879-8200
Facsimile: (786) 879-7520

[Additional counsel listed on signature pages]

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Michael W. Sobol (SBN 19485)
Michael K. Sheen (SBN 288284)
Amelia A. Haselkorn (SBN 339633)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
Theodore W. Maya (SBN 223242)
Alyssa D. Brown (SBN 301313)
Sarper Unal (SBN 341739)
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Interim Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Meta Android Privacy Litigation,*<br><br>This document Relates to:<br><br>All Actions | Case No. Case No. 3:25-cv-04674-RFL<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS


Page

I. NATURE OF THE ACTION ..... 1
II. THE PARTIES ..... 3
III. JURISDICTION AND VENUE ..... 3
IV. STATEMENT OF FACTS ..... 4
A. Meta's Use of the Meta Pixel ..... 4
1. Meta and the Meta Pixel ..... 4
2. How the Meta Pixel Works ..... 6
3. Meta's Use of Pixel-Derived Data for Advertising ..... 10
B. Meta Exploits the Android Operating System to Impermissibly Collect Meta Users' Personal Information. ..... 13
1. Meta Modified the Pixel and Its Facebook and Instagram Apps to Violate Mobile Sandboxing Principles. ..... 174
2. Meta Surreptitiously Combined Users' Browsing Data with Personal Information from Their Meta Accounts. ..... 17
3. Reactions to Meta's Misconduct Universally Reflect the Impropriety of Its Circumvention of Security Protocols. ..... 19
4. Android Users and Website Developers Did Not Consent to Meta's Conduct. ..... 20
C. Google's Failure to Secure Users' Privacy on Android Devices ..... 21
V. PLAINTIFFS' EXPERIENCES ..... 26
A. Plaintiff Devin Rose ..... 26
B. Plaintiff Yolanda Cunningham ..... 26
C. Plaintiff Bert Velilla ..... 27
D. Plaintiff John Ginder ..... 28
VI. CLASS ALLEGATIONS ..... 29
VII. FRAUDULENT CONCEALMENT AND TOLLING ..... 31
VIII. CAUSES OF ACTION ..... 32
COUNT I ..... 32
Intrusion Upon Seclusion (On Behalf of the Class Against Meta) ..... 32
COUNT II ..... 34
Invasion of Privacy Under California's Constitution (On Behalf of Plaintiffs and the California Subclass Against Meta) ..... 34
COUNT III ..... 37
Violation of the Electronic Communications Privacy Act 18 U.S.C. §§ 2511(1), *et seq.* (On Behalf of the Class Against Meta) ..... 37
COUNT IV ..... 39
Violation of the California Invasion of Privacy Act § 631 (On Behalf of the California Subclass Against Meta) ..... 39

## TABLE OF CONTENTS
## (continued)


Page

COUNT V ... 41

Violation of the California Invasion of Privacy Act § 632 (On Behalf of the California Subclass Against Meta) ... 41

COUNT VI ... 43

Violation of the California Invasion of Privacy Act § 635 (On Behalf of the California Subclass Against Meta) ... 43

COUNT VII ... 43

Violation of the California Invasion of Privacy Act § 638.51 (On Behalf of the California Subclass Against Meta) ... 43

COUNT VIII ... 45

Violation of the California Comprehensive Computer Data Access and Fraud Act Cal. Pen. Code § 502 ("CDAFA") (On Behalf of the California Subclass Against Meta) ... 45

COUNT IX ... 50

Negligence (On Behalf of the Class Against Google) ... 50

COUNT X ... 52

Negligent Misrepresentation (On Behalf of the Class Against Google) ... 52

IX. PRAYER FOR RELIEF ... 55

X. JURY TRIAL DEMANDED ... 56

Plaintiffs Devin Rose, Yolanda Cunningham, Bert Velilla, and John Ginder ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Meta Platforms, Inc. ("Meta") and Google LLC ("Google") (collectively, "Defendants"). Plaintiffs bring this action for Meta's violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), et seq. ("ECPA"); the California Invasion of Privacy Act, Cal. Penal Code §§ 631, 632, 635, and 638.51 ("CIPA"); the California Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502, et seq. ("CDAFA"); California's Constitutional Right to Privacy; and unlawful intrusion upon seclusion. Plaintiffs bring this action for Google's negligence and negligent misrepresentation.

## I. NATURE OF THE ACTION

1. This action concerns Meta's intentional exploitation of existing vulnerabilities in Google's Android operating system, which allowed Meta to unlawfully seize and de-anonymize the personal data of many millions of Android users, which Meta otherwise would not have achieved absent those vulnerabilities. Specifically, Meta knowingly circumvented a fundamental principle of modern internet security, known as "sandboxing," to engage in this misconduct. Google knew or should have known about the faulty design of its Android operating system and could have taken reasonable measures to prevent Meta's intrusion.

2. To protect mobile device users' privacy and security, the Android operating system "sandboxes" apps into their own silos to prevent unauthorized access between them. As a result, for example, a user's web browser and other apps should operate independently from one another, and may not communicate with each other unless explicitly permissioned to do so. While Meta engages in extensive surveillance of users' activity both on web browsers and on the Facebook and Instagram apps, Android's sandboxing protocol should keep this surveillance separate, and allow for users to search the Internet on mobile devices more anonymously.

3. Meta tracks users' web browsing activity through the Meta Pixel. When a user visits a website where one of Meta's tracking technologies is installed, Meta acquires certain browsing information about the user (e.g., what webpages they visit, what items they search for, and what products they purchase). However, due to Android's sandboxing protections, when users are logged into their Meta account exclusively via the Facebook or Instagram mobile app (as is overwhelmingly the case on mobile devices),

the Meta Pixel cannot also collect their Facebook or Instagram identifiers and associated personal information (e.g., email addresses). This security mechanism prevents Meta from directly identifying and targeting many Android mobile device users as they browse online.

4. On June 3, 2025, a group of internet security researchers disclosed[1] publicly for the first time that between September 2024 and at least June 2, 2025, Meta exploited a communication channel—typically "used for making audio or video calls"—in the Android ecosystem to tie users' browsing information directly to their Facebook and Instagram profiles and the information associated with those profiles (e.g., names, email addresses), rendering that browsing information *completely non-anonymous and identifiable*. Thus, when an Android user with the Facebook or Instagram app installed on their mobile device visited a webpage where the pervasive Meta Pixel was installed, Meta linked the browsing information (e.g., any data present in the HTTP header, button click data, optional values, and form field names) to the personal information on their Facebook and Instagram profiles, making such users non-anonymous and identifiable to Meta.

5. Meta's conduct not only violated Android's sandboxing protocols, which (among other things) keep app and web browser data separate, but it also bypassed commonly used user-initiated privacy protections such as "incognito mode" and cookie clearing, all the while exposing users' data to potentially malicious actors or other apps. The breach was so egregious, in fact, that web browser developers like Mozilla and DuckDuckGo quickly took measures to mitigate these techniques. Accordingly, Meta impaired the ability of many millions of Android mobile device users to maintain their online privacy, in violation of federal and California privacy laws, without users' knowledge or consent.

6. Meta could not have achieved this privacy violation in the absence of a vulnerability in the Android operating system. Meta specifically targeted Android-based mobile devices due to Google's imposition of "fewer controls on local host communications and background executions of mobile apps."[2]

7. Like other members of the Class, Plaintiffs are Android mobile device users with Facebook

---

[1] Narseo Vallina-Rodriguez, et al., *Disclosure: Covert Web-to-App Tracking via Localhost on Android*, LOCAL MESS, https://localmess.github.io/ [https://perma.cc/P2GG-MR2D]; Dan Goodin, *Meta and Yandex Are De-Anonymizing Android Users' Web Browsing Identifiers*, ARSTECHNICA (June 3, 2025), https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/ [https://perma.cc/T2Y3-WW8N].

[2] Goodin, *supra* note 1.

and/or Instagram accounts whose web browsing activities were captured and linked to their identities without their knowledge or consent. Plaintiffs now bring this action to enforce their privacy rights and to seek damages for the harm Defendants caused them and others through the unauthorized collection and sale of their personal information.

## II. THE PARTIES

8. Plaintiff Devin Rose is a natural person over 18 years old and a citizen of California, residing in Los Angeles County, California. Plaintiff Rose is an Android user with Facebook and Instagram accounts who, like other members of the Class, was victim to Meta's unlawful data collection practices and Google's illusory privacy protections.

9. Plaintiff Yolanda Cunningham is a natural person over 18 years old and a citizen of California, residing in Solano County, California. Plaintiff Cunningham is an Android user with Facebook and Instagram accounts who, like other members of the Class, was victim to Meta's unlawful data collection practices and Google's illusory privacy protections.

10. Plaintiff Bert Velilla is a natural person over 18 years old and a citizen of Illinois, residing in Cook County, Illinois. Plaintiff Velilla is an Android user with Facebook and Instagram accounts who, like other members of the Class, was victim to Meta's unlawful data collection practices and Google's illusory privacy protections.

11. Plaintiff John Ginder is a natural person over 18 years old and a citizen of California, residing in Santa Barbara, California. Plaintiff Ginder is an Android user with a Facebook account who, like other members of the Class, was victim to Meta's unlawful data collection practices and Google's illusory privacy protections.

12. Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, California 94025.

13. Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

## III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises from violations of the ECPA. This Court may also exercise supplemental jurisdiction over

Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a), because they are so related to the ECPA claims (within the Court's original jurisdiction) that they form part of the same case or controversy under Article III of the United States Constitution. This case does not present novel or complex issues of state law that predominate over claims for which this Court has original jurisdiction, and there are no compelling reasons for declining supplemental jurisdiction over those of Plaintiff's claims that do not arise under the ECPA.

15. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

16. This Court has personal jurisdiction over Defendants Meta and Google because each Defendant's principal place of business is in California.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because both Defendants reside in this District.

## IV. STATEMENT OF FACTS

### A. Meta's Use of the Meta Pixel

#### 1. Meta and the Meta Pixel

18. Although popularly considered a social media company, Meta's principal business entails monetizing its users' personal data by serving them targeted digital ads. Companies that advertise on Meta's platforms do not directly control who sees their ads. Instead, they pay Meta to serve targeted ads to its users. Specifically, when a user signs up for access to one of Meta's social media platforms, like Facebook or Instagram, Meta collects the user's personal information including name,[3] gender, email address, birthday, and location. The more the user interacts with the social media platform, the more Meta learns about the user's interests and communities. With profiles on each of the billions of users who use its platforms, Meta serves as a self-described "real identity platform."[4] Fueled by its social media users'

---

[3] *Community Standards: Account Integrity and Authentic Identity*, META, https://transparency.meta.com/policies/community-standards/authentic-identity-representation/. [https://perma.cc/26S7-3FAC] (unlike other social media platforms, Meta requires that users provide "the name they go by in everyday life.").

[4] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701/ [https://perma.cc/C339-KU49].

personal data, Meta develops detailed insights into each user's behavior, preferences, and demographics to serve personalized, targeted advertising or to otherwise track users for advertising purposes.[5]

19. Meta's targeting abilities are exceptional because its surveillance covers not only users' activities on Meta's social media platforms, but also extends to users' web browsing activities outside of those platforms.[6] By collecting information it obtains and infers about users' behaviors across the Internet, Meta compiles a holistic picture of each user, allowing Meta to identify and target personalized "audiences" likely to respond to a particular advertiser's messaging, and to track their actions in response to that messaging.[7] As of 2024, Meta generated over $164 billion in annual revenue, nearly all of which was from advertising.[8] Meta has every incentive to accumulate as much data as possible, with as much detail as possible, to better serve advertisers and grow its profits.

20. To support its surveillance business, Meta offers web and app developers a suite of so-called "Business Tools" for integration into websites and apps. Chief among those tools is the Meta Pixel. Introduced in 2015 as the "Facebook Pixel," the Pixel is a piece of code that can be integrated into a website to imperceptibly capture information about website visitors and their communications, becoming a primary means through which Meta supports its targeted advertising business.

21. Meta's public-facing descriptions characterize the Meta Pixel as a simple "snippet of JavaScript code" that helps website owners keep track of user activity on their websites, obscuring the Pixel's fundamental purpose of tracking and collecting personal information from users to fuel Meta's advertising business.[9] Meta emphasizes that website managers can set up a Pixel easily, without any help

---

[5] *See Why Advertise on Facebook*, *Instagram and Other Meta Technologies,* META BUSINESS HELP CENTER, https://www.facebook.com/business/help/205029060038706 [https://perma.cc/7J6V-JQZ7].

[6] *About Meta Pixel*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 [https://perma.cc/MQ7U-XR2C]; *Facebook Core Audience Targeting*, META, https://www.facebook.com/business/news/Core-Audiences [https://perma.cc/A554-BYXP].

[7] *Audience Ad Targeting*, META, https://www.facebook.com/business/ads/ad-targeting [https://perma.cc/35A8-72LU].

[8] Meta, *Meta Reports Fourth Quarter and Full Year 2024 Results*, (Jan. 29, 2025), https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-Fourth-Quarter-and-Full-Year-2024-Results-2025.pdf [https://perma.cc/U8SR-4PKY].

[9] *Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel/ [https://perma.cc/A6Y2-7875]; *Retargeting: Inspire People to Rediscover What They Love About Your Business*, META, https://www.facebook.com/business/goals/retargeting [https://perma.cc/R2WF-XEGH].

from their web developer. "You only need to place a single pixel across your entire website."[10]

22. Today, the Meta Pixel can be found on millions of websites across the Internet.[11] Indeed, as of 2022, the Meta Pixel had been embedded on an estimated 30 percent of the most popular Internet websites, which has likely increased in the interim.[12]

**2. <u>How the Meta Pixel Works</u>**

23. When a user uses their web browser to log into their Meta account (e.g., via Facebook or Instagram) or visits a website where the Meta Pixel is installed, Meta places cookies on the user's device to allow Meta to follow the user's web browsing behavior across the Internet.[13] A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[14] Among other things, persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[15]

24. When the user initially visits a website where the Meta Pixel is installed, the following events occur. To load the website, the user's web browser sends an "HTTP request" or "GET" request to the website's server where the relevant website data is stored. In response to the request, the website's server sends an "HTTP response" back to the web browser with a set of instructions that includes how to properly display the website—e.g., what images to load, what text should appear, or what music should play. The

---

[10] Cecile Ho, *Announcing Facebook Pixel*, META, https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ [https://perma.cc/7CC5-TGER].

[11] *Websites Using Facebook Pixel*, BUILT WITH, https://trends.builtwith.com/websitelist/Facebook-Pixel [https://perma.cc/D42V-Z26L].

[12] Surya Mattu et al., *How We Built a Meta Pixel Inspector,* THE MARKUP (Apr. 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector [https://perma.cc/5DSD-3J8P] ("Blacklight, our real-time web privacy inspector, found that more than 30 percent of popular websites embed the Meta Pixel.").

[13] *See, e.g.*, Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs,* at 2139 (Apr. 2023), https://dl.acm.org/doi/pdf/10.1145/3543507.3583311 [https://perma.cc/FQL7-K9DN] (The Meta Pixel (formerly known as the Facebook Pixel) is "a conversion tracking tool embedded via JavaScript on websites, and be used to track users' activities both in space (i.e., in websites utilizing FB Pixel), and in time (i.e., in the past and future)." The Meta Pixel generally has a three-month lifespan, but it can employ "rolling expiration dates," "which can postpone its lifespan (and its associated tracking) indef[i]nitely.").

[14] *Cookie*, PC MAGAZINE, https://www.pcmag.com/encyclopedia/term/cookie [https://perma.cc/Z8NQ-P5VD].

[15] *What Are Tracking Cookies and How Do They Work?,* COOKIEBOT, https://www.cookiebot.com/en/tracking-cookies/ [https://perma.cc/7TLW-G54C].

server's instructions also cause the Pixel's code to be executed in the user's web browser.

25. Thereafter, and whenever the user performs an action on the website (e.g., visiting a specific webpage, viewing a product, or making a purchase), the Pixel surreptitiously directs the web browser to send a message to Meta's servers, separate from and in addition to any message the browser sends to the website itself. This hidden transmission to Meta contains information that the browser transmits to the host website (e.g., in a subsequent HTTP request), including, for example: (i) the URLs of the webpages visited; (ii) the information (e.g., items, products, articles, etc.) the user searched for in a search bar; (iii) the actions the user took on a page (e.g., opened an article, added an item to a shopping cart); (iv) the contents of commonly used form fields; and (v) the user's IP addresses and other identifying information (e.g., in an HTTP header). In that same transmission, Meta attempts to include other information to identify that user, typically using cookies that Meta embeds on the user's device.

26. Each transmission to Meta, like each transmission to the host website, includes an HTTP header, "a standard web protocol sent between any browser request and any server on the internet," which contains "data like IP addresses, information about the web browser, page location, document, referrer and person using the website."[16] As Meta itself notes, the Meta Pixel collects "[a]nything that is generally present in HTTP headers," including the user's IP address. Accordingly, every time the Pixel directs the web browser to send information about the user's web browsing activity, such information is sent along with the user's IP address to Meta.

27. Meta also collects certain "customer information parameters," which "are a set of user identifiers [websites] share alongside [] event information."[17] This information includes "[t]he IP address of the browser corresponding to the event," which Meta notes "is automatically added to events sent through the browser."[18] Transmissions to Meta may also include the user's e-mail address and phone number.[19]

28. The ability of Meta to learn the real identity of, and to later target, an otherwise anonymous visitor to a website is a critical aspect of Meta's surveillance apparatus. That ability is fundamentally

---

[16] *Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel/ [https://perma.cc/84AE-RD3].

[17] *Customer Information Parameters*, META, https://developers.facebook.com/documentation/ads-commerce/conversions-api/parameters/customer-information-parameters [https://perma.cc/XQE5-XLT3].

[18] *Id.*

[19] *Id.*

affected by whether the visitor is browsing the Internet within a mobile computing environment (e.g., on a mobile device) or outside of it (e.g., on a desktop or laptop). That is because in the mobile computing space, users of Meta's social media platforms overwhelmingly access their Meta accounts by logging in via their Facebook and Instagram apps. On a desktop or laptop, however, users typically log into their Meta accounts via a web browser (e.g., at https://www.facebook.com/login/ or https://www.instagram.com/accounts/login/).

29. As described immediately below, Meta can much more easily identify users who have logged into their Meta accounts via web browsers, but Meta cannot typically do the same on mobile devices via the Facebook and Instagram apps due to the sandboxing protocols described herein (*see* Section IV.B below).

30. For example, if a user is logged into their Meta account (i.e., Facebook or Instagram) using the same web browser, the Meta Pixel will compel that user's browser to transmit the contents of several cookies, including the c_user, datr, fr, and _fbp cookies.[20]

31. The c_user cookie contains the user's unencrypted Facebook ID or Instagram ID.[21] It typically has a lifespan of 365 days.[22]

32. The datr cookie contains a value that uniquely identifies a browser.[23] It has a lifespan of 400 days.[24]

33. The fr cookie contains a value that uniquely identifies a browser and the user's encrypted Facebook ID.[25] It has a lifespan of 90 days.[26]

---

[20] The Meta Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting." *First-Party Cookie*, PC MAGAZINE, https://www.pcmag.com/encyclopedia/term/first-party-cookie [https://perma.cc/8FAM-DEXK]. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Third-Party Cookie, PC MAGAZINE, https://www.pcmag.com/encyclopedia/term/third-party-cookie [https://perma.cc/R4RV-VN9E].

[21] *Cookie Compliance*, MICROSOFT, https://learn.microsoft.com/en-us/dynamics365/commerce/cookie-compliance [https://perma.cc/6XBS-Y9JD] (Meta's c_user cookie "contains the user ID of the currently signed-in user.").

[22] *Cookies Policy*, META, https://www.facebook.com/policy/cookies/ [https://perma.cc/M552-YHN8].

[23] *Id.* ("'Datr' is a unique identifier for your browser.").

[24] *Id.*

[25] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf [https://perma.cc/8QT5-TUNN] (The fr cookie has two parts: (1) "a browser ID, used to identify the web browser," and (2) "an encrypted version of the logged in user's Facebook ID.").

[26] *Cookies Policy*, META, https://www.facebook.com/policy/cookies/ [https://perma.cc/M552-YHN8].

34. The _fbp cookie "identifies browsers for the purposes of providing advertising and site analytics services and has a lifespan of 90 days."[27] As relevant here, the _fbp cookie is typically a first-party cookie, described below, which means it is offered by and unique to the website the user is visiting. Accordingly, the same user may have multiple different _fbp cookies for different websites. The _fbp cookie contains, among other things, a pseudonymous identifier associated with the user.[28] By itself, the _fbp cookie cannot be used to personally identify the user. Instead, Meta must rely on data from other sources (such as the c_user cookie), if available, to identify the user.

35. If a user is not logged into their Meta account using a web browser (as is typical of Android mobile device users who are logged into the Facebook or Instagram app), the Meta Pixel still compels the user's browser to send a smaller set of cookies, including the datr, fr, and _fbp cookies. Critically, the Meta Pixel does *not* compel the web browser to send a c_user cookie that would contain the user's Facebook ID or Instagram ID.

36. Thus, under normal circumstances, users are afforded a certain degree of privacy because the Meta Pixel can only access cookies placed by the same web browser (e.g., the c_user, datr, fr, and _fbp cookies) to associate a user's web browsing activity with their Meta account.[29] Meta, itself, explains that these, and/or other "customer information parameters," are ultimately "matched to Meta accounts."[30] In this way, the "cookie[s] identif[y] browsers for the purposes of providing advertising and site analytics services."[31]

37. In the decade since its introduction, the Meta Pixel has evolved to maximize the scope of the private information it collects and transmits back to Meta's servers. Since 2015, the Pixel has transmitted HTTP header information, including a user's IP address and the URL of each page visited on a website, by default. Starting in 2017, Meta quietly modified the Pixel code to transmit additional information by default, including "microdata" (details about the website and substance of what it offers, including the

[27] *Advertising, Recommendations, Insights and Measurement*, META, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 [https://perma.cc/43R5-SP2Y].
[28] *ClickID and the fbp and fbc Parameters*, META, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/#fbp [https://perma.cc/SJF9-APKU].
[29] *Cookies Policy*, META, https://www.facebook.com/policy/cookies/ [https://perma.cc/M552-YHN8].
[30] *About Event Match Quality*, META, https://www.facebook.com/business/help/765081237991954 [https://perma.cc/QMD8-88AL].
[31] *Cookies Policy*, META, https://www.facebook.com/policy/cookies/ [https://perma.cc/M552-YHN8].

structure and content of the website being viewed), other "contextual information" (including details about the structure of a particular webpage), and "SubscribedButtonClick" information (details about buttons available to click on each page including the text), which fires each time a user clicks on a hyperlink or button on the webpage.[32]

38. In 2018, Meta again modified the default operation of the Pixel to maximize the private information it transmits. Meta introduced a "first-party cookie option" for the Pixel to circumvent improvements in how web browsers may block third-party cookies (a primary means by which Facebook historically tracked people across the web) and to undermine user privacy controls that limit third-party cookies. By using first-party cookies, rather than third-party cookies, Meta causes web browsers to treat the Pixel as though it is being offered by the website a user is visiting, rather than by Meta, a third party. When the Pixel is embedded in a website as a first-party cookie, the third-party cookie blocking functions of modern web browsers do not inhibit the Meta Pixel's collection of data. Operating similarly to, and with the same privacy exemptions applicable to, a first-party cookie became the Pixel's default setting in or around October 2018.[33] Meta's improper deployment and use of the Pixel on healthcare websites and apps gained public attention in 2022, prompting Congressional inquiries, numerous class actions against Meta, and an historic jury trial verdict against Meta concerning the company's conduct in a health and wellness app.[34]

### 3. Meta's Use of Pixel-Derived Data for Advertising

39. After collecting and intercepting this information, Meta processes, analyzes, and assimilates it into datasets like Core Audiences and Custom Audiences.

40. Meta's other Business Tools function similarly. For mobile applications, advertisers can use

---

[32] *Automatic Facebook Pixel Events*, PIXELYOURSITE, https://www.pixelyoursite.com/major-facebook-pixel-update-automatic-facebook-pixel-events [https://perma.cc/YQ2Q-RHZ2]; Carey-Simon, George, *Facebook Pixel is about to Get a Bit Smarter,* WERSM (Apr. 28, 2017), https://wersm.com/facebook-pixel-get-little-smarter/ [https://perma.cc/49JS-8DX9].

[33] Sergiu Gatlan, *Facebook to Circumvent Cross-Site Tracking Block with New First-Party Cookie,* SOFTPEDIA (Oct. 6, 2018), https://news.softpedia.com/news/facebook-to-circumvent- cross-site-tracking-block-with-new-first-party-cookie-523089.shtml [https://perma.cc/U2J3-5VGX].

[34] *See, e.g.*, Steve Alder, *Meta Facing Scrutiny Over Use of Meta Pixel Tracking Code on Hospital Websites*, THE HIPAA JOURNAL (Oct. 24, 2022), https://www.hipaajournal.com/meta-facing-scrutiny-over-use-of-meta-pixel-tracking-code-on-hospital-websites/ [https://perma.cc/3E95-9PR9]; Steve Alder, *Jury Finds Meta Violated California Privacy Law by Collecting Flo App Users' Sensitive Data*, THE HIPAA JOURNAL (Aug. 6, 2025), https://www.hipaajournal.com/jury-trial-meta-flo-health-consumer-privacy/ [https://perma.cc/RS7T-TD8K] (noting August 2025 jury verdict against Meta concerning the Flo Period & Ovulation Tracker app).

the Meta SDK, which contains functionalities such as Meta's "Conversions API," which enables tracking directly through advertisers' website servers (server events), instead of relying on the use of pixels and cookies.[35] The App Events API also allows advertisers to track events on native mobile apps so they can "measure ad performance and build audiences for ad targeting."[36]

41. Meta can also connect the information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[37]

42. Further, Meta can use the event data to help websites "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[38]

43. Finally, Meta can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products"[39] and to train machine learning algorithms for ad targeting.

44. Thus, Meta has the capability to use the information it collects for purposes other than simply providing it to website developers to help track user activity, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; product improvement, provision, and securement; and maintaining its own internal ecosystem of data for advertisers.

45. Meta feeds the vast quantities of information obtained from the Meta Pixel and its social media platforms into its advertising products for numerous purposes, including to identify users and their personal characteristics, categorize them for Meta's (and its clients') business purposes, target them with marketing messages from its advertising clients, and to train Meta's artificial intelligence technology.[40]

---

[35] *Conversions API*, META, https://developers.facebook.com/docs/marketing-api/conversions-api [https://perma.cc/CQC9-X8KE] ("The Conversions API is designed to create a connection between an advertiser's marketing data . . . from an advertiser's server[] . . . to Meta systems.").

[36] *App Events API*, META, https://developers.facebook.com/docs/marketing-api/app-event-api/ [https://perma.cc/GR3U-424C].

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *See*, *Privacy Policy,* META PRIVACY CENTER (June 16, 2025), https://www.facebook.com/privacy/policy [https://perma.cc/D8LV-27FL].

46. Meta acknowledges this use of data. For example, the Meta Pixel is one of Meta's many "Business Tools," and the websites on which the Pixel is embedded are considered Meta's "Partners." Meta explains in its Privacy Policy, among other places, that Meta uses "[i]nformation from Partners," expressly including information about "[w]ebsites you visit and cookie data, like through . . . the Meta Pixel," "to provide a personalized experience to [users], including ads."[41]

47. One of the ways that Meta uses data obtained via the Pixel for advertising is by using it to define "audiences" customized for particular advertisers. Meta sells access to three types of tailored audiences. Advertisers can purchase access to "Core Audiences," composed of individuals with specified traits and characteristics. Meta assigns users to Core Audiences based on data it has learned or inferred (including via data from the Meta Pixel) about a range of their personal qualities, including users' location, age, gender, education, job title, connections to other Facebook and Instagram users or pages/accounts, interests and hobbies, and behavior such as prior purchases and device usage.[42]

48. Meta also sells access to "Custom Audiences," meaning the ability to reach "people who have already shown interest in [an advertiser's] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[43] Meta assigns users to Custom Audiences based on information from the Meta social media platform, and/or information the advertiser discloses about those users, such as email subscriber lists, and activity tracked on the advertiser's website(s), including via the Meta Pixel.[44]

49. Meta also sells access to "Lookalike Audiences," a Meta feature that "leverages information such as demographics, interests and behaviors from your source audience [i.e., a Custom Audience tailored from the advertiser's records] to find new people who share similar qualities" with existing customers or Custom Audiences.[45] To generate Lookalike Audiences, Meta uses data it has obtained from across the web,

---

[41] *Id.*

[42] *Ad Targeting: Help Your Ads Find the People Who Will Love Your Business*, META, https://www.facebook.com/business/ads/ad-targeting [https://perma.cc/35A8-72LU].

[43] *Id.*

[44] *Create a Customer List Custom Audience*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/170456843145568?id=2469097953376494. [https://perma.cc/3TVK-NBX6]; *see also Facebook Custom Audiences 101: The Complete Guide for Marketers,* ADESPRESSO (Mar. 23, 2021), https://adespresso.com/blog/facebook-ads-custom-audiences-guide/ [https://perma.cc/LF7B-R9RR].

[45] *About lookalike audiences*, META BUSINESS HELP CENTER,

including from Meta Pixels embedded in third-party websites that have no relationship with the advertiser requesting access to a Lookalike Audience.

### B. Meta Exploits the Android Operating System to Impermissibly Collect Meta Users' Personal Information.

50. Over time, Meta has developed a sophisticated ability to link personal information associated with Meta accounts (e.g., names and emails addresses) to users' browsing activity outside of the mobile environment, where they have logged into their accounts via a web browser. However, Meta cannot normally identify and track users in the same way or to the same degree on mobile devices via Meta's mobile apps, where those same users are supposed to be able to browse online free from this kind of surveillance as they move about their daily lives. *See Carpenter v. United States*, 585 U.S. 296, 298 (2018) ("[C]ell phones and the services they provide are such a pervasive and insistent part of daily life that carrying one is indispensable to participation in modern society." (citation and internal quotation marks omitted)).

51. In the Android operating system, sandboxing protocols provided added security by erecting a digital wall between mobile apps, including between web browser apps and Meta's social media apps. This means that Facebook and Instagram users would reasonably expect that they could browse in a more anonymous fashion on their Android mobile devices than on a desktop or a laptop, because the Facebook and Instagram apps were not permitted to access their browsing activities and tie those activities to the personal information associated with users' Meta accounts.

52. However, from September 2024 through at least June 2, 2025, Meta sought to circumvent and "abus[e]" these sandboxing restrictions, by causing Chrome and other Chromium-based browsers (e.g., Microsoft Edge) to "surreptitiously send unique identifiers" to Meta via its Facebook and Instagram apps.[46] Class members did not (and could not) have consented to Meta's actions, which it did not disclose to Class members.

53. As described below, Meta's scheme involved exploiting "localhost" (or device) "communication ports" on Android devices by: (1) modifying the Pixel to route a user's browsing-related

---

https://www.facebook.com/business/help/164749007013531?id=401668390442328 [https://perma.cc/9RN3-A2R3].

[46] Goodin, *supra* note 1.

pseudonymous identifiers located in the _fbp cookie (which does not, by itself, identify a user) through an unsecured port on the Android device; (2) instructing Meta's social media apps to collect and link those identifiers to the user's Meta account information (e.g., names and email addresses); and (3) allowing Meta to identify and de-anonymize the user's browsing activity.[47] This process is illustrated below.[48]




### 1. Meta Modified the Pixel and Its Facebook and Instagram Apps to Violate Mobile Sandboxing Principles.

54. Sandboxing is a "crucial," best practices security mechanism used in the mobile computing environment to "create[] a controlled environment where an application can run without affecting the rest of the system."[49] It protects against security threats and allows for "proper testing and debugging of software."[50] Both Apple and Google use sandboxing in their respective operating systems, but Apple's iOS "employs a more restrictive sandboxing approach."[51]

55. In a typical mobile computing environment, each application (or "app") operates in an isolated and contained environment called a "sandbox." "By default, apps can't interact with each other and have limited access to the [operating system]. If app A tries to do something malicious, such as read app B's data or dial the phone without permission, it is prevented from doing so because it does not have the appropriate default user privileges."[52] As relevant here, one app installed on an Android device (like the

---

[47] Narseo Vallina-Rodriguez, *supra* note 1.
[48] *Id.*
[49] *Sandboxing*, ZIMPERIUM, https://zimperium.com/glossary/sandboxing [https://perma.cc/KKA3-QZSQ].
[50] *Sandboxing: Importance, Best Practices and More*, SENSFRX, https://blog.sensfrx.ai/sandboxing/ [https://perma.cc/E4PX-WLVY].
[51] *Sandboxing*, ZIMPERIUM, *supra* note 49.
[52] *Application Sandbox*, SOURCE, https://source.android.com/docs/security/app-sandbox

Facebook or Instagram app) is not supposed to be able to access data collected or stored by another app (like a web browser), and vice versa. The systematic implementation of sandboxing protocols prevents unnecessary and potentially harmful interactions between "different elements running on" Android devices by cutting off access to sensitive data or privileged system resources."[53]

56. To get around the sandboxing security protocols so that it could match users' web browsing activity directly to their Facebook or Instagram profiles, Meta exploited and misused so-called "localhost" communications channels in the Android operating system. These internal channels are intended to allow different Android programs or applications to communicate with one another safely and appropriately.

57. In computer networking, the term "localhost" refers to the current device that an application or service is running on.[54] In other words, a device's localhost IP address, 127.0.0.1, provides a shorthand for applications or services running on the device to communicate with each other (as if they were communicating over a network), without those communications leaving the device. Each application or service uses one or more localhost "ports," and multiple applications or services cannot use the same port. In this way, data intended for one application or service can be routed to properly to its designated port.[55] For example, "localhost:80" is the commonly used default port for unsecured web traffic (HTTP), while "localhost:443" is the commonly used default port for secure web traffic (HTTPS).

58. Google designed and implemented the Android operating system in a manner such that apps can access localhost ports with little or no user knowledge or consent. For example, web browsers can access localhost ports without user consent or platform mediation. The Android operating system also permits any installed app with the "internet" permission (android.permission.INTERNET) to open a localhost port on to "listen" for, or receive, data transmitted through that port.[56]

59. Meta modified the Meta Pixel code—and also its Facebook and Instagram apps—to take advantage of certain localhost ports to surreptitiously pass data from Chromium-based web browsers (e.g.,

---

[https://perma.cc/NPS5-L2GR].

[53] Goodin, *supra* note 1.

[54] Beloslava Petrova, *Understanding Localhost: The Basics of 127.0.0.1 Explained,* CLOUDNS (June 7, 2024), https://www.cloudns.net/blog/understanding-localhost-the-basics-of-127-0-0-1-explained/ [https://perma.cc/DME3-3WWB].

[55] Goodin, *supra* note 1.

[56] *Id.*

Chrome, Edge) to its Facebook or Instagram apps via localhost ports. Specifically, during the relevant period, whenever the user of an Android mobile device visited a website containing the Meta Pixel, the Pixel would direct the user's web browser to send that user's browsing-related pseudonymous identifier (contained in the _fbp cookie) to a designated localhost port. Simultaneously, and because Meta had configured them to do so, the Facebook and Instagram apps on the same device secretly "listened" to that designated localhost port for incoming browsing-related data. The localhost port routed any browsing-related data to the user's Facebook or Instagram app, which Meta combined with personal information and identifiers stored in the app that the Pixel otherwise would not have access to. Meta then shipped that combined data from the user's Android device to its own servers, allowing Meta to de-anonymize the user's otherwise anonymous browsing activity.

60. Over time, Meta's method for channeling users' browsing-related information to its apps via localhost ports evolved. Indeed, Meta *deliberately changed* its methods for transmitting such information, from web browsers to the Facebook and Instagram apps, to overcome sandboxing restrictions and data privacy settings.

61. Initially, from September 2024 through at least October 2024, the Meta Pixel sent user browsing-related information through HTTP requests to port 12387.[57]

62. From November 2024 to January 2025, the Meta Pixel switched to a new method that sent the same browsing-related information via WebSocket, a protocol for two-way communications, to port 12387.[58]

63. Around the same time, the Meta Pixel also began using a method called WebRTC, a peer-to-peer communication protocol typically used for making audio and video calls, to "UDP" (User Data Protocol) ports 12580–12585.[59] In this way, Meta caused the Pixel to employ a complicated technique, called "SDP munging," that inserted the contents of the _fbp cookie into the "ice-ufrag" field, a data field meant for connection information, resulting in a Binding Request STUN message sent to the localhost port.[60]

---

[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*

64. In May 2025, a beta version of the Chrome web browser introduced a mitigation that blocked the type of SDP munging that Meta was using. Within days, around May 17, 2025, Meta modified the Pixel to circumvent the mitigation by adding a new method that sent the contents of the _fbp cookie via WebRTC, using a TURN message that did not require SDP munging.[61]

**2. Meta Surreptitiously Combined Users' Browsing Data with Personal Information from Their Meta Accounts.**

65. Having established a backdoor communications channel between a user's web browser and its Facebook and Instagram apps, Meta could then tie the user's "vast browsing history to the account holder logged into the [Facebook or Instagram] app."[62]

66. Specifically, once it received the contents of a user's _fbp cookie, the Facebook or Instagram app would then transmit the user's browsing-related identifiers to Meta's servers, thereby allowing Meta to link the user's detailed browsing activity with personally identifying information associated with their Meta accounts (e.g., Facebook ID, Instagram ID, full name, email address, and other identifying information). Meta's systematic tying of Android users' web browsing data to their Meta accounts, summarized in the illustration below,[63] would not have been otherwise possible.

[61] Vallina-Rodriguez, *supra* note 1.
[62] Goodin, *supra* note 1.
[63] *Id.*




67. This process rendered the browsing history of an Android user completely identifiable and de-anonymized in real time, as Meta collected a user's browsing information and tied that browsing information to personally identifiable information like full name, email address, and other information associated with the user's Facebook or Instagram profiles.

68. In addition, because this method of tracking did not rely on a user's web browser to identify them but instead relied on personal information accessible through Meta's social media apps, Meta was even able to identify Class members who had chosen to use private browsing modes, like Chrome's Incognito mode, which is intended to prevent the saving of browser history and cookies on the user's

device.[64] Users also could not prevent Meta's actions by using a virtual private network (or "VPN"), which encrypts connections between devices and servers, or by clearing any cookies. Worse, by placing a user's detailed web browsing information on an unsecured and non-exclusive localhost channel, Meta exposed user data to potentially malicious actors or other apps that could "listen" for this information in the same way the Facebook and Instagram apps were modified to do.[65]

### 3. **Reactions to Meta's Misconduct Universally Reflect the Impropriety of Its Circumvention of Security Protocols.**

69. After researchers publicly exposed Meta's misconduct, a Google representative stated that Meta's conduct "violates the terms of service for [Google's] Play marketplace and the privacy expectations of Android users." Google stated also that Meta was "using capabilities present in many browsers across iOS and Android in unintended ways that blatantly violate our security and privacy . . . We've already implemented changes to mitigate these invasive techniques and have opened our own investigation and are directly in touch with the parties."[66]

70. However, these countermeasures came too late: Meta already had been harvesting, using, and monetizing the private information of Plaintiffs and Class members. Google knew or should have known about the vulnerabilities in its Android design and should have taken reasonable steps to prevent this access. Instead, Google made specific statements publicly assuring users that Android devices were secure and privacy protective.

71. Browser developers also took immediate action. For much if not all of the relevant period, Google's Chrome browser and most Chromium-based web browsers, including the Firefox browser, executed the Meta Pixel script as Meta intended. After the revelation, Firefox developer Mozilla stated: "We are actively investigating the reported behavior, and working to fully understand its technical details and implications. . . . Based on what we've seen so far, we consider these to be severe violations of our anti-tracking policies, and are assessing solutions to protect against these new tracking techniques."[67]

72. But because the underlying vulnerabilities of the Android operating system persisted, any

---

[64] *Id*. (emphasis added); *see also How Chrome Incognito Keeps Your Browsing Private*, GOOGLE CHROME HELP, https://support.google.com/chrome/answer/9845881?hl=en [https://perma.cc/83G4-3QA6].
[65] Vallina-Rodriguez, *supra* note 1.
[66] Goodin, supra note 1.
[67] *Id.*

fixes implemented by web browser developers could not fully remedy the consequences of the misconduct. One of the researchers to uncover Meta's wrongdoing observed:

> Any browser doing blocklisting will likely enter into a constant arms race, and it's just a partial solution. . . . Creating effective blocklists is hard, and browser makers will need to constantly monitor the use of this type of capability to detect other hostnames potentially abusing localhost channels and then updating their blocklists accordingly. . . .
>
> While this solution works once you know the hostnames doing that, it's not the right way of mitigating this issue, as trackers may find ways of accessing this capability (e.g., through more ephemeral hostnames). A long-term solution should go through the design and development of privacy and security controls for localhost channels, so that users can be aware of this type of communication and potentially enforce some control or limit this use (e.g., a permission or some similar user notifications).[68]

73. Meta claimed that it had ceased the misconduct described herein for the time being, and that it had "decided to pause" its previous actions as it worked with Google to resolve what Meta described as a "miscommunication" concerning Google's "policies."[69] As of June 3, 2025, Meta had purportedly caused the Meta Pixel script to "no longer sen[d] any packets or requests to localhost [Android device] ports and had removed "[t]he code responsible for sending the _fbp cookie to those Android device ports."[70]

74. To date, Meta has not adequately explained its actions, including what it intended to do with Class members' improperly collected personal information and data and/or whether Meta has destroyed the data or anything derived therefrom. Indeed, leaked internal Meta documents suggest the company itself may not know what it does with user data or where it goes. In one such document, Meta engineers observed, "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, this is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation."[71]

**4. <u>Android Users and Website Developers Did Not Consent to Meta's Conduct.</u>**

75. Meta did not disclose the misconduct alleged herein, including in any public-facing policies.

---

[68] *Id.*

[69] *Id.*

[70] Vallina-Rodriguez, *supra* note 1.

[71] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document,* VICE (Apr. 26, 2022), https://www.vice.com/en/article/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes/ [https://perma.cc/AU8Q-CA3P].

Indeed, a reasonable user would believe the opposite, that Meta was not engaged in these actions because doing so would be an egregious violation of their privacy rights as well as the sandboxing principles around which mobile devices generally and Android devices specifically are built.

76. The nature of Meta's misconduct is only amplified by the fact that it occurred even if users were "not logged in to Facebook [or] Instagram . . . on their mobile browsers," or if they took affirmative steps to protect their privacy such as using Chrome's Incognito mode or "[c]lear[ing] their cookies or other browsing data."[72] This stands in stark contrast to Meta's public statements about how their users can purportedly "control [their] privacy."[73] Meta's actions alleged herein eliminated the possibility of such user control.

77. Even website developers, who were far better positioned than the typical Meta account holder to know of Meta's wrongdoing were not aware of the purpose or validity of Meta's actions for almost one year, and did not consent to it. This is supported by "several complaints from puzzled website owners questioning why Meta Pixel communicates with localhost in Facebook developer forums by September 2024" with "[n]o official response from Meta representatives."[74]

78. On top of this, and as described above, Meta changed protocols between September 2024 and June 2025 (from HTTP-based transmissions to the WebSocket network protocol and finally to WebRTC technology) to cover up its conduct by making it harder for web developers to detect its actions.[75]

**C. <u>Google's Failure to Secure Users' Privacy on Android Devices</u>**

79. Android is a mobile operating system developed by Google that powers billions of mobile devices globally, including smartphones, tablets, and wearable devices.[76] As of 2022, approximately 133 million individuals in the United States owned a smartphone powered by the Android operating system in the United States.[77]

---

[72] Vallina-Rodriguez, *supra* note 1.

[73] *Privacy Policy*, META (June 16, 2025), https://www.facebook.com/privacy/policy/ [https://perma.cc/UGK9-SB7V].

[74] Vallina-Rodriguez, *supra* note 1.

[75] *Id.*

[76] *See* ANDROID, https://www.android.com/ [https://perma.cc/9CJM-JVU3].

[77] *iPhone vs Android Statistics*, BACKLINKO.COM, https://backlinko.com/iphone-vs-android-statistics [https://perma.cc/3XLP-SJHN].

80. Google pre-installs a suite of software on Android devices, including the Chrome web browser, and allows consumers to download third-party apps—such as Facebook and Instagram—from its Google Play store. Google represents that it is "continually working on ways to weed out harmful apps" from Google Play, employing "extensive review processes" to keep users safe.[78]

81. Google promises that Android allows users to "choose when to share certain sensitive data with apps you download."[79] However, it is now clear that users were not able to avoid the privacy violations alleged herein, in part, because Google negligently and/or recklessly allowed Meta to manipulate fundamental aspects of Android's software without corresponding safeguards.

82. Google markets its Pixel phones and Android platform as "secure to the core," "private by design," and "designed to help protect you and your stuff, and to keep you in control."[80]




83. Google knows and appreciates that consumers' mobile data is sensitive and understands the importance of keeping that data safe and mobile apps downloaded from its own Google Play store free of malicious software and vulnerabilities. Google tells consumers that "your life is on your phone: your

---

[78] *How We Help Keep Google Play Safe for Users and Developers*, GOOGLE, https://safety.google/intl/en_us/stories/google-play-safety/ [https://perma.cc/K9MW-6U39].

[79] *Your Android Privacy on Your Terms*, ANDROID, https://www.android.com/safety/privacy/#safetyprivacy-dashboard [https://perma.cc/F9BQ-ZJFH].

[80] *Your Protection, Built into Pixel*, GOOGLE, https://safety.google/products/pixel/ [https://perma.cc/8XEB-3QGF].

financial information, personal data, photos, and more," and that Pixel hardware and software "work together to help keep your phone and data private, safe, and secure."[81]

84. Google touts that "[a]ll Pixel devices are designed to respect your privacy" by minimizing, de-identifying, and restricting access to data.[82]

85. Google publicly makes security guarantees to users about Android's "advanced protection" system, including that Google engages "[p]owerful, proactive protection that's built right into your Android device to help keep your data safe,"[83] employs "[i]ndustry-leading" Android security features, and "minimizes and de-identifies your data from intelligent features . . . . to technically ensure [users'] privacy and safety."[84]




86. Google represents that "[o]ngoing updates provide fixes for possible issues and upgrade your device's safety features to help battle evolving threats."[85]

---

[81] *Your Protection, Built into Pixel*, GOOGLE, https://safety.google/pixel/ [https://perma.cc/8XEB-3QGF].

[82] *Id.*

[83] *Proactive Security Meets Advanced Protection,* ANDROID, https://www.android.com/safety/security [https://perma.cc/N2BN-LEXP].

[84] *Your Android Privacy on Your Terms*, ANDROID, *supra* note 79.

[85] *Proactive Security Meets Advanced Protection,* ANDROID, *supra* note 83.




87. However, Google failed to keep its promises to its users to maintain their privacy. Despite Google's promises, its architecture contains fundamental design flaws that enabled Meta's cover tracking scheme, including but not limited to the following:

88. ***Overly Permissive Model.*** Google has implemented an "overly permissive" design of its Android operating system that "allows Meta Pixel . . . to send web requests with web tracking identifiers to specific localhost ports that are continuously monitored by the Facebook [and] Instagram . . . apps."[86]

89. Specifically, Google's decision to allow third-party developers to access specific localhost ports should have been, and upon information and belief was not, supplemented with a security protocol to ensure such access was not misused. Due to this failure, Meta was able to exploit Android's software and de-anonymize users and their browsing activity without sufficient oversight from Google.

90. While "similar data sharing between iOS browsers and native apps is technically possible, iOS browsers (which are all based on WebKit) allow developers to programmatically establish localhost connections where apps can listen through local ports. Technical and policy restrictions for running native apps in the background may explain why iOS users were not targeted by these trackers."[87] In other words, Apple's iOS requires apps to declare specific network/server entitlements and tightly restricts background network activity, such that any attempt by Meta to listen on localhost ports on an Apple device would

[86] Goodin, *supra* note 1.
[87] Vallina-Rodriguez, *supra* note 1.

trigger a privacy warning.

91. Google knew, or should have known, that by failing to monitor access to localhost ports, it had allowed a core vulnerability in the Android software that would allow developers such as Meta to identify users and track their online activity without consent.

92. ***Weak Sandbox Protocol Enforcement.*** Android allows apps to open listening sockets on localhost ports without user consent or system-level monitoring, which thereby creates a hidden data channel between apps. Android's sandbox isolates app data but permits localhost traffic, allowing Meta to bridge the browser (web data) and app (user identity). By contrast, Apple's iOS runs apps in isolated sandboxes with specific entitlements, and any communication between apps generally requires explicit user approval through app extensions or URL schemes.

93. ***Inadequate Privacy Protections.*** Android fails to offer basic privacy protections. Even if users enable Incognito mode for every Internet browsing session, doing so does not block localhost traffic or app background activity. Meta capitalized on this vulnerability, which allowed it to track and intercept users' communications, even when the user was implementing Incognito Mode.

94. Google could and should have done more to protect Android users from Meta's malicious attack and unauthorized tracking by securing its Android software. Google left the door wide open to this attack. The vulnerability was made possible by, among other things, the lack of controls Android imposes on developers operating on its platform. These failures are contrary to the assurances Google provided to its users, and purchasers of Android devices, about the safety and privacy of Android software.

95. Google breached its duty to Android users by failing to implement proper protections and safeguards to prevent abuse. As one researcher remarked, "The fundamental issue is that the access to the local host sockets is completely uncontrolled on Android. There's no way for users to prevent this kind of communication on their devices. Because of the dynamic nature of JavaScript code and the difficulty to keep blocklists up to date, the right way of blocking this persistently is by limiting this type of access at the mobile platform and browser level, including stricter platform policies to limit abuse."[88]

[88] Goodin, *supra* note 1.

## V. PLAINTIFFS' EXPERIENCES

### A. Plaintiff Devin Rose

96. Between September 2024 and the present, Plaintiff Rose visited several websites on his Android mobile device where the Meta Pixel was installed, including but not limited to techcrunch.com and wired.com. Both of these websites were among those affected by the aforementioned practices.[89]

97. When he visited these websites on his Android device, Plaintiff Rose was located in California and had both the Facebook and Instagram apps installed on his device.

98. Unbeknownst to Plaintiff Rose, when he visited these websites (and others), everything Plaintiff Rose did thereon—e.g., what articles he viewed, what he searched for, the specific search terms he used, and his IP address(es) and other HTTP header information related to his device—were collected by Meta in real time using its Pixel.

99. Further, when Plaintiff Rose visited these websites on his Android device, he had an expectation that his browsing activity would remain anonymous to Meta and independent from his activity in the Facebook and Instagram apps. Unbeknownst to him, Meta secretly sent a separate signal within that Android device in violation of sandboxing protocols that allowed Meta to tie his browsing information to personal information associated with his Facebook and Instagram profiles (e.g., his name, address, email address). As a result, Meta was able to and did de-anonymize and identify Plaintiff Rose using his Facebook ID and associated personal information to track him as he used the Internet on his Android device.

100. Meta engaged in this misconduct to identify and create a real-time comprehensive profile of Plaintiff Rose and his Internet activity, which was not possible if Meta complied with Android's sandboxing protocols. Meta used the information it collected in violation of the sandboxing protocols to increase its ability to serve targeted advertising which, in turn, enlarged Meta's revenue and profit.

101. Plaintiff Rose did not consent to Meta's conduct, which he did not know about, and which Meta conducted in secret.

### B. Plaintiff Yolanda Cunningham

102. Between September 2024 and the present, Plaintiff Cunningham visited several websites on her Android mobile phone where the Meta Pixel was installed, including but not limited to zillow.com,

[89] Vallina-Rodriguez, *supra* note 1.

nike.com, and eventbrite.com. All of these websites were among those affected by the aforementioned practices.[90]

103. When she visited these websites on her Android device, Plaintiff Cunningham was located in California and had the Facebook and Instagram apps installed on her device.

104. Unbeknownst to Plaintiff Cunningham, when she visited these websites (and others), everything Plaintiff Cunningham did thereon—e.g., what articles she viewed, what she searched for, the specific search terms she used, and her IP address(es) and other HTTP header information related to her device—were collected by Meta in real time using its Pixel.

105. Further, when Plaintiff Cunningham visited these websites on her Android device, she had an expectation that her browsing activity would remain anonymous to Meta and independent from her activity in the Facebook and Instagram apps. Unbeknownst to her, Meta secretly sent a separate signal within that Android device in violation of the sandboxing protocols that allowed Meta to tie her browsing information to personal information associated with her Facebook and Instagram profiles (e.g., her name, address, email address) in real-time, thus de-anonymizing and identifying Plaintiff and her browsing information in real-time. As a result, Meta was able to and did de-anonymize and identify Plaintiff Cunningham using her Facebook ID and associated personal information to track her as she used the Internet on her Android device.

106. Meta engaged in this misconduct to identify and create a real-time comprehensive profile of Plaintiff Cunningham and her Internet activity, which was not possible if Meta complied with Android's sandboxing protocols. Meta used the information it collected in violation of the sandboxing protocols to increase its ability to serve targeted advertising which, in turn, enlarged Meta's revenue and profit.

107. Plaintiff Cunningham did not consent to Meta's conduct, which she did not know about, and which Meta conducted in secret.

### C. <u>Plaintiff Bert Velilla</u>

108. Between September 2024 and the present, Plaintiff Velilla visited several websites on his Android mobile device where the Meta Pixel was installed, including but not limited to apnews.com,

---

[90] *Id.*

poshmark.com, and www.coursera.org. All of these websites were among those affected by the aforementioned practices.[91]

109. When he visited these websites on his Android device, Plaintiff Velilla was located in Illinois and had both the Facebook and Instagram apps installed on his device.

110. Unbeknownst to Plaintiff Velilla, when he visited these websites (and others), everything Plaintiff Velilla did thereon—e.g., what articles he viewed, what he searched for, the specific search terms he used, and his IP address(es) and other HTTP header information related to his device—were collected by Meta in real time using its Pixel.

111. Further, when Plaintiff Velilla visited these websites on his Android device, he had an expectation that his browsing activity would remain anonymous to Meta and independent from his activity in the Facebook and Instagram apps. Unbeknownst to him, Meta secretly sent a separate signal within that Android device in violation of sandboxing protocols that allowed Meta to tie his browsing information to personal information associated with his Facebook and Instagram profiles (e.g., his name, address, email address). As a result, Meta was able to and did de-anonymize and identify Plaintiff Velilla using his Facebook ID and associated personal information to track him as he used the Internet on his Android device.

112. Meta engaged in this misconduct to identify and create a real-time comprehensive profile of Plaintiff Velilla and his Internet activity, which was not possible if Meta complied with Android's sandboxing protocols. Meta used the information it collected in violation of the sandboxing protocols to increase its ability to serve targeted advertising which, in turn, enlarged Meta's revenue and profit.

113. Plaintiff Velilla did not consent to Meta's conduct, which he did not know about, and which Meta conducted in secret.

**D. <u>Plaintiff John Ginder</u>**

114. Between September 2024 and the present, Plaintiff Ginder visited several websites on his Android mobile device where the Meta Pixel was installed, including but not limited to nytimes.com. This website was among those affected by the aforementioned practices.[92]

115. When he visited these websites on his Android device, Plaintiff Ginder was located in

---

[91] *Id.*

[92] Surya Mattu et al., *supra* note 12.

California and had both the Facebook and Instagram apps installed on his device.

116. Unbeknownst to Plaintiff Ginder, when he visited these websites (and others), everything Plaintiff Ginder did thereon—e.g., what articles he viewed, what he searched for, the specific search terms he used, and his IP address(es) and other HTTP header information related to his device—were collected by Meta in real time using its Pixel.

117. Further, when Plaintiff Ginder visited these websites on his Android device, he had an expectation that his browsing activity would remain anonymous to Meta and independent from his activity in the Facebook and Instagram apps. Unbeknownst to him, Meta secretly sent a separate signal within that Android device in violation of sandboxing protocols that allowed Meta to tie Plaintiff's browsing information to personal information associated with his Facebook and Instagram profiles (e.g., his name, address, email address). As a result, Meta was able to and did de-anonymize and identify Plaintiff Ginder using his Facebook ID and associated personal information to track him as he used the Internet on his Android device.

118. Meta engaged in this misconduct to identify and create a real-time comprehensive profile of Plaintiff Ginder and his Internet activity, which was not possible if Meta complied with Android's sandboxing protocols. Meta used the information it collected in violation of the sandboxing protocols to increase its ability to serve targeted advertising which, in turn, enlarged Meta's revenue and profit.

119. Plaintiff Ginder did not consent to Meta's conduct, which he did not know about, and which Meta conducted in secret.

## VI. CLASS ALLEGATIONS

120. **Class**: Plaintiffs Devin Rose, Yolanda Cunningham, Bert Velilla, and John Ginder seek to represent the following Class of similarly situated individuals defined as follows:

> All Android users in the United States (including its territories) with a Facebook or Instagram account who, between September 1, 2024 and June 2, 2025: (i) have or had the Facebook or Instagram app installed on their Android mobile device, and (ii) visited a website on their Android mobile device where the Meta Pixel was installed.

121. **California Subclass**: Plaintiffs Devin Rose, Yolanda Cunningham, and John Ginder also seek to represent a subclass of similarly situated individuals defined as follows:

> All Android users in California with a Facebook or Instagram account who, between September 1, 2024 and June 2, 2025: (i) have or had the Facebook or Instagram app installed on their Android mobile device, and (ii) visited a website on their Android mobile device where the Meta Pixel was installed.

122. Excluded from the Class are Defendants, any affiliate, parent, or subsidiary of Defendants; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

123. **Numerosity (Rule 23(a)(1))**: Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of members of the Class is unknown to Plaintiffs at this time. However, it is estimated that there are at least tens of millions of individuals. The identity of such membership is readily ascertainable from Defendants' records and non-party records, including from Meta's records of its Facebook and Instagram account holders and Google's records of users of its Android operating system.

124. **Typicality (Rule 23(a)(3))**: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all Class members, each have or had an Android device or devices, a Facebook and/or an Instagram account, visited a website where the Meta Pixel was installed, and had their browsing information collected by Meta without their consent based on the misconduct alleged herein and due to Google's negligence.

125. **Adequacy (Rule 23(a)(4))**: Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of other Class members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of all Class members.

126. **Commonality (Rule 23(a)(2))**: Questions of law and fact are common to the members of the Class because Defendants have acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct. Questions of law and fact common to the Class include:

(i) Whether Meta's acts and practices alleged herein constitute egregious breaches of social norms;

(ii) Whether Meta accessed Plaintiffs' and Class member's personal information and browsing information from their Android mobile devices;

(iii) Whether Meta acted intentionally and/or knowingly in violating Plaintiffs' and Class members' privacy rights under the ECPA, CIPA and CDAFA;

(iv) Whether Meta was unjustly enriched as a result of its violations of Plaintiffs' and Class members' privacy rights;

(v) Whether Google acted negligently; and

(vi) Whether Plaintiffs and Class members are entitled to damages under the ECPA, CIPA, CDAFA, or any other relevant statute.

127. **Predominance & Superiority (Rule 23(b)(3)**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class and Subclass members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to individual Plaintiffs is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII. FRAUDULENT CONCEALMENT AND TOLLING

128. The applicable statutes of limitations are tolled as to Meta by virtue of Meta's knowing and active concealment of the facts alleged above. Plaintiffs and Class members were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part.

129. At the time the action was filed, Meta was under a duty to disclose the true character, quality, and nature of its activities to Plaintiffs and Class members. Meta is therefore estopped from relying on any statute of limitations.

130. Meta's fraudulent concealment is common to the Class.

## VIII. CAUSES OF ACTION

### COUNT I
### Intrusion Upon Seclusion
### (On Behalf of the Class Against Meta)

131. Plaintiffs Rose, Cunningham, Velilla, and Ginder incorporate the factual allegations set forth above by reference.

132. Plaintiffs bring this claim individually and on behalf of the Class and California Subclass against Meta.

133. Plaintiffs and Class members maintain a reasonable expectation of privacy in their Android mobile devices and their online behavior, generally.

134. The reasonableness of Plaintiffs' and Class members' expectation of privacy in their web browsing in the Android mobile environment is supported by Google's sandboxing protocols, which are meant to keep their Android devices and secure and prevent the collection and treatment of their browsing information in the manner alleged herein Meta's flagrant violation of these important Android protocols, and its announcement that it would "pause" its misconduct immediately after researchers discovered it, support the reasonableness of Plaintiffs and Class members' expectations. It is further supported by the surreptitious and non-intuitive nature of Meta's misconduct, which Plaintiffs and Class members had no way of knowing, and which prevented them from being able to take any steps to avoid the consequences of Meta's misconduct.

135. The reality of modern life increasingly requires that much of our daily activities are conducted online—Plaintiffs and Class members have no practical choice or ability but to conduct their daily lives substantially in the digital world, connected to the Internet. This is especially true for mobile devices upon which we all heavily rely, and which travel with us throughout these daily activities. The necessary engagement with the digital world makes Plaintiffs' and Class members' private lives susceptible to unlawful observation and recording. Plaintiffs and Class members have a reasonable expectation of privacy that their web browsing will not be amassed into a comprehensive and intrusive chronicle of Plaintiffs' and Class members' lives, traced directly to them, and that there are conditions and protocols set

forth in the Android mobile environment that enhances and bolsters these expectations (i.e., sandboxing protocols).

136. By conducting such widespread surveillance, including through the interception, collection, tracking and compilation of their Internet activity, Meta intentionally violated Plaintiffs' and Class members' reasonable expectation of privacy, and accordingly intruded upon Plaintiffs' and Class members' seclusion.

137. Plaintiffs and Class members did not and could not authorize Meta to intercept data on every aspect of their lives and activities.

138. The conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

a. Meta engages in widespread data collection and interception of Plaintiffs' and Class members' Internet activity, including their communications with websites, thereby learning intimate details of their daily lives based on the massive amount of information collected about them;

b. Meta abused a communication channel in violation of Google's policies to connect website information and Plaintiffs' and Class members' Facebook and Instagram accounts, thus de-anonymizing and identifying Plaintiffs and Class members and tying their browsing information with their identities;

c. Meta combined the information collected on websites with users' identities for advertising purposes; and

d. Meta sells access to or discloses this information, which contains the data improperly collected about Plaintiff and Class members, to an unknown number of advertisers who choose to advertise on the Facebook/Instagram ecosystem, which likewise violates Plaintiffs' and Class members' common law right to privacy and the control of their personal information.

139. Meta was enriched through this collection of data because users' browsing information became more valuable when Meta exploited the Android communication channels to tie browsing information to users' identities.

140. Meta's amassing of electronic information reflecting all aspects of Plaintiffs' and Class members' lives into identifiable profiles for future or present use is in and of itself a violation of their right to privacy in light of the serious risk these profiles pose to their autonomy.

141. Accordingly, Plaintiffs and Class members have been damaged by Meta's intrusion upon their seclusion and are entitled to all relief available under common law.

142. For Meta's intrusion into their seclusion, Plaintiffs and Class Members seek nominal damages, compensatory damages, punitive damages, disgorgement, and any other relief the Court deems just. Plaintiffs seek restitution for the unjust enrichment obtained by Meta as a result of unlawfully tying Plaintiffs personal data to their identities. Plaintiffs seek punitive damages because Meta's calculated actions were carried out in conscious disregard for Plaintiffs' and Class Members rights. Punitive damages are warranted to deter Meta from engaging in future misconduct, which it has only "paused."

**COUNT II**
**Invasion of Privacy Under California's Constitution**
**(On Behalf of Plaintiffs and the California Subclass Against Meta)**

143. Plaintiffs Rose, Cunningham, and Ginder (the "California Plaintiffs") incorporate the factual allegations set forth above by reference.

144. The California Plaintiffs bring this claim individually and on behalf of the California Subclass against Meta.

145. Article I, section 1 of the California Constitution provides that "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*." The phrase "and privacy" was added by the "Privacy Initiative" adopted by California voters in 1972.

146. The addition of the phrase "and privacy" occurred after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

> The right of privacy is the right to be left alone. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our

> privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

147. This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more measures of protection against this most modern threat to personal privacy:

> Computerization of records makes it possible to create "cradle-to-grave" profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.

148. In recognizing these privacy rights, the California Constitution provides insight into and serves to define the nature of the reasonable expectation of privacy of an objectively reasonable California resident. In contravention to the California Constitution and the reasonable expectations of privacy of California residents, Meta "stockpil[es] unnecessary information about [California Subclass members] and [] misus[es] information gathered for one purpose in order to serve other purposes," creating "cradle-to-grave" profiles of California Subclass members.

149. The California Plaintiffs and California Subclass members maintain a reasonable expectation of privacy in the conduct of their lives, including their Internet browsing activities and in their electronic communications and exchange of personal information. The reality of modern life increasingly requires that much of our daily activities are conducted online— California Plaintiffs and California Subclass members have no practical choice or ability but to conduct their daily lives substantially in the digital world, connected to the Internet. The necessary engagement with the digital world makes Plaintiffs' and California Subclass members' private lives susceptible to unlawful observation and recording, capable of yielding a comprehensive and intrusive chronicle of California Plaintiffs' and California Subclass members' lives. If the California Plaintiffs and California Subclass members cannot have a reasonable expectation of privacy in the conduct of their lives online and the digital transmission of their personal information, they can have no reasonable expectation of privacy for virtually any facet of their lives.

150. By conducting such widespread surveillance, including through the interception, collection, tracking, and compilation of their Internet activity, Meta intentionally invaded the California Plaintiffs' and

California Subclass members' privacy rights, as well as intruded upon the California Plaintiffs' and California Subclass members' seclusion.

151. The California Plaintiffs and California Subclass members did not and could not authorize Meta to intercept data on every aspect of their lives and activities.

152. The conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

a. Meta engages in widespread data collection and interception of the California Plaintiffs' and California Subclass members' Internet activity, including their communications with websites, thereby learning intimate details of their daily lives based on the massive amount of information collected about them;

b. Meta abused a communication channel in violation of Google's policies to connect website information and the California Plaintiffs' and California Subclass members' Facebook and Instagram accounts, thus de-anonymizing and identifying Plaintiffs and Class members and tying their browsing information with their identities;

c. Meta combined the information collected on websites with users' identities for advertising or other monetization purposes; and

d. Meta sells access or discloses this information, which contains the data improperly collected about the California Plaintiffs and Class members, to an unknown number of advertisers who choose to advertise on the Facebook ecosystem, which likewise violates the California Plaintiffs' and California Subclass members' common law right to privacy and the control of their personal information.

153. Meta was enriched through this collection of data because users' browsing information became more valuable when Meta exploited the Android communication channels to tie browsing information to users' identities.

154. Meta's amassing of electronic information reflecting all aspects of the California Plaintiffs' and California Subclass members' lives into profiles for future or present use is in and of itself a violation of their right to privacy in light of the serious risk these profiles pose to their autonomy.

155. The California Constitution created an inalienable right to be free from pervasive electronic surveillance; Plaintiffs and California Subclass members are under no obligation to "opt out" of such

violations of their constitutional privacy rights to stop Meta's intrusions into their daily lives—that right inheres automatically for every California Subclass member.

156. The right to privacy in California's constitution creates a right of action for California residents against private entities such as Meta. Meta lacks a legitimate business interest in stockpiling and compiling the personal information of the California Plaintiffs and California Subclass members.

157. The California Plaintiffs and California Subclass members have been damaged by Meta's invasion of their privacy and are entitled to just compensation and injunctive relief.

**COUNT III**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. §§ 2511(1), *et seq.***
**<u>(On Behalf of the Class Against Meta)</u>**

158. Plaintiffs Rose, Cunningham, Velilla, and Ginder incorporate the factual allegations set forth above by reference.

159. Plaintiffs bring this claim individually and on behalf of the Class against Meta.

160. The Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510, et seq. prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication. In relevant part, the ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

161. The ECPA protects both the sending and the receipt of communications.

162. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

163. The transmission of Plaintiffs' and Class members' website page visits, browsing and search information, and persistent identifiers each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

164. The transmission of this information between Plaintiffs and Class members, on the one hand, and each website with which they chose to exchange communications, on the other, are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio,

electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

165. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

166. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

167. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication." 18 U.S.C. § 2510(5). The following instruments constitute "devices" within the meaning of the ECPA: (a) the Meta Pixel; (b) the code that enabled Meta to link browsing information with Facebook and Instagram profiles; and (c) any other tracking code or SDK used by Meta. Plaintiffs and Class members' interactions with each website are electronic communications under the ECPA.

168. By utilizing the methods described herein, Meta intentionally intercepted and/or endeavored to intercept the electronic communications of Plaintiffs and Class members in violation of 18 U.S.C. § 2511(1)(a).

169. Meta then used the intercepted communications for advertising or other monetization purposes. By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

170. Meta was not acting under the color of law to intercept Plaintiffs' and Class members' electronic communications.

171. Plaintiffs and Class members did not authorize Meta to acquire the content of their communications for purposes of invading Plaintiffs' and Class members' privacy. Plaintiffs and Class members had a reasonable expectation that Meta would not intercept their communications and sell their data for advertising or other monetization purposes without their knowledge or consent, particularly in the Android environment.

172. The websites Plaintiffs and Class members visited did not authorize or consent to Meta's conduct, given Meta's conduct constituted an abuse of Android security protocols and a violation of Google's terms.

173. As a result of every violation of the ECPA, on behalf of Plaintiffs and Class members, Plaintiffs seeks all remedies available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorneys' fees and costs.

**COUNT IV**
**Violation of the California Invasion of Privacy Act § 631**
**(On Behalf of the California Subclass Against Meta)**

174. Plaintiffs Rose, Cunningham, and Ginder incorporate the factual allegations set forth above by reference.

175. Plaintiffs Rose, Cunningham, and Ginder bring this claim individually and on behalf of the California Subclass against Meta.

176. The California Invasion of Privacy Act (CIPA) is codified at Cal. Penal Code §§ 630–638. The Act begins with its statement of purpose:

> The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630 ("Legislative declaration and intent").

177. California Penal Code § 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars.

178. Speaker of the California Assembly, Jesse Unruh, who introduced CIPA, urged that the law "represents an important advance in California law protecting the inherent rights of our citizens to privacy in their personal affairs. It is far stronger than the laws of many states in this field, and much tougher than the proposed federal eavesdropping legislation." He further emphasized that the law would act as "a powerful deterrent to those who wiretap illegally for profit."

179. Meta is a "person" within the meaning of Cal. Penal Code § 631.

180. Each of the following items constitutes a "machine," "instrument," or "contrivance," under CIPA, and even if they do not, Meta's deliberate and purposeful scheme to intercept communications falls under the broad catch-all category of "any other manner":

a. The Meta Pixel;

b. The code that enabled Meta to link browsing information with Facebook and Instagram profiles;

c. Any other tracking code or SDK used by Meta;

d. Plaintiffs' and Class members' browsers; and

e. Plaintiffs' and Class members' Android devices.

181. Meta willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents the electronic communications of Plaintiffs and California Subclass Members, on the one hand, and the websites at issue, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

182. Meta used those intercepted communications, including but not limited to de-anonymizing and identifying Plaintiffs and California Subclass members through the signals sent on the Android communication channels, using all of this information to build comprehensive audiences for advertisers, and selling access to those audiences to interested advertisers for a profit.

183. Neither Plaintiffs nor California Subclass members nor website operators provided their prior consent to Meta's intentional interception, reading, learning, recording, collection, de-anonymization, and usage of Plaintiffs' and California Subclass members' electronic communications. Nor could they have done

so, because Meta acted surreptitiously, such that even website operators did not know or consent to Meta's actions.

184. The wiretapping of Plaintiffs and California Subclass members occurred in California, where Plaintiffs and California Subclass members accessed the websites, where the Meta Pixel was loaded on Plaintiffs' and California Subclass members' browsers, where Meta used the Android communication channels to de-anonymize and identify Plaintiffs and California Subclass members, and where Meta routed Plaintiffs' and California Subclass members' electronic communications to Meta's servers, which were located in California where Meta is headquartered.

185. Plaintiffs and California Subclass members have suffered loss by reason of these violations including, but not limited to, violations of their rights to privacy and loss of value in their personally identifiable information.

186. Pursuant to California Penal Code § 637.2, Plaintiffs and California Subclass members have been injured by Meta's violations of California Penal Code § 631, and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT V**
**Violation of the California Invasion of Privacy Act § 632**
**(On Behalf of the California Subclass Against Meta)**

187. Plaintiffs Rose, Cunningham, and Ginder incorporate and reallege the above factual allegations by reference.

188. Plaintiffs Rose, Cunningham, and Ginder bring this claim individually and on behalf of the California Subclass against Meta.

189. California Penal Code § 632(a) provides, in pertinent part:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation.

190. A "confidential communication" is any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto. *See* Cal. Penal Code § 632(c).

191. Meta is a "person" within the meaning of Cal. Penal Code § 632.

192. Each of the following items constitutes "an electronic amplifying or recording device" under CIPA:

a. The Meta Pixel;

b. The code that enabled Meta to link browsing information with Facebook and Instagram profiles;

c. Any other tracking code or SDK used by Meta;

d. Plaintiffs' and Class members' browsers; and

e. Plaintiffs' and Class members' Android devices.

193. Through the use of the Meta Pixel, Meta intentionally eavesdropped upon confidential communications between and Plaintiffs and California Subclass members, on the one hand, and each website with which they chose to exchange confidential communications, on the other, and further caused the contents of Plaintiffs' and California Subclass members' confidential communications with those websites to be automatically recorded and transmitted to Meta, without the knowledge or consent of Plaintiffs and Subclass members.

194. Plaintiffs and California Subclass members had a reasonable expectation that their communications with websites would remain confidential vis-à-vis Meta and not be recorded or disclosed thereto.

195. At no time did Plaintiffs or California Subclass members consent, expressly or otherwise, to Meta's recording or eavesdropping on their confidential communications with websites. Neither Meta's nor any website's privacy policy provided clear, explicit, or adequate notice that such recording or disclosure would occur.

196. Plaintiffs and California Subclass members have suffered loss by reason of these violations including, but not limited to, violations of their rights to privacy and loss of value in their personally identifiable information.

197. Pursuant to California Penal Code § 637.2, Plaintiffs and California Subclass members have been injured by Meta's violations of California Penal Code § 632, and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT VI**
**Violation of the California Invasion of Privacy Act § 635**
**(On Behalf of the California Subclass Against Meta)**

198. California Penal Code § 635(a) provides, in pertinent part:

> Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another . . . shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500).

199. Each of the Meta Pixel and the code Meta uses to tie users' communications with websites to their identities is a "device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another."

200. Meta manufactured, assembled, advertised or offered for sale, and possessed these devices.

201. Meta's use of these devices on the various websites that Plaintiffs and California Subclass members visited caused Plaintiffs and California Subclass members real and concrete harm, including but not limited to Meta's unjust enrichment and the loss of control of their personal information. *See Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041, at *7 (N.D. Cal. Dec. 30, 2024).

202. Neither Plaintiffs nor California Subclass members nor website operators provided their prior consent to Defendant's manufacturing or use of these wiretapping devices.

203. Pursuant to California Penal Code § 637.2, Plaintiffs and California Subclass members have been injured by Meta's violations of California Penal Code § 635, and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT VII**
**Violation of the California Invasion of Privacy Act § 638.51**
**(On Behalf of the California Subclass Against Meta)**

204. Plaintiffs Rose, Cunningham, and Ginder incorporate and reallege the above factual allegations by reference.

205. Plaintiffs Rose, Cunningham, and Ginder bring this claim individually and on behalf of the California Subclass against Meta.

206. California Penal Code § 638.51(a) prohibits any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

207. California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

208. California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

209. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information. For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

210. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. Courts have repeatedly recognized that in the Internet era, pen registers and trap and trace devices can take the form of software and, as a result, private companies and persons have the ability gather the same electronic information as law enforcement. The California legislature does not limit its prohibition on installing pen registers to law enforcement.

211. Meta's code, as described above, constitutes a "pen register" because it is "a device or process that records . . . addressing[] or signaling information"—such as Plaintiffs' and California Subclass members' IP addresses and HTTP header information—from the electronic communications transmitted by their Android devices to the websites they visited.

212. Alternatively, Meta's code constitutes a "trap and trace device" because it is a "device or process that captures the incoming electronic or other impulses that identify the originating number or other

dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication"—such as the IP addresses and HTTP header information of Plaintiffs and California Subclass members who are communicating with websites.

213. At all relevant times, Meta installed or used the pen register and/or trap and trace device on various websites and Android communication channels, enabling Meta to de-anonymize and identify Plaintiffs and California Subclass members by tying their browsing information to their Facebook and Instagram profiles.

214. Meta was not authorized by any court order to use a pen register and/or trap and trace device to record Plaintiffs' and California Subclass members' routing, addressing, or signaling information. Nor did Plaintiffs, California Subclass members, or website operators provide their prior consent to Meta's installation or use of a pen register and/or trap and trace device.

215. Meta uses pen registers and/or trap and trace devices to collect such information en masse from Plaintiffs and California Subclass members as a non-party to their communications with websites, for the express purpose of creating comprehensive profiles of Plaintiffs and California Subclass members and facilitating the tracking of all of their online activity and making that information available to third parties. The interception of data is done for the express purpose of personally identifying Plaintiffs and California Subclass members and using that information to link Plaintiffs and California Subclass members' online activities to the profiles Meta maintains of them. The data Meta collects and aggregates through its pen registers and/or trap and trace devices constitutes "unique fingerprinting," thereby providing unique information normally within the domain of law enforcement officers with a warrant.

216. Pursuant to California Penal Code § 637.2, Plaintiffs and California Subclass members have been injured by Meta's violations of California Penal Code § 638.51(a), and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT VIII**
**Violation of the California Comprehensive Computer Data Access and Fraud Act**
**Cal. Pen. Code § 502 ("CDAFA")**
**(On Behalf of the California Subclass Against Meta)**

217. Plaintiffs Rose, Cunningham, and Ginder (the "California Plaintiffs") incorporate and reallege the allegations set forth above.

218. The California Plaintiffs bring this claim individually and on behalf of the California Subclass against Meta.

219. Meta engaged in the misconduct alleged herein by the California Plaintiffs within the state of California.

220. CDAFA was enacted to provide protection from "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

221. CDAFA affords a private right of action to owners of computers, systems, networks, programs, and who suffer damage or loss as a result of a violation of the Act. *See* Cal. Penal Code § 502(e)(1).

222. Relevant here, CDAFA imposes civil liability on anyone who:

a. Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data. Cal. Penal Code § 502(c)(1);

b. Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2);

c. Knowingly and without permission uses or causes to be used computer services. Cal. Penal Code § 502(c)(3);

d. Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4);

e. Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section. Cal. Penal Code § 502(c)(6);

f. Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network. Cal. Penal Code § 502(c)(7); and

g. Knowingly introduces any computer contaminant into any computer, computer system, or computer network. Cal. Penal Code § 502(c)(8).

223. "Computer services" under the CDAFA "includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(4).

224. "Computer network" is "any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities." Cal. Penal Code § 502(b)(2).

225. "Computer system" is "a device or collection of devices, including support devices…one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

226. "Data" is defined as "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions" that "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

227. "Computer contaminant" is defined as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consumer computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." Cal. Penal Code § 502(b)(12).

228. Meta's conduct, described herein, violates Cal. Penal Code §§ 502(c)(1), (2), (3), (4), (6), (7), and (8).

229. The California Plaintiffs and California Subclass members are the owners or lessees of Android devices that comprise the computers, computer systems, computer networks impacted by the misconduct alleged herein, and the owners of data and personal information Meta collected from the California Plaintiffs'

and California Subclass members' Android mobile devices and from their online web browsing conducted on those devices.

230. In violation of Cal. Penal Code § 502(c)(8), Meta knowingly introduced computer contaminants into the California Plaintiffs' and Subclass members' computers, computer systems, or computer networks. Meta did so by creating a set of computer instructions designed to modify, alter, take advantage of, and transmit information from the Android operating systems of the California Plaintiffs' and California Subclass members' Android devices by surreptitiously violating Android sandboxing protocols. Meta's computer instructions, by design, compromised the safety and operation of the California Plaintiffs' and California Subclass members' Android devices and their operating systems, and usurped normal operation of the same, by supplanting the intended functioning of those devices and their compliance with sandboxing protocols.

231. Meta knowingly and without permission used the California Plaintiffs' and California Subclass members' data, computer, computer system, or computer network including to devise or execute its scheme or artifice to obtain money, property, or data, in violation of Cal. Penal Code §§ 502(c)(1)-(3).

232. In violation of Cal. Penal Code §§ 502(c)(1)-(4), (6)-(8), Meta knowingly took, copied, accessed, used, caused to be used, altered, and added the California Plaintiffs' and California Subclass members' data, computers, computer services, and computer networks. Among other things, Meta knowingly changed technologies on the California Plaintiffs' and California Subclass members' computers, computer systems, and computer networks and provided itself and other (currently unknown) entities the means of accessing those computers, computer systems, and computer networks in violation of CDAFA and sandboxing principles and protocols.

233. Meta makes use of the California Plaintiffs' and California Subclass members' valuable data to obtain money for numerous purposes, including to identify users and their personal characteristics, categorize them for Meta's (and it clients') business purposes, target them with marketing messages from its advertising clients, and to train Meta's artificial intelligence technology..

234. Meta's use of the California Plaintiffs' and California Subclass members' data is wrongful and unlawful, as described herein.

235. Meta's use and access of the California Plaintiffs' and California Subclass Members' data, computers, computer services, and computer networks, and Meta's alteration of the California Plaintiffs' and California Subclass members' computers, computer services, and computer networks was without permission because:

a. The California Plaintiffs and California Subclass members never authorized Meta to make these changes to their computers, computer services, or computer networks or otherwise access or use their data, computers, computer services, or computer networks in violation of sandboxing protocols;

b. Meta's changes to the Android devices and the Android operating system were, by design, to invisible to the California Plaintiffs and California Subclass members;

c. The California Plaintiffs and California Subclass members were unaware that Meta was surreptitiously accessing and using the California Plaintiffs' and California Subclass members' data, computers, computer services, or computer networks;

d. Meta circumvented technical and/or code-based barriers to access and use the California Plaintiffs' and California Subclass members' data, computers, computer services, and computer networks, when it took action to circumvent sandboxing protocols.

236. None of Meta's technologies are necessary for any California Plaintiff's or California Subclass member's device to communicate effectively with websites and other online services and, in fact, compromised the functioning and safety of their Android devices and the operating system thereon.

237. As a result of Meta's violation of CDAFA, the California Plaintiffs and California Subclass members have suffered damage and/or loss, including but not limited to the deprivation of control over their valuable property, i.e., their personal information, the ability to receive compensation for their data, Meta's illegal and unequitable profiting from that data, the ability to withhold their data for sale, and from Meta's depletion of their Android devices' battery and bandwidth through the unauthorized access alleged herein.

238. Meta's violations were willful, fraudulent, and/or oppressive. Meta used these technologies to surreptitiously intercept, collect, and compile detailed profiles of the California Plaintiffs' and California subclass members' online activity in an environment (Android) where their ability to browse online anonymously was protected and enhanced by the sandboxing protocols Meta sought to and did evade. At all times, Meta was aware of how its technology functioned but made no effort to alert or obtain permission from

the California Plaintiffs and California Subclass members prior to deploying it on their computing devices and continued to attempt to hide its actions after deployment.

239. California Plaintiffs and California Subclass members seek actual damages, general damages, unjust enrichment, punitive damages, appropriate injunctive or other equitable relief pursuant to Cal. Penal Code § 502(e)(1) and any other relief the Court deems just. Pursuant to Cal. Penal Code § 502(e)(2), California Plaintiffs and California Subclass members also ask the Court to award them their reasonable attorneys' fees.

240. Pursuant to Cal. Penal Code § 502(e)(4), California Plaintiffs and California Subclass Members are also entitled to punitive or exemplary damages because Meta's violations were willful, and upon information and belief, Meta is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

**COUNT IX**
**Negligence**
**(On Behalf of the Class Against Google)**

241. Plaintiffs Rose, Cunningham, Velilla, and Ginder incorporate and reallege the allegations set forth above.

242. Plaintiffs bring this claim individually and on behalf of the Class against Google.

243. California common law on negligence is applicable to all members of the Class and California Subclass.

244. Google develops, markets, and distributes the Android mobile operating system, which powered and facilitated Meta's use of unsecured localhost ports to collect, store, and use vast amounts of non-public, sensitive personal information from users such as Plaintiffs and Class members.

245. In using their Android devices as intended, Plaintiffs and Class members necessarily transmit and store their private information—including highly sensitive data—through Google's software and ecosystem.

246. By designing, operating, and profiting from Android, Google assumed and owed a duty to provide reasonable care to Plaintiffs and Class members. Google also assumed a duty to provide reasonable care to Plaintiffs and Class members who purchased and used Android by holding itself out as a trusted provider of secure, privacy-protective software.

247. Google's duty to Plaintiffs and the Class included, at minimum, exercising reasonable care in its design, development, testing, implementation, and updating of Android so that these products employed

reasonable security measures, protected users' private information from unauthorized access and misuse, and did not expose users to foreseeable privacy harms from third parties such as Meta.

248. A special relationship existed between Google, on the one hand, and Plaintiffs and Class members, on the other. Google placed its Android into the stream of commerce with the express purpose of enabling users to conduct personal, financial, and other sensitive activities through it. Plaintiffs and Class members reasonably relied on Google's representations and conduct, entrusted Google with their confidential information, and had no ability or expectation to independently inspect, audit, or secure the underlying operating system. Google was in a unique and superior position to identify, prevent, and mitigate the very harms that occurred here.

249. The risk that unauthorized entities would attempt to gain access to or exploit Plaintiffs' and Class members' private information through Android was foreseeable to Google. Google knew, or should have known, that its software handles data that is highly valuable and routinely targeted for unauthorized access, and that any failure to implement reasonable safeguards, monitoring, and controls at the platform level would expose users to significant privacy harms. In fact, Google regularly assumes the duty to install software "patches" to Android to prevent similar privacy and security harms from occurring.

250. Despite its duties, Google failed to exercise reasonable care. Google negligently designed and maintained an "overly permissive" architecture in Android that allowed third parties—including Meta—to exploit localhost communications and other platform features to gain unauthorized access to users' private information, de-anonymize users, and track their online activity without consent.

251. Google failed to implement and enforce adequate controls on localhost communications, background executions, and access to sensitive identifiers; failed to reasonably monitor and test Android for known and foreseeable abuses; and failed to adopt timely safeguards and policies—such as stricter platform-level restrictions—that other industry participants had already implemented.

252. Google further breached its duties by failing to: (a) reasonably identify and assess foreseeable internal and external risks to the security, confidentiality, and integrity of Android; (b) design and implement adequate technical and administrative safeguards to control those risks; (c) adequately test, monitor, and update its key controls, systems, and procedures; (d) detect and stop Meta's unauthorized access and misuse of users' private information within a reasonable time; and (e) follow and enforce its own

stated privacy and security policies with respect to data processed through Android=.

253. Google also owed Plaintiffs and Class members a duty to provide prompt, accurate, and complete notice when it learned, or reasonably should have learned, that Meta was exploiting vulnerabilities in Android to access and misuse users' private information. Google breached this duty by failing to timely and adequately disclose Meta's conduct, the nature and scope of the unauthorized access, and the categories of data affected, thereby depriving Plaintiffs and Class members of the opportunity to take steps to prevent, mitigate, or remediate the resulting harms.

254. As a direct and proximate result of Google's negligence, Plaintiffs and Class members suffered damages to their autonomy and freedom not to be surveilled. These damages also include but are not limited to: the loss of privacy; the unauthorized interception, tracking, and misuse of their private information; diminished value of their data; and an increased risk of future harm and misuse of their information.

255. Plaintiff and Class members are therefore entitled to compensatory and consequential damages in an amount to be proven at trial, together with any other relief the Court deems just and proper.

**COUNT X**
**Negligent Misrepresentation**
**(On Behalf of the Class Against Google)**[93]

256. Plaintiffs Rose, Cunningham, Velilla, and Ginder incorporate and reallege the allegations set forth above.

257. Plaintiffs bring this claim individually and on behalf of the Class against Google.

258. California common law on negligent misrepresentation is applicable to all members of the Class and California Subclass.

259. Google markets and promotes its Android operating system, Chrome web browser, and Pixel devices as safe, privacy-protective products that give users control over their personal information. In doing so, Google has made repeated, affirmative representations of existing material fact, including but not limited to:

- that it is "continually working on ways to weed out harmful apps" from Google Play to

[93] The Court's May 11, 2026 Order (ECF No. 120) dismissed this claim with leave to amend. To preserve their right to appeal at a later date, Plaintiffs reallege this claim and any related allegations. *See Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012).

"keep users safe," and that it uses "extensive review processes" to prevent harmful apps from entering the store and to ensure user safety;

- that Android allows users to "choose when to share certain sensitive data with apps you download";
- that "Android minimizes and de-identifies your data from intelligent features" and "restricts access to technically ensure your privacy and safety";
- that "your life is on your phone: your financial information, personal data, photos, and more. So Pixel is built with security at its core. Pixel hardware and software work together to help keep your phone and data private, safe, and secure"; and
- that "[a]ll Pixel devices are designed to respect your privacy… we ensure the privacy and safety of your data by minimizing the amount of data stored, de-identifying it so that the data is not linked to you, and restricting its access altogether."

260. These statements, among others, were presented to consumers, including Plaintiffs and Class members, as factual descriptions of the security and privacy protection of Android, Chrome, Pixel devices, and the Google Play ecosystem.

261. Google was negligent in ascertaining the truth of its statements about Android's privacy and security. Before and while making those statements, Google failed to reasonably investigate, test, or review the actual behavior of Android with respect to localhost communications, background executions, and tracking technologies.

262. Google further failed to account for or adequately investigate: warnings and research about localhost and tracking abuses; and the fact that other browsers (including DuckDuckGo and Brave) had implemented stricter blocking measures. Had Google exercised reasonable care, it would have learned that its products did not in fact provide the level of minimization, de-identification, access restriction, and user control described in its statements.

263. At the time Google made and disseminated these statements, Android allowed the unauthorized interception, tracking, and exploitation of users' private information by third-party tracking technologies.

264. Google was under a duty to communicate accurate information to Plaintiffs and Class members regarding the privacy, security, and data-protection features of Android, Chrome, Pixel devices, and the Google Play ecosystem. Google knew that consumers would rely on its statements about privacy and security in deciding whether to purchase and use Android devices and Pixel phones, to use Chrome, and to download apps from Google Play, and it undertook to provide such information in its marketing, product descriptions, and privacy representations.

265. Google's assurances that Android and Pixel devices minimized and de-identified user data, restricted access to ensure privacy and safety, and allowed users to choose when to share sensitive data with apps, were false statements of existing material fact, or at minimum were made without reasonable grounds for believing them to be true.

266. Google is liable even if it subjectively believed its statements were accurate, where, as here, it had no reasonable basis for such belief given the actual design and behavior of Android, Chrome, and the Google Play ecosystem.

267. Google had no reasonable ground for believing its privacy and security statements were true in light of: (a) the known and foreseeable risks associated with localhost communications and background app execution; (b) the fact that other browser providers had already implemented stricter blocking measures to prevent similar tracking; and (c) Google's own later implementation of countermeasures to block the very techniques Meta was using.

268. Google made these misrepresentations with the intent to induce Plaintiffs and Class members to: (a) purchase and use Android devices and Pixel phones; (b) use the Chrome browser; (c) download and use apps from Google Play; and (d) entrust their sensitive personal and browsing information to Google's software and ecosystem.

269. Because Google was in a superior position to know the true privacy and security characteristics of Android, Chrome, and Pixel devices, and because it voluntarily undertook to communicate that information to the public, Plaintiffs and Class members reasonably and justifiably relied on Google's affirmative statements about privacy, security, and user control.

270. In reliance on those representations, Plaintiffs and Class members purchased or continued to use Android devices and Pixel phones, browsed the Internet using Chrome, downloaded and used apps from

Google Play, configured their devices and settings based on the belief that Android minimized and de-identified their data and restricted access as promised.

271. Had Plaintiffs and Class members known that Google's products did not in fact provide the level of privacy, protection, and control represented they would not have purchased or used Google's products on the same terms, or at all.

272. As a direct and proximate result of Google's negligent misrepresentations, Plaintiffs and Class members suffered damages to their autonomy and freedom not to be surveilled. These damages also include but are not limited to: the unauthorized interception, tracking, and exploitation of their private information; loss of their privacy and confidentiality; diminution in the value and benefit of the products they purchased (which were worth less than represented); and exposure to an increased risk of further misuse of their data and attendant harms.

273. Plaintiffs and Class members are therefore entitled to recover damages and all other relief available under California law.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all members of the Class, respectfully request that this Court:

(a) Certify the proposed Class and Subclass pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiffs Rose, Cunningham, Velilla, and Ginder as representatives of the Class, and Plaintiffs Rose, Cunningham, and Ginder as representatives of the California Subclass, and designating the undersigned attorneys as Class Counsel.

(b) Permanently restrain Meta, and its officers, agents, servants, employees and attorneys, from violating Android sandboxing protocols to unlawfully track, obtain, and use Plaintiffs' and Class members' data and personal information (or any information derived from that data and personal information), and to delete or destroy any data and personal information obtained as a result of the misconduct alleged herein;

(c) Award compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Meta for all damages sustained as a result of Meta's wrongdoing, in an amount to be proven at trial, including interest thereon;

(d) Award punitive damages on the causes of action that allow for them and in an amount that will deter Meta and others from like conduct;

(e) Award equitable relief including restitution and disgorgement of all revenues, earnings, profits, and ill-gotten gains that Meta obtained as a result of its unlawful and wrongful conduct, in an amount to be proven at trial;

(f) Award declaratory relief against Meta as appropriate;

(g) Award injunctive relief against Google for its negligence in designing and maintaining the Android operating system;

(h) Enter judgment in favor of Plaintiffs and Class members against Meta and Google;

(i) Award attorneys' fees, expenses, and costs of suit;

(j) Award pre- and post-judgment interest on all amounts awarded; and

(k) Award such other, further, and different relief as the Court deems proper under the circumstances.

## X. JURY TRIAL DEMANDED

Pursuant to Federal Rule Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: June 1, 2026

Respectfully submitted,

By: */s/ Philip L. Fraietta*
Philip L. Fraietta

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
pfraietta@bursor.com
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*pro hac vice*)
ykopel@bursor.com
Max S. Roberts (SBN 363482)
mroberts@bursor.com
Victoria X. Zhou (*pro hac vice*)
vzhou@bursor.com
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Michael W. Sobol (SBN 19485)
msobol@lchb.com
Michael K. Sheen (SBN 288284)
msheen@lchb.com
Amelia A. Haselkorn (SBN 339633)
ahaselkorn@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Douglas I. Cuthbertson (*pro hac vice*)
dcuthbertson@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile: 212.355.9592

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa D. Brown (SBN 301313)
abrown@ahdootwolfson.com
Sarper Unal (SBN 341739)
sunal@ahdootwolfson.com
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

**AHDOOT & WOLFSON, PC**
Melissa Clark (*pro hac vice*)
mclark@ahdootwolfson.com
521 5th Avenue, 17th Floor
New York, NY 10175
Telephone: (917) 336-0171
Facsimile: (917) 336-0177

**MILBERG, PLLC**
Mariya Weekes (*pro hac vice*)
333 SE 2nd Avenue, Suite 2000
Miami, FL, 33131
Tel: (786) 879-8200
Fax: (786) 879-7520

**MILBERG, PLLC**
Gary M. Klinger (*pro hac vice*)
William Edelman (SBN 285177)
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
gklinger@milberg.com
wedelman@milberg.com

*Interim Class Counsel*