LATHAM & WATKINS LLP
Serrin Turner (*pro hac vice*)
*serrin.turner@lw.com*
Nicolas Luongo (*pro hac vice*)
*nicolas.luongo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Brad Baglien (*pro hac vice*)
*brad.baglien@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

*Attorneys for Defendant*
*Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re Meta Android Privacy Litigation.<br><br>This Document Relates To:<br>All Actions | Case No. 3:25-cv-04674-RFL<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing: August 25, 2026<br>Time: 10:00 a.m.<br>Location: Courtroom 15—18th Floor<br>Judge: Hon. Rita F. Lin |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on August 25, 2026 at 10:00 a.m., before the Honorable Rita F. Lin, United States District Court, Courtroom 15, 18th Floor, 450 Golden Gate Avenue, San Francisco, California, Defendant Meta Platforms, Inc. ("Meta") will and hereby does move for an order dismissing Plaintiffs' First Amended Consolidated Class Action Complaint (Dkt. 122) for failure to state a claim under Rule 12(b)(6). This motion is based on this notice of motion; the memorandum of points and authorities in support thereof that follows; the pleadings, records, and papers on file in this action; oral argument; and any other matters properly before the Court.

## STATEMENT OF ISSUE TO BE DECIDED

Whether the Court should dismiss the Consolidated Class Action Complaint for failure to state any claim upon which relief can be granted under Rule 12(b)(6).

Dated: July 15, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Serrin Turner*

Serrin Turner (*pro hac vice*)
*serrin.turner@lw.com*
Nicolas Luongo (*pro hac vice*)
*nicolas.luongo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Brad Baglien (*pro hac vice*)
*brad.baglien@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

*Attorneys for Defendant Meta Platforms, Inc.*

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

III. LEGAL STANDARD ..... 3

IV. ARGUMENT ..... 3

A. Plaintiffs' Consent Bars All of Their Claims ..... 3

1. Meta's Privacy Policy Broadly Discloses the Data Collection and Use at Issue ..... 3

2. Plaintiffs Cannot Narrow the Policy's Broad Language Based on Extrinsic Factual Beliefs ..... 6

B. Plaintiffs' Wiretapping Claims Fail ..... 11

C. Plaintiffs' Pen Register Claim Fails ..... 13

D. Plaintiffs' CDAFA Claim Fails ..... 18

E. Plaintiffs' Invasion-of-Privacy Claim Fails ..... 24

V. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Agensys, Inc. v. Regents of Univ. of California*,
2024 WL 5679162 (C.D. Cal. Oct. 22, 2024) ... 21

*Application of U.S. of Am. for an Ord. Authorizing an In-Progress Trace of Wire Commc'ns*,
616 F.2d 1122 (9th Cir. 1980) ... 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 3

*Aviles v. Liveramp, Inc.*,
2025 WL 487196 (Cal. Super. Jan. 28, 2025) ... 15, 16

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ... 11, 18, 19

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) ... 4, 5, 7, 8, 9

*Camacho v. DG Premium Brands LLC*,
No. 24STCV21672 (Cal. Super. Apr. 17, 2025) ... 15

*Campbell v. Facebook, Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ... 11

*Capitol Recs. Inc. v. Thomas-Rasset*,
2009 WL 1664468 (D. Minn. June 11, 2009) ... 17

*Cottle v. Plaid Inc.*,
536 F. Supp. 3d 461 (N.D. Cal. 2021) ... 23

*Crowley v. CyberSource Corp.*,
166 F. Supp. 2d 1263 (N.D. Cal. 2001) ... 13

*Dameron Hosp. Assn. v. AAA N. California, Nevada & Utah Ins. Exch.*,
229 Cal. App. 4th 549 (2014) ... 6

*Dellasala v. Samba TV, Inc.*,
2026 WL 1138358 (N.D. Cal. Apr. 21, 2026) ... 23

*Doe v. Eating Recovery Ctr. LLC*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) ... 17

*Doe v. Wirta*,
2019 WL 13472128 (N.D. Cal. Apr. 10, 2019) ... 25

*F.B.T. Prods., LLC v. Aftermath Recs.*,
621 F.3d 958 (9th Cir. 2010) .................... 5

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994).................... 17

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*,
109 Cal. App. 4th 944 (2003) .................... 6

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) .................... 25

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024).................... 7, 8, 24

*Heiting v. HP Inc.*,
2025 WL 2993673 (Cal. Super. Aug. 1, 2025).................... 15, 16

*Hendrickson v. California Newspapers, Inc.*,
48 Cal. App. 3d 59 (1975) .................... 25

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994) .................... 24

*Hohenshelt v. Superior Ct.*,
18 Cal. 5th 310 (2025) .................... 16

*Holden v. Hagopian*,
978 F.2d 1115 (9th Cir. 1992) .................... 21

*In re Consumer Vehicle Driving Data Tracking Collection*,
2026 WL 1092882 (N.D. Ga. Apr. 22, 2026).................... 23

*In re Facebook, Inc. Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) .................... 8, 23

*In re Facebook, Inc. Internet Tracking Litigation*,
956 F.3d 589 (9th Cir. 2020) .................... 8, 23, 24

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .................... 3

*In re Google Android Consumer Priv. Litig.*,
2013 WL 1283236 (N.D. Cal. Mar. 26, 2013).................... 24

*In re Google Location History Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) .................... 12

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ........ 24

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ........ 12

*Johnson v. Walmart Inc.*,
57 F.4th 677 (9th Cir. 2023) ........ 6

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) ........ 14

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) ........ 10

*Lau v. Gen Digital Inc.*,
2024 WL 1880161 (N.D. Cal. Apr. 3, 2024) ........ 11

*Lineberry v. AddShopper, Inc.*,
2025 WL 551864 (N.D. Cal. Feb. 19, 2025) ........ 23

*Lloyd v. Facebook, Inc.*,
2023 WL 1802415 (N.D. Cal. Feb. 7, 2023) ........ 3, 18

*Lloyd v. Facebook, Inc.*,
2024 WL 3325389 (9th Cir. July 8, 2024) ........ 3, 5

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009) ........ 17

*Meta Platforms, Inc. v. Nguyen*,
2023 WL 8686924 (N.D. Cal. Nov. 21, 2023) ........ 4

*Opperman v. Path, Inc.*,
205 F. Supp. 3d 1064 (N.D. Cal. 2016) ........ 24

*Opperman v. Path, Inc.*,
87 F. Supp. 3d 1018 (N.D. Cal. 2014) ........ 21, 22

*Oracle USA, Inc. v. Rimini St., Inc.*,
879 F.3d 948 (9th Cir. 2018) ........ 18, 19, 20, 21

*Perkins v. LinkedIn Corp.*,
53 F. Supp. 3d 1190 (N.D. Cal. 2014) ........ 8

*Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*,
55 Cal. 4th 223 (2012) ........ 4

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ........ 14, 23

*Reisberg v. Renaissance Learning, Inc.*,
2026 WL 1048242 (C.D. Cal. Feb. 17, 2026) .......... 23

*Shah v. Cap. One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) .......... 23, 24

*Shah v. Fandom*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .......... 17

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) .......... 5

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) .......... 5, 9, 25

*Smith v. LoanMe*,
11 Cal. 5th 183 (2021) .......... 16, 17

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 2210002 (N.D. Cal. Aug. 4, 2025) .......... 3, 23

*Stamas v. Cnty. of Madera*,
795 F. Supp. 2d 1047 (E.D. Cal. 2011) .......... 6, 10

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) .......... 3

*Torres v. SeatGeek, Inc.*,
2026 WL 1495202 (N.D. Cal. May 28, 2026) .......... 23

*Tsering v. Meta Platforms, Inc.*,
2026 WL 89320 (N.D. Cal. Jan. 12, 2026) .......... 14, 23

*Twitter, Inc. v. Garland,*
61 F.4th 686 (9th Cir. 2023) .......... 16

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) .......... 11, 22

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) .......... 14

*United States v. Swinburne*,
988 F.2d 125 (9th Cir. 1993) .......... 16

*Van Buren v. United States*,
593 U.S. 374 (2021) .......... 13

*Wagging Tails Prods., Inc. v. Coakley*,
2023 WL 4316777 (C.D. Cal. Feb. 21, 2023) .......... 25

*Wendover Prods., LLC v. PayPal, Inc.*,
2025 WL 3251667 (N.D. Cal. Nov. 21, 2025) ........................................................ 19, 22

*Westlands Water Dist. v. United States*,
337 F.3d 1092 (9th Cir. 2003) ........................................................................................ 6

*Yates v. United States*,
574 U.S. 528 (2015)......................................................................................................... 17

*Zak v. Bose Corp.*,
2019 WL 1437909 (N.D. Ill. Mar. 31, 2019)................................................................. 13

**STATUTES**

18 U.S.C. § 2511(1)(d) ......................................................................................................... 11

Cal. Civ. Code §1644............................................................................................................... 8

Cal. Pen. Code § 502(e)(1) ..................................................................................................... 22

Cal. Pen. Code § 638.50(b)..................................................................................................... 15

Cal. Pen. Code § 638.50(c) ..................................................................................................... 15

**TREATISES**

Restatement (Second) of Contracts § 211(2) (1981) .............................................................. 10

Restatement (Second) of Torts § 892A(4) (1979) ................................................................... 13

**LEGISLATIVE HISTORY**

Bill Analysis, Assemb. B. 929, Reg. Sess. (Cal. Apr. 7, 2015) ............................................ 16

**OTHER AUTHORITIES**

*Manner*, Dictionary.com,
https://www.dictionary.com/browse/manner ..................................................................... 20

## I. INTRODUCTION

Plaintiffs challenge a functionality that did one thing: it helped Meta match a user's browsing activity to their Meta account. They claim that functionality amounted to wiretapping, a pen register, computer hacking, and an invasion of privacy, in violation of state and federal laws. This Court previously allowed most of Plaintiffs' claims to survive dismissal. Respectfully, that order was wrong, and did not fully address Meta's arguments—which compel dismissal.

Above all, Plaintiffs' claims fail because they consented to the conduct at issue. Meta's Privacy Policy discloses that Meta collects identifiers from third-party sites, including the "_fbp cookie," and uses them to "match your activities with your account." Every named Plaintiff agreed to that Policy, and none disputes it. The scope of their consent is a question of contract interpretation resolved by the text of the policy, not by a user's extrinsic assumptions about how technology works. Plaintiffs consented to the very matching they now complain about. That consent defeats every claim.

Plaintiffs' claims also fail for claim-specific reasons. The wiretapping claims fail because the matching they challenge was not an interception of their alleged communications (i.e., their browsing data); rather, it was a *subsequent use* of their browsing data, which is not actionable under the wiretapping laws given that Meta's collection of their browsing data was otherwise consented to. The repleaded pen-register claim still does not allege that the functionality at issue recorded routing information; and it certainly did not record routing information reflecting who Plaintiffs communicate with, which is the only type of routing information the pen register laws concern. The CDAFA claim fails because Plaintiffs' complaint is about the *method* by which Meta accessed their data, which is not actionable under CDAFA given that Meta had permission to access that data in the first instance; nor do Plaintiffs allege cognizable loss under the statute. Finally, the invasion-of-privacy claims fail because a disclosed, consented-to practice does not support either a reasonable expectation of privacy or a highly offensive intrusion.

The Court should consider Meta's arguments anew, closely examine Plaintiffs' allegations and the applicable case law, and, for the reasons detailed below, dismiss the Amended Complaint.

## II. BACKGROUND[1]

The facts have been elaborated in prior briefing, and Meta does not repeat them at length here. *See* Meta's Mot. to Dismiss (Dkt. No. 101) at 2-6. In brief: Meta operates Facebook and Instagram, ¶¶ 18-19, and each named Plaintiff is a Facebook user who agreed to Meta's Terms of Service and the incorporated Privacy Policy, ¶¶ 97, 103, 109, 115. The Privacy Policy discloses that Meta collects identifiers from third-party websites—including the _fbp cookie—and uses them to "match your activities with your account," subject to user controls that Meta offers. ¶¶ 34, 36-37, 46. Plaintiffs do not dispute that they agreed to that Policy. ¶¶ 33, 36, 46, 195.

The challenged conduct concerns a matching functionality Meta allegedly used for a limited time in connection with the Meta Pixel (the "Subject Functionality"). It allegedly operated only on certain Android browsers, for a window of roughly nine months. ¶¶ 4, 52. The Subject Functionality sent the _fbp cookie from the user's browser to Meta's Facebook or Instagram app, via a "localhost port"—an "internal channel[] … intended to allow different Android programs or applications to communicate with one another." ¶¶ 56-59. The app then linked the cookie to the user's Facebook or Instagram account and transmitted the combined data to Meta servers—helping Meta to match browsing activity associated with that cookie to that account. ¶¶ 59, 65-67. Plaintiffs claim that they visited websites on their browsers on their Android devices that would have been affected by the Subject Functionality, though the only ones they specify are non-sensitive sites such as nytimes.com, techcrunch.com, and apnews.com. ¶¶ 96, 108, 114.

Meta moved to dismiss the original Consolidated Complaint. The Court granted the motion in part and denied it in part, dismissing the pen-register and unjust-enrichment claims against Meta with leave to amend, while allowing the remaining claims to proceed. Dkt. No. 120 ("Order") at 1-2. Plaintiffs then filed the FAC. The FAC added allegations that Meta collects IP addresses through the Pixel, ¶¶ 26-27, 37, in an attempt to revive the dismissed pen-register claim. Plaintiffs otherwise dropped the unjust-enrichment claim and left their remaining allegations unchanged.

---

[1] Unless otherwise indicated, the facts recited herein are based on the First Amended Class Action Complaint ("FAC") and are accepted as true only for purposes of this motion. Cites to the Complaint are designated with paragraph marks. All exhibits cited are attached to the Declaration of Serrin Turner filed with Meta's first motion to dismiss.

## III. LEGAL STANDARD

A claim must be dismissed unless it pleads "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Moreover, courts deciding motions to dismiss "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998).

"'[P]ermitting the filing of an amended complaint,' as the Court did here, 'requires a new determination' if a subsequent motion to dismiss is filed." *Smith v. Rack Room Shoes, Inc.*, 2026 WL 183852, at *1 (N.D. Cal. Jan. 23, 2026) (Lin, J.). The "traditional motion to dismiss standard applies," and the Court is "free to correct any errors or misunderstandings without having to find that its prior decision was 'clearly erroneous.'" *Id.*

## IV. ARGUMENT

### A. Plaintiffs' Consent Bars All of Their Claims

This Court correctly noted in its previous Order that "the Privacy Policy capaciously explains that Meta broadly collects browsing data, including 'cookie data,'" and that it uses cookies to "help 'match your activities with your account.'" Order at 9. The Court should have found consent based on that disclosure; its contrary conclusion was wrong on two grounds. First, the Policy's terms explicitly disclose the particular, or at least substantially the same, data collection and use that Plaintiffs challenge, permissibly using broad language to do so. Second, neither Plaintiffs nor the Court may narrow the Privacy Policy's broad, unqualified language based on extrinsic beliefs about how cellphones work, which are not rooted in Meta's disclosures.

#### 1. Meta's Privacy Policy Broadly Discloses the Data Collection and Use at Issue

Plaintiffs all allege they are Facebook users, ¶¶ 97, 103, 109, 115, and like "all users" they had to agree to Meta's Terms of Service and the incorporated Privacy Policy "to create a Facebook account." *Lloyd v. Facebook, Inc.*, 2023 WL 1802415, at *1 (N.D. Cal. Feb. 7, 2023), *aff'd in relevant part*, 2024 WL 3325389 (9th Cir. July 8, 2024); *see Meta Platforms, Inc. v. Nguyen*, 2023

WL 8686924, at *2 (N.D. Cal. Nov. 21, 2023) ("All Facebook users must agree to its Terms of Service[.]"). Plaintiffs do not dispute that they agreed, and they acknowledge the Privacy Policy (and the Cookies Policy incorporated therein) throughout the Complaint. ¶¶ 31, 33, 36, 46, 76, 195. The Court has already recognized as much, observing that Plaintiffs "do not argue that they lacked notice" and "implicitly allege that they agreed to the Privacy Policy." Order at 8-9.

Because privacy policies like Meta's are contracts, they are governed by "general principles of contract law." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) (citing *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012)). To establish consent, the privacy policy "must explicitly notify users of … the particular conduct, or … substantially the same conduct" that allegedly harmed them. *Id.* (quotation omitted). The controlling question is therefore a narrow one of contract interpretation: whether the conduct Plaintiffs challenge falls within the language of the disclosures they accepted—that is, whether the natural meaning of the Privacy Policy's terms covers what is alleged. Answering it requires "review[ing] the terms of the various disclosures and decid[ing] whether a reasonable user reading them would think that he or she was consenting to the data collection." *Id.* at 1148.

Applied here, that inquiry establishes consent because the terms of Meta's policies "explicitly" disclose "the particular" or at least "substantially the same" data collection and use that Plaintiffs challenge. *Id.* at 1147. The terms state that Meta "collect[s] and receive[s] information from partners ... about a variety of your information and activities on and off our Products," including the "[w]ebsites you visit and cookie data" received through tools "like ... the Meta Pixel." Order at 8. The terms specifically identify the "_fbp" cookie as an identifier partner sites may share, and they explain that such sharing "helps us match your activities with your [Meta] account, if you have one." *Id.* These statements disclose that Meta collects browsing data transmitted by third party websites, along with identifiers like the _fbp cookie, and uses the identifiers to match users' browsing data to their accounts. In agreeing to the Privacy Policy, users grant permission to Meta to engage in this type of data collection and use. Indeed, the Ninth Circuit has held these very policies sufficient to establish consent, as "a reasonable person viewing those disclosures would understand that [Meta] maintains the practices of (a) collecting its users' data

from third-party sites and (b) later using the data for advertising purposes." *Smith v. Facebook, Inc.*, 745 F. App'x 8, 8-9 (9th Cir. 2018); *see Lloyd*, 2024 WL 3325389, at *2 (rejecting claim based on targeted advertising using plaintiff's browsing data: "[B]ecause Facebook's data policy gives clear notice that third party partners may share data with Facebook, [the plaintiff] did not have a reasonable expectation of privacy in this information.").

This Court's Order nonetheless held that Plaintiffs did not consent to the complained-of conduct, finding that "a reasonable user could plausibly read the Privacy Policy to not disclose that Meta would open a backdoor to link their Android web browsing activities to their Meta accounts with absolute certainty." Order at 9. But effective consent does not require the defendant to explain precisely *how* it collects and uses the data it says it can collect and use. Consent instead turns on whether a "reasonable user" would understand "*that* an action would be carried out," not on the technical means by which it happens. *Calhoun*, 113 F.4th at 1147, 1149 (emphasis added). Here, what Plaintiffs say harmed them is the matching of their browsing activity to their accounts. That was disclosed. Plaintiffs were expressly told that Meta uses identifiers like the _fbp cookie to "match your activities with your account." That is *at least* "substantially the same" as the conduct at issue. The *substance* is the *matching*—which is the action Plaintiffs claim to have harmed them, and the action that Meta told users would be carried out.

*Smith v. Facebook* confirms the point. There, the district court held that Meta's broad disclosures that it receives "information" from "third-party websites" put plaintiffs on notice that Meta could receive even health-related browsing data. *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 953 (N.D. Cal. 2017). Although the plaintiffs argued the disclosure was too "broad" to secure consent, the court explained that "a contractual term is not ambiguous just because it is broad." *Id.* at 954 (quoting *F.B.T. Prods., LLC v. Aftermath Recs.*, 621 F.3d 958, 964 (9th Cir. 2010)). The Ninth Circuit affirmed. Looking only to whether the policies disclosed that Facebook collected users' third-party browsing data and later used it, it held that consent reached even health-related browsing because that data was not "qualitatively different" from what the policy disclosed, and that a "reasonable person viewing those disclosures" would understand Facebook could receive the data at issue. *Smith*, 745 F. App'x at 8-9. So too here. Any difference between matching and

matching "with absolute certainty" is at most *quantitative*—a matter of degree in how well the disclosed matching performs—not a *qualitative* difference in the conduct itself.

**2. Plaintiffs Cannot Narrow the Policy's Broad Language Based on Extrinsic Factual Beliefs**

Plaintiffs cannot limit the scope of their consent based on expectations that do not derive from the Privacy Policy's text. "To determine the reach of a particular agreement, [a court] must look to its express terms," *Johnson v. Walmart Inc.*, 57 F.4th 677, 682 (9th Cir. 2023), because "[i]t is the objective intent, as evidenced by the words of the contract," that controls, while the "parties' undisclosed intent or understanding is irrelevant," *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003); *accord Stamas v. Cnty. of Madera*, 795 F. Supp. 2d 1047, 1083 (E.D. Cal. 2011). Fundamentally, the court's "function is to determine what, in terms and substance, is contained in the contract, not to insert what has been omitted. [Courts] do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there." *Dameron Hosp. Assn. v. AAA N. California, Nevada & Utah Ins. Exch.*, 229 Cal. App. 4th 549, 569 (2014).

Those rules mean that Plaintiffs' assumptions about how mobile phones work cannot subtract from or vary the Privacy Policy's broad, unqualified disclosure of identity-matching. Interpreting the contract asks *what its words mean*; Plaintiffs instead invoke their own factual assumptions about *how technology works* to vary what the words plainly say. The distinction is fundamental, and dispositive: "A court cannot, under the guise of construction, add words to a contract, which would impermissibly re-write that contract." *Westlands Water Dist. v. United States*, 337 F.3d 1092, 1103 (9th Cir. 2003). That is why the Order's premise—that "a reasonable user could believe" the matching "would never occur" on their phones—answers the wrong question. Whether a user believed the conduct would not happen says nothing about whether the conduct falls within the language the user accepted. And no reasonable user could *read* the Privacy Policy that discloses that Meta will "match your activities with your account" as somehow *not* covering the account-matching Plaintiffs allege.

In *Calhoun*, the Ninth Circuit rejected a similar attempt to graft extrinsic technical

assumptions onto the language of a privacy policy in order to find an exception that was not present in the text. In reversing summary judgment for Google, the court held that the district court erred by reading a "technical distinction" into Google's policies between data collection that was "browser agnostic" as opposed to being "specific to Chrome," which had led the district court to conclude that policy language cited by the plaintiffs did not apply to the data collection at issue. 113 F.4th at 1148-49. The Ninth Circuit found that this was error, because "nothing in Google's disclosures [was] tied" to this distinction. *Id.* Rather than "focusing on 'browser agnosticism,'" the Ninth Circuit explained, the district court simply "should have reviewed the terms of the various disclosures and decided whether a reasonable user reading them would think that he or she was consenting to the data collection." *Id.* That involves construing the meaning of the words in the policy—not incorporating technological assumptions that the policy does not address. As the Ninth Circuit put it, "the governing standard is what a 'reasonable user' of a service would understand they were consenting to, not what a technical expert would." *Id.* at 1149.

The Ninth Circuit reasoned similarly in *Hammerling v. Google, LLC*, 2024 WL 937247 (9th Cir. Mar. 5, 2024), where it emphasized that the words of the parties' agreement control—not the expectations users may independently have about what the defendant can do. The plaintiffs in that case alleged that Google improperly tracked user activity on third-party apps on Android phones, and the question was whether Google's privacy policy disclosed that conduct. The policy stated that Google received data about "activity on third-party … apps that use [its] services," and it defined "services" to include "the Android operating system." *Id.* at *1. Thus, on its face, the policy disclosed that Google could collect data about users' activity on third-party apps running on Android. Nonetheless, the district court agreed with the plaintiffs that it was "counterintuitive[]" to construe the policy this way, because it meant that Google could collect information from "*every single* app" running on Android. *Id.* at *2. The district court held that it was "at least as plausible that a reasonable consumer would read" the agreement only to apply to apps requiring users to sign into Google services. *Id.* On appeal, the Ninth Circuit rejected this reasoning, finding that the policy "unambiguously discloses Google's collection of user activity data in third-party apps." *Id.* The court explained that, even in the context of an online privacy policy, the "words of a contract

are to be understood in their ordinary and popular sense ... unless used by the parties in a technical sense, or unless a special meaning is given to them by usage." *Id.* (quoting Cal. Civ. Code §1644). While the Ninth Circuit acknowledged that the sweep of the language in Google's policy was "broad," it refused to narrow "that definition simply because it may deviate from our expectations." *Id.*[2]

Respectfully, this Court's Order cannot be squared with these holdings. The Court justified its reliance on Plaintiffs' extrinsic assumptions about cellphone technology by invoking *Calhoun*'s general statement that consent depends on the "circumstances, considered as a whole." Order at 9. But, as *Calhoun* illustrates, where there is an express agreement between the parties, the relevant "circumstances" are defined by what the agreement says—rather than "technical distinctions" unrooted in the text. Thus, in *Calhoun*, the only "circumstances" the Ninth Circuit found to narrow the scope of the plaintiffs' consent were affirmative limiting statements in the text of Google's privacy policy. Specifically, the *Calhoun* court found that, despite Google's general disclosures that it collects users' browsing data, a reasonable user would expect Google not to collect such data from the Chrome browser when the "Sync" setting was turned off—because Google's policies contained specific language indicating that. 113 F.4th at 1149 (citing *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 603 (9th Cir. 2020) (relying on similar affirmative statement in privacy policy to find lack of consent)). Google's "affirmative statement," the court concluded, put the case "more in line with *Internet Tracking Litigation* than with *Smith* or *Hammerling*." *Id.* In other words, the *Calhoun* court distinguished between what it was doing—determining how a reasonable user would construe narrowing language in the contract—versus what the plaintiffs improperly sought to do in *Smith* or *Hammerling*—narrow otherwise broad language based on expectations held independently from the contract.

---

[2] Other courts have similarly concluded that the language in an online data-privacy agreement controls even if its effects are surprising or unanticipated. *See also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1213 (N.D. Cal. 2014) (refusing to narrowly construe disclosure that LinkedIn would collect Google Contacts, even where that resulted in allegedly unanticipated collection of every contact the user had ever emailed with via Google); *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 792 (N.D. Cal. 2019) (finding that, based on what the relevant policies "told users," the plaintiffs consented to app developers collecting information the users shared with their Facebook friends, notwithstanding their belief that this would not occur if they set their Facebook privacy settings to "friends only").

Here, unlike in *Calhoun* or *Internet Tracking Litigation*, there is no narrowing language in the contract. While this Court relied on Plaintiffs' alleged belief that Meta "would only roughly match" browsing activity to accounts and could not "perfectly match Android browsing activity to Meta accounts," Order at 9-10, "nothing in [Meta]'s disclosures is tied" to any such rough-versus-perfect distinction, *Calhoun*, 113 F.4th at 1149. The Privacy Policy's disclosures that Meta uses identifiers to "match your activities with your account" are made without qualification, and without any promise that the matching would merely be approximate or stop short of identification. To the contrary, the Policy explains that matching is accomplished with identifiers "like your email address, cookies and advertising device ID." Order at 8. Matching a user by a unique email address or a persistent cookie is *exact* identification, not rough approximation—so the Policy already discloses the possibility of "perfect" matching. And Plaintiffs' beliefs about Android's "sandboxing" architecture fare no better, even if "objectively reasonable," because they derive from nothing Meta wrote. Meta "is not bound by promises it did not make." *Smith*, 745 F. App'x at 9. Indeed, there is no material difference between the expectation rejected in *Hammerling*—that Google would collect from only certain apps—and the expectation credited here that Meta could only "roughly" match mobile browsing to accounts. Neither derives from the contract, and neither can override its plain terms.

Allowing a plaintiff's alleged "reasonable expectations" to trump the words of a contract is fundamentally problematic because it makes it impossible to determine what the contract objectively means—as there are different possible expectations that reasonable people may hold. In particular, people have widely varying beliefs about how technology works (or no beliefs at all) depending on how technically savvy they are. Here, for example, while the court held that a "reasonable user could believe" that there is a "digital wall between mobile apps" that would prevent a user's browser from sending data to another app on their device, Order at 9, it is equally true that a *different* "reasonable user"—one who is better informed—could believe that things aren't so simple, and that Android devices, as alleged in the FAC, include a localhost channel that is "*intended* to allow different Android programs or applications to communicate with one another"—just "as if they were communicating over a network." ¶¶ 54, 56-57 (emphasis added).

Why should the former (false) "reasonable belief" govern the interpretation of the agreement, rather than the latter (true) "reasonable belief"? If the meaning of an online agreement were to turn on what a "reasonable user *could* believe"—separate from the language of the contract—the result would be that the agreement would lack any determinate meaning, because reasonable people can believe different things. That is contrary to "the objective theory of contracts, under which it is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation." *Stamas*, 795 F. Supp. 2d at 1083 (quotation omitted); *see also* Restatement (Second) of Contracts § 211(2) (1981) ("[A] writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.").

Similarly, while the Court's Order faulted Meta's Policy for "[doing] nothing to dispel" Plaintiffs' "plausibly objectively reasonable beliefs" about how their cellphones work, Order at 9-10, no authority imposes any such boundless duty, which would be impossible to comply with. If companies must anticipate every mistaken but "plausibly objectively reasonable" belief a user could have, and "dispel" such beliefs in their privacy policies, those policies would become unmanageable for companies to write—and incomprehensible to average users anyway, *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1056 (N.D. Cal. 2025). The Court itself recognized this concern at oral argument on Meta's first motion to dismiss, even though it never addressed the concern in its Order:

> I think there is a concern about how do we set up a regime where companies can make sure that they're disclosing what they need to without requiring them to disclose every possible scenario that could happen with all of its factual permutations. I mean, I think this [i.e., Meta's Privacy Policy] is a pretty good disclosure I think overall and so it's – it's hard for me to imagine what it is they should have written in their privacy policy that they didn't.

Mot. to Dismiss Hr'g Tr. at 20-21.

The Court's initial instinct was right: It is hard to imagine what Meta should have included in its Privacy Policy that is not already there—because the Privacy Policy already "capaciously explains" that Meta collects browsing data and matches it to user accounts through identifiers like the _fbp cookie. Order at 9. There is also already a regime that enables companies to disclose what

data they collect and what they use it for without requiring them to disclose every possible permutation of how they execute the collection and use. That regime is simply to allow companies to disclose their data policies using broad language, and to give effect to that broad language where it fairly encompass the particular conduct at issue. That is what the Ninth Circuit did in *Hammerling*, and that is what this Court should do here.

**B. Plaintiffs' Wiretapping Claims Fail**

Plaintiffs' Wiretap Act, CIPA § 631, and CIPA § 632 claims should be dismissed because, regardless of whether they consented to the matching of their browsing data to their accounts via the Subject Functionality, they consented to the initial *acquisition* of that data. The Wiretap Act and CIPA only reach the unauthorized interception of a communication, not what a defendant later does with data it lawfully acquired. The Court's prior order failed to address this critical point.

The wiretapping laws hinge on the unauthorized interception—i.e., acquisition—of a communication. *See, e.g.*, *Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 840 (N.D. Cal. 2014) ("[T]he focus of this provision is on the *interception* of the communication itself."). "Any subsequent use of [a] recorded conversation" is not governed "by the prohibition on interception." *United States v. Christensen*, 828 F.3d 763, 796 (9th Cir. 2015); *see also Lau v. Gen Digital Inc.*, 2024 WL 1880161, at *1 (N.D. Cal. Apr. 3, 2024) (Lin, J.), *aff'd*, 2025 WL 3002610 (9th Cir. Oct. 27, 2025) (rejecting wiretapping claim based on storage and use of data for advertising purposes, given that the "wiretapping statutes … are directed at the unauthorized *interception* of communications, not any subsequent storage and/or use"). While the Wiretap Act includes a use provision that prohibits the use of information "obtained through" an unlawful interception, 18 U.S.C. § 2511(1)(d), that provision too hinges on the interception being unauthorized in the first instance. "[I]f there is no unlawful interception, there can be no unlawful use." *Campbell*, 77 F. Supp. 3d at 840. CIPA is analyzed "the same," and its wiretap and eavesdropping provisions likewise turn on acquisition in transit, not later processing. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

The only acquisition of user communications alleged here is Meta's collection of a user's browsing activity—which is part of the standard operation of the Pixel and occurs with or without

the Subject Functionality. Plaintiffs do not and cannot deny that Meta discloses this collection in the Privacy Policy; again, "the Privacy Policy capaciously explains that Meta broadly collects browsing data." Order at 9. Instead, the alleged basis for Plaintiff's lack of consent is the *matching* of Plaintiffs' browsing data to their accounts via the Subject Functionality. As the Court put it, Plaintiffs' non-consent theory is based on their alleged belief that "Meta would only roughly 'match your activities with your account,'" and that "[c]ontrary to that belief, the Modified Pixel [i.e., the Subject Functionality] allegedly allowed Meta to match browsing activities to Meta accounts with perfect confidence." Order at 9. That alleged "perfect" matching of user browsing data happened—necessarily—only *after* the browsing data was acquired in the first place. The Subject Functionality did not itself involve the acquisition of user communications, for it transmitted only the _fbp cookie—a randomly generated "identifier associated with the user," ¶ 34, rather than a user's "intended message to another," *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (holding that a Facebook ID does not constitute "contents" of communication for purposes of wiretapping laws). Thus, even if Plaintiffs' non-consent theory is accepted, it is based on the subsequent use of their browsing data, not its initial acquisition, so it cannot support their wiretapping claims.

In its Order, the Court nonetheless held that "Meta cannot avoid these claims by relying on consent in the Privacy Policy to the standard Pixel's collection of data," reasoning that "Plaintiffs have plausibly alleged that users would not agree, and have not agreed, to permit the collection of standard Pixel data in a context where it would be combined via the Modified Pixel with perfectly matched identifiers from their Facebook and Instagram phone apps." Order at 13. But this amounts to holding that Plaintiffs did not consent to the initial acquisition of their browsing data because they did not consent to the way the data was subsequently used. This conflates the initial collection with the subsequent use and ignores that Plaintiffs do not assert any objection to the collection in and of itself. *See In re Google Location History Litig.*, 428 F. Supp. 3d 185, 197 (N.D. Cal. 2019) (rejecting CIPA claim because "Plaintiffs['] issue is not with Defendant tracking them during application use, rather their issue is with the *storage* of that data … [and] CIPA, by its plain terms, is not concerned with data storage"); *Zak v. Bose Corp.,* 2019 WL 1437909 (N.D. Ill. Mar. 31,

2019) (rejecting wiretapping claims where plaintiffs alleged that defendant stored user data from music app and disclosed it to third parties: "To the extent Zak's real issue is with the fact that Bose allegedly collects and discloses the Media Information that it legitimately receives, this complaint falls outside the purview of the Wiretap Act."). It is black-letter law that the consented-to portion of a course of conduct is not actionable; a claim can rest only on conduct that *exceeds* the scope of consent. *See* Restatement (Second) of Torts § 892A(4) (1979) ("If the actor exceeds the consent, it is not effective *for the excess*." (emphasis added)).

Plaintiffs' complaint is not about Meta's collection of their browsing data in the first instance—they were indisputably on notice that it would be collected. Rather, their complaint concerns how their browsing data was matched to their accounts *subsequent* to it being collected—which falls outside the purview of the wiretapping laws. Any contrary holding would convert the narrow prohibitions of the Wiretap Act and CIPA—meant to apply only at the point of "interception" of a communication—into omnibus restrictions broadly and indefinitely governing the use of electronic data. If a plaintiff could claim their data was "intercepted" without their consent merely by asserting that they did not consent to what was done with the data after it was collected, then anyone could claim a "wiretap" whenever they felt someone was using their data in some way they had not approved. Particularly given that the wiretapping laws are criminal statutes, any such expansive reading of the laws must be avoided. *Cf. Van Buren v. United States*, 593 U.S. 374, 393 (2021) (rejecting interpretation of federal hacking statute that "would attach criminal penalties to a breathtaking amount of commonplace computer activity"); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1266-69 (N.D. Cal. 2001) (rejecting wiretapping claim based on allegations that Amazon collected and shared "more information ... than is necessary" to process user purchases).

**C. Plaintiffs' Pen Register Claim Fails**

This Court concluded that Plaintiffs failed to allege that the Subject Functionality operates as a pen register because they failed to allege that it records "dialing, routing, addressing, or signaling" information. *See* Order at 13-14. Plaintiffs' additional allegations do not cure this defect. The Court should dismiss this claim again—this time with prejudice.

As an initial matter, the FAC does not alter any of the original Complaint's defective pen register allegations based on the Subject Functionality's transmission of the _fbp cookie to Meta servers. The _fbp cookie is an advertising identifier, not "dialing, routing, addressing, or signaling information." Accordingly, as the Court held, "the contents of the _fbp cookie do not fall within the scope of the pen register provision." Order at 14.

Nor do the sparse new allegations regarding IP addresses provide adequate support for a pen register claim. For one thing, nowhere do Plaintiffs allege that the *Subject Functionality* operates as a pen register; instead, they merely allege that, "since 2015," the Pixel has included "HTTP header information, including a user's IP address" in every transmission, which "'is automatically added to events sent through the browser.'" ¶¶ 26-27, 37. These allegations do not concern the Subject Functionality. They concern the standard operation of the Pixel—or, really, internet communications generally, which always include the user's IP address. Thus, Plaintiffs still "have not adequately alleged that the Modified Pixel records IP addresses," Order at 14, and so have failed to correct the deficiency this Court identified. *Id.* Plaintiffs' reliance on the standard operation of the Pixel is further problematic because it means, as they themselves allege, that the IP address is contained in the "same transmission" that also includes "information about the user's web browsing activity"—i.e., the alleged contents of their communications. ¶ 26. That rules out treating the Pixel as a "pen register," because Plaintiffs must "allege that the information collected" by the purported pen register "did not constitute the content of [a] communication." *Tsering v. Meta Platforms, Inc.*, 2026 WL 89320, at *6 (N.D. Cal. Jan. 12, 2026) (Lin, J.).

Even if Plaintiffs had adequately alleged that the "Modified Pixel records IP addresses," Plaintiffs could not sustain their pen-register claim in any event—for two reasons. First, the alleged "disclosure of IP addresses" does not "give[] rise to a privacy injury" sufficient for Article III standing. *Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1179 (N.D. Cal. 2025); *see generally Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025). IP addresses are merely information "associated with a device," *Khamooshi*, 786 F. Supp. 3d at 1180, and courts have long recognized that there is no reasonable expectation of privacy in an IP address, *see United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008). Particularly here, Plaintiffs cannot claim any privacy interest

in their IP address, given that Meta's Privacy Policy clearly discloses that Meta receives users' "device information" from third-party websites, "including your IP address." Order at 7; *see also id.* (explaining that Meta also receives device information from third-party websites).

Second, Plaintiffs' IP-address theory remains fundamentally flawed on the merits. As Meta previously explained, *see* Dkt. 101 at 17-20, a pen register does not capture the IP address of the device it is *installed on,* but rather it captures the *outgoing* IP addresses the device is *communicating with*. This is evident from the statutory text. The statute defines a "pen register" as capturing the routing information "transmitted by" a device, i.e., the routing information *sent* by a device to direct a communication to its destination, analogous to the "to" information on an envelope—which, in the case of internet communications, would be the IP addresses of the computers it is sending communications *to*. Cal. Pen. Code § 638.50(b). This reading is supported by the accompanying "trap-and-trace" provision, which defines a trap-and-trace as capturing "incoming" routing information reflecting the "source" of a communication, i.e., the routing information *received* by a device, analogous to the "from" information on an envelope—which, in the case of internet communications, would be the IP addresses of the computers the device is receiving communications *from*. *Id.* § 638.50(c). *See, e.g.*, *Aviles v. Liveramp, Inc.*, 2025 WL 487196, at *2 (Cal. Super. Jan. 28, 2025) (explaining that a pen register collects the IP address "of a website accessed by a computer – but not the computer's own IP address"); *Heiting v. HP Inc.*, 2025 WL 2993673, at *3 (Cal. Super. Aug. 1, 2025) (concluding that technology that "identif[ies] the source of the incoming … communications to [a] [w]ebsite" "is not a trap and trace device" because it does not "allow[] Defendant to monitor who else contacts Plaintiff"); Ex. I (Dkt. 111-1), *Camacho v. DG Premium Brands LLC*, No. 24STCV21672, Order at 2-3 (Cal. Super. Apr. 17, 2025) (holding that pen register statute covers capture of "outgoing data identifying who the subject is contacting and incoming data identifying who is contacting the subject," but does not prohibit merely collecting the subject's IP address).

Reading the provisions in this way allows them to be construed harmoniously as a cohesive statutory framework: By providing a legal process for law enforcement to install both a pen register and a trap-and-trace on a device, CIPA enables law enforcement to identify all the *other* devices

the target device is in communication with. *Smith v. LoanMe*, 11 Cal. 5th 183, 190 (2021) ("We do not examine [statutory] language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment."). This reading also accords with how the terms "pen register" and "trap-and-trace" have long been interpreted by courts (under the similarly worded federal pen register statute)[3]—precedent the California legislature is presumed to have known about. *See Hohenshelt v. Superior Ct.*, 18 Cal. 5th 310, 340 (2025) ("[W]e presume the Legislature is aware of existing laws and intends to enact new law in harmony with background laws absent a 'definitive indication' to the contrary."). Indeed, the legislative history of CIPA's pen register and trap-and-trace provisions explains that their purpose was to model California state law after federal law, which was understood to provide a process by which law enforcement could track "incoming" and "outgoing" phone numbers, in order "to track which people in an investigation are communicating with one another." Bill Analysis, Assemb. B. 929, Reg. Sess., at pp. T-U (Cal. Apr. 7, 2015).

By contrast, reading CIPA's pen register provision as Plaintiffs do, to encompass merely collecting the IP address of a device—as opposed to collecting all the IP addresses *in contact with* the device—would have absurd consequences. IP addresses of devices on the internet are generally visible to each other, as they must be for the devices to communicate with each other. Thus, if any process for collecting a device's IP address constitutes a "pen register," then every device on the internet is operating a pen register—*and every internet user is therefore a criminal*—because devices must collect the IP addresses of other devices for internet communication to work. *See Aviles*, 2025 WL 487196, at *3 (rejecting pen register claim based on IP address collection that simply reflected "how the internet normally works"); *Heiting*, 2025 WL 2993673, at *4 ("If CIPA broadly prohibits any process by which anyone identifies any 'originating number,' then every cell

[3] *See, e.g.*, *Twitter, Inc. v. Garland,* 61 F.4th 686, 691 n.2 (9th Cir. 2023) ("Pen registers and trap and trace devices, respectively, capture the phone number associated with an outgoing or incoming call (or other communication) on a given communication line."); *United States v. Swinburne*, 988 F.2d 125, 125 n.1 (9th Cir. 1993) ("A pen register records the outgoing numbers dialed from a telephone … . A trap and trace identifies the originating points of incoming calls to a telephone number."); *Application of U.S. of Am. for an Ord. Authorizing an In-Progress Trace of Wire Commc'ns*, 616 F.2d 1122, 1127 (9th Cir. 1980) ("[T]he pen register records the telephone numbers to which all outgoing calls are made from the monitored telephone, while an ESS trace records the numbers from which incoming calls to the subject telephone have been made.").

phone in the world—which identify the phone number of incoming calls—would be a prohibited trap and trace device. So would every website interaction that identifies electronic information about the user in a manner that allows the website to function."); *Capitol Recs. Inc. v. Thomas-Rasset*, 2009 WL 1664468, *3 (D. Minn. June 11, 2009) ("If [the pen register laws] did apply in those cases, then the Internet could not function because standard computer operations require recording IP addresses so parties can communicate with one another over the Internet.").

Under well-established California rules of statutory construction, courts must give statutes a "commonsense meaning" and avoid "a literal interpretation" if it "would result in absurd consequences the Legislature did not intend." *Smith*, 11 Cal. 5th at 190. Had the California legislature intended to outlaw practices basic to the functioning of the internet, surely it would have given "a clearer indication of that intent." *Yates v. United States*, 574 U.S. 528, 540 (2015); *see also Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994) ("Such a bold departure from traditional practice would have surely drawn more explicit statutory language and legislative comment.").[4] Particularly given that CIPA is a *criminal* statute to which the rule of lenity applies, any such sweeping reading of the statute is unjustified. *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134 (9th Cir. 2009) ("The Supreme Court has long warned against interpreting criminal statutes in surprising and novel ways that impose unexpected burdens on defendants."); *Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109, 1112 (N.D. Cal. 2025) (criticizing conflicting rulings on CIPA's scope as "untenable," as "companies have no way of telling whether their online business activities will subject them to liability," and urging that courts "resolve CIPA's many ambiguities in favor of the narrower interpretation" given rule of lenity).[5]

---

[4] For similar reasons, to the extent CIPA could be construed to apply so broadly, it would be unconstitutionally vague. *See Doe*, 806 F. Supp. 3d at 1118 n.9 (citing void-for-vagueness concerns as additional reason to adopt narrower construction of CIPA).

[5] We are aware that the Court has previously interpreted CIPA's pen register provision to apply to the collection of a device's IP address, rather than the IP addresses of the computers the device is communicating with. *See Shah v. Fandom*, 754 F. Supp. 3d 924, 929-30 (N.D. Cal. 2024) (Lin, J.). If the Court were to reach the question here, Meta respectfully requests that it reconsider that holding in light of the above arguments, which were not squarely raised or addressed in *Shah*. However, there is no need for the Court to reach the question here, given that, as explained above, Plaintiffs consented to Meta's collection of their IP addresses by agreeing to its Privacy Policy.

**D. Plaintiffs' CDAFA Claim Fails**

Plaintiffs' CDAFA claim fails for two independent reasons: Meta had permission to access and use the data at issue, and Plaintiffs do not plausibly allege the cognizable loss the statute requires. Either defect requires dismissal.

**Permission to Access.** CDAFA "prohibits only access or disruptions to a computer system that are 'without permission.'" *Brodsky*, 445 F. Supp. 3d at 131. The "key" question is not *how* a defendant obtained information, but whether it "was authorized in the first instance to take and use the information"; if so authorized, it does not matter that a plaintiff "disapproved of the *method* … by which [the defendant] took [the plaintiff's] information." *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 962 (9th Cir. 2018) (emphasis added), *rev'd on other grounds*, 586 U.S. 334 (2019). Taking data "using a *method* prohibited by the applicable terms of use, when the taking itself generally is permitted, does not violate the CDAFA." *Id.*

Here, the specific data Meta allegedly accessed are the _fbp cookie and the Facebook account identifiers the Subject Functionality linked to it, which Meta used to match Plaintiffs' browsing activity to their accounts. ¶ 53. The gravamen of Plaintiffs' claim is that Meta performed those acts in a manner that supposedly violated "Android sandboxing protocols." ¶ 230. That is an objection to the method, and it cannot state a claim.

Meta had permission to take and use the data in question. The Privacy Policy explains that partners "share information like your email address, cookies and advertising device ID" with Meta, which "helps us match your activities with your account, if you have one." Order at 8. The Cookies Policy specifically identifies the "_fbp" cookie as an identifier partners may share, and that Meta may use to "personalise content" and related purposes. Order at 8; *see* Ex. E (Dkt. 102-5) at 5-6. The account identifiers are no different: the policies disclose that Meta collects "IDs from … accounts you use," Ex. A (Dkt. 102-1) at 17, and uses them to "match [users'] activities with [their] account," Order at 8. And as to Plaintiffs' browsing data, the Privacy Policy "gives clear notice that third party partners may share [that] data with [Meta]." *Lloyd*, 2023 WL 1802415, at *2.

*Oracle* and *Brodsky* illustrate why Meta's permission to collect and use these data elements is dispositive. In *Oracle*, the defendant had permission to access the plaintiff's servers to download

software, but it used automated means to do so, which was expressly in violation of the plaintiff's terms of use. 879 F.3d. at 961-62. The Ninth Circuit rejected the plaintiff's CDAFA claim, holding that "taking data using a *method* prohibited by the applicable terms of use, when the taking itself generally is permitted, does not violate the CDAFA." *Id.* at 962. Similarly, in *Brodsky*, the plaintiffs alleged they had revoked consent for Apple to use a particular feature on Apple devices as a "method of access[ing]" their "login activity"; but the court, following *Oracle*, rejected this as a basis for a CDAFA claim, because it was undisputed that the plaintiffs had granted Apple "access to [their] login activities through other means." 445 F. Supp. 3d at 130-32. The same logic controls here. Plaintiffs authorized Meta to take the _fbp cookie and use it to match their browsing data to their account identifiers, and their objection runs only to the method by which Meta did so—routing the cookie through an Android localhost port rather than some other channel. Because the underlying collection and use were permitted, that objection to method cannot state a claim. *See Wendover Prods., LLC v. PayPal, Inc.*, 2025 WL 3251667, at *5 (N.D. Cal. Nov. 21, 2025) (CDAFA imposes no "duty to disclose how permissions will be exercised").[6]

In its prior Order, the Court attempted to distinguish *Oracle* by asserting that "Plaintiffs do not simply 'disapprove[] of the method' by which Meta acted, but instead contend that Meta knowingly used and introduced software that acted in a manner understood to be impermissible." But this is not a genuine distinction. The objection is still to the "manner" in which Meta (or its software) accessed and used the data in question—rather than being focused on whether Meta had authorization to access and use the data in the first instance. *See Brodsky*, 445 F. Supp. 3d at 129 ("[I]f a plaintiff authorizes an individual to access the plaintiff's computer, the plaintiff's [CDAFA] claim cannot be based simply on … the *means, manner, or method* for such access[.]"

[6] Meta was equally authorized to access Plaintiffs' devices more generally. The Privacy Policy discloses in detail that Meta "collect[s] and receive[s] information from and about the different devices you use and how you use them," including device identifiers, device signals, network and IP information, and information stored "from cookies stored on your device." Ex. A (Dkt. 102-1) at 7, 18. Plaintiffs, moreover, affirmatively downloaded and installed the Facebook and Instagram apps through which the Subject Functionality operated. Where a plaintiff voluntarily installs the software at issue, its operation is not access to a device "without permission." *See Wendover*, 2025 WL 3251667, at *4-5 (finding users who downloaded browser extension thereby "granted authorization to PayPal to carry out the actions that Plaintiffs complain of in their [CDAFA] claims"); *see also Brodsky*, 445 F. Supp. 3d at 123 ("[V]oluntary installation runs counter to the notion that the alleged act was a trespass[.]").

(emphasis added)); *see also Manner*, Dictionary.com, https://www.dictionary.com/browse/manner (last visited July 15, 2026) (listing "method" as a synonym for "manner"). The point remains that all the data Meta allegedly accessed and used—the _fbp cookie, Plaintiffs' account identifiers, and browsing data transmitted to Meta by third-party websites—are pieces of data Meta was *authorized* to access and use. Whether Meta's software accessed or used them in an allegedly objectionable "manner" is not the relevant question under *Oracle*.

For similar reasons, whether Meta "allegedly circumvented 'technical or code-based barriers,'" as the Court focused on, *see* Order at 16-17, does not answer the "key" question under *Oracle*. The alleged circumvention merely goes to whether the *method* of access was unauthorized; it is not by itself sufficient to state a CDAFA claim if the defendant was independently authorized to take and use the data that was accessed. By comparison, in *Oracle* there was no question that the defendant's method of access was unauthorized—the defendant used automated means to download software, which was expressly "prohibited by the applicable terms of use." 879 F.3d. at 961-62. But it did not matter because the defendant was authorized to obtain that software through other means. The same is true here: Meta was "authorized in the first instance to take and use the information" at issue. *Id.* at 962. Whether Meta allegedly circumvented a barrier in the way it accessed the data does not change the fact that it was authorized to access it in the first instance. By analogy, a person permitted to enter a store and collect the day's cash does not become a thief merely because they leave through a door that is blocked off or marked "No Exit."

Nor is there any argument that the type of data accessed was outside the scope of Meta's permission. The Court in its order acknowledged that "Meta was permitted to send the _fbp cookie to its servers," yet it found a lack of permission because Meta allegedly circumvented sandboxing "so that the Pixel would also know Plaintiffs' Meta account information." Order at 17. But Meta was independently permitted to take and use Plaintiff's Meta account information just as much as the _fbp cookie—both are clearly identified in the Privacy Policy. The alleged "circumvention" concerns only *how* Meta *linked* two categories of data it was authorized to collect and use. That is method, not permission—and equating the two is error. The same goes for the Court's conclusion that "Meta was not 'authorized in the first instance to take and use' Plaintiffs' Meta account

information *through the Pixel*." Order at 17 (emphasis added). That is likewise an objection to method of access, not permission to access in the first instance. (Again, the defendant in *Oracle* was not authorized to obtain defendant's software *through automated means*.) *Oracle* draws a firm line between the method of taking and permission to take, holding the method irrelevant when permission exists. 879 F.3d at 962. Treating circumvention as proof that use was "without permission" collapses *Oracle*'s distinction.

Finally, the premise that Meta "circumvented 'technical or code-based barriers'" cannot be squared with the allegations of the Complaint to begin with. While the Court found that Meta allegedly circumvented "Android's sandboxing protection," Plaintiffs' own allegations make clear there is no absolute "wall" between mobile apps on Android devices.[7] Plaintiffs specifically allege that Android uses a less "restrictive" approach to sandboxing, in that it allows apps to communicate over "localhost" channels, which "are *intended* to allow different Android programs or applications to communicate with one another." ¶¶ 54, 56-57 (emphasis added); *see also* ¶ 58 (alleging that "Google designed and implemented the Android operating system in a manner such that apps *can access* localhost ports" (emphasis added)). Plaintiffs thus cannot plausibly allege that the Subject Functionality circumvented technical barriers, when it used internal communication channels included in the Android operating system by design. The very reason they profess to be suing Google is because they believe the Android operating system should not have permitted apps to use these channels. *See* ¶¶ 84, 90 (alleging that Google "implemented an 'overly permissive' design of its Android operating system," due to a "lack of controls Android imposes on [app] developers"). Google's alleged decision not to implement controls negates any allegation that such controls existed and that Meta circumvented them. *See Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1054 n.19 (N.D. Cal. 2014) (rejecting CDAFA claim where the complaint did not allege "that the subject apps circumvented any restrictions" but instead alleged that "Apple failed to implement any such restriction, thereby enabling the App Defendants to copy Plaintiffs' address

[7] *See Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992) (explaining that courts must "examine whether conclusory allegations follow from the description of facts as alleged by the plaintiff"); *Agensys, Inc. v. Regents of Univ. of California,* 2024 WL 5679162, at *4 (C.D. Cal. Oct. 22, 2024) (explaining that "when specific facts alleged in a complaint contradict general, conclusory allegations, 'the specific facts are controlling'").

books"); *see also Wendover Prods*., 2025 WL 3251667, *4 (holding, where defendant was granted permissions to access data, that "for the purpose of the … CDAFA, it is of no consequence that Plaintiffs apparently believe that these authorizations are 'far beyond what would be needed'").

The Court nonetheless found that Plaintiffs' allegations of "secretive and evasive behavior" by Meta were enough to conclude that "Plaintiffs did not give Meta permission to evade Android's sandboxing in this way." Order at 16. But whether or not Meta was acting in a "secretive" manner, the fact remains there was no technical "sandboxing" barrier that Meta needed to—or did—"evade." Based on Plaintiffs' own allegations, Meta utilized a channel that was available to all "Android programs or applications to communicate with one another." That is not circumventing a barrier; it is traversing an open pathway. The *Opperman* case is fully on point. The court there held that the plaintiffs had not plausibly alleged any circumvention of technical barriers because Apple's design of the iPhone allegedly gave the defendant apps "open access" to users' address books on the plaintiffs' Apple devices. 87 F. Supp. 3d at 1054. The court reached this holding even though the defendant apps allegedly incorporated this address book functionality "in non-discernible manners" so they "would not be noticed by the iDevice owner." *Id.* at 1044. Thus, the mere unexpected use of an available functionality, even if done secretively, is not enough to establish a CDAFA claim.[8] And that is all that is alleged here.

**No Cognizable Loss.** Plaintiffs' CDAFA claim independently fails because the statute affords a private right of action only to seek "compensatory damages" for "damage or loss by reason of a violation." Cal. Pen. Code § 502(e)(1). Plaintiffs assert five species of loss, but none is cognizable: (i) "deprivation of control over their valuable property, i.e., their personal information"; (ii) "the ability to receive compensation for their data"; (iii) "Meta's illegal and unequitable profiting from that data"; (iv) "the ability to withhold their data for sale"; and

[8] The Ninth Circuit has also specifically rejected the notion that concealment alone shows a lack of authorization. In *Christensen*, the government argued that an employee's use of an "ERR" code "to cover her tracks" showed unauthorized access; the court disagreed, explaining that the employee "might have used the 'ERR' code simply to divert suspicion as to what she was doing," and "may nonetheless have been authorized to access the database." 828 F.3d at 787. So too here: that Meta allegedly obscured its methods cannot somehow negate the authorization to take and use the data elements in question, as conveyed through Plaintiffs' agreement to the Privacy Policy. Nor does secrecy necessarily connote bad motives. It is equally consistent with ordinary commercial motives, such as protecting proprietary methods or avoiding disclosure to competitors.

(v) "depletion of their Android devices' battery and bandwidth." ¶ 237. The first, second, and fourth are theories that are routinely dismissed under CDAFA, as there is "no support" for the proposition that "the loss of the right to control [plaintiffs'] own data, the loss of the value of their data, and the loss of the right to protection of the data" constitute "'damage or loss' within the meaning of the CDAFA." *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 488 (N.D. Cal. 2021); *see also Torres v. SeatGeek, Inc.*, 2026 WL 1495202, at *7 (N.D. Cal. May 28, 2026) (following *Cottle* in holding same); *Reisberg v. Renaissance Learning, Inc.*, 2026 WL 1048242, at *9 (C.D. Cal. Feb. 17, 2026) (same); *In re Consumer Vehicle Driving Data Tracking Collection*, 2026 WL 1092882, at *30 (N.D. Ga. Apr. 22, 2026) (same). The compensation and withholding theories are speculative in any event, because Plaintiffs allege no market for their data and no concrete value it lost. *See Lineberry v. AddShopper, Inc.*, 2025 WL 551864, at *2 (N.D. Cal. Feb. 19, 2025).

The third theory—Meta's "profiting"—fares no better, because a defendant's gain is not the plaintiff's loss. "That [Meta] may have gained from Plaintiffs' data does not mean Plaintiffs have suffered a loss." *Dellasala v. Samba TV, Inc.*, 2026 WL 1138358, at *8 (N.D. Cal. Apr. 21, 2026); *accord Shah v. Cap. One Fin. Corp.*, 768 F. Supp. 3d 1033, 1048 (N.D. Cal. 2025) ("Facebook may have gained money through its sharing or use of the plaintiffs' information, but that's different from saying the plaintiffs lost money." (citing *Facebook User Profile Litig.*, 402 F. Supp. 3d at 804)). While this Court has previously relied on the disgorgement discussion in *In re Facebook, Inc. Internet Tracking Litigation* to allow CDAFA claims to proceed on an unjust-enrichment theory of loss,[9] this Court's peers have rejected that position, particularly after *Popa*. In *Dellasala*, Judge Corley expressly declined to follow this Court's decision in *Rack Room*, explaining that *In re Facebook* "did not address CDAFA's damage or loss requirement," Article III injury and CDAFA "damage or loss" "are not necessarily equivalent," and *In re Facebook*'s premise—that "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss"—"does not align with the … analysis adopted in *TransUnion*." 2026 WL 1138358, at *8 (quoting *Popa*, 153 F.4th at 792). Judge Beeler recently reached the same conclusion in *Torres*, 2026 WL 1495202, at *7. And

[9] *See Tsering*, 2026 WL 89320, at *6; *Rack Room*, 2025 WL 2210002, at *3.

Judge Thompson also rejected the unjust-enrichment theory in *Shah*, 768 F. Supp. 3d at 1048. This Court should reevaluate its prior holdings in light of these decisions.

That leaves the lone reference in the FAC to "battery and bandwidth" depletion. Even assuming resource depletion can constitute cognizable loss, Plaintiffs fail to plausibly plead it. The FAC invokes "battery and bandwidth" exactly once—in its boilerplate damages paragraph—without a single supporting fact: no allegation of how much battery or bandwidth the since-discontinued functionality consumed, and no allegation that any Plaintiff experienced any measurable impairment. ¶ 237. A bare, conclusory assertion of resource depletion does not satisfy Rule 8. "[D]iminution in the performance of an electronic device may constitute an injury in fact, but a plaintiff must 'allege facts showing that this is true.'" *In re Google Android Consumer Priv. Litig.*, 2013 WL 1283236, at *5 (N.D. Cal. Mar. 26, 2013) (emphasis omitted); *see In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1067 (N.D. Cal. 2012) (similar).

Because every loss theory Plaintiffs plead is either foreclosed or unsupported, the CDAFA claim fails for the independent reason that Plaintiffs allege no cognizable loss.

**E. Plaintiffs' Invasion-of-Privacy Claim Fails**

Plaintiffs' common-law privacy claims fail for the same reason their statutory claims do: they consented to the matching they now challenge. Intrusion upon seclusion and invasion of privacy under the California Constitution both require, among other elements, that the plaintiff had "a reasonable expectation of privacy." *In re Facebook, Inc. Internet Tracking*, 956 F.3d at 601; Order at 11. Consent negates that element. A "plaintiff cannot have a reasonable expectation of privacy if she consented to the intrusion." *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1072 (N.D. Cal. 2016); *see Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 26 (1994).

Here, Meta's Policy discloses that it collects identifiers like the _fbp cookie from third-party sites and uses them to "match your activities with your account." Order at 8. That language covers the matching Plaintiffs challenge, and Plaintiffs agreed to it. *See supra* Section IV.A. A disclosed practice cannot support a reasonable expectation of privacy, because a user cannot reasonably expect privacy in the conduct the defendant said it would undertake. *See Hammerling*, 2024 WL 937247, at *3 (no expectation where the policy "expressly disclosed" the tracking);

*Smith*, 745 F. App'x at 9. The Court's contrary holding rested on the premise that the Policy "did not disclose the extent and precision of the practice at issue." Order at 11. But a user who consents to identity-matching cannot reasonably expect that her identity will not be matched, and Plaintiffs cannot manufacture an expectation of privacy from a limitation the Policy never contained. *See supra* Section IV.A.

Moreover, while Plaintiffs invoke a "vast repository of personal data" amassed across millions of users in arguing that the scope of the data collection was unexpected, Order at 11, this allegation is not a valid basis for their own assertion of a privacy expectation. The right to privacy is "purely a personal one," so allegations about *other* users' data say nothing about these Plaintiffs' own information. *Wagging Tails Prods., Inc. v. Coakley*, 2023 WL 4316777, at *12 (C.D. Cal. Feb. 21, 2023) (citing *Hendrickson v. California Newspapers, Inc.*, 48 Cal. App. 3d 59, 62 (1975)); *see Doe v. Wirta*, 2019 WL 13472128, at *4 (N.D. Cal. Apr. 10, 2019). Moreover, the "repository" theory also improperly bootstraps the challenged Subject Functionality onto the standard Pixel's ordinary collection of browsing data—collection Plaintiffs concede was disclosed and consented to. *See supra* Section IV.A; ¶ 46. The scale the Court invoked is a product of the standard Pixel, not the Subject Functionality: it is the routine, consented-to collection of browsing events, aggregated across time and users, that builds any "repository" at all. Strip away the disclosed matching and the consented-to collection, and what remains alleged as to *these* Plaintiffs is a handful of visits to ordinary sites such as nytimes.com, techcrunch.com, and apnews.com. ¶¶ 96, 108, 114. There is no reasonable expectation of privacy in non-sensitive browsing of that kind. *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1089 (N.D. Cal. 2022).

## V. CONCLUSION

For all of the foregoing reasons, the motion to dismiss should be granted.

Dated: July 15, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Serrin Turner*
Serrin Turner (*pro hac vice*)
*serrin.turner@lw.com*

Nicolas Luongo (*pro hac vice*)
*nicolas.luongo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Brad Baglien (*pro hac vice*)
*brad.baglien@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

*Attorneys for Defendant*
*Meta Platforms, Inc.*