**BURSOR & FISHER, P.A.**
Philip L. Fraietta (SBN 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**MILBERG, PLLC**
Gary M. Klinger (*pro hac vice*)
William Edelman (SBN 285177)
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
Michael K. Sheen (SBN 288284)
Amelia A. Haselkorn (SBN 339633)
Clare D. Perez (SBN 363027)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

*[Additional Counsel Listed On Signature Pages]*

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
Theodore W. Maya (SBN 223242)
Alyssa D. Brown (SBN 301313)
Sarper Unal (SBN 341739)
Lisa Cintron (SBN 356009)
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Interim Class Counsel*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

*In re Meta Android Privacy Litigation,*

This document Relates to:

All Actions

Case No. 3:25-cv-04674-RFL

**PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**

Date: September 22, 2026
Time: 10:00 a.m.
Crtrm: 15 – 18th Floor
Judge: Hon. Rita F. Lin

## TABLE OF CONTENTS

PAGE(S)


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. Meta's De-Anonymization Scheme. .......... 2

B. Plaintiffs Modestly Amend Only Their Pen Register Claim. .......... 4

III. STATEMENT OF THE ISSUE TO BE DECIDED .......... 4

IV. ARGUMENT .......... 5

A. Plaintiffs' Allegations Demonstrate Meta Lacked Their Consent. .......... 5

1. Meta's Policies Do Not Disclose the Alleged Misconduct. .......... 5

2. A Holistic Reading of Meta's Disclosures Support the Court's Conclusions Regarding Consent. .......... 8

3. The Court's Prior Order Applied the Correct Consent Framework. .......... 9

B. As Amended, Plaintiffs Plausibly Allege a CIPA § 638.51 Pen Register Claim. .......... 11

1. Plaintiffs Have Now Plausibly Alleged That the Modified Pixel Records Users' "Routing, Addressing, or Signaling Information." .......... 11

2. As This Court and Every Federal Court Has Held, Trackers That Capture Users' Own Information Are "Pen Registers." .......... 13

C. Plaintiffs Plausibly Allege Invasion of Privacy Claims. .......... 17

D. Plaintiffs Plausibly Allege CIPA §§ 631, 632, 635, and ECPA Claims. .......... 19

E. Plaintiffs Plausibly Allege a CDAFA Claim. .......... 20

1. Meta Lacked Permission to Access Plaintiffs' Identities. .......... 20

2. Plaintiffs Suffered Cognizable Loss. .......... 23

V. CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ... 21

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ... 8, 21, 22

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) ... 10, 23, 24

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) ... 7, 9

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) ... 1, 5, 9, 10

*Campbell v. Facebook Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ... 5, 8

*Capitol Recs. Inc. v. Thomas-Rasset*,
2009 WL 1664468 (D. Minn. June 11, 2009) ... 16

*Chabolla v. ClassPass Inc.*,
129 F.4th 1147 (9th Cir. 2025) ... 5

*Chatrie v. United States*,
146 S. Ct. 2193 (2026) ... 13

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ... 15

*de Ayora v. Inspire Brands, Inc.*,
2025 WL 3707561 (N.D. Cal. Dec. 22, 2025) ... 12

*Deivaprakash v. Condé Nast Digital*,
798 F. Supp. 3d 1100 (N.D. Cal. 2025) ... 13, 17

*Dellasala v. Samba TV, Inc.*,
2026 WL 1138358 (N.D. Cal. Apr. 21, 2026) ... 24

*Doe v. Eating Recovery Ctr. LLC*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) ... 17

*Doe v. GoodRx Holdings, Inc.*,
2025 WL 2052302 (N.D. Cal. July 22, 2025) ... 6, 10

*Doe v. Roblox Corp.*,
602 F. Supp. 3d 1243 (N.D. Cal. 2022) .......... 5

*Drummer v. Costar Grp., Inc.*,
2025 WL 3190656 (C.D. Cal. Oct. 22, 2025) .......... 12, 16

*Edwards v. MUBI, Inc.*,
773 F. Supp. 3d 868 (N.D. Cal. 2025) .......... 5

*Esparza v. Kohl's, Inc.*,
723 F. Supp. 3d 934 (S.D. Cal. 2024) .......... 22

*Facebook, Inc. v. Power Ventures, Inc.*,
2010 WL 3291750 (N.D. Cal. July 20, 2010) .......... 21

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) .......... 15

*Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*,
2014 WL 2213910 (N.D. Cal. May 28, 2014) .......... 22, 23

*Frasco v. Flo Health, Inc.*,
2024 WL 4280933 (N.D. Cal. Sept. 23, 2024) .......... 10

*Frasco v. Flo Health, Inc.*,
2025 WL 2680068 (N.D. Cal. Sept. 17, 2025) .......... 6

*Fregosa v. Mashable, Inc.*,
2025 WL 2886399 (N.D. Cal. Oct. 9, 2025) .......... 14, 16, 17

*Fregosa v. Mashable, Inc.*,
2026 WL 183857 (N.D. Cal. Jan. 23, 2026) .......... 16

*Freifeld v. Epsilon Data Mgmt., LLC*,
2026 WL 1759012 (N.D. Ill. June 15, 2026) .......... 18

*Gabrielli v. Haleon US Inc.*,
815 F. Supp. 3d 852 (N.D. Cal. 2025) .......... 12

*Gilligan v. Experian Data Corp.*,
2026 WL 32259 (N.D. Cal. Jan. 6, 2026) .......... 12, 18

*Gliksman v. Healthline Media, LLC*,
2026 WL 1908082 (N.D. Cal. July 2, 2026) .......... 12

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......... 21

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024) .......... 5, 10

*Harris v. iHeartMedia, Inc.*,
2026 WL 247875 (N.D. Cal. July 29, 2026) ........ 14

*In re Application of U.S. for an Ord. Authorizing Use of a Pen Reg. & Trap On (XXX) Internet Serv. Acct./User Name [xxxxxxxx@xxx.com]*,
396 F. Supp. 2d 45 (D. Mass. 2005) ........ 17

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ........ 22

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........ 10, 19

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ 5, 8

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ........ 6, 8

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ........ 8

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ........ 6, 10

*In re Meta Pixel Tax Filing Cases*,
793 F. Supp. 3d 1147 (N.D. Cal. 2025) ........ 12

*In re Meta Pixel Tax Filing Cases*,
793 F. Supp. 3d (citation modified) ........ 12

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ........ 18

*Krzyzek v. OpenX Techs., Inc.*,
817 F. Supp. 3d 857 (N.D. Cal. 2026) ........ 14, 18

*Lewis v. Magnite, Inc.*,
2025 WL 3687546 (C.D. Cal. Dec. 4, 2025) ........ 14, 16

*Lloyd v. Facebook, Inc.*,
2024 WL 3325389 (9th Cir. July 8, 2024) ........ 6

*Lynch v. Express Scripts Holding Co.*,
2026 WL 1749550 (N.D. Cal. June 17, 2026) ........ 19

*Moody v. C2 Educ. Sys. Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. 2024) ........ 15

*Nelson v. Reddit, Inc.*,
2026 WL 445627 (S.D. Cal. Feb. 17, 2026) .... 14, 17

*NovelPoster v. Javitch Canfield Grp.*,
140 F. Supp. 3d 954 (N.D. Cal. 2014) .... 23

*Ocasio v. United States*,
578 U.S. 282 (2016) .... 17

*Opperman v. Path, Inc.*,
205 F. Supp. 3d 1064 (N.D. Cal. 2016) .... 7, 8

*Oracle USA, Inc. v. Rimini St., Inc.*,
879 F.3d 948 (9th Cir. 2018) .... 21

*Perkins v. LinkedIn Corp.*,
53 F. Supp. 3d 1190 (N.D. Cal. 2014) .... 10

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) .... 24

*Pratt v. Higgins*,
2023 WL 4564551 (N.D. Cal. July 17, 2023) .... 23

*R.C. v. Sussex Publishers, LLC*,
2025 WL 948060 (N.D. Cal. Mar. 28, 2025) .... 12

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025) .... 17

*Rodriguez v. Google LLC*,
772 F. Supp. 3d 1093 (N.D. Cal. 2025) .... 23, 24

*Rojo v. Kliger*,
52 Cal. 3d 65 (1990) .... 15

*Roney v. Miller*,
705 F. App'x 670 (9th Cir. 2017) .... 25

*Selby v. Sovrn Holdings, Inc.*,
2025 WL 2950164 (N.D. Cal. Oct. 17, 2025) .... 12, 18

*Selby v. Sovrn Holdings, Inc.*,
2026 WL 1623480 (N.D. Cal. June 3, 2026) .... 18

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .... 11, 14, 15, 16

*Smith v. LoanMe, Inc.*,
11 Cal. 5th 183 (2021) .... 17

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 2210002 (N.D. Cal. Aug. 4, 2025) ........ 23, 24

*Smith v. Rack Room Shoes, Inc.*,
2026 WL 183852 (N.D. Cal. Jan. 23, 2026) ........ 20

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ........ 6

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
313 F. Supp. 3d 1056 (N.D. Cal. 2018) ........ 21, 22, 23

*Torres v. SeatGeek, Inc.*,
2026 WL 1495202 (N.D. Cal. May 28, 2026) ........ 24

*Tsao v. Desert Palace, Inc.*,
698 F.3d 1128 (9th Cir. 2012) ........ 5

*Tsering v. Meta Platforms, Inc.*,
2026 WL 89320 (N.D. Cal. Jan. 12, 2026) ........ 23, 24

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) ........ 16

**STATUTES**

18 U.S.C. § 2511(d) ........ 19

18 U.S.C. § 3127 ........ 15, 16

28 U.S.C. § 1292(b) ........ 4

Cal. Civ. Code § 1798.140(v)(1) ........ 13

Cal. Pen. Code § 502 ........ 22, 23

Cal. Pen. Code § 631 ........ 19, 20

Cal. Pen. Code § 632 ........ 20

Cal. Pen. Code § 638.50 ........ 11, 14, 15, 17

Cal. Pen. Code § 638.51 ........ 17

**RULES**

Fed. R. Civ. P. 15(a) ........ 25

**OTHER AUTHORITIES**

*How the Rise of Big Data and Predictive Analytics Are Changing the Attorney's Duty of Competence*, 16 N.C. J. L. & TECH. 527 (2015) .......... 13

Restatement (Second) of Torts § 892A(2)(b) (1979).......... 10

## I. INTRODUCTION

Between September 2024 and at least June 2, 2025, Meta covertly modified its Meta Pixel (embedded on millions of websites across the world) (the "Modified Pixel") and its social media apps (i.e., Facebook and Instagram) (the "Modified Meta Apps") in violation of a widely accepted internet security and privacy principle, known as sandboxing, to render people's detailed browsing activity completely non-anonymous and identifiable without their knowledge or consent. When internet researchers discovered Meta's brazen de-anonymization scheme, industry experts voiced outrage and the company claimed to immediately "pause" its practice. This litigation followed.

Earlier this year, this Court largely denied Meta's first motion to dismiss Plaintiffs' claims. Following an hour-long hearing and rejecting Meta's argument that Plaintiffs consented to its secret de-anonymization scheme, the Court concluded that Plaintiffs sufficiently pled claims for invasion of privacy and violations of ECPA, CIPA §§ 631, 632, and 635, and CDAFA. The Court dismissed Plaintiffs' pen register claim with leave to amend. ECF No. 120 (the "MTD Order"). On June 1, 2026, Plaintiffs filed a First Amended Consolidated Class Action Complaint (ECF No. 122) ("FAC"), which mirrors the original consolidated complaint except for a handful of additional factual allegations to support their pen register claim. See ECF No. 122-1. Now, Meta not only moves to dismiss Plaintiffs' amended pen register claim, but it recycles its prior arguments and adds new challenges to every other claim on the basis that the Court's prior order "was wrong." For all the reasons set forth in Plaintiffs' opposition to Meta's first motion to dismiss, and articulated in the Court's well-reasoned order, Meta's motion should be denied again.

Meta's consent arguments, now presented to this Court for a third time, lack merit. Meta continues to ignore the long-settled standard in this Circuit that courts must consider whether a defendant's disclosures, understood by a reasonable person, "explicitly notify users of the conduct at issue." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) (citation modified). Retreating behind generic and undefined terms like "collect" and "match," Meta argues it has immunized itself from liability for any conceivable interpretation of those words, including conduct that violates industry norms of privacy. Applying the reasonable person standard, this Court held that while such language might have disclosed widely understood functionalities of the standard Meta Pixel, it did not disclose Meta's creation and use of the Modified Pixel, permitting Meta to "perfectly match Android browsing activity to Meta accounts by

opening a backdoor to users' Facebook and Instagram apps." MTD Order at 10. Meta insists (again) that the Court isolate just one aspect of its de-anonymization scheme—the so-called "Subject Functionality"—arguing that because it disclosed "a matching functionality" in one context (the standard Meta Pixel), users have consented to all forms of matching functionality in all contexts. The Court rejected that argument the first time, and it should do so again here.

Plaintiffs' amended pen register claim addresses the Court's prior concerns by including the requisite specificity as to how the Modified Pixel recorded users' IP addresses and other identifying information (e.g., in an HTTP header) when users visited a Pixel-enabled website during the relevant period. See FAC ¶¶ 24–28. As pled, Plaintiffs' allegations support the type of pen register claim that courts in this District (including this Court) have consistently upheld at the motion to dismiss stage. The Court should permit Plaintiffs' amended pen register claim to proceed. And, consistent with its well-reasoned order on Meta's first motion to dismiss, the Court should deny Meta's rehashed motion as to Plaintiffs' remaining claims, which are exactly the same—word for word—as those Meta previously attempted to dismiss and which the Court previously adjudicated in Plaintiffs' favor.

## II. BACKGROUND

### A. Meta's De-Anonymization Scheme.

To address the risks inherent in running multiple third-party apps on a single device, operating systems implement a foundational internet security and privacy principle called "sandboxing," which prevents unauthorized interactions between apps and protects access to sensitive data or privileged system resources. FAC ¶¶ 1–2, 54–55. On the Android operating system, this means that Meta's surveillance of activity conducted on a person's web browser must occur separate and apart from Meta's tracking of that person's activity in its Facebook and Instagram social media apps (the "Meta Apps"). *Id.* ¶¶ 2, 51, 54–56. Sandboxing therefore generally allows Meta App users to browse websites on their mobile web browsers free from identification and associated targeting by Meta. *Id.* ¶¶ 2–3, 29, 36, 51, 54–55, 68–69, 75–76, 99, 105, 117, 133–35, 194. It also allows users to engage in privacy protections, such as clearing cookies, using private browsing modes, or using a virtual private network ("VPN"), none of which function as intended without sandboxing. *See id.* ¶¶ 5, 68.

On June 3, 2025, internet security researchers revealed that, from September 2024 through at least June 2, 2025, Meta intentionally circumvented sandboxing restrictions on Android mobile devices to tie people's browsing information directly to their Meta account information, rendering their web browsing activity *completely non-anonymous and identifiable in real time*. *Id.* ¶¶ 4, 52. To accomplish this, Meta configured the Modified Pixel and the Modified Meta Apps to create a backdoor channel between each person's web browser and their Modified Meta App. Meta's de-anonymization scheme involved four key components. *See id.* ¶ 66 (illustration). First, when a person visited a website on an Android device, the Modified Pixel directed the person's web browser to send detailed web browsing activity—including the person's IP address, the website address, actions taken on the website, and the person's browsing-related pseudonymous identifier (the "_fbp" cookie)—to Meta's servers. *Id.* ¶¶ 24–37. Second, the Modified Pixel simultaneously directed the web browser to send the _fbp cookie to a designated Android device "localhost" port, an internal communication channel that allows apps running on the same device to route information to each other without that information leaving the device. *Id.* ¶¶ 4, 53, 56, 59–66. Third, a Modified Meta App "listened" on that designated localhost port for and collected the _fbp cookie from the Modified Pixel. *Id.* ¶ 59. Fourth, the Modified Meta App combined that cookie data with personal information and Meta account identifiers residing in the app and transmitted the combined data to Meta's servers. *Id.* ¶¶ 59, 66. In this manner, Meta could instantaneously and accurately attribute a person's detailed browsing activity to the vast real-world identifying information already associated with their Meta account, something Meta could not have achieved absent its circumvention of Android's sandboxing protections. *Id.* ¶¶ 18, 59, 65–68.

Knowing it lacked permission to bypass mobile device security to identify and surveil Android users, Meta took careful steps to prolong and cover up its scheme, deliberately and repeatedly modifying its methods to circumvent privacy updates and avoid public detection. *Id.* ¶¶ 57, 59–64, 69, 71, 73; ECF No. 104 at 17. As a result, Meta successfully shielded its misconduct from Google, web browser developers, and website developers, who could not understand why Meta's Pixel was communicating with localhost ports. *Id.* ¶¶ 69, 71, 77. The reactions to Meta's misconduct upon its public disclosure were telling. On the same day researchers publicly reported their findings, Meta immediately "decided to pause" its scheme. *Id.* ¶ 73. Google confirmed that Meta's "invasive techniques" had "violate[d] the terms of service for [Google's]

Play marketplace and the privacy expectations of Android users," in a manner that "blatantly violate[d]" Google's security and privacy principles. *Id.* ¶ 69. Firefox developer Mozilla likewise denounced Meta's conduct as "severe violations of [its] anti-tracking policies." *Id.* ¶ 71.

### B. Plaintiffs Modestly Amend Only Their Pen Register Claim.

Plaintiffs assert the following causes of action against Meta: intrusion upon seclusion under California common law; invasion of privacy under California's Constitutional Right to Privacy; violation of the Electronic Communications Privacy Act ("ECPA"); violations of Sections 631, 632, 635, and 638.51 of the California Invasion of Privacy Act ("CIPA"); and violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"). On May 11, 2026, this Court granted in part and denied in part Meta's motion to dismiss Plaintiffs' original consolidated complaint, dismissing Plaintiffs' pen register claim with leave to amend[1] while allowing all other claims to proceed. MTD Order at 23.

In largely denying the motion, the Court rejected Meta's consent-based arguments, holding that a "reasonable user could plausibly read the Privacy Policy to not disclose that Meta would open a backdoor to link their Android web browsing activities to their Meta accounts with absolute certainty," and that Meta's Privacy Policy "did nothing to dispel" the reasonable belief that a "digital wall" separated mobile apps. *Id.* at 9–10. On June 10, 2026, Meta moved to certify the MTD Order for interlocutory appeal under 28 U.S.C. § 1292(b), on the issue of whether the Court properly applied the law of consent to Meta's privacy disclosures. ECF No. 123. Meta withdrew its certification motion on June 30, 2026, while purporting to reserve the right to seek interlocutory review at a later date. ECF No. 133.

On June 1, 2026, Plaintiffs filed the FAC, which added only narrowly tailored allegations to support their pen register claim—including allegations that the Pixel has, since 2015, automatically transmitted HTTP header information, including a user's IP address, with every event sent through the browser. *See* FAC ¶¶ 24–27, 37, 98, 104, 116, 211–12). On July 15, 2026, Meta filed the instant motion, in which Meta does not confine itself to Plaintiffs' pen register amendments, but also invites the Court to revisit and reverse its rulings on consent and on each of the already-upheld claims. ECF No. 136 ("Mot.").

## III. STATEMENT OF THE ISSUE TO BE DECIDED

Whether the FAC plausibly alleges claims upon which relief can be granted.

[1] Plaintiffs also voluntarily dismissed their unjust enrichment claim. ECF No. 107 at 25 n.14.

# IV. ARGUMENT

## A. Plaintiffs' Allegations Demonstrate Meta Lacked Their Consent.

### 1. Meta's Policies Do Not Disclose the Alleged Misconduct.

The Ninth Circuit has long held that for consent to be effective, the person alleging harm must have consented "to the *particular conduct*, or to substantially the same conduct," and the alleged tortfeasor cannot have exceeded the scope of that consent. *Calhoun*, 113 F.4th at 1147 (emphasis added) (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012)); *see also Hammerling v. Google, LLC*, No. 22-17024, 2024 WL 937247, at *1 (9th Cir. Mar. 5, 2024); *In re Facebook, Inc. Internet Tracking Litig.* ("*Facebook Tracking*"), 956 F.3d 589, 602 (9th Cir. 2020); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 847 (N.D. Cal. 2014) (disclosure must be "specific enough to establish that users expressly consented"). Pointing to various disclosures that it broadly "collects," "receives," "uses," and "match[es]" information from third parties, Meta argues it "explicitly notif[ied]" users of the practice of breaching sandboxing protocols to de-anonymize people's browsing activity on their mobile devices. *See* Mot. at 2–5, 6, 9–12. Even assuming Plaintiffs could have and did agree to terms containing these disclosures, they do not establish consent to Meta's conduct here.[2]

Meta identifies the following statements from its Privacy Policy and Cookies Policy as evidence of user consent: (1) Meta "collect[s] and receive[s] information from [third parties (including, as relevant here, websites employing the Meta Pixel)] about a variety of your information and activities on and off our Products"; (2) third parties share identifiers "like your email address, cookies, and advertising device ID with us"; (3) third parties "may also choose to share information with Meta from cookies set in their own

[2] Plaintiffs do not concede they agreed to Meta's privacy or cookies policies before Meta subjected them to its de-anonymization scheme. *See Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1156 (9th Cir. 2025) (inquiry notice of a sign-in wrap agreement is determined by "the conspicuousness and placement of the Terms of Use hyperlink, other notices given to users of the terms of use, and the website's general design") (citation modified); *Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1255 (N.D. Cal. 2022) ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." (citation modified)). Rather, Plaintiffs reference the policies in the FAC only to demonstrate that Meta never disclosed that it was de-anonymizing Android users' browsing activity. *See Edwards v. MUBI, Inc.*, 773 F. Supp. 3d 868, 883–84 (N.D. Cal. 2025) (complaint's references to defendant's sign-in wrap policies did not demonstrate that plaintiffs had agreed to them). Regardless, as it recognized in the MTD Order, the Court need not focus on whether the policies are enforceable because, even if they were, they cannot establish consent to the de-anonymization scheme as a matter of law. *See* MTD Order at 9 ("[T]he mere existence of a privacy policy is generally not dispositive on a motion to dismiss because users might lack actual or constructive notice of the policy." (citation modified)).

websites' domains," including "cookies named . . . _fbp"; and (4) such sharing "helps us match your activities with your [Meta] account, if you have one." *See* Mot. at 4 (citing MTD Order at 8); ECF Nos. 102-1 (Privacy Policy) at 8, 102-5 (Cookies Policy) at 5–6. Adopting Meta's interpretation of these disclosures, a reasonable person might understand that, through the standard Meta Pixel, third parties may disclose a variety of information (including from the _fbp cookie) to Meta, which it may use to "match" users' browsing activity with their Meta account. *See also* FAC ¶¶ 3, 20, 25–36. These were the kinds of data collection practices at issue in *Lloyd v. Facebook, Inc.* and *Smith v. Facebook, Inc.*, which the Ninth Circuit ruled were covered by similar disclosures. *See Lloyd*, No. 23-15318, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024) (finding Facebook's policy gave "clear notice" that third parties may share data with Facebook); *Smith*, 262 F. Supp. 3d 943, 956 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) (finding Facebook disclosed its practices of collecting user data from third parties and using it for advertising).

Critically, Meta's admittedly "capacious" statements about a general practice of tracking people (*see* Mot. at 3) are "too general to conclusively establish consent." *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 823 (N.D. Cal. 2020). Courts in this District have repeatedly held that Meta's broad disclosures about receiving data from third parties (like the ones it relies on now) are insufficient to establish consent for specific conduct not referenced in those disclosures. *See, e.g.*, *Frasco v. Flo Health, Inc.*, No. 21-CV-00757-JD, 2025 WL 2680068, at *20 (N.D. Cal. Sept. 17, 2025) ("There was more than enough evidence at trial for the jury to conclude that [plaintiffs] did not consent to the recording of their answers to the onboarding survey because a reasonable user could find Meta's privacy disclosure too ambiguous to explicitly notify users of the conduct at issue.") (citation modified)); *Doe v. GoodRx Holdings, Inc.*, No. 23-CV-00501-AMO, 2025 WL 2052302, at *9 (N.D. Cal. July 22, 2025) ("A reasonable user reading [Meta's] broad disclosures . . . about the general use of the tracking technologies on the GoodRx Platform, when reading them together with the portions of GoodRx's policies . . . and its Co-CEO's express promises . . . would reasonably think they were not consenting to the sharing and interception of sensitive medical information."); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) (Meta's "generalized notice [was] not sufficient to establish consent" to "acquire *health data* obtained from Facebook users' interactions with their *medical providers' websites*.").

Moreover, despite Meta's arguments to the contrary (*see* Mot. at 5–6), the manner in which an action is accomplished can "change[] the nature" of consent. *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1077 (N.D. Cal. 2016). In *Opperman*, plaintiffs gave Yelp permission to "access," "use," and "look at" their address book data to find their friends on the Yelp app. *Id.* at 1069, 1073. Despite these broad disclosures, evidence supported plaintiffs' reasonable expectation that Yelp's matching process would take place locally on their phones, rather than on Yelp's servers. *Id.* As Meta does here, Yelp argued that once plaintiffs consented to its matching function, they had no business in knowing *how* Yelp accomplished that matching. *Id.* at 1077 ("Yelp argues that consent to the Friend Finder process does not require the user to understand how the process works." (citation modified)). Rejecting Yelp's argument, the court recognized that "the details about how the process works matter to the consent analysis if those details involve conduct that transcends what was consented to and interferes with the Plaintiffs' objectively reasonable expectations of privacy." *Id.* Accordingly, Yelp had not obtained consent to perform the matching on its servers. *Id.*

So too here. The cited disclosures say nothing whatsoever about Meta bypassing user-initiated actions that users understand normally prevent Meta from tying their browsing activity to their profiles, such as clearing cookies, using private browsing modes, or using a VPN. *See* FAC ¶¶ 5, 68. In fact, even sophisticated website developers who deployed the Modified Pixel and Google itself claim they were not aware of Meta's scheme until it was publicly revealed. *Id.* ¶ 77; *see* ECF No. 104 (Google's Mot. to Dismiss) at 11 (contending Google did not foresee Meta's "exploitation technique"); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 624 (N.D. Cal. 2021) (no consent where Google could not demonstrate that websites "even knew about, the interception of their communications with users who were using Chrome without sync"). There was no disclosure that the Modified Pixel would automatically open a covert communication channel on one's mobile device, and no disclosure that the Modified Pixel and Modified Meta Apps would, together, simultaneously transmit detailed browsing activity to Meta's servers while pairing a person's pseudonymous browsing-related identifier (the _fbp cookie) with Meta account information to render that browsing activity completely identifiable. *See* FAC ¶¶ 3, 35–36, 59, 65–68. As a result, the Court appropriately found that "a reasonable user could read [Meta's policy] as disclosing only that Android browsing data will be broadly collected to be matched imperfectly on some occasions to the user's Meta account." MTD Order at 9.

Because Meta's de-anonymization scheme was never disclosed, no reasonable person could have

consented to it. *See, e.g.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1064 (N.D. Cal. 2021) (general disclosure that "never mentions private browsing mode" could not establish consent to collection of data from users in private browsing mode); *Facebook Tracking*, 956 F.3d at 602 (no consent to tracking of logged-out users where Facebook "failed to acknowledge" such conduct); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 824 (consent to Google's collection of voice data does not extend to its data disclosure of same to third parties); *Opperman*, 205 F. Supp. 3d at 1073 (consent to Yelp's "access" to user contact data does not extend to Yelp's "upload" of data to its servers); *Campbell*, 77 F. Supp. 3d at 847–48 (disclosure that Facebook may use information it receives for "data analysis" did not establish consent for "the scanning of message content for use in targeted advertising"); *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *13–14 (N.D. Cal. Sept. 26, 2013) (disclosure that Google may review emails to exclude objectionable content did not constitute consent to interception of emails for purposes of creating user profiles or targeted advertising where the latter interception was "not specifically mention[ed]").

**2. <u>A Holistic Reading of Meta's Disclosures Support the Court's Conclusions Regarding Consent.</u>**

As the Court correctly concluded, "Plaintiffs allege that users generally understand the sandboxing principle of mobile operating systems means that there is a 'digital wall between mobile apps,' including between browsers and other apps." MTD Order at 9 (quoting ECF No. 84 ¶¶ 47, 71). In its instant motion, Meta argues that the Court erred by importing sandboxing principles into its interpretation of Meta's privacy policy, "graft[ing] extrinsic technical assumptions" and "overrid[ing] its plain terms." Mot. at 6–7, 9. But a closer review of the entirety of Meta's disclosures reveals that even Meta understood its technologies (including its Meta Pixel and Meta Apps) to function according to widely accepted industry norms like sandboxing. Specifically, Meta's disclosures would inform a reasonable person that, consistent with sandboxing principles, Meta requires user consent to interact with other applications on a mobile device, such as the photos or camera apps. *See* ECF No. 102-1 (Privacy Policy, dated June 26, 2024) at 007 ("Device information we collect and receive includes . . . *Information you've shared with us* through device settings, like GPS location, camera access, photos, and related metadata . . . ." (emphasis added)), 017 ("For example, *if you give us permission to access your device's camera roll*, we collect metadata." (emphasis added)); ECF No. 102-2 (Privacy Policy, dated Nov. 14, 2024) at 006, 015; ECF No. 102-3 (Privacy Policy, dated June

16, 2025) at 006, 015; ECF No. 102-4 (Privacy Policy, dated Dec. 16, 2025) at 006, 015.

Likewise, when Meta's Privacy Policy explains when and how Meta Apps may access users' browsing activities, it indicates that Meta will only feed browsing information to the Facebook or Instagram applications when a user visits the web *via an in-app browser*, as opposed to the free-standing browsers (e.g., Chrome) at issue here. *See* ECF Nos. 102-1 at 014 (disclosing that within its apps, Meta logs "[i]nformation about websites that you visit or interact with *when you use our in-app browser*" (emphasis added)), 102-2 at 013, 102-3 at 013, 102-4 at 013. Meta's insistence that undefined words like "collect" and "match" grant its disclosures limitless permission to Plaintiffs' data and devices ignores the limitations described above, which imply (if not promise) Meta will abide by commonly understood notions of sandboxing. *See Calhoun*, 113 F.4th at 1150 (finding that "when the disclosures [were] read together and in the light most favorable to Plaintiffs, a reasonable user would not necessarily understand that they were consenting to the data collection at issue").

Moreover, Meta's disclosures make clear that the Meta Pixel is normally *incapable* of identifying a person (e.g., by using their Meta account information in the Meta Apps) on a mobile device. Instead, Meta relies on a probabilistic scoring system to make inferences about one's identity, *see* ECF No. 102-8 at 1 ("Meta calculates a score from 0 to 10 based on the quality of customer information.")—exactly the type of uncertainty Meta sought to eliminate by opening a backdoor in Android mobile devices.

The plain terms of Meta's disclosures demonstrate that Plaintiffs did *not* consent to Meta bypassing their mobile devices' security to identify and surveil them. Meta's disclosures make no mention of the de-anonymization scheme achieved with the Modified Pixel and Modified Meta Apps but, rather, suggest that Meta complied with sandboxing principles—a reasonable belief, shared by the entire industry. *See* FAC ¶¶ 69, 71, 73. Meta therefore fails to establish that the only plausible interpretation of its policies would give "users notice of the specific practice at issue." *Calhoun*, 526 F. Supp. 3d at 620 ("The disclosures must have only one plausible interpretation for a finding of consent.").

### 3. <u>The Court's Prior Order Applied the Correct Consent Framework.</u>

Evaluating whether Meta obtained users' express or implied consent before engaging in the de-anonymization scheme, the Court correctly identified that consent turns on an objective standard: what a reasonable user would understand from the disclosures and the circumstances as a whole. "[C]onsent is

typically a fact-bound inquiry," naturally informed by evidence beyond the four corners of the policy disclosures. *Frasco v. Flo Health, Inc.*, 2024 WL 4280933, at *2 (N.D. Cal. Sept. 23, 2024); *see, e.g.*, *GoodRx Holdings*, 2025 WL 2052302, at *9 ("Co-CEO's express promises that GoodRx would not share its users' health information" informed what a user "would reasonably think they were not consenting to" when reading the GoodRx's privacy policy); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 928 (N.D. Cal. 2023) (considering evidence that Google internally understood that its disclosures "made users 'overestimate privacy mode protections,' including that Incognito 'hides browsing activity from Google.'"). In response, Meta invents a consent framework predicated on "narrow . . . contract interpretation," arguing that the Court may not consider any allegations "unrooted in the text" of its policies. Mot. at 4, 8.

Meta's proposed test ignores that the consent framework originates from tort law, not rigid contract interpretation. *See Calhoun*, 113 F.4th at 1147 ("To be effective, consent must be . . . to the particular conduct, or substantially the same conduct." (quoting Restatement (Second) of Torts § 892A(2)(b) (1979)); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 793 ("As the Restatement explains, "[i]n order to be effective, the consent must be to the particular conduct of the actor, or to substantially the same conduct." (quoting Restatement (Second) of Torts § 892A (1979)).[3] Neither *Smith* nor *Hammerling* announce a different consent rule; each held that the applicable disclosures before it unambiguously covered the general data collection practices at issue.[4] Here, by contrast, Plaintiffs challenge a specific de-anonymization scheme, and the Court correctly concluded that Meta's disclosures did not "explicitly notify" users of that conduct. *Calhoun*, 113 F.4th at 1147; MTD Order at 8–10.

[3] Elsewhere in its brief, Meta even acknowledges that consent is a creature of tort law. *See* Mot. at 13 (citing Restatement (Second) of Torts § 892A(4) (1979) ("If the actor exceeds the consent, it is not effective for the excess" (Meta's emphasis removed))).

[4] Meta misquotes *Hammerling* to suggest that a disclosure's broad language may be stretched to conduct that a user never could have expected to occur. Mot. at 7–8. Not so. In *Hammerling*, the Ninth Circuit merely observed that "where a contract expressly defines a term, we cannot reject that definition simply because it may deviate from our expectations. *Hammerling*, 2024 WL 937247, at *2. Meta has not pointed to any express definition of terms like "match," "collect," "use," or "receive," in its disclosures, let alone one that expressly disclosed its de-anonymization scheme. Nor did the courts in *Perkins v. LinkedIn Corp.* and *In re Facebook, Inc., Consumer Privacy User Profile Litigation* hold that generic disclosures could cover unexpected conduct. In both instances, the courts' decisions rested on "the clarity of the disclosure." *Perkins*, 53 F. Supp. 3d 1190, 1213 (N.D. Cal. 2014); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 792 (N.D. Cal. 2019) (finding the disclosure clearly instructed users that they needed to adjust their application settings to block applications from receiving their information).

Meta's public policy concerns do not change the settled consent standard. Meta could have disclosed that it would violate sandboxing protections to harvest users' data and link it directly to their identities, but it did not. The Court correctly asked whether Meta's "capacious" representations regarding its general data collection practices disclosed the "perfect" de-anonymization of browsing activity using its Modified Pixel and Modified Meta Apps, and correctly answered no. MTD Order at 7–11.

### B. As Amended, Plaintiffs Plausibly Allege a CIPA § 638.51 Pen Register Claim.

#### 1. Plaintiffs Have Now Plausibly Alleged That the Modified Pixel Records Users' "Routing, Addressing, or Signaling Information."

Meta does not dispute that an IP address is "routing, address, or signaling" information." *See* Cal. Pen. Code § 638.50(b). But Meta disputes that "the Subject Functionality operates as a pen register" because Plaintiffs have ostensibly "not adequately alleged that the Modified Pixel records IP address." Mot. at 13–14 (citation modified). Not so.

Plaintiffs allege that "[w]hen the user initially visits a website where the Meta Pixel is installed . . . [t]he [website] server's instructions [] cause the Pixel's code to be executed in the user's web browser." FAC ¶ 24. "Thereafter . . . the Pixel surreptitiously directs the web browser to send a message to Meta's servers, separate from and in addition to any message the browser sends to the website itself . . . [which includes] the user's IP addresses and other identifying information (*e.g.*, in an HTTP header)." *Id.* ¶ 25. Indeed, Meta's own documentation for the standard Pixel notes the Pixel records "the IP address of the browser." *See id.* ¶¶ 26–27 (citation modified).[5] These allegations are materially identical to those the Court sustained in *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 927 (N.D. Cal. 2024)—a decision Meta acknowledges the Court would need to "reconsider" and reject to reach the conclusion Meta seeks here. *See* Mot. at 17 n.5. Like the plaintiffs in *Shah*, Plaintiffs plausibly allege here that the Modified Pixel records or decodes the IP address—"routing, addressing, or signaling information"—transmitted from Plaintiffs' phones that is associated with Plaintiffs' communications to the various websites. *See Shah*, 754 F. Supp. 3d at 928–29.

[5] Because "Plaintiffs challenge the operation of the standard Pixel as enhanced by the Modified Pixel," allegations regarding the standard Pixel's operation "remain relevant." MTD Order at 13.

Meta also argues its Modified Pixel is not a "pen register" because "the IP address is contained in the same transmission that also includes information about the user's web browsing activity—i.e., the alleged contents of their communications." Mot. at 14 (citation modified). This is wrong. As Judge Pitts noted in evaluating the standard Meta Pixel:

> the Pixel is a small library of functions with an array of capabilities that allows the website owner to do a variety of things. One of those functions collects data such as HTTP Headers and IP addresses, while a different function collects the contents of users' communications. If the various functionalities within the Meta Pixel operate independently from one another, as plaintiffs plausibly allege, the process that records metadata in a pen register-like manner is a separate device or process from the one that collects the contents of users' communications.

*In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147, 1155 (N.D. Cal. 2025) (citation modified). Plaintiffs allege as much here. *See* FAC ¶¶ 25-27. In any event, courts confronted directly with this question have overwhelmingly found that a tracker may still be a "pen register" even if it records both "addressing" information *and* the "contents" of a communication, so long as it does not *only* "record[] . . . the contents of communications." *In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d at 1155 (citation modified); *Drummer v. Costar Grp., Inc.*, No. EDCV 25-1047 JGB (SPX), 2025 WL 3190656, at *5 (C.D. Cal. Oct. 22, 2025) ("[I]t is not apparent from the face of CIPA that it excludes pen registers that may also collect some additional information."); *Gliksman v. Healthline Media, LLC*, No. 24-CV-08650-AMO, 2026 WL 1908082, at *6 (N.D. Cal. July 2, 2026) (same); *Gabrielli v. Haleon US Inc.*, 815 F. Supp. 3d 852, 871 (N.D. Cal. 2025) (same); *de Ayora v. Inspire Brands, Inc.*, No. 25-CV-03645-AGT, 2025 WL 3707561, at *8 (N.D. Cal. Dec. 22, 2025) (same). Indeed, this Court has sustained complaints alleging both Section 631 and Section 638.51 claims. *Gilligan v. Experian Data Corp.*, No. 25-CV-02873-RFL, 2026 WL 32259, at *3–4 (N.D. Cal. Jan. 6, 2026) (Lin, J,); *Selby v. Sovrn Holdings, Inc.*, No. 25-CV-03139-RFL, 2025 WL 2950164, at *3–4 (N.D. Cal. Oct. 17, 2025) (Lin, J.). Whether the Modified Pixel records both the contents of communications and an IP address is irrelevant, so long as it does not only record the contents of communications.

Meta also contends that Plaintiffs lack Article III standing to pursue claims related to their IP address because "there is no reasonable expectation of privacy in an IP address," which "merely [divulges] information associated with a device." Mot. at 14 (citation modified). Contrary to Meta's representation, there is no categorical rule disclaiming a reasonable expectation of privacy in IP addresses. *See R.C. v.*

*Sussex Publishers, LLC*, No. 24-CV-02609-JSC, 2025 WL 948060, at *3 (N.D. Cal. Mar. 28, 2025) ("[T]he Court cannot find, as a matter of law, that disclosure of Plaintiffs' IP addresses and other information Plaintiffs input into the site . . . is not a concrete and particularized injury sufficient to confer standing.").[6] Indeed, the Supreme Court recently held that "police officers invade a cell-phone user's reasonable expectation of privacy when they access his Location History," which includes cellphone information based in part on "IP address information." *Chatrie v. United States*, 146 S. Ct. 2193, 2215 (2026). More important, the disclosure of IP addresses here is a part of Meta's compilation of "detailed profiles." *See* MTD Order at 6–7; *see also* FAC ¶¶ 18, 25–28. Plaintiffs' "reasonable expectation of privacy in the information collected" encompasses a "privacy violation [that] extends beyond the collection of just [their] IP address[es] . . . it encompasses how that collection allegedly allowed [Meta] to: (1) build a profile reflecting [their] personal information; and (2) interfere with [their] ability to remain anonymous." *Deivaprakash v. Condé Nast Digital*, 798 F. Supp. 3d 1100, 1107 (N.D. Cal. 2025) (Lin, J.) (citation modified).

Meta also points to its Privacy Policy's statement that Meta receives "device information" from third-party websites, "including your IP address," and argues that Plaintiffs therefore cannot claim a privacy injury from IP-address collection. Mot. at 15. That argument fails because Plaintiffs' theory is not bare IP-address collection; it is the use of IP and HTTP-header information together with URLs, searches, page actions, and Meta account identifiers to create identifiable real-time profiles. FAC ¶¶ 25–28, 65–68, 98–100, 104–06, 116–18; *see also* MTD Order at 13 ("Plaintiffs have plausibly alleged that users would not agree, and have not agreed, to permit the collection of standard Pixel data in a context where it would be combined via the Modified Pixel with perfectly matched identifiers from their Facebook and Instagram phone apps.").

### 2. <u>As This Court and Every Federal Court Has Held, Trackers That Capture Users' Own Information Are "Pen Registers."</u>

Meta contends its Modified Pixel is not a "pen register" because it records a user's own IP address rather than the IP address of the website the user is communicating with. *See* Mot. at 15. That argument has been rejected *ad nauseum* by federal courts, including this one:

[6] It is also not necessarily true that an IP address can at most be associated with a device. *See id.* at 14–15. California law itself categorizes IP addresses as "personal information" because they are "capable of being associated with . . . a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1); *see also* Peter Segrist, *How the Rise of Big Data and Predictive Analytics Are Changing the Attorney's Duty of Competence*, 16 N.C. J. L. & TECH. 527, 539 (2015) (noting an IP address "can also easily become associated with a specific individual through a rather simple analysis of a user's web traffic").

> Nothing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register. . . . By the plain meaning of § 638.50(b), collection of the recipient phone number or IP address is not a required element. All that is required is that the Trackers record addressing information transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to [a] website, *regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue*.

*Shah*, 754 F. Supp. 3d at 929 (emphasis added); *see also*, *e.g.*, *Harris v. iHeartMedia, Inc.*, No. 25-CV-06038-EKL, 2026 WL 247875, at *2 (N.D. Cal. July 29, 2026) (rejecting argument that "the trackers are not pen registers because they only collect information about the source of communications made to the Website . . . rather than the outgoing dialing, routing, addressing, or signaling information sent from that source") (citation modified); *Krzyzek v. OpenX Techs., Inc.*, 817 F. Supp. 3d 857, 870 (N.D. Cal. 2026) (rejecting argument that a "pixel is not a pen register because it records a user's own information, and is therefore not akin to the numbers dialed on a telephone"); *Nelson v. Reddit, Inc.*, No. 25-CV-1470 JLS (AHG), 2026 WL 445627, at *4 (S.D. Cal. Feb. 17, 2026) ("The Court is not persuaded that the definition of pen register requires the collection of only outgoing data.").

Meta does not provide a compelling reason for the Court to reconsider its prior reasoning. Users' IP addresses are sent by their devices and used to direct communications. *See* Section IV.B.1, *supra*; *see also Fregosa v. Mashable, Inc.*, No. 25-CV-01094-CRB, 2025 WL 2886399, at *5 (N.D. Cal. Oct. 9, 2025) ("An IP address, like a telephone number, is quintessential 'addressing' information transmitted by the user's computer or smartphone in connection with an outgoing HTTP request to [a] website: it identifies the device sending the communication and determines where the packet is to be routed."). The statutory definition of a "pen register," as this Court previously held, only requires the information to be "transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to [a] website." *Shah*, 754 F. Supp. 3d at 929. Moreover, Meta "records Plaintiffs' movements across the internet as they move across the internet," and thus, "would necessarily have to capture destination information." *Lewis v. Magnite, Inc.*, 2025 WL 3687546, at *13 (C.D. Cal. Dec. 4, 2025).

Meta claims its interpretation is needed to square the definition of a "pen register" with the definition of a "trap and trace device" (Mot. at 15), but an easier way to square those provisions is to find that a "trap and trace device" captures information associated with a communication *to* a user's computer or device,

while a "pen register" captures information associated with a communication *from* a user's computer or device. This accords with the purpose of the CIPA to "protect the right of privacy of the people of this state" (*Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002) (citation modified)), which supports a reading that the subject of the statute—that is, the person to whom information is "incoming" or "outgoing"—is the user, not Meta. *See Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1077 (C.D. Cal. 2024) (finding the plaintiff who visited the website was the relevant "user" for CIPA § 638.51(b)(5), not the website). Beyond that, it does not matter who the information concerns, as this Court held in *Shah*.[7]

And even under Meta's source/destination framing (*see* Mot. at 15), the FAC separately preserves a trap-and-trace theory: Meta's code allegedly captured incoming electronic impulses and source-identifying IP and HTTP-header information associated with users communicating with websites. FAC ¶¶ 212–15. Meta does not separately defeat that alternative theory.

Meta argues its interpretation "also accords with how the terms 'pen register' and 'trap-and-trace' have long been interpreted by courts." Mot. at 16. But "[n]othing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register." *Shah*, 754 F. Supp. 3d at 929. And "the Court's analysis must begin with the statutory text, and if that text is clear, must end there." *Id.*; *see Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (noting "[t]he text of a law controls over purported legislative intentions unmoored from any statutory text" (citation modified)). Moreover, the older definition of a "pen register" in the Federal Pen Register Act defined a "pen register" as "a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached." 18 U.S.C. § 3127 (1986). In enacting CIPA § 638.50(b) in 2015, the California Legislature made the deliberate decision to copy the modern definition of a "pen register" found in the federal statute—which is agnostic as to whose information is recorded—rather than the older version that is specific to "dialed" telephone numbers. That was a consequential decision; had the legislature intended to limit the "pen register" statute in the way Meta advocates, "it plainly knew how to do so." *Rojo v. Kliger*, 52 Cal. 3d 65, 75 (1990).

Meta complains that "[h]ad the California legislature intended to outlaw practices basic to the

[7] At worst, Meta's argument would simply mean Plaintiffs have alleged the Modified Pixel is a "trap and trace device," which otherwise applies to the same types of information as a "pen register." *See* Cal. Pen. Code § 638.50(c)).

functioning of the internet, surely it would have given a clearer indication of that intent." Mot at 17. The California legislature did no such thing. Surreptitious disclosure of an IP address to a third party for profiling and targeted advertising has nothing to do with basic internet functionality. *Drummer*, 2025 WL 3190656, at *4 ("Defendant has failed to persuade the Court that liability for *further* use of IP addresses would interrupt basic internet function.") (emphasis in original). Similarly, Meta's argument that "if any process for collecting a device's IP address constitutes a pen register, then every device on the internet is operating a pen register" (Mot. at 16) is hyperbolic. *See Fregosa v. Mashable, Inc.*, No. 25-CV-01094-CRB, 2026 WL 183857, at *2 (N.D. Cal. Jan. 23, 2026); *Lewis*, 2025 WL 3687546, at *13 ("Defendant's prophecy has not come to fruition in the last few years since other courts have interpreted CIPA as this Court does."). As this Court recognized, "[a] user who consents to disclose their IP address to [a website] as part of accessing its website does not necessarily consent to disclose their IP address to [a] third part[y] operating [a] [t]racker[]." *Shah*, 754 F. Supp. 3d at 932; *see also id.* at 932 n.3 (distinguishing *Capitol Recs. Inc. v. Thomas-Rasset*, No. CIV 06-1497(MJD/RLE), 2009 WL 1664468, at *3 (D. Minn. June 11, 2009), which Meta cites). And again, Plaintiffs do not allege that Meta—a third party to the communication here—"violated CIPA simply by receiving IP addresses as part of an ordinary online exchange," but rather, surreptitiously "for profiling and advertising purposes." *Fregosa*, 2025 WL 2886399, at *7; *see also Walsh v. Dollar Tree Stores, Inc.*, No. 25-CV-01601-SVK, 2025 WL 2939229, at *18 (N.D. Cal. Oct. 16, 2025) ("The [c]omplaint implicates not only Essential Cookies, which may be subject to the carveout . . . but also Analytics Cookies and Advertising Cookies, which are not . . . .") (citation modified). In short, the Court's holding—and that of *every federal court* confronted with this question—does not sweep in ordinary internet communications or even every type of communication to a third party.

Regardless, the California Legislature could not have been clearer in its intent by adopting a broad definition of a "pen register"—identical to the modern Federal Pen Register Act (18 U.S.C. § 3127(3)), which has long been held to apply to the collection of IP addresses. *See*, *e.g.*, *Fregosa*, 2025 WL 2886399, at *9 ("The statutory text is deliberately expansive, designed to encompass new technologies and apply to conduct like that alleged here."); *Shah*, 754 F. Supp. 3d at 933 ("The pen register statute is broadly written, and under California law, is to be interpreted broadly to protect privacy and to be applied to new techniques

and technologies."); *In re Application of U.S. for an Ord. Authorizing Use of a Pen Reg. & Trap On (XXX) Internet Serv. Acct./User Name [xxxxxxxx@xxx.com]*, 396 F. Supp. 2d 45, 47 (D. Mass. 2005).

Last, Meta argues that because "CIPA is a criminal statute to which the rule of lenity applies, any such sweeping reading of the statute is unjustified." Mot. at 17. But the rule of lenity only applies "when a criminal statute contains a grievous ambiguity or uncertainty." *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (citation modified). And here, the CIPA "contains no grievous ambiguity." *Fregosa*, 2025 WL 2886399, at *9. The California Supreme Court has rejected the rule of lenity's application to other unambiguous provisions of CIPA. *See Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 202 (2021) (declining to apply rule of lenity to CIPA § 632.7). Likewise, this Court and every other federal court to adjudicate this question has rejected the rule of lenity's application to CIPA §§ 638.50-638.51. *See Deivaprakash*, 798 F. Supp. 3d at 1108 ("[T]he application of the CIPA to the allegations . . . does not require the interpretation of any ambiguities in the statute."); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1094 (N.D. Cal. 2025) ("LiveRamp . . . has not established [] any 'grievous ambiguity' in the statute's express language."); *Nelson*, 2026 WL 445627, at *6 ("The Court again follows other courts addressing similar arguments and finds that there is no ambiguity regarding the application of §§ 638.50 and 638.51 to these facts."). *Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109 (N.D. Cal. 2025), evaluated CIPA § 631, not CIPA §§ 638.50-638.51, and both did not cite to and is in tension with the *LoanMe* regardless.

### C. Plaintiffs Plausibly Allege Invasion of Privacy Claims.

Meta argues that "Plaintiffs' common-law privacy claims fail for the same reason their statutory claims do: they consented to the matching they now challenge." Mot.at 24. For the reasons stated above, Meta cannot establish such consent and its argument necessarily fails. *See* Section IV.A, *supra*; *see also* MTD Order at 11 ("While Meta points to its Privacy Policy as evidence that Plaintiffs knew it would be amassing that data and therefore could not have a reasonable expectation of privacy, that policy did not disclose the extent and precision of the practice at issue.").

Meta also argues that, even if it compiles profiles about other users, "allegations about *other* users' data say nothing about these Plaintiffs' own information." Mot. at 25. But Plaintiffs each allege that, without consent and in breach of privacy expectations, Meta "identif[ied] and create[d] a real-time comprehensive profile of" each Plaintiff and their "Internet activity, which was not possible if Meta complied with Android's

sandboxing protocols." *See*, *e.g.*, FAC ¶¶ 51, 99–101, 105–07, 117–19. Plaintiffs' subjection to these profiling practices shows their *own* reasonable privacy interests were invaded. *Gilligan*, 2026 WL 32259, at *2 ("Gilligan and Mitchell have adequately alleged that they were subject to these profile-building practices."); MTD Order at 11 ("Meta built detailed profiles of them by collecting detailed browsing data and covertly using a backdoor to link that data to their Meta accounts. Those allegations support a reasonable belief that Meta would not accumulate such a vast repository of personal data perfectly linked to their identities through covert behaviors." (citation modified)).

The sheer breadth of information Meta collected—and the fact that Meta "circumvented browsers' sandboxing protections in order to perfectly link users' browsing behavior with their Meta accounts" (MTD Order at 12)—undermines any argument that there is no expectation of privacy based on Plaintiffs' "visits to ordinary sites."[8] Mot. at 25; *see*, *e.g.*, *Selby*, 2025 WL 2950164, at *3 ("Plaintiffs have alleged that Sovrn engages in unauthorized widespread tracking and data collection, allowing it to compile detailed profiles of each Plaintiff's online web browsing activity."); *Krzyzek*, 817 F. Supp. 3d at 865 (rejecting argument that "plaintiffs cannot reasonably expect privacy while browsing on the internet on websites such as Bon Appetit and Covered California"); *Freifeld v. Epsilon Data Mgmt., LLC*, No. 25-CV-9984, 2026 WL 1759012, at *6 (N.D. Ill. June 15, 2026) ("Defendant argues that Plaintiffs have not alleged a reasonable expectation of privacy or a highly offensive intrusion. The Court disagrees, based on the breadth of personal data allegedly collected and the fact that it was collected by an entity that Plaintiffs had no idea existed.").

Meta also avers that "[t]he scale the Court invoked is a product of the standard Pixel, not the Subject Functionality: it is the routine, consented-to collection of browsing events . . . that builds any 'repository' at all." Mot. at 25. Putting aside whether the scale of Meta's collection is "routine," Meta's argument draws an artificial wall between the Modified Pixel and Meta's subversion of sandboxing protocols. As this Court already determined, "Plaintiffs have plausibly alleged that users would not agree, and have not agreed, to permit the collection of standard Pixel data in a context where it would be combined via the Modified Pixel

[8] The websites mentioned in the FAC are exemplars, and each Plaintiff alleges he or she visited other websites too. FAC ¶¶ 96, 102, 114; *see also Selby v. Sovrn Holdings, Inc.*, No. 25-CV-03139-RFL, 2026 WL 1623480, at *1 (N.D. Cal. June 3, 2026) ("The complaint alleges a broad pattern of conduct that necessarily covers many websites."). And at this level of aggregation, such website information can hardly be viewed as "innocuous." *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 942 (N.D. Cal. 2023) ("accumulation of a 'vast repository of personal data'" from sources including Plaintiffs' browsing activity and online communications "contravene[d] the reasonable expectation of privacy").

with perfectly matched identifiers from their Facebook and Instagram phone apps." MTD Order at 13. In other words, it is the combination of Meta's collection of browsing information through the Modified Pixel, perfectly linked to users' identities through the subversion of sandboxing, that gives rise to the invasion of privacy. Meta cannot artificially exclude one element of that equation.

### D. Plaintiffs Plausibly Allege CIPA §§ 631, 632, 635, and ECPA Claims.

Meta repeats its argument that Plaintiffs' ECPA and CIPA §§ 631 and 632 claims fail because Plaintiffs consented to the collection of their browsing information by "the standard operation of the Pixel," and any subsequent use of that information "falls outside the purview of the wiretapping laws." Mot. at 11, 13. The Court previously repudiated that argument. MTD Order at 13; *see also In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp.3d at 789–90 ("[A]t this early stage of the case, is that if a reasonable Facebook user could plausibly have interpreted the contract language as not disclosing that Facebook would engage in particular conduct, then Facebook cannot obtain dismissal of a claim about that conduct (at least not based on the issue of consent)."); *Lynch v. Express Scripts Holding Co.*, No. 23-CV-01170-AMO, 2026 WL 1749550, at *4 (N.D. Cal. June 17, 2026) (same).

Meta contends the Court's prior holding "conflates the initial collection with the subsequent use." Mot. at 12 (citing MTD Order at 13). It does not. To be sure, Plaintiffs also allege violations of CIPA § 631(a) and the ECPA based on Meta's subsequent "use" of their wiretapped communications. FAC ¶¶ 169, 182; *see also* Cal. Pen. Code § 631(a)[iii]; 18 U.S.C. § 2511(d). But Plaintiffs' communications were intercepted here by the *Modified* Pixel, not the standard one. *See*, *e.g.*, FAC ¶¶ 59, 64. And as the Court previously (and correctly) held, Plaintiffs did not consent to the collection of their information by the Modified Pixel. *See* MTD Order at 11–13; *see also* Section IV.A, *supra*. The fact the Modified Pixel collects similar information to the standard Pixel is of no import, because the *device* Meta used for wiretapping—the device that is a focus of Plaintiffs' wiretapping claims—is meaningfully different than the one Meta claims Plaintiffs consented to be tracked by.

Meta's contrary framing—that the Subject Functionality merely enabled later matching because the alleged browsing data was collected by the standard Pixel while the localhost path transmitted only the _fbp cookie—improperly atomizes a single pleaded interception process. Mot. at 11–12. Plaintiffs do not contend that the _fbp cookie alone is the content of their communication. Rather, the FAC alleges that the Modified

Pixel and Modified Meta Apps operated together: the Modified Pixel contemporaneously transmitted URLs, page activity, searches, form-field information, IP addresses, and HTTP-header information to Meta, while the covert localhost channel facilitated transmission of the browser identifier and app-resident account information that allowed Meta to acquire those communications in an undisclosed, identity-linked context. FAC ¶¶ 25–27, 59, 65–67, 167, 180, 192–93.

Meta also offers no basis to dismiss Plaintiffs' separate CIPA § 635 claim. Meta's wiretap section addresses the ECPA and CIPA §§ 631 and 632 theories, but it does not analyze whether the devices alleged in Count VI satisfy § 635's primary-design, manufacturing, assembly, sale, furnishing, possession, or advertising elements. Mot. at 11–13. Count VI alleges that the Modified Pixel and the code used to tie website communications to users' identities are devices primarily or exclusively designed or intended for eavesdropping, and that Meta manufactured, assembled, advertised or offered for sale, and possessed those devices. FAC ¶¶ 198–202. Because Meta has not established consent as a matter of law, and does not otherwise address those elements, it has not carried its Rule 12 burden as to § 635.

Plaintiffs' claims thus also encompass the initial, simultaneous, unconsented-to acquisition of their communications by the Modified Pixel, not just the subsequent use of those communications. *Smith v. Rack Room Shoes, Inc.*, No. 24-CV-06709-RFL, 2026 WL 183852, at *2 (N.D. Cal. Jan. 23, 2026) (Lin, J.) ("At the pleading stage, Plaintiffs have alleged both intercepted 'content' and its subsequent use."); *see also id.*, at *1 ("Plaintiffs plausibly allege that the content is incorporated into the consumer profiles that Rack Room receives and uses.").[9]

### E. Plaintiffs Plausibly Allege a CDAFA Claim.

#### 1. <u>Meta Lacked Permission to Access Plaintiffs' Identities.</u>

Meta argues it had "permission to take and use the data in question." Mot. at 18. In support, Meta cites to its Privacy Policy and the Cookies Policy to show it informed Plaintiffs of the collection of certain types of information Meta collects, and thus by doing so, Plaintiffs gave their permission for Meta to use the information, de-anonymize it, and sell it for profit. That is an attempt to divert the Court's attention from the missing factor under the CDAFA: permission to obtain Plaintiffs' *de-anonymized* information. MTD

[9] It is also not necessarily true that Meta's use of the communications was "subsequent." As Plaintiffs allege, "Meta collected a user's browsing information and tied that browsing information to personally identifiable information" "in real time." FAC ¶ 67.

Order at 16 ("Plaintiffs do not simply disapprove of the method by which Meta acted, but instead contend that Meta knowingly used and introduced software that acted in a manner understood to be impermissible." (citation modified)). Accordingly, the issue is not whether Meta "performed those acts [of obtaining information] in a manner that supposedly violated 'Android sandboxing protocols.'" Mot. at 18. Instead, the issue is whether Meta had permission to de-anonymize Plaintiffs' information in the first place. It did not. *See* Section IV.A, *supra*; *see also* MTD Order at 17 ("Meta was not authorized in the first instance to take and use Plaintiffs' Meta account information through the Pixel." (citation modified)).

Meta's reliance on *Oracle* and *Brodsky* does not compel a different result. Mot. at 18–21. In *Oracle*, the Ninth Circuit held that using automated tools in violation of website terms did not violate CDAFA where the defendant was "authorized in the first instance to take and use the information that it downloaded." *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 962 (9th Cir. 2018). And *Brodsky* dismissed a computer-access claim where the plaintiffs challenged Apple's two-factor-authentication login method without alleging that Apple lacked authorization to receive the same login information through other Apple ID login methods. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 129–32 (N.D. Cal. 2020). Plaintiffs here allege something different: Meta was not merely using an objectionable method to obtain the same information it was otherwise authorized to obtain; it used hidden, evolving cross-app code to obtain a de-anonymized, Meta-account-linked browsing dataset the ordinary Meta Pixel could not access in the Android environment. FAC ¶¶ 34–36, 59–67, 230–36.

Courts in this District have held that defendants may act "without permission" under a variety of circumstances. *See, e.g.*, *Brown*, 525 F. Supp. 3d at 1075 (circumvention of user-imposed privacy barriers); *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1073–74 (N.D. Cal. 2018) (users given no notice or ability to remove or opt-out of a hidden code's functionality); *Facebook, Inc. v. Power Ventures, Inc.*, No. C 08-05780 JW, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010) (access or use "in a manner that overcomes technical or code-based barriers"). Here, as in the original consolidated complaint, Plaintiffs adequately allege that Meta knowingly acted without permission.

*First*, Meta acted without permission by surreptitiously deploying the Modified Pixel and Modified Meta Apps to de-anonymize Plaintiffs' browsing activity in real time, which Plaintiffs "were unaware" of and therefore did not consent to. FAC ¶ 235(c); *id.* ¶¶ 50–53, 56, 59–63, 64, 65–68; *see also Greenley v.*

*Kochava, Inc.*, 684 F. Supp. 3d 1024, 1049 (S.D. Cal. 2023) ("Code hidden in embedded software may plausibly use or take computer data 'without permission.'"); *Synopsys*, 313 F. Supp. 3d at 1074 (hidden code, even in voluntarily-installed software, may plausibly violate CDAFA if users have no notice the code is operating and have no way to remove or opt out of its functionality); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1099–1101 (N.D. Cal. 2015) (same); *Esparza v. Kohl's, Inc.*, 723 F. Supp. 3d 934, 944–45 (S.D. Cal. 2024) (same). Here, Plaintiffs had no notice of Meta's covert de-anonymization scheme. Indeed, Meta deliberately and repeatedly revised its code in the Modified Pixel and Modified Meta Apps to avoid detection and continue its de-anonymization of users and their browsing data. *See* FAC ¶¶ 59–64.

*Second*, Meta acted without permission by defeating user-level privacy controls. *See* MTD Order at 17 ("While Meta was permitted to send the _fbp cookie to its servers, it allegedly circumvented 'technical or code-based barriers' (Android's sandboxing protection) so that the Pixel would also know Plaintiffs' Meta account information."); *Brown*, 525 F. Supp. 3d at 1074–75 (nullifying users' ability to prevent access to their data circumvents any user-imposed technical barriers and is therefore "without permission" (citation omitted)). In *Brown*, the plaintiffs plausibly alleged Google acted "without permission" when it "render[ed] ineffective any barrier that [p]laintiffs implemented" by continuing to transmit their data to Google without notice while they used its private browsing mode. 525 F. Supp. 3d at 1075. Here, too, as Meta provided no notice to users of its de-anonymization scheme, it also did not offer any method for disabling such a scheme. Moreover, it rendered ineffective other user-initiated anonymization controls such as private browsing modes, VPNs, and the clearing of cookies from browsers. FAC ¶¶ 5, 68.

Regardless, Plaintiffs also plead a claim under Section 502(c)(8), which independently supports CDAFA liability. *See* FAC ¶¶ 222(g), 227, 228, 230. Meta's permission argument (Mot. at 18–22) does not defeat that theory. Section 502(c)(8) does not turn on whether Meta's initial introduction of code itself overcame a technical barrier; rather, the contaminant definition asks whether the computer instructions were designed to record or transmit information without the owner's intent or permission. Cal. Pen. Code § 502(b)(12). In this District, a "plaintiff need only allege that the actions of the contaminant (modify/damage/destroy/record/transmit) were undertaken by overcoming a technical barrier without the permission of the owner; the introduction of the contaminant to the system need not surmount the same hurdle." *Synopsys*, 313 F. Supp. 3d at 1074 (citing *Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*, No.

5:13-cv-00034-PSG, 2014 WL 2213910, at *5 (N.D. Cal. May 28, 2014)). Thus, both *Synopsys* and *Flextronics* found a § 502(c)(8) claim plausible where the defendant allegedly embedded hidden technology in the plaintiff's system, even though the initial access was with permission, and thereafter used that technology to transmit information without the owner's intent or permission. *Id.* (citing *Flextronics*, 2014 WL 2213910, at *6). Plaintiffs have made similar allegations here. *See* FAC ¶¶ 229–30.

**2. Plaintiffs Suffered Cognizable Loss.**

Meta argues "a defendant's gain is not the plaintiff's loss." Mot. at 23. This is incorrect where, as here, the defendant's gain is a direct and unauthorized cause of Plaintiffs' loss. California courts interpret CDAFA as a minimum threshold statute, where "any amount of damage or loss caused by the defendant's CDAFA violation is enough to sustain the plaintiff's claims." *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954, 964 (N.D. Cal. 2014); *see also Rodriguez v. Google LLC*, 772 F. Supp. 3d 1093, 1110 (N.D. Cal. 2025) ("As the statute sets no minimum threshold for damage or loss, even small harms due to depletion of battery and bandwidth satisfy CDAFA's requirements.").

Specifically, nothing within the statute limits "damage or loss" to system integrity harms at the exclusion of economic injury. In fact, this Court and multiple others in this District have made clear that "a defendant's alleged unjust profit from the use of a plaintiff's personal information, which holds financial value to the defendant, can plausibly constitute a 'damage or loss' under CDAFA." *Tsering v. Meta Platforms, Inc.*, No. 25-CV-01611-RFL, 2026 WL 89320, at *5 (N.D. Cal. Jan. 12, 2026) (Lin, J.); *accord Rodriguez*, 772 F. Supp. 3d at 1110 ("Plaintiffs have a stake in the value of their data. . . . Accordingly, a reasonable juror could find that Plaintiffs suffered damage or loss because Google profited from the misappropriation of their data."); *Brown*, 685 F. Supp. 3d at 940 (holding "plaintiffs can state an economic injury for their misappropriated data"); *Pratt v. Higgins*, No. 22-CV-04228-HSG, 2023 WL 4564551, at *9 (N.D. Cal. July 17, 2023) ("In the context of a § 502 violation, "loss" has been defined to encompass costs related to . . . lost revenue"); *Smith v. Rack Room Shoes, Inc.*, No. 24-CV-06709-RFL, 2025 WL 2210002, at *3 (N.D. Cal. Aug. 4, 2025) ("Plaintiffs are damaged by not having received a share of the allegedly unjust profits generated from their data.") (Lin, J.). "That reading is also consistent with CDAFA's statutory

purpose." *Id.*[10]

Meta's contrary authorities do not require dismissal. Meta points to decisions rejecting a data-disgorgement theory of CDAFA loss. Mot. at 22–24. Those cases reflect, at most, a nonbinding intra-district disagreement. *See Dellasala v. Samba TV, Inc.*, No. 3:25-CV-03470-JSC, 2026 WL 1138358, at *8–9 (N.D. Cal. Apr. 21, 2026) (rejecting CDAFA loss where plaintiffs alleged loss of control and defendant's gain from data, but had not alleged that collection diminished data value to them); *Torres v. SeatGeek, Inc.*, No. 25-cv-07118-LB, 2026 WL 1495202, at *7 (N.D. Cal. May 28, 2026) (rejecting unjust-enrichment theory of CDAFA loss while separately recognizing plaintiff plausibly pleaded lack of permission). This Court's own post-*Popa* decision held that unjust profits from financially valuable personal information can plausibly constitute CDAFA damage or loss, and nothing in CDAFA limits "damage" or "loss" to computer-system remediation costs. *Tsering v. Meta Platforms, Inc.*, No. 25-cv-01611-RFL, 2026 WL 89320, at *5–6 (N.D. Cal. Jan. 12, 2026). *Popa* addressed Article III injury, not the statutory meaning of "damage or loss" under CDAFA. *Popa v. Microsoft Corp.*, 153 F.4th 784, 791–94 (9th Cir. 2025). In any event, Plaintiffs also plead independent device and functionality harms, including compromised device operation and unnecessary background transmissions. FAC ¶¶ 230, 236–37.

Here, Plaintiffs allege sufficient facts to support their claim's damage or loss in the misappropriation of their personal data, and Meta's subsequent unjust enrichment. *See* FAC ¶¶ 18, 65–68, 70, 233, 237. Thus, Plaintiffs plausibly plead a cognizable injury in "the deprivation of control over their valuable property, *i.e.*, their personal information, the ability to receive compensation for their data, Meta's illegal and unequitable profiting from that data, the ability to withhold their data for sale, and from Meta's depletion of their Android devices' battery and bandwidth through the unauthorized access." FAC ¶ 237.

Even ignoring whether the disgorgement theory alone satisfies statutory standing under CDAFA, Plaintiffs' allegations are sufficient to plead damage or loss. Plaintiffs allege how Meta modified the Pixel to "direct the user's web browser to send that user's browsing-related pseudonymous identifier . . . to a designated localhost port," and then "configured . . . the Facebook and Instagram apps on the same device"

[10] To the extent Meta argues that the disgorgement theory is incompatible with *Transunion* (Mot. at 23–24), other courts in this District disagree and have found the "disgorgement theory *is* compatible with *Transunion*." *Rodriguez*, 772 F. Supp. 3d at 1109 (emphasis added); *see also Brown*, 685 F. Supp. 3d at 940.

to "secretly 'listen[]' to that designated localhost port for incoming browsing-related data." FAC ¶ 59. Plaintiffs also allege how, "[o]ver time, Meta's method for channeling user's browsing-related information to its apps via localhost ports evolved" and Meta "*deliberately changed* its methods for transmitting such information . . . to overcome sandboxing restrictions and data privacy settings." *Id.* ¶ 60. In short, Plaintiffs allege how Meta's Modified Pixel configured web browsers and the Facebook and Instagram applications within the users' devices to first send browser identifiers to different 'backdoors' where the Facebook and Instagram applications were configured to "listen[]" for incoming browsing-related data, ultimately consolidating the browsing activity and identifiers with an Android user's Facebook and Instagram accounts. *See id.* ¶¶ 52–64. Each configuration constituted unauthorized damage to the software of the applications and the original, promised functionality of Plaintiffs' Android devices, and Meta's conduct caused Plaintiffs to lose the original functions of their apps and Android devices. This is sufficient to satisfy CDAFA's damage or loss requirement.

Plaintiffs also allege damage and loss theories associated with Meta's deployment of the Modified Pixel and Modified Meta Apps. These include "depletion of their Android devices' battery and bandwidth through the unauthorized access" and backdoor activities Meta's configurations set in motion in Android users' devices as well as targeted marketing messages. FAC ¶ 237; *see also id.* ¶¶ 52–64; *id.* ¶ 45 (Meta "feeds the vast quantities of information obtained from the Meta Pixel and its social media platforms into its advertising products for numerous purposes, including to . . . target them with marketing messages from its advertising clients and to train Meta's artificial intelligence technology."). Each of these detailed descriptions constitutes a separate damage or loss under CDAFA.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant Meta's Motion to Dismiss. To the extent the Court grants the Motion in any respect, Plaintiffs respectfully request leave to amend under Fed. R. Civ. P. 15(a) to cure any such deficiencies. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017).

Dated: August 12, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
pfraietta@bursor.com
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656

Yitzchak Kopel (*pro hac vice*)
ykopel@bursor.com
Max S. Roberts (SBN 363482)
mroberts@bursor.com
Victoria X. Zhou (*pro hac vice*)
vzhou@bursor.com
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
msobol@lchb.com
Michael K. Sheen (SBN 288284)
msheen@lchb.com
Amelia A. Haselkorn (SBN 339633)
ahaselkorn@lchb.com
Clare D. Perez (SBN 363027)
cdperez@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

Douglas I. Cuthbertson (*pro hac vice*)
dcuthbertson@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile: 212.355.9592

**AHDOOT & WOLFSON, PC**
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa D. Brown (SBN 301313)
abrown@ahdootwolfson.com
Sarper Unal (SBN 341739)

sunal@ahdootwolfson.com
Lisa Cintron (SBN 356009)
lcintron@ahdootwolfson.com
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

**MILBERG, PLLC**
Mariya Weekes (*pro hac vice*)
333 SE 2nd Avenue, Suite 2000
Miami, FL, 33131
Tel: (786) 879-8200
Fax: (786) 879-7520

Gary M. Klinger (*pro hac vice*)
William Edelman (SBN 285177)
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
gklinger@milberg.com
wedelman@milberg.com

*Interim Class Counsel*