LATHAM & WATKINS LLP
Serrin Turner (*pro hac vice*)
*serrin.turner@lw.com*
Nicolas Luongo (*pro hac vice*)
*nicolas.luongo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Brad Baglien (*pro hac vice*)
*brad.baglien@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

*Attorneys for Defendant*
*Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

In re Meta Android Privacy Litigation.

This Document Relates To:
All Actions

Case No. 3:25-cv-04674-RFL

**DEFENDANT META PLATFORMS, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**

Hearing: September 22, 2026
Time: 10:00 a.m.
Location: Courtroom 15—18th Floor
Judge: Hon. Rita F. Lin

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT ..... 1

II. ARGUMENT ..... 1

A. Plaintiffs' Consent Arguments Fail ..... 1

1. The Policies Disclose Substantially the Same Conduct at Issue ..... 1

2. Plaintiffs Cannot Narrow the Policies Based on Beliefs Unrooted in the Text ..... 4

B. Plaintiffs' Wiretapping Arguments Fail ..... 7

C. Plaintiffs' Pen Register Arguments Fail ..... 8

D. Plaintiffs' CDAFA Arguments Fail ..... 12

E. Plaintiffs' Invasion-of-Privacy Claim Fails ..... 15

III. CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bradshaw v. Lowe's Cos.*,
2025 WL 3171740 (S.D. Cal. Nov. 12, 2025) ....................9

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ....................13

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ....................3, 14

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) ....................2, 3

*Campbell v. Facebook Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ....................4

*Chatrie v. United States*,
146 S. Ct. 2193 (2026) ....................9

*Cottle v. Plaid Inc.*,
536 F. Supp. 3d 461 (N.D. Cal. 2021) ....................15

*Dameron Hosp. Assn. v. AAA N. Cal., Nev. & Utah Ins. Exch.*,
229 Cal. App. 4th 549 (2014) ....................6

*Dawidzik v. Tesla, Inc.*,
2025 WL 3786963 (C.D. Cal. Dec. 29, 2025) ....................15

*Deivaprakash v. Conde Nast Digital*,
798 F. Supp. 3d 1100 (N.D. Cal. 2025) ....................9

*Dellasala v. Samba TV, Inc.*,
2026 WL 1138358 (N.D. Cal. Apr. 21, 2026) ....................15

*Doe v. Eating Recovery Ctr. LLC*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) ....................12

*Doe v. GoodRx Holdings*,
2025 WL 2052302 (N.D. Cal. July 22, 2025) ....................4

Esparza *v. Kohl's, Inc.*,
723 F. Supp. 3d 934 (S.D. Cal. 2024) ....................13

*Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*,
2014 WL 2213910 (N.D. Cal. May 28, 2014) ....................14

*Frasco v. Flo Health*,
2025 WL 2680068 (N.D. Cal. Sept. 17, 2025) ....................................................................4

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023)..............................................................................13

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024)..............................................................................5

*In re Application of U.S. for an Ord. Authorizing Use of A Pen Reg. & Trap*,
396 F. Supp. 2d 45 (D. Mass. 2005) ..................................................................................11

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ..........................................................................13, 14

*In re Facebook Internet Tracking*,
956 F.3d 589 (9th Cir. 2020) ..........................................................................................15

*In re Google Assistant Privacy Litigation*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ...............................................................................3

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015)...............................................................................................8

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ....................................................................4

*In re Meta Pixel Healthcare Litigation*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ...............................................................................4

*Khamooshi v. Politico LLC*,
2025 WL 2822879 (N.D. Cal. Oct. 2, 2025)........................................................................15

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) ..............................................................................2

*Nedlloyd Lines B.V. v. Superior Ct.*,
3 Cal. 4th 459 (1992) ..........................................................................................................5

*Noel v. Hall*,
568 F.3d 743 (9th Cir. 2009) ..............................................................................................8

*Opperman v. Path, Inc.*,
205 F. Supp. 3d 1064 (N.D. Cal. 2016) ..............................................................................3

*Opperman v. Path, Inc.*,
87 F. Supp. 3d 1018 (N.D. Cal. 2014) ...............................................................................13

*Oracle USA, Inc. v. Rimini St., Inc.*,
879 F.3d 948 (9th Cir. 2018) ......................................................................................12, 13

*People v. Achrem*,
213 Cal. App. 4th 153 (2013) ....................11

*People v. Marcus*,
45 Cal. App. 5th 201 (2020) ....................10

*Ramos v. Gap, Inc.*,
2025 WL 2144837 (N.D. Cal. July 29, 2025)....................8

*Ryman v. Sears, Roebuck & Co.*,
505 F.3d 993 (9th Cir. 2007) ....................10

*San Diegans for Open Gov't v. City of San Diego*,
242 Cal. App. 4th 416 (2015) ....................11

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021)....................2

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ....................2

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
313 F. Supp. 3d 1056 (N.D. Cal. 2018) ....................13, 14

*Travelers Ins. Co. v. Budget Rent-A-Car Sys., Inc.*,
901 F.2d 765 (9th Cir. 1990) ....................5

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) ....................13

*Variety Media, LLC v. Superior Court*,
2d Civil No. B350578 (Cal. Ct. App. Aug. 24, 2026) ....................10

*Yale v. Clicktale, Inc.*,
2021 WL 1428400 (N.D. Cal. Apr. 15, 2021) ....................8

**STATUTES**

18 U.S.C. § 2511....................8

Cal. Code Regs. Title 11, § 7003(a)....................3

Cal. Pen. Code
§ 502(b)(12) ....................14
§ 631....................7, 8
§ 632....................8
§ 635(a) ....................8
§ 638.50(b)....................9, 11
§ 638.50(c) ....................10

## I. PRELIMINARY STATEMENT

Consent resolves this case. Plaintiffs do not dispute that Meta disclosed it collects identifiers like the _fbp cookie and uses them to match browsing activity with users' Meta accounts. Plaintiffs identify no ambiguity in those disclosures, no information collected beyond the disclosed cookie, and no use beyond the disclosed matching. They instead insist Meta had to disclose precisely *how* it accomplished the disclosed collection and use—but no such requirement is found in Ninth Circuit law, which only requires that the conduct at issue be disclosed in substance. Their remaining arguments ask the Court to narrow the parties' agreement based on limitations found nowhere in the text. Meta is entitled to enforcement of the Privacy Policy as written—not as Plaintiffs wish to rewrite it now. Their consent bars every claim.

Plaintiffs' claim-specific arguments fare no better. Their wiretapping theory is not about the acquisition of their browsing data, but rather concerns the matching of it after it is acquired—which is subsequent use the statute does not reach. Their pen-register claim fails because they consented to collection of their IP addresses, which cannot support standing anyway, and in any event the conduct they allege does not constitute a pen register. Their CDAFA claim fails because the statute does not reach objections to the method of data collection when the defendant had permission to collect the data in the first place, as Meta had here; and they plead no cognizable loss regardless. Lastly, the privacy claims fail based on Plaintiffs' consent and the lack of allegations sufficient to show any highly offensive collection of data from their Android devices.

The Court should grant the motion and dismiss the First Amended Complaint.

## II. ARGUMENT

### A. Plaintiffs' Consent Arguments Fail

#### 1. The Policies Disclose Substantially the Same Conduct at Issue

As Plaintiffs recognize, Meta discloses that it receives "a variety of information (including from the _fbp cookie)," which it "may use to 'match' a user's browsing activity with their Meta account." Opp. 6. Plaintiffs do not claim Meta collected any "information" beyond the disclosed _fbp cookie, or that Meta put it to any "use" beyond the disclosed matching. *Id.* Those concessions are dispositive: They mean Meta disclosed "substantially the same conduct" that allegedly harmed

Plaintiffs. *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024).

Plaintiffs try to cabin their concession by suggesting the Privacy Policy only discloses that Meta collects information "through the standard Meta Pixel" as opposed to what they describe as the "Modified" Pixel. Opp. 6. But nothing in the Privacy Policy draws any such standard-versus-modified Pixel distinction. That is precisely the kind of "technical distinction unfamiliar to most 'reasonable users'" that *Calhoun* forecloses a court from grafting onto otherwise ordinary, technology-neutral language. 113 F.4th at 1148-49. Instead, the Privacy Policy broadly discloses the substance of what data Meta collects and what it uses the data for—without limiting itself to any particular technical means about *how* this collection and use might be effectuated. As Meta has explained, requiring companies to enumerate all the mechanisms by which they collect and use data would transform privacy policies into technical manuals, rendering them incomprehensible to lay readers. Mot. 10-11. That is why this Court previously remarked that it is "hard … to imagine what it is [Meta] should have written in their privacy policy that they didn't." Mot. to Dismiss Hr'g Tr. 20-21. Plaintiffs still have no answer to this concern.

Unable to argue that Meta's "admittedly 'capacious'" disclosures are not broad enough to cover the conduct at issue, Plaintiffs resort to complaining they are "too general," demanding that Meta's "specific conduct [be] referenced" expressly. Opp. 6. But *Smith* forecloses that argument, holding that "general consent to Facebook's data tracking and collection practices" includes particular data collection within the language's scope, even if not specifically called out. *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (affirming 262 F. Supp. 3d 943, 954 (N.D. Cal. 2017) (holding that "a contractual term is not ambiguous just because it is broad")). Likewise, *Calhoun* does not require disclosure of the precise conduct alleged; it says disclosure of "substantially the same" conduct is enough. 113 F.4th at 1147. That is what Meta did here, and no authority demands more.[1] Indeed, it is not only permissible for companies to frame their policies

[1] *See, e.g., Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1055-57 (N.D. Cal. 2025) (recognizing requirement to "explicitly notify" users of conduct, but surveying cases and holding "[n]one … support Plaintiffs' request for a highly granular disclosure"); *Silver v. Stripe Inc.*, 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021) (rejecting argument that policy failed to disclose tracking at issue where it stated "without limitation" that partners "use various technologies" to "collect information about your online activity over time and across different websites").

using broad, non-technical language—regulators require it. *See* Cal. Code Regs. Tit. 11, § 7003(a) ("Disclosures and communications to consumers shall be easy to read and understandable to consumers. For example, they shall use plain, straightforward language and avoid technical or legal jargon.").

Plaintiffs' cases do not support their demand for additional specificity. Plaintiffs cite *Opperman* as holding that "the manner in which an action is accomplished can 'change[] the nature' of consent." Opp. 7 (quoting *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1077 (N.D. Cal. 2016)). But *Opperman* did not hold that a user's consent to otherwise disclosed data collection is invalid unless the defendant also discloses the specific manner of collection. Rather, the issue in *Opperman* was that the substance of the collection was not adequately disclosed: the defendant's policies indicated only that its app would "look at" a user's address book to find their friends on the app, not that it would "take" the address book data by uploading it to the defendant's servers. The court found the two actions to be "qualitatively different" because the uploading meant that the defendant would *retain* users' contact information rather than merely processing it on-device to provide an app feature. 205 F. Supp. 3d at 1077 (explaining user concerns that "uploading means that you can then use that information how you please"). Here, Meta's Privacy Policy expressly discloses that it "collect[s] and receive[s]" cookie data and uses it to match user browsing activity to their accounts—which is qualitatively *the same* as what the Subject Functionality did. Given that, Meta was not separately required to obtain user consent to the "manner" in which this collection and use was accomplished.

Plaintiffs' remaining cases fall into three groups, none like this one. In the first, broad language was ambiguous because other language in the disclosures indicated the challenged conduct would not occur. *See Calhoun*, 113 F.4th at 1149-50 (finding broad language about storage of device information ambiguous in light of Google's "affirmative statement that it would not receive" personal information unless user activated sync mode); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1064-66 (N.D. Cal. 2021) (finding "statement that Incognito Mode allowed users to 'browse privately'" "could be read to contradict [defendant's] suggested interpretation of the Privacy Policy"); *In re Google Assistant Privacy Litigation*, 457 F. Supp. 3d 797, 823 (N.D. Cal.

2020) (finding lack of consent based on statement that Google "do[es] not share your personal information … except in the following cases"). Here, by contrast, Meta's Privacy Policy discloses that it collects cookies and uses them to match browsing activity *without* any such limitation.

In the second group, the policy disclosed particular uses and the challenged use was not among them. *Campbell* involved a policy enumerating six permitted uses; Facebook invoked "data analysis," which the court found "not specific enough" to reach the alleged scanning of private messages for targeted advertising. *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 847-48 (N.D. Cal. 2014). *In re Google Inc.* is the same: terms disclosing interception "to exclude objectionable content" did not reach interception for "creating user profiles or providing targeted advertising." 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013). Here, by contrast, Meta's Policy discloses the very use—"match[ing] your activities with your account"—that Plaintiffs challenge.

That leaves three cases about health information: *Doe v. GoodRx Holdings*, *In re Meta Pixel Healthcare Litigation*, and *Frasco v. Flo Health*. Those cases do not turn on the manner in which data collection is performed, but the type of data collected. They hold that one type of data—sensitive health information—is "a different matter entirely" from "general internet browsing." *Healthcare*, 647 F. Supp. 3d 778, 793-94 (N.D. Cal. 2022); *see GoodRx*, 2025 WL 2052302, at *9 (N.D. Cal. July 22, 2025); *Flo*, 2025 WL 2680068, at *20-21 (N.D. Cal. Sept. 17, 2025). In this case, the Privacy Policy plainly discloses the type of data collected—the _fbp cookie—rendering those cases inapposite. Moreover, the cases also involved alleged affirmative limiting statements in the relevant privacy policies; here there are none.[2] To the extent any of those cases rested on the idea that the policy language was simply "too general" to encompass health data, that cannot be squared with *Smith*, *Hammerling*, and *Calhoun*.

### 2. Plaintiffs Cannot Narrow the Policies Based on Beliefs Unrooted in the Text

Meta's motion explained that Plaintiffs may not import extrinsic technical assumptions

---

[2] *See Healthcare*, 647 F. Supp. 3d at 793-94 (relying on Meta's "representation that it 'requires' any third-party to have 'lawful rights to collect, use and share your data before providing any data to us'"); *GoodRx*, 2025 WL 2052302, at *9 (relying on "portions of GoodRx's policies" and "express promises … that GoodRx would not share its users' health information"); *Flo*, 2025 WL 2680068, at *20-21 ("The Flo policy expressly assured its users that it would not communicate their personal information to Meta in any way.").

about mobile operating systems to override the terms of the agreement they accepted. Mot. 6-9. Plaintiffs scarcely defend their reliance on those extrinsic beliefs, arguing merely "that the consent framework originates from tort law." Opp. 10. But tort law recognizes that consent may arise from contract, and in such cases, courts apply ordinary contract principles to determine its scope. *See, e.g.*, *Hammerling v. Google, LLC*, 2024 WL 937247, at *2 (9th Cir. Mar. 5, 2024) (applying California contract law to determine scope of consent). Indeed, the very point of a contract is to fix the parties' consent in writing so that its scope can be readily determined, rather than being left to the vagaries of alleged societal expectations. *See Travelers Ins. Co. v. Budget Rent-A-Car Sys., Inc.*, 901 F.2d 765, 768 (9th Cir. 1990) ("Contracts enable parties to define their mutual rights and responsibilities; they are useful only insofar as each side can count on being able to hold the other to the terms of the agreement."); *see also Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 469-70 (1992) (explaining that "the manifest purpose" of a "broad" contract term "is precisely to avoid" "a protracted litigation battle concerning [a] threshold question").

Tacitly recognizing the primacy of the contractual language, Plaintiffs—for the first time—now scour the Privacy Policy's text for intrinsic support, purporting to offer a "holistic reading" of the disclosures. Opp. 8-9.[3] They argue that the disclosures "imply (if not promise)" that Meta "will abide by commonly understood notions of sandboxing." Opp. 8-9. But nothing in the policies mentions sandboxing. So Plaintiffs grasp at a bullet stating: "Device information we collect and receive includes … Information you've shared with us through device settings, like GPS location, camera access, photos and related metadata," and that "if you give us permission to access your device's camera roll, we collect metadata." Opp. 8-9 (quoting ECF No. 102-1 at 7, 17). Then, from a bullet disclosing that Meta logs "[i]nformation about websites that you visit or interact with when you use our in-app browser," Plaintiffs infer that Meta will only "feed browsing information" to its apps from in-app browsers. Opp. 9 (quoting ECF No. 102-1 at 14).

Neither of these bullets has anything to do with Meta's collection of identifiers like the _fbp cookie, nor do they purport to limit the means through which Meta may collect such

---

[3] Notably, Plaintiffs previously conceded that they "do not … rely on an explicitly limiting statement" in contesting consent. Dkt. 130 at 9 n.4.

identifiers. To the contrary, the camera-roll bullet appears in a list of "[d]evice information we collect and receive," alongside *other* bullets disclosing that Meta collects "[i]dentifiers that tell your device apart from other users" and "[i]nformation from cookies and similar technologies." ECF No. 102-1 at 7. Unlike the bullet about "GPS location, camera access, photos and related metadata," the bullets disclosing collection of identifiers and cookies are *not* conditioned on whether users have "shared [the identifiers and cookies] with us through device settings." *Id.* Indeed, the Cookies Policy specifically states that Meta "uses cookies and receives information when you visit [third-party] sites and apps, including device information and information about your activity, *without any further action from you*." ECF No. 102-5 at 6 (emphasis added). As for the bullet relating to the in-app browser, it does not suggest that the *only* type of browsing data Meta apps can receive is from the in-app browser; and the Subject Functionality did not send browsing data to Meta apps anyway—it only sent the _fbp cookie.

Plaintiffs strain even further in arguing that "Meta's disclosures make clear that the Meta Pixel is normally *incapable* of identifying a person … on a mobile device." Opp. 9 (quoting ECF No. 102-8 at 1). The document they cite says no such thing—and is not even part of the Privacy Policy to begin with. It is a Business Help Center page telling advertisers how to improve their own matching results. ECF No. 102-8. Far from indicating that Meta normally cannot identify a person on a mobile device, it instead reflects that Meta has a variety of ways of matching browsing activity to users' accounts. *Id.* at 1-3. Nor does the document indicate that these methods are all "uncertain" in some way that make them qualitatively different from the Subject Functionality. To the contrary, the document lists certain matching parameters as being "high" quality—such as a user's email address—precisely because they can be matched directly to a user's Meta account. *Id.* at 2. And in any event, the Privacy Policy itself specifically states that the devices from which Meta collects identifiers for purposes of matching include mobile devices.[4]

In short, Plaintiffs are seeking to import a limitation of their own invention. But courts "cannot insert language [into a contract] that one party now wishes were there." *Dameron Hosp.*

---

[4] *See* ECF No. 102-1 at 8 (explaining that device information and other identifiers are received from third-party websites and used for identity-matching), 15 ("Devices include … phones"), 16-17 ("Identifiers we collect include device IDs [and] mobile advertiser ID").

*Assn. v. AAA N. Cal., Nev. & Utah Ins. Exch.*, 229 Cal. App. 4th 549, 569 (2014).

**B. Plaintiffs' Wiretapping Arguments Fail**

Even assuming Plaintiffs' consent theory to be true—namely, as the Court put it, that Meta did not sufficiently disclose that it could "perfectly match Android browsing activity to Meta accounts by opening a backdoor to users' Facebook and Instagram apps," Order at 10—Plaintiffs' wiretapping claims fail because that is a complaint about the *matching* of Plaintiffs' alleged communications, not their *interception* in the first instance. The wiretapping laws do not extend to the subsequent use of communications that are lawfully collected, as Plaintiffs' browsing activity was, because Meta indisputably discloses it collects browsing activity from third-party websites.

Plaintiffs respond that "Plaintiffs did not consent to the collection of their information by the Modified Pixel." Opp. 19. But the Privacy Policy does not say that Meta will only collect users' browsing data through some particular version of Pixel code. It simply tells users that "[w]e collect and receive information from partners … about a variety of your information and activities," including "[w]ebsites you visit" and "[h]ow you use our partners' products and services." ECF No. 102-1 at 8. Further, the so-called "Modified Pixel" is not alleged to have modified anything about the *collection* of this browsing data: the browsing data was transmitted to Meta by third-party websites just as it was before. The alleged modifications to the Pixel code solely concerned the way the _fbp cookie was transmitted to Meta—which does not constitute user communications. While the modifications allegedly affected Meta's ability to *match* the user's browsing activity, that is downstream use of the data, which necessarily occurred after collection. And "subsequent use" is not governed by the wiretapping laws, as Meta has explained. Mot. 11.

Plaintiffs cannot claim that they did not consent to the collection of their browsing data based on their supposed lack of consent to how it was subsequently used. That would eviscerate the very distinction courts have drawn between interception and subsequent use. And it would contravene the plain language of the wiretapping statutes. Thus, CIPA Section 631, as relevant here, prohibits persons from "without consent" "read[ing] or [] learn[ing]" the "contents" of communications while in transit. Cal. Penal Code § 631. The prohibited act is the *reading* without consent. Holding the consent requirement to turn on what happens *after* the alleged reading

improperly decouples the consent element from the other elements of the statute. The same is true for the federal Wiretap Act and CIPA's eavesdropping provisions, which also tie consent to real-time acquisition or eavesdropping. *See* Cal. Penal Code § 632; 18 U.S.C. § 2511. Any plaintiff can allege they *would not* have consented to the collection of their communications had they known about some later, objected-to use; but that does not mean they *did not* in fact consent to the collection, which precludes them bringing a wiretapping claim about it. For example, if a consumer consents to the recording of a customer-support call, and on the call they provide their mailing address for purposes of receiving a purchase, they cannot later allege they were "wiretapped" based on an objection to the recorded mailing address being used to send them an advertising catalog. The *recording* was authorized, and therefore legal; it cannot become illegal later based on how the recorded contents were subsequently used. *See Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009) (explaining that "[a]ny subsequent use of the recorded conversation" is not "governed … by the prohibition on interception"); *cf. In re Google Inc. Cookie Placement Consumer Priv. Litig.,* 806 F.3d 125, 144 (3d Cir. 2015) ("The Wiretap Act is a wiretapping statute, and just because a scenario sounds in fraud or deceit does not mean it sounds in wiretapping.").[5]

### C. Plaintiffs' Pen Register Arguments Fail

None of Plaintiffs' arguments suffice to save their pen register claim. First, Plaintiffs acknowledge their pen register theory is now based on the collection of user IP addresses by "the standard Pixel," which they allege "records 'the IP address of the browser'" and includes it in the message sent from the browser to Meta's servers. Opp. at 11. As with the wiretapping claim, this is conduct that would have occurred with or without the alleged modifications to the Pixel code; and it is plainly disclosed by the Privacy Policy, which states that Meta collects users' IP addresses.

---

[5] Plaintiffs also assert that Meta "offers no basis to dismiss Plaintiffs' separate CIPA § 635 claim," Opp. 20, which alleges the sale or provision of tools "primarily designed" for "eavesdropping" or the "unauthorized interception" of communications. Cal. Penal Code § 635(a). But any Section 635 claim presumes that what the Subject Functionality did constitutes "eavesdropping" or "unauthorized interception"—which, as explained, it did not. Thus, the claim falls along with Plaintiffs' other wiretapping claims. *See Ramos v. Gap, Inc.*, 2025 WL 2144837, at *7 (N.D. Cal. July 29, 2025) (dismissing Section 635 claim as "derivative" of Section 631 claim); *see also Yale v. Clicktale, Inc.*, 2021 WL 1428400, at *3 (N.D. Cal. Apr. 15, 2021) (dismissing Section 635 claim where plaintiffs did "not plausibly plead wiretapping").

Accordingly, Plaintiffs have no argument they did not consent to the collection.

Second, the collection of IP addresses cannot give rise to Article III standing. Plaintiffs protest that "there is no categorical rule disclaiming a reasonable expectation of privacy in IP addresses," Opp. 12, but that ignores Ninth Circuit law, *see* Mot. 14.[6] Plaintiffs otherwise assert their standing is based not on "bare IP-address collection" but on IP address combined with browsing data. Opp. 12. But Plaintiffs cannot show standing for a pen register claim by pointing to information not covered by the pen register statute. *See Bradshaw v. Lowe's Cos.*, 2025 WL 3171740, at *4-5 (S.D. Cal. Nov. 12, 2025) (rejecting standing based on non-IP address allegations, because injury "would not be caused by" violation of pen register statute).

Third, Plaintiffs acknowledge a user's IP address is sent to Meta in the very same transmission as their browsing activity—the alleged contents of their communications. Opp. 11 (explaining that message sent from browser to Meta servers "includes" user's IP address); *see also* FAC ¶¶ 25-26. That process cannot describe a pen register, which is defined as collecting routing information "but not the contents of" communications. Cal. Pen. Code § 638.50(b). As this Court has held, "devices that go beyond these four categories to also collect the contents of a communication fall outside the definition" of a pen register. *Deivaprakash v. Conde Nast Digital*, 798 F. Supp. 3d 1100, 1105 (N.D. Cal. 2025) (Lin, J.). Plaintiffs cite other cases holding otherwise, Opp. 12, but those cases never explain how a process that collects routing information *and* contents can qualify as one that collects routing information "but *not* the contents."

Fourth, Plaintiffs' pen register claim fails because a pen register captures routing information reflecting the devices one is communicating *with*, not the IP address of the device on which the pen register is installed. Mot. 15-17. While Plaintiffs cite several federal district-court cases holding to the contrary, Opp. 14, none considered the arguments based on statutory structure, legislative history, and absurd consequences raised by Meta here. Further, Plaintiffs ignore the

---

[6] Nor can Plaintiffs find support for standing from *Chatrie v. United States*, 146 S. Ct. 2193 (2026), which they misleadingly cite, Opp. 13. That case was not a standing case, and the privacy interest it concerned was based not on mere IP addresses, but on Google "Location History," a "time-stamped record of every place a cell phone has been…within 20 meters." *Id.* at 2200. IP addresses were merely one of many signals that went into the location calculation. *Id.* Nowhere does the opinion hold that IP addresses alone implicate a privacy interest or cognizable injury.

California state-court holdings cited by Meta that endorse those very arguments. *See* Mot. 15 (collecting cases). Indeed, a California appeals court recently issued a tentative opinion agreeing with the position Meta has argued here. As it explains:

> Trackers [on a website] do not qualify [as pen registers], because they collect information identifying the sender of a communication (a visitor's IP address) rather than the destination to which the communication is directed. Consistent with the historical understanding of how a pen register operates and the parallel trap and trace definition's focus on source-identifying information, we tentatively conclude [CIPA's pen register provision] reaches only a device or process that records or decodes metadata likely to identify the destination of a communication.

*Variety Media, LLC v. Superior Court*, 2d Civil No. B350578 (Cal. Ct. App. Aug. 24, 2026), attached to Second Decl. of Serrin Turner as Ex. A. On questions of state law, "[w]here there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 995 (9th Cir. 2007). While the above decision is currently tentative, it counsels at least in favor of waiting for the final decision before this Court rules.

Moreover, Plaintiffs fail to offer any persuasive response to Meta's arguments on the substance. As to statutory structure, they suggest that a "trap and trace" reaches *any* "information associated with a communication *to* a user's computer," so it makes sense for a "pen register" to reach *any* "information associated with a communication *from* a user's computer." Opp. 14-15. But the argument ignores that the statute defines "trap and trace" more narrowly, as capturing only incoming routing information reflecting the "source" of a communication. *See* Cal. Pen. Code § 638.50(c).[7] Construing "pen register" in parallel means that it should cover only outgoing information reflecting the *destination* of a communication. That approach would read the statute as "a cohesive whole." *People v. Marcus*, 45 Cal. App. 5th 201, 213-14 (2020).

As to legislative history, Plaintiffs vaguely point to CIPA's purpose of "protect[ing] the right of privacy," Opp. 15, but they ignore that the privacy interest the pen register/trap-and-trace provisions were meant to protect concerns information about "which people" a person is

---

[7] For that reason, Plaintiffs' perfunctory attempt to reframe their claim under a "trap-and-trace theory" in the alternative, Opp. 15, fails as well. Plaintiffs do not—and cannot—allege that Pixel code collected the IP address of the "source" of any "incoming" communications they *received*. They instead allege that it collected *their own* IP address. That is not a "trap and trace."

"communicating *with.*" Ex. J, Bill Analysis, Assemb. B. 929, Reg. Sess., at pp. T-U (Cal. Apr. 7, 2015); *see id.* at p. X (explaining that pen register laws were enacted in response to case law holding that "individuals have no Fourth Amendment expectation of privacy in the numbers *dialed to or from* their telephone lines").[8]

Finally, Plaintiffs have no real answer to the absurd consequences their interpretation of the statute entails. They say the Court may not look beyond the statutory text, Opp. 15, but that is not how statutory interpretation works under California law, which is clear that "statutory language should not be given a literal meaning if it would result in absurd consequences that the Legislature did not intend." *People v. Achrem*, 213 Cal. App. 4th 153, 157 (2013).[9] And the consequences of Plaintiffs' construction are truly absurd—because internet-connected devices generally must collect IP addresses of other devices as part of how internet communication works. Plaintiffs try to wave all this away by arguing that the pen register statute only prohibits "[s]urreptitious disclosure of an IP address to a third party for profiling and targeted advertising." Opp. 15-16. But nothing in the statute limits its application to "disclosure of an IP address to a third party," let alone "for profiling and targeted advertising." Plaintiffs cannot insist the statute be construed literally, yet then read in exceptions to escape the absurdities of that construction.[10]

Nor would grafting a "third-party disclosure" limitation onto the statute solve the absurd-

---

[8] Plaintiffs also point to the fact that the legislature chose to adopt the definition of "pen register" from the modern federal statute, as opposed to an older version specific to "'dialed' telephone numbers." Opp. 15. But the amendments to the federal statute merely expanded the statute to make it technology-neutral, so as to cover internet-based communication as opposed to just phone communications. They did not change the fact that the pen register laws fundamentally concern "to/from" information that reflects the parties whom one is communicating with. *See, e.g.*, *In re Application of U.S. for an Ord. Authorizing Use of A Pen Reg. & Trap*, 396 F. Supp. 2d 45, 47 (D. Mass. 2005) (explaining that "Congress revised the definitions of 'pen registers' and 'trap and trace devices' so as to broaden the communications media upon which such devices could be installed," including "*incoming and outgoing* IP addresses used to determine web-sites visited [by] the subject of the pen register") (emphasis added).

[9] Likewise, "[w]hen it appears that a literal interpretation of a statute may lead to absurd results, a review of the legislative history is proper." *San Diegans for Open Gov't v. City of San Diego*, 242 Cal. App. 4th 416, 429 (2015).

[10] Plaintiffs obliquely reference a "carveout" in the pen register definition, as if it somehow covers all of the absurd applications of their reading of the statute. *See* Opp. 16. The suggestion is baseless, as the carveout only applies to processes used by communications services providers for "billing" or "accounting" (which yet again confirms the pen register provision is about "to" information, as providers historically billed based on outgoing phone calls). Cal. Pen. Code § 638.50(b).

consequences problem, since many commonplace internet technologies involve IP address collection by third parties. For example, an individual may install anti-virus software that allows a third-party security provider to inspect all incoming traffic for malicious IP addresses; a company may pass all incoming email through a vendor that can block IP addresses associated with spam; an online merchant may seek to prevent fraud by using a vendor to check whether purchasers' IP addresses are suspicious. Under Plaintiff's reading of the statute, all of these ubiquitous technologies would be transformed into criminal activities. Plaintiffs have no answer, except to dismiss such concerns as "hyperbolic." Opp. 16. They are not—they are direct implications of their exceedingly broad reading of the statute. Especially given that the statute carries criminal penalties, those implications cannot be cavalierly disregarded. "Even though most CIPA cases are private civil actions, the interpretations courts adopt while adjudicating those actions could affect the extent to which people or companies are subject to criminal liability"—which is an "important reason to avoid reading … any portion of CIPA … too broadly." *Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109, 1118 (N.D. Cal. 2025).

**D. Plaintiffs' CDAFA Arguments Fail**

CDAFA asks whether the defendant "was authorized in the first instance to take and use the information." *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 962 (9th Cir. 2018); Mot. 18. Meta was so authorized here: users agree to let Meta collect browsing activity and identifiers from third-party websites and use the identifiers to match their activity to their accounts. Plaintiffs try to elide the issue by asserting that Meta lacked "permission to obtain Plaintiffs' *de-anonymized* information." Opp. 20. Nonsense: matching a user's browsing activity to the user's Meta account *is* obtaining de-anonymized information. Plaintiffs agreed to allow Meta to engage in that collection and use, so Meta had the permission CDAFA requires.

Plaintiffs' real objection is to *how* Meta accomplished the disclosed collection and use. That is why Plaintiffs cannot distinguish *Oracle* and *Brodsky*. All their efforts to do so amount to hand-waving. They say Meta "used hidden, evolving cross-app code to obtain a de-anonymized, Meta-account-linked browsing dataset the ordinary Meta Pixel could not access in the Android environment." Opp. 21. Every operative word in that sentence describes the *manner* of access.

Whether Meta's code was "hidden," or "evolve[ed]," or used a "cross-app" pathway, or could only operate "in the Android environment" all goes to the particular method through which Meta collected the _fbp cookie via the Subject Functionality. Plaintiffs never identify data Meta was forbidden to take or a use Meta was forbidden to make. *Oracle* turned on that very distinction: the defendant's *automated* downloading was unauthorized, yet there was no violation because it was "authorized in the first instance to take and use the information" that was downloaded. 879 F.3d at 961-62. *Brodsky* is similar. "[I]f a plaintiff authorizes an individual to access the plaintiff's computer, the plaintiff's [CDAFA] claim cannot be based simply on … the means, manner, or method for such access." *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 129 (N.D. Cal. 2020).

Plaintiffs offer two theories of how Meta acted "without permission" notwithstanding the disclosures. First, Plaintiffs say Meta proceeded "surreptitiously": they "had no notice of Meta's covert de-anonymization scheme." Opp. 21-22. Again, that is an argument about manner. Plaintiffs had notice of the collection and use of their cookies and browsing data through the Privacy Policy. Mot. 19 n.6. What Plaintiffs allegedly did not know was just the technique—which *Oracle* makes irrelevant. Meta's authorities, which Plaintiffs do not address, illustrate the point. *United States v. Christensen,* 828 F.3d 763, 787 (9th Cir. 2015) (employee's "cover[ing] her tracks" did not establish that she lacked authorization); *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1044, 1054 (N.D. Cal. 2014) (no violation even though functionality operated "in non-discernible manners"). In Plaintiffs' cases, by contrast, concealment mattered only because the defendants lacked authorization to take and use the data in the first instance.[11]

Second, Plaintiffs say "Meta acted without permission by defeating user-level privacy controls," "such as private browsing modes, VPNs, and the clearing of cookies." Opp. 22. This theory fails for multiple reasons. First, no Plaintiff even alleges having used private browsing, a VPN, or cookie clearing during the relevant period. That distinguishes *Brown*, where the plaintiffs

---

[11] *See Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1074 (N.D. Cal. 2018) (software accessed data "wholly unconnected" to authorization); *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1101 (N.D. Cal. 2015) (plaintiffs "had no notice [the defendant's software] was operating" on their device at all); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1049 (S.D. Cal. 2023) (considering circumvention because defendant lacked consent to access data); E*sparza v. Kohl's, Inc.*, 723 F. Supp. 3d 934, 944 (S.D. Cal. 2024) (similar).

affirmatively used private browsing mode and alleged that Google "render[ed] ineffective any barrier that Plaintiffs implemented." 525 F. Supp. 3d at 1074-75. Second, Plaintiffs never address the controls Meta did offer to users who wanted them, including the ability to "disconnect" off-Meta activity from an account. ECF No. 102-6 at 1; *see* ECF No. 102-5 at 12. Thus, if Plaintiffs wanted to deny Meta authorization to de-anonymize their activity, Meta offered them an unambiguous way to do so, which they never availed themselves of. Third, Plaintiffs leave Meta's point unanswered that, based on Plaintiffs' own allegations, localhost channels were "intended to allow different Android programs or applications to communicate with one another," ¶¶ 54, 56-57. Those allegations describe an open pathway, and traversing one is not "defeating" or "circumvent[ing]" controls. Mot. 22. Plaintiffs are instead really asserting the violation of an alleged *norm*—of their own invention—rather than circumvention of technical controls.

Plaintiffs' backup "contaminant" theory, Opp. 22-23, also fails, as their own authorities show. "[T]he definition of 'contaminant' in the statute incorporates a permission requirement, so, in reality, all of the conduct prohibited by § 502(c) requires a showing that the defendant acted 'without permission.'" *Carrier IQ*, 78 F. Supp. 3d at 1099 n.9. Specifically, the contaminant's use of the data at issue—"to modify, damage, destroy, record, or transmit" it—must be "without the permission of the owner," *see* Cal. Penal Code § 502(b)(12), even if "the introduction of the contaminant to the system need not surmount the same hurdle." *Flextronics Int'l, Ltd. v. Parametric Tech. Corp.*, 2014 WL 2213910, at *5-6 & n.51 (N.D. Cal. May 28, 2014); *see Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1074 (N.D. Cal. 2018) (same). Here, the alleged transmission of the _fbp cookie to Meta—not just the introduction of Pixel code (the alleged "contaminant") onto their browser—was done with permission, as the Privacy Policy discloses that Meta collects and receives the _fbp cookie. Once more, Plaintiffs' real objection is to the *manner* of the transmission—which *Oracle* precludes as a basis for a CDAFA claim.

Finally, as to Meta's arguments regarding lack of cognizable damages, Plaintiffs' principal answer is that CDAFA sets only a "minimum threshold." Opp. 23. But that concerns the amount, not the *kinds* of losses that count. On whether unjust profits can constitute loss, Plaintiffs concede there is intra-district disagreement and they simply prefer one side of it. Opp. 24 & n.10. The Court

should reevaluate its prior holdings in light of that disagreement and *Popa*. Mot. 24; *see also Dellasala v. Samba TV, Inc.*, 2026 WL 1138358, at *8-9 (N.D. Cal. Apr. 21, 2026) (declining to follow *Rack Room* because *In re Facebook* "did not address CDAFA's damage or loss requirement" and the disgorgement premise "does not align with … *TransUnion*").[12] Courts also reject Plaintiffs' deprivation-of-control, ability-to-receive-compensation, and ability-to-withhold theories. Mot. 22-23 (collecting cases); *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 488 (N.D. Cal. 2021). Plaintiffs respond by simply reasserting their conclusory allegations of injury under these theories, or repeating their allegations about what Meta *did* without explaining how it caused them cognizable damage. Opp. 24-25. Neither satisfies their pleading burden.[13]

**E. Plaintiffs' Invasion-of-Privacy Claim Fails**

Besides rearguing consent, which is addressed above, Plaintiffs attempt to support their invasion-of-privacy claims by pointing to their allegations that Meta "identif[ied] and create[d] a real-time comprehensive profile of" each of them," Opp. 17-18. But that allegation is a conclusion. The FAC pleads no facts to show any "comprehensive" profile was collected about them through the Subject Functionality. Again, the only specific sites they allege they visited on their Android devices that would have been affected by the Subject Functionality are ordinary commercial and news sites. FAC ¶¶ 96, 102, 108, 114. Plaintiffs answer that these are mere "exemplars" and that each Plaintiff visited "other websites too." Opp. 18 n.8. That is the pleading deficiency: they do not allege any exemplars of *sensitive* sites they visited on their Android devices that could give rise to a "highly offensive" intrusion of their privacy, or otherwise provide facts sufficient to show that their web-browsing on those devices encompassed a significant number of such sites. *See Khamooshi v. Politico LLC*, 2025 WL 2822879, at *3 (N.D. Cal. Oct. 2, 2025) ("Absent specific allegations about the type of browsing … information disclosed, [such information is] insufficient to support [a claim]."); *Dawidzik v. Tesla, Inc*., 2025 WL 3786963, *5 (C.D. Cal. Dec. 29, 2025).

---

[12] Plaintiffs dismiss *Popa* on the ground that it "addressed Article III injury," rather than loss under CDAFA. Opp. 24. But so too with *In re Facebook Internet Tracking*, on which this Court's prior CDAFA loss decision rested. 956 F.3d 589, 600 (9th Cir. 2020).

[13] Plaintiffs reference supposed "detailed descriptions" of "depletion of their Android devices' battery and bandwidth" caused by Meta's conduct, Opp. 25, but battery and bandwidth are mentioned exactly once, in the boilerplate damages paragraph, FAC ¶ 237.

## III. CONCLUSION

For all of the foregoing reasons, the motion to dismiss should be granted.

Dated: September 2, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Serrin Turner*

Serrin Turner (*pro hac vice*)
*serrin.turner@lw.com*
Nicolas Luongo (*pro hac vice*)
*nicolas.luongo@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Brad Baglien (*pro hac vice*)
*brad.baglien@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

*Attorneys for Defendant*
*Meta Platforms, Inc.*